UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

```
UNITED STATES OF AMERICA,      )  Adversary No. 01-04605
                               )  Chapter 11
                Plaintiff,     )
                               )  Courtroom No. 2
versus                         )  824 Market Street
                               )  Wilmington, Delaware 19801
STATE STREET BANK and TRUST    )
COMPANY as Trustee for Junior  )
Subordinated Secured PIK Notes,)
                               )  October 1, 2003
                Defendant.     )  11:30 A.M.
```

TRANSCRIPT OF STATUS CONFERENCE
BEFORE HONORABLE PETER J. WALSH
UNITED STATES CHIEF BANKRUPTCY JUDGE

APPEARANCES:

For Scott Cable:          Klett Rooney Lieber & Schorling
                          By:  PETER J. DUHIG, ESQ.
                          The Brandywine Building
                          1000 West Street, Suite 1410
                          Wilmington, Delaware 19801

                          Akin, Gump, Strauss, Hauer & Feld, LLP
                          By:  ABID QURESHI, ESQ.
                          590 Madison Avenue
                          New York, New York 10022

For the Plaintiff,        U.S. Department of Justice, Tax Div.
United States of          By:  ALAN SHAPIRO, ESQ.
America:                  555 4th Street, N.W.
                          Room 7122
                          Washington, DC 20001


ECRO:                     Brandon McCarthy

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

## TRANSCRIPTS PLUS
### 435 Riverview Circle, New Hope, Pennsylvania 18938
e-mail courttranscripts@aol.com

215-862-1115    (FAX) 215-862-6639

Appearances:
(continued)

For U.S. Bank formerly         Walsh, Monzack & Monaco
State Street Bank:             By:  FRANCIS A. MONACO, JR., ESQ.
                               1201 N. Orange Street, Suite 400
                               Wilmington, Delaware 19801

                               Shipman & Goodwin, LLP
                               By:  PETER W. BENNER, ESQ.
                               One American Row
                               Hartford, Connecticut 06103-2819

For Media Communication        Zuckerman Spaeder, LLP
parties:                       By:  VIRGINIA W. GULDI, ESQ.
                               One Commerce Center
                               1201 Orange Street, Suite 650
                               Wilmington, Delaware 19801

For Allstate Insurance         Ashby & Geddes
Company:                       By:  JOE HANDLON, ESQ.
                               222 Delaware Avenue, 17th Floor
                               Wilmington, Delaware 19801

                               Sidley Austin Brown & Wood
                               By:  GUY NEAL, ESQ.
                               1501 K Street NW
                               Washington, DC 20005-1401

<u>INDEX</u>

<u>DEPOSITION READING</u>                                              <u>PAGE</u>

    Mr. Armstrong                                          14
    Mr. Churchill                                          17
    Mr. Bloch                                              22
    Mr. Doppel                                             50

4

1              THE COURT:  Please be seated.  Okay.  As I understand

2    it, we're here to resolve the discovery dispute, the motion to

3    compel.  I want to get a better understanding of what's going

4    on in this case first.  And as I understand it, the Chapter 11

5    case is still pending in Connecticut.  And Judge Shiff's

6    decision as to the effect that a Chapter 11 plan cannot be

7    confirmed absent the payment of tax.  And I guess my question

8    is why doesn't somebody move to convert the case to Chapter 7?

9    And if you converted it to Chapter 7, I'm not sure what happens

10   to the tax liability, but it's certainly clear that in a

11   Chapter 11, there would be no third party releases.

12              And so I'm -- I guess I'm wondering why this dispute

13   can't be resolved in the context of the Chapter 7 case without

14   regard to the adversary proceeding being resolved.  Anybody

15   wish to respond to that inquiry?

16              MR. SHAPIRO:  Good morning, Judge Walsh.  My name is

17   Alan Shapiro, I represent the United States.  A lot has

18   happened in this case.  And I don't want to suggest that my

19   memory of every event in it is perfect, but I believe that the

20   Government did make a motion to convert the case to the Chapter

21   7.

22              THE COURT:  And --

23              MR. SHAPIRO:  We made that motion in addition, Your

24   Honor --

25              THE COURT:  And was the motion scheduled for a

1 hearing or --

2          MR. SHAPIRO:  I believe that it's either been denied

3 and then appealed, and an appeal is pending, or it was denied

4 and nothing further could be done with it.  But my memory on

5 that is not perfect.  I do recall, however, that one of the

6 reasons the Government made the motion was because it felt that

7 an impartial trustee should be appointed, which would impact

8 decisions regarding whether to assert the attorney/client

9 privilege.

10          We felt that there as a conflict of interest that is

11 pretty obvious and prevents the debtors' management from making

12 unbiased decisions since they have a financial interest in this

13 matter regarding the assertion of the attorney/client

14 privilege.

15          THE COURT:  Does anybody else have an understanding

16 of what's going on in Connecticut?

17          MR. BENNER:  Your Honor, Peter Benner for the

18 indenture trustee, State Street Bank, now U.S. Bank by change

19 of name.

20          My understanding is that there is an appeal in

21 Connecticut.  My recollection is it is of a motion to appoint a

22 trustee, and I'm not positive that there was a conversion

23 motion attached to that but that the motion itself was the

24 appointment of a trustee for the purpose that Mr. Shapiro noted

25 in terms of representing the debtor and not having any reason

1  to continue separation between the debtor and the estate

2  itself.

3          So, there is an appeal pending in Connecticut.  I

4  don't believe Judge Shiff, the Connecticut Bankruptcy Judge, by

5  denying the motion to appoint the Trustee, would have favorably

6  entertained a motion to convert.  Although, again, we'd have to

7  go back and double-check to be sure what was actually the

8  nature of that motion.  But the basis, I believe, for the

9  denial of the motion to appoint a trustee was that the case is

10 basically now going to be resolved, for all practical purposes,

11 within the context of this case pending before you.  The

12 adversary proceedings would then determine the outcome of the

13 remainder of the case.  But, again, we can verify that.

14         THE COURT:  All right.  Well, what I'm getting to is

15 I think -- I hope everybody would agree with me that Judge

16 Shiff's opinion in denying confirmation makes it absolutely

17 clear that absent payment of the tax, which is an

18 administrative expense, there cannot be a Chapter 11 plan

19 confirmed.  You cannot satisfy 1129(a)(7), I guess it is, or

20 (9), I forget which, with respect to the administrative expense

21 claim.

22         And if that's so, it seems to me that conversion or

23 dismissal is inevitable.  Obviously it's Judge Shiff's case, so

24 I can't do anything about that.  But in looking at this matter,

25 I was just curious as to why that course of the proceeding

1  hasn't taken place.

2          MR. BENNER:  Your Honor, I wish we had --

3          THE COURT:  May I --

4          MR. BENNER:  -- a better answer for you this morning.

5          THE COURT:  Does anybody believe that a Chapter 11

6  plan can be confirmed absent payment of the tax?

7          MR. BENNER:  I don't know if that's the case, Your

8  Honor.  I simply am not -- having not looked at that issue, I'm

9  not --

10          THE COURT:  Yeah, well --

11          MR. BENNER:  -- able to answer at this point.

12          THE COURT:  I think Judge Shiff's opinion makes it

13  abundantly clear that that's the law.  So, I'm not concerned

14  that what we're engaged in here in this adversary proceeding is

15  a side show because the real action is up there and I don't

16  know how -- I don't know why it's not proceeding to a Chapter 7

17  or dismissed.  And I don't know how the tax can be avoided in

18  that bankruptcy case, regardless of what happens in the

19  adversary proceeding.  Well, if nobody has the answer to it, I

20  don't either.  But I would hope that the parties would look

21  into that and perhaps pursue the solution in the Bankruptcy

22  Chapter case itself.

23          Okay.  Mr. Shapiro, could you give me a little

24  background on the government's theory for the

25  recharacterization count of your complaint?  I'm not sure I

1 understand it.

2      MR. SHAPIRO:  There's a body of case law that

3 basically says that in tax matters, the substance of a

4 transaction governs over the form of the transaction.  In other

5 words, the taxpayer is free to label documents or instruments

6 as debt or stock.  But the tax authority is not required to

7 necessarily agree with the characterization or label that the

8 individuals attach to their transactions if the economic

9 substance of them is inconsistent.  And the Court Holding

10 Doctrine is a very old case on the Substance Over Form

11 Doctrine.  I don't think anybody in this room would dispute the

12 general principle that in tax matters substance over form

13 controls a wide array of different types of cases, including

14 instances in which the government seeks recharacterization of a

15 note as an equity instrument.

16      In this particular case, I kind of am in a quandary

17 because I could talk to you for hours about why I think the

18 notes should be recharacterized as equity, but I realize that

19 the Court simply doesn't have that kind of time today.  And at

20 the same time, I'm a little bit hesitant to try to give you an

21 abridged version out of fear that if I don't really provide you

22 with the full panoply of all the facts, that I might leave you

23 with a weaker opinion of my case.

24      But in a nutshell, I guess, to try to move things

25 along, we believe that looking at these notes from the time

that they were put into effect that if you look back to 1988
when the predecessor to these -- to the notes that are in issue
in this case, which are referred to as the junior subordinated
PIK note instruments, the debt to equity ratio of the debtor
was extreme, it was forty to one.  They set up a leverage
buyout where they purchased the company basically setting up
the capital structure with $180 million worth of notes and only
four and a half million dollars worth of stock.  And there's a
variety of reasons that I'm sure that they wanted to do that,
certainly interest deductions for the company would be better
than having to get the tax treatment you get for dividends.

         But as the events that we'll provide to the Court by
way of a summary judgment motion will make clear, by the time
this floundering economically wiped out position of the junior
subordinated PIK notes came to a head at the 1996 bankruptcy,
the company's value in the marketplace was so low that if the
company were sold, as indicated by the company's own
liquidation analysis attached to its disclosure statement and
plan in the 1996 bankruptcy, made clear that the notes that are
at issue in this case would receive no payment.  Interestingly,
the management of the debtor had a financial tie to those
notes.  Their management incentive agreement provided for them
to receive a portion of any recovery on them, which is why we
have emphasized repeatedly in this case that we feel that there
is a conflict of interest there.

1    We also feel that when you look at the financial

2  circumstances of this debtor leading into the 1996 bankruptcy,

3  they had already been through one restructuring and the cable

4  market did not take an increase in value, and the company was

5  having trouble paying its debts and the problem persisted and

6  they tired to sell the company and couldn't get a price that

7  was anywhere near close enough to pay all of their various note

8  instruments, let alone anything to their stockholders, that by

9  the time they were rolling around in 1996 and, again, were

10  unable to satisfy all of their notes and the senior lender

11  wanted to pull out, there simply wasn't any real value if you

12  simply looked at what would happen if you sold this company and

13  what monies would be available and the distribution to all of

14  the various layers of debt that had been used to do the

15  leverage buyout back in 1988, to pay the taxes that would

16  result from the sale and then have anything left to pay to the

17  note holders in question in this case, let alone the stock --

18  the small amounts of stock that the same individual or same

19  entities also held.  And there's a large body of case law

20  dealing with what analysis do you apply in cases where the

21  government seeks to recharacterize debt as equity.  And it lays

22  out a bunch of factors.

23    In the 3rd Circuit, there's a case called <u>Finhay</u>

24  (phonetic), which lists quite a few of them.  And, frankly,

25  there's a great variety of cases all over the country dealing

1  with the different types of factors that one looks at, whether

2  the capital structure was too thin, whether the interest was

3  too high, whether the notes themselves are accurately drawn as

4  note instruments which, you know, there's no one factor which

5  is determinative whether another creditor or lender would have

6  made a same type of loan under similar circumstances.  Which,

7  by the way, the deposition testimony makes clear that even

8  these investors acknowledge they wouldn't have made the same

9  investment that they essentially made in the 1996 bankruptcy

10 but for the fact that they already had all their money tied up

11 from the early 1988 leverage buyout where they invested their

12 money and never got a penny of it back, not even an interest

13 payment.  And it seems highly unlikely that any creditor would

14 have made the same type of loan either.  In fact, I think it

15 would be virtually impossible to find a legitimate arm's length

16 third party lender to make a loan as reflected in the

17 instruments issued under the confirmed 1996 bankruptcy plan.

18       But if we were to go through an analysis of applying

19 all of the factors that the case law on debt recharacterization

20 applies to the facts that we will marshal and put before you in

21 this case, we feel that it is just overwhelmingly clear that

22 the note instruments that were issued in conjunction with the

23 1996 bankruptcy plan were, in substance, equity instruments.

24 They were extremely high risk.  I mean even coming out of the

25 1996 bankruptcy, the company's own projections of its cash flow

1  show that it would not be able to retire all of its various

2  note instruments issued under the plan as they reached

3  maturity.

4          It would take, unfortunately, just too many hours to

5  go through this exercise of fact -- proving fact for fact for

6  fact for fact why the government today in the position I'm in

7  here today to prove our entire case for you here to day.  I

8  mean I took ten depositions.  There are literally hundreds if

9  not thousands of pages of deposition testimony.  I used

10 hundreds of exhibits, they were complicated financial documents

11 to prove our case.  The government has an expert witness who

12 has issued a report on this very topic and we've had

13 evaluations performed as well.  The company --

14         THE COURT:  Let me ask you a question.  Is your

15 theory that the debt instruments even prior to the '96 plan

16 confirmation were really equity?

17         MR. SHAPIRO:  No.  Our theory is that at the time

18 that the instruments were issued, the 1996 bankruptcy plan

19 confirmed allowed for these new junior subordinated PIK note

20 instruments to be issued, from the time that they were issued,

21 we believe that the substance of them was that they really were

22 equity instruments.

23         However, that being said, we think that it is useful

24 evidence and that it is relevant evidence to see what was the

25 character and nature of the predecessor notes that led into the

1  new notes that were issued under the bankruptcy plan.  And that

2  when you look at those, you would most likely come to the same

3  conclusion that leading into the 1996 bankruptcy plan the

4  predecessor notes likewise also had an equity substance nature

5  to them.

6          It's not mandatory that we prove that the predecessor

7  notes were in fact or in substance equity instruments in order

8  for us to sustain our case as to the notes in question.  And by

9  the way, Your Honor, it is the defendants that have the burden

10 of proof on this issue.  They have to prove that the

11 instruments in question, in fact, were debt instruments.

12         THE COURT:  Okay.  All right, let's proceed with the

13 discovery dispute.

14         MR. SHAPIRO:  Do you want me to continue on that

15 point?

16         THE COURT:  Yes.

17         MR. SHAPIRO:  Before I start, Your Honor, I really

18 must apologize.  I normally come more prepared to talk about a

19 subject like the one that you began with.  But my mind was so

20 focused on the oral argument I'm about to get into that I

21 apologize for not having a more polished presentation for you.

22         In our motion to compel papers, we indicated that a

23 man named Richard Churchill was a member of the Board of

24 Directors of Scott Cable prior to the 1996 bankruptcy.  During

25 discovery, following the filing of the motion to compel, it

1  became clear that, in fact, Mr. Churchill did not become a

2  member of the Board of Directors until after the confirmation

3  of the 1996 bankruptcy plan.

4        I want to point that out, not only just out of my

5  obligation to try to make clear the facts in the record, but

6  also because this is important for purposes of whether or not

7  certain privileges or immunities were waived by disclosures to

8  third parties.  The depositions reveal additional reasons to

9  grant the government's motion to compel.

10        At Page 117 of the CEO of Scott Cable's deposition

11  transcript, Mr. Armstrong, beginning at Line 13, the question

12  is:

13  "Q   And who did you hear the idea of providing the security

14  interest to the junior subordinated note holders from?"

15        There's a series of objections followed by an answer:

16  "A   It came up in a meeting with our attorneys and Rich

17  Churchill and John Flanagan from the company.  I don't recall

18  specifically who put it on the table."

19  "Q   That's the first time that you had heard of that idea?"

20        Mr. Zensky, who represented Mr. Armstrong at the

21  deposition said:

22        "MR. ZENKY:  In connection with the junior

23  subordinated note holders, correct?"

24        "MR. SHAPIRO:  Yes."

25  "A   Yes."

1  "Q    Where did the discussion take place?"

2  "A    At Baer Marks and Upham.  That's a law firm where Mr.

3  Bloch works or worked."

4  "Q    Where he worked, yes.  And was Mr. Bloch one of the

5  attorneys present for this conversation when you first heard of

6  the idea of providing a security interest to the junior

7  subordinated PIK note holders of Scott Cable?"

8  "A    He was."

9           And, again, at Page 251, the deposition transcript of

10 Bruce Armstrong --

11           THE COURT:  I'm sorry.  And he is?  Mr. Armstrong is?

12           MR. SHAPIRO:  Mr. Armstrong was the CEO of Scott

13 Cable and he may still be technically.

14           THE COURT:  Okay.

15           MR. SHAPIRO:  At Page 251 of his deposition

16 transcript, beginning at Line 21, the question:

17 "Q    Is it accurate to say that at the early November, 1995

18 meeting of DLJ, the note holders of Scott Cable, yourself and

19 perhaps some others, that there was discussion about providing

20 a security interest to the junior subordinated note holders

21 under a restructuring plant."

22 "A    Yes."

23           At Page 255 and 256 of Mr. Armstrong's deposition

24 transcript, beginning at Line 14, the question:

25 "Q    At the meeting in early November, 1995, attended by

1 representatives of DLJ, representatives of Scott Cable and its

2 management, the unsecured note holders and other note holders

3 of Scott Cable, was a representation made by Scott Cable or DLJ

4 that a security interest to be provided to the junior

5 subordinated note holders under a proposed restructuring plan

6 would provide them with a better recovery for their junior

7 subordinated PIK notes in the event of a subsequent sale of

8 Scott Cable?"

9        An objection follows by:

10 "A    I believe it was, yes."

11        At Page 289 of Mr. Armstrong's deposition transcript,

12 question at Line 8 begins:

13 "Q   All right.  Did you have any discussions with the

14 investors in the junior subordinated PIK notes and Scott Cable

15 during 1995 and during 1996 or during 1996 prior to the

16 confirmation of the plan of Scott Cable in bankruptcy about the

17 need to obtain a security interest for, amongst other reasons,

18 to position the junior subordinated PIK notes to be paid ahead

19 of any taxes that would result from either a liquidation,

20 subsequent bankruptcy and sale of the assets of Scott Cable or

21 subsequent voluntary sale of the assets of Scott Cable

22 occurring after its 1996 bankruptcy?"

23        Series of objections followed by:

24 "A   We discussed the desirability.  I don't know that we used

25 the word need."

1 "Q    You discussed the desirability of obtaining a security

2 interest for the purpose stated in my prior question."

3          More objections followed by the answer:

4 "A    For the purpose stated, among other reasons, taxes, yes."

5          On 292 and 293 of his deposition, it says:

6 "Q    With that in mind, let me rephrase the question.  Is it

7 accurate to say that during 1995 or 1996, but prior to the

8 confirmation of Scott Cable's 1996 bankruptcy plan, that you

9 were involved in at least one discussion with investors in the

10 junior subordinated PIK notes in which it was considered

11 desirable and people spoke of the desirability of obtaining a

12 security interest for, among other reasons, positioning the

13 junior subordinated PIK notes to be paid ahead of any taxes

14 that would result from a sale of Scott Cable assets after

15 confirmation of the 1996 bankruptcy plan, whether it be in some

16 sort of liquidation, some sort of voluntary sale or even in a

17 subsequent bankruptcy."

18          A series of objections followed by the answer:

19 "A    Yes."

20 "Q    And do you recall which representatives of the investors

21 were part of that discussion with you?"

22 "A    My only recollection of an individual was Rich Churchill."

23          I'll move on to Mr. Churchill.

24          THE COURT:  Okay.  And tell me who Mr. Churchill is?

25          MR. SHAPIRO:  I will tell you that Mr. Churchill was

1  the head of the venture capitalists fund or firm that is

2  comprised of Media Communications, Milk Street Partners, Inc.,

3  Church Street Partners, Inc. and T.A. Investors, who are the

4  defendants in this case -- are amongst the defendants in this

5  case.

6        At Page 247 of Richard Churchill's deposition

7  transcript, the question at Line 3:

8  "Q   Was it also your understanding prior to the filing of the

9  bankruptcy of Scott Cable in 1996 that any capital gains taxes

10 that were owed and for which there were insufficient net

11 operating losses to offset were supposed to be paid by Scott

12 Cable before any payments were made for junior subordinated PIK

13 notes."

14        There were objections followed by the answer:

15 "A   Yes."

16        At 263 and 264 of Mr. Churchill's deposition:

17 "Q   But from the perspective of Media Communications and Milk

18 Street and Chestnut Street, reorganization was essential to

19 obtaining some sort of recovery on the junior subordinated

20 notes, is that correct?"

21        Objection.  Answer:

22 "A   Yes."

23 "Q   Because if there was no reorganization in 1996 of Scott

24 Cable, the likelihood was that the junior subordinated notes

25 would receive no payment at all, is that correct?"

1  "A   Yes."

2          At 272 through 274 of Mr. Churchill's deposition, it

3  says, beginning at Line 1, question:

4  "Q   Well, there's something else that was a new feature with

5  the junior subordinated notes in the context of the 1996

6  bankruptcy plan, and that was the provision of a security

7  interest in the assets of Scott Cable, is that correct?"

8  "A   Yes."

9  "Q   And that security interest was subordinated to at least

10 two other layers of debt instruments, is that correct?"

11 "A   Yes."

12 "Q   Wasn't there real concern on the part of Media

13 Communications, Milk Street and Chestnut Street that in the

14 event that the assets of Scott Cable were sold, that taxes

15 would have to be paid on the capital gains, and that wouldn't

16 leave anything to pay the junior subordinated notes?"

17         There were objections followed by the answer:

18 "A   That was a consideration."

19 "Q   In fact, that was a consideration before filing the

20 bankruptcy plan in 1996 by Scott Cable, correct?"

21         Another objection followed the answer:

22 "A   Yes."

23 "Q   And it was another consideration during the filing and

24 negotiations that took place in the 1996 Scott Cable

25 bankruptcy, at least for Media Communications, Milk Street and

1  Chestnut Street."

2          Objection.  Answer:

3  "A   Yes."

4  "Q   And that's at least one reason why that Medical" -- it

5  should have been Media, it's a typo -- "That Medical

6  Communications and Milk Street and Chestnut Street wanted a

7  security interest, is that correct?"

8  "A   Yes."

9  "Q   All right.  So, Milk Street, Media Communications and

10  Chestnut Street were preparing themselves for the possibility

11  of a sale of the assets of Scott Cable following confirmation

12  of the 1996 bankruptcy plan to try to position themselves to

13  get paid ahead of any capital gains taxes that would be owed

14  from the sale of the assets of the company, is that correct?"

15          There were objections followed by the answer:

16  "A   Yes."

17  "Q   And did you discuss that, that strategy of obtaining a

18  security interest to prepare for the potential sale of the

19  assets of Scott Cable with attorneys from Media Communications

20  or Milk Street or Chestnut Street?"

21          Objection.  Answer:

22  "A   I believe I testified earlier.  I remember having a

23  conversation with attorneys.  I don't remember who they --

24  whether they were representing us or the company."

25          And finally with respect to Mr. Churchill at Page 313

1  of his deposition transcript.  Question at Line 5:

2  "Q   Isn't it true that the reason that Media Communications,

3  Milk Street and Chestnut Street Partners wanted a

4  reorganization of Scott Cable to take place in 19966 was

5  because if one was not effectuated, they stood to loose all or

6  substantially all of their investment in the junior

7  subordinated notes?"

8          Objection.  Followed by the witness answering:

9  "A   Do you mean by reorganization, a Chapter 11 proceeding?"

10          Mr. Shapiro:

11  "Q   Any kind."

12  "A   Yes."

13  "Q   What consideration did Milk Street, Media Communications

14  and Chestnut Street Partners provide for the security interest

15  that they obtained in conjunction with their junior

16  subordinated notes in the 1996 Scott Cable Bankruptcy?"

17          A series of objections, the answer:

18  "A   I don't know."

19          And that takes us finally to Mr. Bloch.  Mr. Bloch

20  was and perhaps still is the attorney for Scott Cable

21  Communications.  When I say still is because technically Scott

22  Cable is still an entity, but we all know that basically it's a

23  bank account and not an active going concern right now.  But he

24  did indicate that at his deposition that he was the attorney

25  for Scott Cable Communications prior to and during the 1996

1  bankruptcy and even I guess through the 1998 bankruptcy, as

2  well.

3       The relevant information from Mr. Bloch is found

4  beginning at 69 through 70 of his deposition transcript,

5  beginning at Line 17.

6  "Q   During 1990 through 1992, did you do any research,

7  analysis or provide any advice or counseling regarding the

8  application of the insolvency statute, a statute of federal law

9  providing certain circumstances under which an officer of a

10 corporation could be held personally liable for nonpayment of

11 taxes of a company with respect to Mr. Simmons or Scott Cable

12 Communications?"

13      There were a series of objections and answer:

14 "A   On advice of counsel, I can't answer that."

15 "Q   Did Mr. Simmons express to you any concerns about

16 potentially being held personally liable for nonpayment of

17 taxes with respect to Scott Cable and using any available funds

18 to pay creditors other than the Internal Revenue Service?"

19      There were additional objections following by an

20 answer:

21 "A   On the advice of counsel, I cannot answer that."

22      Mr. Simmons was the head and the found of Simmons

23 Communication.  Mr. Simmons was the one who initially found and

24 proposed the idea of a leverage buyout to Media Communications,

25 Mr. Churchill and the other primary investors in the leverage

1 buyout, such as Allstate Insurance Company.  Mr. Simmons was

2 part of the -- became the head of a management company that

3 operated Scott Cable after the leverage buyout in 1988.

4 Sometime around 1993 or 1994, he chose to retire and he was

5 replaced by Mr. Armstrong.  So, that's the linkage of these

6 individuals.  Mr. Armstrong had already been working for the

7 management company, he moved up to this higher level position

8 and acquired, I believe, a stock interest, as well, in Scott

9 Cable at that time.

10        The Insolvency Statute that was referenced earlier is

11 also important because in some of the documents that we

12 attached to our motion to compel papers, there were some

13 handwritten notes by an individual named James Wade.  Mr. Wade

14 worked with Mr. Churchill from Media Communications, Milk

15 Street, Church Street Partners and T.A. Investors.  And he also

16 did some overseeing and some work for his entities regarding

17 the investment in Scott Cable Communications.

18        Mr. Wade apparently attended some telephone and in-

19 person meetings and he took down notes which were discussed in

20 a deposition and the notes themselves were also, as I

21 indicated, made part of the government's motion to compel

22 papers.

23        Specifically, there was a reference in his notes to

24 Steve Simmons being concerned about insolvency and potential

25 personal liability.  So, I'm trying these things together for

1 you.

2           At Page 86 of Mr. Bloch's deposition transcript,

3 beginning at Line 5:

4 "Q   When were you aware or when did it come to your attention

5 that there was concern on the part of Scott Cable and/or its

6 management that a future sale of assets of Scott Cable would

7 not provide sufficient proceeds to pay the junior subordinated

8 PIK notes if the taxes resulting from that sale also had to be

9 paid first."

10          There were a series of objections and --

11 "A   On the advice of counsel, I cannot answer that question."

12          -- was the answer.  At 107 and 108 of Mr. Bloch's

13 deposition transcript, beginning Line 21:

14 "Q   Isn't it true that during the 1995 and/or 1996 time period

15 that you provided either research analysis, negotiation and/or

16 other types of work regarding efforts to obtain a security

17 interest for the junior subordinated PIK note holders in Scott

18 Cable Communications to attempt to position those note holders

19 to receive recovery on their note instruments ahead of any

20 taxes that would result from a future sale of assets of Scott

21 Cable?"

22          There were some objections following by an answer:

23 "A   On the advice of counsel, I cannot answer that question."

24          At Page 112 and 113 of the deposition of Mr. Bloch,

25 the attorney for Scott Cable, beginning at Line 23, question:

1  "Q   Isn't it true that during 1996 and before the confirmation

2  of a bankruptcy plan for Scott Cable Communications that the

3  management of Scott Cable, together with the investors in the

4  junior subordinated PIK note instruments, recognized and

5  discussed in your presence the fact that there as a great

6  unlikelihood that a sale of Scott Cable's assets or stock would

7  produce sufficient sale proceeds for there to be a recovery on

8  the junior subordinated PIK note instruments unless those notes

9  could be somehow paid ahead of the taxes resulting from the

10 gain on the sale of those assets?"

11         There were a series of objections on that, following

12 an answer at Page 114:

13 "A   I can't answer that question."

14         At 119 and 120 of Mr. Bloch's deposition transcript,

15 question:

16 "Q   Did you prepare any memoranda or written communications

17 that discuss a security interest to be provided to the junior

18 subordinated PIK note holders and Scott Cable?"

19         There were more objections, followed by an answer at

20 120:

21 "A   I can't answer that question."

22         At 122 and 123 of Mr. Bloch's deposition transcript.

23 Question:

24 "Q   Did you participate in any negotiations regarding a

25 security interest or security agreement for the junior

1   subordinated PIK note holders during the Scott Cable 1996

2   bankruptcy?"

3   "A    To the best of my recollection, the answer is yes."

4   "Q    Who did you have the negotiations with regarding a

5   security interest and/or security agreement for the junior

6   subordinated PIK note holders and Scott Cable during 1996?"

7   "A    I believe it was with the attorneys for the junior

8   subordinated debt holders."

9   "Q    What were the names of the attorneys for the junior

10  subordinated debt holders?"

11  "A    Arnold Zaff, I'm not sure who else from his firm was

12  involved, but there were others, I believe."

13          125 of Mr. Bloch's deposition transcript.  Question

14  at 11, Line 11.  Question:

15  "Q    Was Mr. Churchill present for any of the discussions?  Was

16  Mr. Churchill present during any of the negotiations that you

17  mentioned regarding discussion of security interest for the

18  junior subordinated PIK notes in Scott Cable Communications?"

19  "A    I believe so."

20          At 136 and 137, beginning Line 15 of Mr. Bloch's

21  deposition transcript.  Question:

22  "Q    Did you participate in any negotiations regarding the

23  consideration, if any, that was supplied by or was to be

24  supplied by the junior subordinated PIK note holders for a

25  security interest in Scott Cable?"

1      There were objections, followed by an answer:

2  "A   Yes."

3  "Q   When did those discussions take place or negotiations,

4  rather?"

5  "A   At the time of all of the restructuring discussions,

6  whenever those were."

7  "Q   Does the 1995/1996 time frame seem about right to you for

8  those negotiations?"

9  "A   Yes."

10      And finally at 151 and 152 of the deposition

11  transcript of Mr. Bloch, beginning Line 11.  Question:

12  "Q   Did you engage in any discussions regarding what, if any,

13  consideration was or was to be supplied by the junior

14  subordinated PIK note holders and Scott Cable for the security

15  interest that they received under the bankruptcy plan that was

16  confirmed in 1996?"

17      Mr. Coreschi (phonetic), who represented Mr. Bloch at

18  the deposition, or perhaps he represented the debtor, it was

19  hard for me to distinguish, there was also a Mr. Weingart that

20  I believe also represented Mr. Bloch.  Mr. Coreschi said, "Same

21  objection, same instruction.  Mr. Bloch, if you need me to

22  repeat the instruction, let me know."

23      "THE WITNESS:  I do need you to."

24      "MR. CORESCHI:  The question as phrased does not

25  specify whether any such discussions occurred with any parties

1  in particular.  Therefore, I'm going to instruct you to

2  interpret that question to apply only to any discussions that

3  may have taken place with individuals other than your client,

4  or at which individuals other than your client were present.

5  On that basis, you can answer."

6          "MR. WEINGART:  I join in the objection and the

7  instruction."

8  "A    If you don't mind, I need to listen to the question

9  again."

10          It was reread.  The answer is:

11  "A    Yes."

12          Was Mr. Bloch's answer.  Question:

13  "Q    Who was present at those discussions that you just

14  answered about?"

15  "A    I'm not sure."

16  "Q    Do you recall some of the people that were present?"

17  "A    Well, my discussions, I believe, always would have been

18  with an attorney for the subordinated lenders present.  I just

19  don't recall who -- which attorney or who was that attorney."

20          These portions or passages of these transcripts

21  indicate at the outset obviously that there were discussions

22  with third parties.  There was a waiver, numerous waivers of

23  the privileges and immunity that have been asserted by the

24  defendants to the government's motion to compel.  It seems

25  quite obvious from reading these passages together that there

1  were a number of discussions where the junior subordinated PIK

2  note, holders' representatives or attorneys were meeting with

3  representatives, attorneys for the debtor or the actual CEO of

4  the debtor and discussing important elements of the

5  government's case involving consideration, if any, that was

6  supplied for a security interest, motivation for obtaining a

7  security interest, inequitable conduct in obtaining a security

8  interest.  The list would just go on and on, but it's already

9  described quite accurately in the Government's motion to compel

10 papers as to the various topics that were obviously being

11 discussed in conjunction with these meetings that are testified

12 to.  But the substance of them we're just not able to get

13 because of all of the assertions of privilege and instructions

14 to some of these witnesses not to testify.

15        And it would seem that the government has exhausted

16 its ability to find this information, either in the documents

17 that it has been able to get or through taking these

18 individuals' depositions.  And obviously at the time that the

19 government filed the motion to compel, it hadn't even taken all

20 of these depositions.  And so there's some argument in there

21 that it would be an extra burden for the government to have to

22 take the depositions, but a lot of these depositions have now

23 been taken.

24        But it's our position that these passages taken

25 together show that there were actual discussions where waiver

1  of attorney/client privilege on the relevant topics raised in

2  the motion to compel were discussed.  And those same topics and

3  types of information more than like, we believe, would be found

4  discussed in the documents that we seek to have compelled, only

5  in greater detail and providing more facts, dates, indications

6  of who was present and what these strategies were supposed to

7  be for.  And those things would bear upon the government's

8  equitable subordination claim in terms of whether the conduct

9  amounts to inequitable conduct or whether just the result would

10 be inequitable, which is another way of establishing 11 U.S.C.

11 510(c).

12          In addition, these same topics of discussion that

13 were mentioned in these passages and that we believe would also

14 be found in these documents that we seek to have compelled are

15 at issue.  Because as pointed out quite a lot in our motion to

16 compel and reply brief, the defendants in this case, of

17 necessity, must show that they provided meaningful, valid,

18 adequate consideration for the security interest that went with

19 the note instrument that's in question in this case.  They have

20 to be able to show that their conduct was not inequitable.

21          There's a variety of things, but they're listed in

22 our papers.  I believe, frankly, at Page 33 an 34 of the motion

23 to compel, you'll see at least some of them listed with respect

24 to Allstate.

25          There's also another way of looking at these

1  passages.  And that is that they also help us understand the

2  government has an exception that it can establish to the

3  assertions of the attorney client privilege, as well as the

4  attorney work product immunity, and that is the Crime-Fraud

5  Exception.

6          In the context of this particular motion to compel,

7  we are attempting to show the Court that we believe we have

8  established a prima facie case of civil tax fraud.  And if we

9  have, that, therefore, the assertions of privilege and immunity

10  do not apply or should be overcome and the documents turned

11  over to us.

12          In saying that, I want to also immediately --

13          THE COURT:  Let me ask a question.  With respect to

14  your recharacterization count, do you have to prove fraud?

15          MR. SHAPIRO:  No.  Absolutely not.

16          THE COURT:  Okay.

17          MR. SHAPIRO:  And as a matter of fact, what I was

18  getting to was for our equitable subordination count, we do not

19  have to prove fraud.  That's why in bringing the topic of fraud

20  up, I do so with a certain amount of concern that there not

21  accidentally be some belief on the part of the Court that while

22  the government's telling you they can make a case of civil tax

23  fraud so, therefore, they must need to show that as a means of

24  making either of their two substantive arguments.  And, in

25  fact, that is just not true.

1      In fact, we can show the equitable subordination

2 under existing case law without any proof of civil tax fraud.

3 That is a much higher burden, much higher evidentiary threshold

4 for us to meet.

5      But I bring it up --

6      THE COURT:  I was just focusing on the

7 recharacterization count.  For example, let's say that you

8 present evidence that is undisputed that the debt to equity

9 ratio was a thousand to one.  Is that enough for a court to

10 conclude that it should be recharacterized?

11      MR. SHAPIRO:  No, sir.  The case law makes clear that

12 in doing the debt equity analysis, if you look at a variety of

13 factors, and as I indicated earlier, the case law is clear that

14 no one factor is determinative.  It's an evaluation process.

15      And as far as intent goes, the case law also makes

16 clear that you do that based on the objective evidence.  It is

17 not subject intent that governs the debt versus equity

18 question, which makes sense because, frankly, anybody who has

19 labeled something as a debt instrument and the government is

20 coming in and saying it wants to have it recharacterized would

21 then just be able to say, well, we intended it to be a dead

22 instrument and that would, under that erroneous interpretation,

23 end the case.

24      But there's plenty of case law that makes clear that

25 these factors are used because you're trying to have objective

1  indicia of how to interpret the economic substance of the note

2  as the interim note for something that should be

3  recharacterized and treated as equity.

4          THE COURT:  Okay.  Why don't we get to the discovery

5  that's still in dispute?  Because as I understand it, some of

6  the matters have been resolved.

7          MR. SHAPIRO:  Would you like me to tell you what is

8  still at issue?

9          THE COURT:  Yes.  Yes.

10          MR. SHAPIRO:  Okay.  As I understand it, the only

11  thing that is still at issue with our motion to compel are the

12  documents that Allstate has declined to produce and that are

13  listed in our motion to compel in a chart.  I would ask Mr.

14  Neal, but I believe that probably less than 12 documents there,

15  or roughly about that much.  And --

16          THE COURT:  Where are they?

17          MR. SHAPIRO:  And as far as --

18          THE COURT:  Where are they identified?

19          MR. SHAPIRO:  They're in the first -- in the

20  Government's motion to compel, its initial brief.  If you give

21  me a moment, I can pull my copy and tell you which page.

22          UNIDENTIFIED ATTORNEY:  Page 29.

23                      (Pause)

24          THE COURT:  Well, obviously from this listing, I

25  can't tell -- well, number one, I can't tell whether they're

1   written communications or whether they're memoranda that were

2   not shared with anyone.  How can I tell?  For example, the

3   first item is a memo, it doesn't say to whom, it doesn't say

4   from whom.  It doesn't say who else got it.  How am I supposed

5   to rule on this unless I know that?

6          MR. SHAPIRO:  Well, we think that that's Allstate's

7   burden to produce.  We believe that it's quite possible, given

8   the --

9          THE COURT:  Is this --

10          MR. SHAPIRO:  -- discussion that we've --

11          THE COURT:  Is this the privilege log?

12          MR. SHAPIRO:  It's taken from their privilege log.

13   That was given to me by Allstate.

14          THE COURT:  Well, the privilege log has to identify

15   who it came from and who it went to and who else got it.  Are

16   you telling me that the privilege log doesn't tell us that?

17          MR. SHAPIRO:  What I'm going to answer is that my

18   memory isn't good enough to commit to an answer on that.  But

19   Mr. Neal, I'm sure, would be able to answer that question.

20   Some of the people that provided answers with the privilege log

21   did identify who were the parties to a document or who was the

22   author and some did not.  And my memory is just not good enough

23   on that particular issue to answer your question, and I don't

24   want to venture a guess.

25          What I tried to do was to include the information

35

1  from the privilege log I received to identify the documents as

2  they were identified to me and what the privilege or immunities

3  as asserted by my opponent.

4       THE COURT:  And I can't even tell from the

5  description what it's about.  For example, the second item on

6  Page 30 says Allstate Insurance group security adjustment.  I

7  don't have the foggiest idea what that means.

8       MR. SHAPIRO:  I believe I do, which is why I have

9  tried to have that document produced.  What I think that that

10  particular document would indicate is that Allstate was writing

11  down as a loss the junior notes which, of course, would be an

12  indication that they themselves acknowledge that those notes

13  were of limited, if any, value.  And, therefore, should not

14  have been given a new note in its place, but rather should have

15  probably been converted to equity under the 1996 bankruptcy

16  plan.  That would go to the debt equity issue, as well as the

17  equitable subordination issue because it would be inappropriate

18  on the facts of this case to give yourself a new note and a

19  security interest, which you didn't even have before, for the

20  purposes of trying to position yourself to be paid ahead of

21  taxes from a sale that these people obviously knew that they

22  were planning on doing in a short period of time.

23       THE COURT:  Well, let me hear from Allstate.

24       MR. SHAPIRO:  Your Honor, could I finish by telling

25  you what other documents are still at issue?

1    THE COURT:  Well, I thought we'd take them one at a

2    time.  Actually I thought we were going to start with the

3    debtor because I thought that would be the easiest approach.

4    And why don't we don't that?  Let's jump ahead to the

5    debtor.  I want to find out what -- because I think the

6    documents in their possession, in my view, are probably more

7    important than the documents in the note holder's possession.

8    MR. SHAPIRO:  Do you want them -- the debtor

9    representative to -- or do you want me to tell you which debtor

10    documents are at issue?

11    THE COURT:  Tell me which debtor documents are at

12    issue?

13    MR. SHAPIRO:  Okay, I have to grab something.  On

14    February 28th, 2003, the debtors' counsel sent me a letter

15    which resolved some of the issues that -- some of the documents

16    that initially were put at issue in the government's motion to

17    compel.  They gave us some of the documents.

18    And from this document, it seems to me that the

19    debtor provided three privilege logs.  They broke down their

20    production and gave us three different privilege logs for the

21    different documents.

22    And in log one, it seems that what is still at issue

23    is Items 104, 105, 106, 107, 108 and 109.  I'm taking that from

24    Page 1 and 2 of the February 28th letter which, by the way,

25    Your Honor, I don't think is already in the record.  I'm not

1  sure.  But I'll put it in the record if you want.

2           In addition, on --

3           THE COURT:  Well, how I am to know what you --

4           MR. SHAPIRO:  Well, I've just told you which

5  documents.  It's the ones -- Log 1 is already in the motion to

6  compel.  You'll see a list of documents that --

7           THE COURT:  Okay.

8           MR. SHAPIRO:  -- in the government --

9           THE COURT:  Tell me where I can find them.

10          MR. SHAPIRO:  Actually that one's going to be

11 problematic.  Let me get my motion paper.

12          MR. QURESHI:  Your Honor, Abid Qureshi on behalf of

13 the debtor.  Perhaps I can assist here.  In connection with our

14 reply with the government's motion, we attached an affidavit

15 from Stanley Bloch, the attorney from whose firm the documents

16 at issue were generated.  That declaration lists the documents

17 at issue.

18          Additionally, on the debtors' motion on Page 3 and

19 Page 4 of that motion, the relevant section according to the

20 privilege logs are reproduced.

21          MR. SHAPIRO:  Abid, which motion is that?

22          MR. QURESHI:  This is -- this is the debtors'

23 response to the United States motion dated March 19th of 2003.

24 On Page 3 and going over to Page 4, with that document, for

25 each document which remains at issue, the relevant excerpts

1  from the privilege log has been reproduced.

2        THE COURT:  Okay.  So, on Page 3 of 4 of your

3  response, those are the documents in issue for the debtors?

4        MR. QURESHI:  Correct.  And further detail about

5  those documents is given in the declaration of Stanley Bloch,

6  which was filed in connection with that response.

7        MR. SHAPIRO:  Your Honor, I think that it might be

8  useful to put into the record the letter that I'm reading from,

9  which Mr. Qureshi sent to me.  It indicates basically 15

10 documents by number and log.  And so if you have the log, then

11 you obviously can also use the item numbers from this letter to

12 see the descriptions that the debtors' counsel provided for the

13 documents and any other information that they may have supplied

14 in their privilege log.  Would that be useful to you?

15       THE COURT:  No, I think I can get what I need from

16 here.

17       MR. SHAPIRO:  Okay.

18       THE COURT:  All right.  Let me hear from the debtor

19 with respect to the debtors' documents in issue.

20       MR. QURESHI:  Thank you, Your Honor.  Abid Qureshi

21 from Akin Gump Strauss Hauer and Feld on behalf of the debtor.

22       First, Your Honor, with respect to numerous excerpts

23 that Mr. Shapiro read from the declaration -- from the

24 deposition, rather, of Stanley Bloch, the government never did

25 move to compel the testimony when directions not to answer were

1  given.  So, I did not plan to address that issue.

2         Let me turn to the alleged waiver of the privilege

3  that the government argues as occurred here.  I don't think

4  there is any serious dispute that the debtors' documents all

5  represent attorney work product, as well.  But let me first

6  address the government's allegations that the attorney/client

7  privilege has been waived.

8         First with respect to the Crime-Fraud Exception, the

9  government in its motion raised the Crime-Fraud Exception as

10  one of its arguments that the privilege has been waived but has

11  put forth absolutely no evidence, no documents and no

12  deposition testimony that we are aware of that supports an

13  allegation that would allow the government to make out a prima

14  facie case of fraud, which it is the government's burden to do.

15  So, on the record that is before the Court, I certainly do not

16  believe that there is a sufficient factual basis for this Court

17  to determine that civil fraud has occurred.

18         And, indeed, I also question whether the government

19  has even met the burden that would be sufficient to allow this

20  Court to conduct an in camera review of the documents.  That

21  there must be a showing of a factual basis adequate to support

22  a good faith belief that in camera review might reveal evidence

23  to establish the claim that the Crime-Fraud Exception applies.

24  And that language comes from the United States v. Zoland

25  (phonetic) decision, that's a Supreme Court decision of 1989.

1  And there simply is no evidence.  Merely the government's

2  argument, nothing to substantiate it.

3         The government has seen many thousands of pages of

4  documents produced by the debtors and does not point to any of

5  these documents in substantiation of this theory.

6         Now, the second principal waiver argument with

7  respect to the attorney/client privilege that the government

8  raises is the at issue waiver.

9         THE COURT:  You don't have to argue that.  I don't

10 agree with the government on that.

11        MR. QURESHI:  Okay.  Your Honor, the reminder of my

12 argument goes to these documents all being not only attorney

13 work product, but attorney opinion work product which, in this

14 Circuit, has been accorded, and in all Circuits, indeed, has

15 been accorded a much higher level of protection than mere

16 factual work product.

17        I think the declaration of Stanley Bloch that was

18 submitted with the debtors response to the government's motion

19 to compel establishes that these documents are all opinion work

20 product.  And further, that these documents were all prepared

21 in anticipation of the litigation.

22        Now, even for purposes of argument, if we assume that

23 the documents at issue contained only factual work product,

24 which they do not, but just for purposes of argument, even

25 under that lower standard, the government would need to show a

1  substantial need in order to get past the attorney work product

2  doctrine.

3        And the government has, in my view, fallen woefully

4  short of making that showing.  The government's claimed need

5  for these documents, which was in its motion, was to identify

6  witnesses and their roles in the important events, prepare for

7  taking depositions, decide which witnesses to depose, which

8  order to depose them and obtain exhibits to be used at the

9  depositions or trial for substantive or impeachment purposes.

10        In other words, the government hoped that by gaining

11  access to the debtors privilege documents, it would cut short

12  the discovery process for the government, enable it to take

13  fewer depositions and that is not even close to the substantial

14  need showing that is necessary in order to get past an attorney

15  work product claim, and much less so when it comes to opinion

16  work product.

17        Now, in terms of the anticipation of litigation

18  component of the attorney work product doctrine, I would,

19  again, point to the declaration of Stan Bloch.  Mr. Bloch and

20  his firm represented the debtors in connection with both of the

21  prior bankruptcies and it establishes the -- in Paragraph 6 of

22  that declaration, he states, "In all instances, a primary

23  motivation in creating the documents at issue was potential

24  litigation arising from various reorganization alternatives.

25  These documents reflect legal and not factual analysis and set

1  forth legal theories related to an imminent bankruptcy filing."

2  I don't think there's any serious doubt that it is objectively

3  reasonable for attorneys on the eve of a complex chapter 11

4  bankruptcy filing to hold the belief that litigation related to

5  that filing may be a possibility.  And, indeed, that was the

6  case with these documents.

7       The United States cites a decision involving the

8  United States versus El Paso, the 5th Circuit in 1982 for the

9  proposition that because there is a tax question ultimately at

10 issue here that the prepared in anticipation of litigation

11 argument is not met.

12      The El Paso case, I think it's worthwhile to direct

13 Your Honor's attention, is completely inapposite on the facts.

14 That case involved efforts by the IRS to gain access to a

15 document referred to as a tax pool analysis which it is my

16 understanding from reading the case is really an accounting

17 document.

18      And the Court found that the work product document

19 did not immunize a tax pool analysis from production because

20 the primary motivation of preparing the document had nothing at

21 all to do with litigation.  This was a document prepared in the

22 ordinary course of the company's tax preparation, tax return

23 preparation.  It was not prepared for any litigation.

24      And moreover, there were facts particular to that

25 case about that document having been shared with people outside

1  of the company.  But for my purposes, I think it is important

2  to note that the documents at issue here were not accounting

3  documents.  These were opinion work product documents that went

4  to potential litigation on the eve of complex Chapter 11

5  bankruptcy filings.

6           I have nothing further.  If you have any questions?

7           THE COURT:  No questions.  Okay.  I'm going to rule

8  on this one.

9           MR. SHAPIRO:  Judge Walsh, may I respond to this?

10          THE COURT:  Not unless you want me to rule against

11 you.

12          I think the privilege has been waived with respect to

13 the debtor documents under the Crime-Fraud Exception.  And let

14 me tell you why I believe that.  And I focus on the Section

15 510(c) issue or count raised by the government.

16          First of all, Judge Shiff found that the plan in the

17 second case was a rather convoluted scheme to avoid paying a

18 tax and specifically he found that under Section 1129(d), the

19 entire plan was a tax avoidance purpose.

20          And if this scheme was started in the first plan,

21 then I think there's a good argument that the first plan could

22 be viewed as a fraud on the Court.  There's two good faith

23 requirements in the bankruptcy law.  First is the case law,

24 which is supported in this District, regarding good faith

25 filing.

1          And if the scheme was to get a res judicata effect

2    for the secured debt in the first case to carry out the

3    avoidance attacks in the second, then the first case could be

4    viewed as a bad faith filing which could certainly give rise to

5    a subordination under 510(c).

6          The second good faith requirement in the Bankruptcy

7    Code obviously is Section 1129(a).  And if there was a tax

8    avoidance scheme and the first Chapter 11 case was the first

9    step in that scheme, and it was designed to produce a res

10   judicata protection for the first step, I believe that that

11   first step, namely the first case, could have been viewed as a

12   bad faith plan.

13         And quite frankly, this issue, it seems to me, could

14   possibly implicate a bankruptcy fraud under Section 157 of

15   Title 18.  So, I conclude that it is appropriate for the

16   government to discover these documents which lead up to the

17   first plan confirmation in 1996 and which may then lead up to

18   or be segues to the second plan.  And I think all of the

19   documents identified on Pages 3 and 4 of the debtors' response

20   fall within that time frame.

21         Therefore, I think it's appropriate for the Court to

22   examine these documents in camera and decide whether they

23   should be produced if I find that they're relevant to the

24   issues raised by the complaint.  So, that's my ruling with

25   respect to the debtors' documents.

1              Now, let's talk about the next batch.

2              MR. HANDLON:  Your Honor, good afternoon.  Joe

3  Handlon from Ashby and Geddes, local counsel for Allstate.

4  With me in court today is Guy Neal from Sidley Austin Brown and

5  Wood.  I would ask that he be heard on all Allstate's matter.

6  We'll file a motion this afternoon.

7              THE COURT:  Okay.

8              MR. NEAL:  Good afternoon --

9              THE COURT:  And tell me, what documents are we

10  talking about?  Where do I find them?

11              MR. NEAL:  Certainly, Your Honor.  They appear --

12              THE COURT:  Or their identity.

13              MR. NEAL:  The last point?  I didn't hear you?

14              THE COURT:  Their identity, where do I find them.

15              MR. NEAL:  They do not appear in the government's

16  description, which is a cribbed version of Allstate's privilege

17  log.  The cribbed version appears on 29 through 31 of the

18  government's motion, motion to compel filed on January 17th.

19              THE COURT:  Oh, okay.  This is the one we started out

20  with --

21              MR. NEAL:  Yes.

22              THE COURT:  -- that I found --

23              MR. NEAL:  Your Honor --

24              THE COURT:  I think this description is inadequate

25  for me to address the issue.

1          MR. NEAL:  I would share in your belief in that, Your

2     Honor.  I mean you will note further on in the agenda today

3     that Allstate moves to intervene and for good reason, but we

4     will get to that later.  These documents, Your Honor, just by

5     their very dates, you will see they predate the bankruptcy

6     filing, most of them do, by a year or two.  That would be my

7     first point, Your Honor.

8          My second point is nothing that you heard from Mr.

9     Shapiro this afternoon or this morning into this afternoon

10    regarding the deposition transcripts, none of that related

11    whatsoever to Allstate in specific.  Allstate is one of the

12    note holders and one of the investors in Scott Cable, giving

13    credence to the adage that no good deed goes unpunished,

14    Allstate invested money in '88, restructured its obligation in

15    '93 in an out-of-court restructuring and in an in-court

16    restructuring before Your Honor in '96 had its debt obligation

17    restructured from an unsecured obligation to a secured

18    obligation.

19         Now, Your Honor, there's simply no assertion, number

20    one, by Mr. Shapiro that our privilege log was inadequate.

21    There is very little challenge, if at all, that the assertion,

22    the attorney/client privilege assertion is being raised

23    improperly.

24         The only thing that appears at issue in the

25    Government's motion is whether or not the two exceptions are

applicable to the attorney client privilege.  That is one, the

at issue exception, which Your Honor has discussed relating to

the debtor.  I would submit we have the same argument.

Allstate has not put at issue any of these documents or any

attorney/client communication.  There is no good faith reliance

upon advice of counsel at issue in Allstate.

Indeed, Your Honor, Allstate has not even filed an

answer or been allowed to intervene in this case.  So, it is

hard to imagine, Your Honor, nor has it been deposed in a

30(B)(6) deposed.  So, nor can it be alleged that we have put

at issue any of these documents, that number one.

Number two, this goes to the Crime-Fraud Exception,

Your Honor.  In light of what I heard a few minutes ago

regarding your ruling, Allstate stands in a much different

position than the debtors here.  Again, there is no prima facie

showing that Allstate, a note holder, one of many investors

relied -- excuse me -- was seeking to perpetrate a fraud or,

more importantly, that to give the exact language of the

exception here, that there is any indication that these

documents reflect communications made by the client to a lawyer

for the purpose of giving advice for the commission of a fraud

or a crime.  Nothing in what Mr. Shapiro indicated in these

deposition transcripts which he provided to us this morning,

nothing in the record, nothing in this motion seemed to

indicate that Allstate --

1        THE COURT:  Well, let me ask you a question.  If your

2   client, a representative of your client, had a discussion with

3   a representative of the debtor, to the effect that, hey, we

4   know how to beat this tax liability by converting to a secured

5   debt and then your representative, your client's representative

6   went back and said to his lawyer, research this for me and tell

7   me whether we can get away with this.  I would say that that

8   document would have to be produced.

9        MR. NEAL:  And I would agree with you on that point,

10  Your Honor.  But the law does require that there must be a

11  prima facie showing that he client was engaged, that in this

12  instance Allstate was engaged in a crime or a fraud.  There's

13  no showing -- there's an allegation, most surely, and the

14  allegation tends to --

15       THE COURT:  Well, I've already made the finding that

16  there's a prima facie case with respect to the debtor --

17       MR. NEAL:  And from listening to your --

18       THE COURT:  -- in that regard.

19       MR. NEAL:  -- ruling, that stems from the judge's

20  decision in Connecticut.

21       THE COURT:  That's right.

22       MR. NEAL:  That does not concern, and had zero

23  concern with Allstate.  There are other note holders.  There

24  are many public note holders here.  There's no allegation that

25  Allstate -- and after ten depositions surely if Mr. Shapiro had

something indicating that Allstate had a communication with one

of the debtors, Allstate representative, an employee was

deposed --

THE COURT:  Did you say -- I'm sorry.  You say the

government has not deposed any representative of Allstate yet?

MR. NEAL:  They have deposed a former employee, but

it wasn't a 30(B)(6) company representative.  And there's an

important distinction there.  But in any event, they did depose

a gentleman by the name of Richard Doppel (phonetic), who used

to work in the private equity group of Allstate during the

relevant period.  Surely Mr. Shapiro could supplement his

motion if he had any proof, any prima facie showing that there

were communications from Mr. Doppel, the Allstate employee, to

the debtors.  Or he's also deposed many employees of he

debtors, communications from the debtors to Allstate, join in

our plan to, you know, pull a fast one on the government.

None of that exists as to Allstate.  Not even a shred of

evidence.

THE COURT:  All right.  Then I'm going to deny

without prejudice the government's request with respect to

Allstate until they take a 30(B)(6) deposition to find out

whether Allstate was in any fashion involved in this scheme.

MR. SHAPIRO:  I have the evidence right here.

THE COURT:  What is the evidence?

MR. SHAPIRO:  Mr. Doppel's deposition, and I'll read

1  form Page 218.

2          THE COURT:  Who is he?

3          MR. SHAPIRO:  Mr. Doppel was Mr. Churchill's

4  equivalent at Allstate.  He was the head of the venture capital

5  group -- I'm sorry.  He was not the head of the venture capital

6  group.  He was a member of the venture capital group for

7  Allstate Insurance Company.  And he was in charge of their

8  investment in Scott Cable, that's what I was trying to get to.

9          And at Page 218 of his deposition transcript, I was

10 showing him an exhibit and I read to him from it, and I'll read

11 what I said:

12 "Q   I'm going to read this into the record and then I'm going

13 to ask you some questions about it.  This paragraph at Page

14 A000541 says, quote, 'Unfortunately Scott remains an

15 overleveraged company and, once again, a recapitalization is

16 needed.  A complicated reorganization plan has been finalized

17 that involves paying down debt with new senior debt from

18 Finova.  The company will go through a prepackage Chapter 11

19 proceeding in December and emerge immediately from bankruptcy

20 with a viable financial structure.  One of the main reasons for

21 going through Chapter 11 is to eliminate a federal tax lien

22 that would otherwise divert from Allstate and other equity

23 holders virtually all proceeds from a future asset sale.  Once

24 the plan is completed, Scott would proceed with a reasonable

25 chance for the company to grow and for Allstate to recover some

1 or all of its investment within two to three years.'  Did I

2 accurately read the paragraph?"

3 "A   Yes."

4 "Q   What Federal tax --"

5          THE COURT:  I'm sorry.   What were you reading from?

6          MR. SHAPIRO:  I was reading from a document provided

7 to me by Allstate.  That's what the bate stamp number A000541

8 refers to, it's an Allstate document.

9          THE COURT:  Tell me what the document is.

10          MR. SHAPIRO:  It was an internal memorandum that Mr.

11 -- I believe that Mr. Doppel prepared.  I believe it was a

12 document that he provided to his -- another person in the

13 venture capital group called Mr. Genz (phonetic).

14          THE COURT:  Okay.  And what was the witness' response

15 to the question?

16 "Q   Did I accurately read the paragraph?"

17 "A   Yes."

18 "Q   What Federal tax lien are you referring to in the

19 paragraph that I just read?"

20 "A   I don't really recall."

21 "Q   In general, were you referring to the taxes that would

22 result from the sale of assets of Scott Cable, which had

23 significant built in gain in them?"

24 "A   That could be what the tax lien was.  But, again, I don't

25 really recall specifically."

1          I think that what this document really shows is that

2    Allstate was just like Media Communications, just like Church

3    Street, just like the management company of the debtor, all in

4    cahoots to try to figure out a way to bump themselves ahead of

5    the taxes they knew had to be paid.

6          THE COURT:  Is there any evidence that Mr. Doppel or

7    any other representative met with any representative of the

8    debtor or any other investor to discuss this subject?

9          MR. SHAPIRO:  Mr. Armstrong testified that there were

10   meetings by all of the junior subordinated note holders with

11   management.  And that one of the topics discussed was a

12   security interest for the junior subordinated big note holders.

13          So, it would seem pretty obvious to me that that was

14   discussed.  And there's already been testimony that there was a

15   big meeting with Mr. Churchill, Mr. Armstrong, and attorneys

16   for one or both of their entities where they were discussing

17   the security interest as a means of positioning themselves

18   ahead of the taxes.

19          In addition, there is discussions that must have

20   taken place between Allstate's representative and Mr. Churchill

21   because Mr. Doppel also testified during his deposition that

22   they often relied on Churchill to make their representations

23   and to do their negotiations in the bankruptcy and in context

24   of the bankruptcy.

25          MR. NEAL:  Very brief response, Your Honor?

1          THE COURT:  Okay.

2          MR. NEAL:  I believe, although I don't have perfect

3  knowledge on this, that that memo was around 1996.  Again, I'm

4  not very good with math, but approximately three-quarters of

5  the memos sought by the government here were generated in '93

6  and in '94.  I can represent having, of course, read them, that

7  they don't involve Mr. Doppel.

8          And I want to go back to the Crime-Fraud Exception

9  and what it truly means.  And that is it excepts communications

10 from the lawyer to the client made by the lawyer for the

11 purpose of giving advice for the commission of a fraud or

12 crime.  These documents, based on the description provided by

13 the government, do not indicate that they centered even around

14 that communication in '96.

15         To be -- in full candor, Your Honor, there were

16 communications with Allstate.  Allstate was a principal note

17 holder here.  They had communications with the debtors, I'm not

18 trying to imply that they were in the dark.  No.  They had

19 communications.  But this, Your Honor, is not enough to

20 establish that Allstate sought the advice of counsel for the

21 purpose of a -- to commit a crime or a fraud.

22         THE COURT:  Well, I think that's enough for me to

23 examine them in camera.  But I'm not going to examine the

24 documents back in '94.  I'll start only with the end of '95 up

25 through -- I guess the last one is dated '98, which -- doesn't

1  that predate the Chapter -- second Chapter filing?

2          MR. NEAL:  Yes.

3          THE COURT:  Yes.

4          MR. NEAL:  Yes, very good, Your Honor.  From a

5  practical standpoint, shall I provide them -- shall they be

6  provided, and I guess, as well as the debtors, be provided to

7  you within a week?

8          THE COURT:  Ten days, that's fine.

9          MR. NEAL:  Within ten days we can provide them for in

10  camera review.  Very good, Your Honor.

11          THE COURT:  Okay.  So, that would be all of the items

12  listed on Page 29 through 31, except for the first item on Page

13  29, the first of the -- the only item on Page 29.  The first

14  item on Page 30.  And the first item on Page 31 and the second

15  item on Page 31.  So, except those four, you'll deliver the

16  others.

17          MR. NEAL:  Yes, Your Honor.  And I apologize if

18  they're not provided and they're not numbered accordingly.

19  There are some that are dated '93, '93, '93.  It may be easier,

20  Your Honor, if I can commit to provide you with documents in

21  '95, '96 -- '95 through '98.

22          THE COURT:  Okay.

23          MR. NEAL:  So, '93/94 will not be provided --

24          THE COURT:  Correct.

25          MR. NEAL:  -- for in camera.  Thank you.

1          THE COURT:  Okay.  What else do we have?

2          MR. SHAPIRO:  Your Honor, if I may --

3          THE COURT:  Are there any other discovery issues?

4          MR. SHAPIRO:  Oh, I'm sorry.  On the documents, that

5   covers all of the documents that are still in dispute on the

6   Government's motion to compel.  But there are other items that

7   you may want to address for status conference purposes.

8          THE COURT:  With respect to the delivery of the

9   documents, they should be delivered under cover of a letter,

10  copy of the letter to Mr. Shapiro.  And simply identifying the

11  documents and deliver them to chambers.  And then I'll -- after

12  I review them, I'll communicate with counsel as to what we do

13  next.

14         MR. SHAPIRO:  Your Honor, I apologize, there was one

15  related matter that I remembered.  Since it appears that some

16  documents have already been ordered to be produced, part of my

17  motion to compel sought leave to take limited depositions to

18  the extent necessary just regarding any documents that were

19  produced.  I don't know if I actually am going to want to take

20  any depositions because I haven't seen the documents yet.  So,

21  how do you want me to deal with that particular issue if I --

22  if I see some documents and then feel I need to get some

23  testimony about them?

24         THE COURT:  Is there a limitation on the number of

25  depositions you're --

1          MR. SHAPIRO:  Fact witness discovery is closed, both

2  in time and also because the Government has used its ten-fact

3  witness depositions.

4          THE COURT:  Well, I don't want to rule on that now.

5  But I'd probably be disposed to allow further depositions.

6          MR. SHAPIRO:  Thank you.

7          THE COURT:  Okay.  What else do we have on this

8  agenda?

9          Before I leave the subject, I want to really -- I may

10  want to follow-up with Judge Shiff on this.  And that is I want

11  a letter from counsel, plaintiff and defendants.  Defendants

12  can do it jointly if they want and, quite frankly, that

13  probably would be preferable.

14          I want to a statement, a position as to whether you

15  people believe that it is not possible to have a Chapter 11

16  plan confirmed in the pending case without paying the $29

17  million worth of tax liability, that's the first issue.

18          Next, assuming that it is not possible to have such a

19  plan, what would be the effect of converting the case to

20  Chapter 7 in terms of, number one, whether the Chapter 7

21  Trustee would be obligated to pay the tax.  And two, if not so

22  obligated, what recourse the government would have to any other

23  person or entity other than the debtors' estate with respect to

24  the collection of that tax.

25          And, of course, this is premised on the proposition

1  that unlike the proposed plan, in the Connecticut case, there

2  is no basis in the law for granting releases in a Chapter 7

3  case.  And after I received that letter, quite frankly, I may

4  want to discuss it with Judge Shiff.

5          MR. SHAPIRO:  Your Honor, could you repeat that last

6  sentence about the premise?  I missed it, I was trying to write

7  fast.

8          THE COURT:  I believe it's clear that there is no

9  basis in the law for any third party to obtain a release in a

10 Chapter 7 case.

11         MR. SHAPIRO:  Thank you.

12         THE COURT:  Now, let me back up a little bit.  It's,

13 I think, quite clear that the only way to obtain third party

14 releases in a Chapter 11 case is through a confirmed plan.  And

15 I think it is, therefore, clear that in a Chapter 7 case, you

16 don't have a confirmed plan and there's nothing in the Statute

17 which would suggest there's any other basis for granting third

18 party releases in a Chapter 7 case, including a Chapter 7 case

19 which started out as a Chapter 11 case.

20         Could I request that those letters be sent to me

21 within 20 days?  Simply because I look at this case so

22 infrequently, like every six months, that by the time I look at

23 it I've forgotten a lot of the history of it.

24         Okay.  Is there anything else?

25         MR. SHAPIRO:  I know this make me look foolish, but

1  that happens a lot.  I'm really not much of a bankruptcy

2  attorney and you're using the term release, and I don't really

3  understand what you mean in the context of this bankruptcy

4  proceeding.

5          THE COURT:  A release of claims against third

6  parties.  Let me just give you a typical Chapter 11 case.  A

7  typical Chapter 11 plan, you start off with the proposition

8  that by reason of the Code provisions, once the plan is

9  confirmed, that's a new contract between the debtor and its

10 creditors and all the other claims -- all the claims, as of the

11 petition date, that the creditor may have had against the

12 debtor are extinguished.  It is not uncommon for plans to

13 provide that in addition to the debtor getting a discharge,

14 certain officers and directors or lenders, typically pre-

15 petition secured lenders, or advisors or attorneys get a

16 release which basically says that to a creditor, in addition to

17 the release that the debtor gets by reason of the discharge,

18 you're releasing any claim you may have against the officers,

19 directors, professionals, et cetera.

20          And so we just commonly refer to those as third party

21 releases, that is a release of an entity or person other than

22 the debtor.

23          So, the only way to obtain a third party release is

24 through a confirmed plan.  And in a Chapter 7 case, you don't

25 have a plan.  And, therefore, I know of no basis in the law to

1  obtain third party releases.

2           MR. SHAPIRO:  Thank you.

3           THE COURT:  Okay.  Is there anything else we have to

4  cover?

5           MR. NEAL:  Your Honor, a status conference was also

6  set for today.  There are many other matters that don't fall

7  cleanly under the umbrella of a status conference, but there

8  are other motions that had been pending and have been pending

9  for a few months.  One of those that I would like to address,

10 Your Honor, is the motion that we brought, Allstate Insurance

11 Company's motion to intervene.  As Your Honor may recall, there

12 was --

13          THE COURT:  Pardon me.  Other parties have intervened

14 in this case, haven't they?

15          MR. NEAL:  That is correct.  Similarly situated note

16 holders, immediate partners have intervened, and you've allowed

17 the intervention, of court.  Allstate is similarly situated.

18 Mr. Shapiro and I have been operating under somewhat of an

19 implicit agreement that Allstate is a party in this case.  We

20 have responded to discovery requests.  We have produced

21 documents.  We have participated at all depositions.

22          The government has filed a response, I don't believe

23 it's in opposition to our intervention motion, but a response

24 that the government can address.  But it is, I would submit to

25 Your Honor, uncontested, unopposed motion to intervene and we

1  would ask that we be allowed to intervene promptly.

2          THE COURT:  Okay.

3          MR. NEAL:  Thank you.

4          THE COURT:  I'll allow the intervention.  Do you want

5  to present an order?

6          MR. NEAL:  Certainly, Your Honor.

7          THE COURT:  Do you have one handy?

8          MR. NEAL:  I do.  It was -- it's stapled and I

9  believed it's a very simple order, if I may approach.

10          THE COURT:  Okay.

11                          (Pause)

12          THE COURT:  Okay.

13          MR. NEAL:  Thank you, Your Honor.

14          THE COURT:  Is there anything else we should cover?

15          MR. SHAPIRO:  There's some housekeeping orders such

16  as some -- there's various stipulation in the agenda extending

17  for limited periods of time time to, for example, produce a

18  expert report, time to take an expert's deposition.  These were

19  by stipulation and they were listed in the agenda.

20          THE COURT:  Okay.

21          MR. SHAPIRO:  If you think that's appropriate --

22          THE COURT:  That's fine.

23          MR. SHAPIRO:  Also, I read from a number of

24  deposition transcripts.  Do you want me to put them in the

25  record or do you want me to just leave it as I verbally stated

61

1  it on the record?

2          THE COURT:  No, I don't need anything further in the

3  record.

4          MR. SHAPIRO:  Thank you.

5          THE COURT:  Okay.  Is that it?

6                  (No audible response heard)

7          THE COURT:  Okay.  We stand in recess.

8                  (CONCLUSION 1:01 P.M.)

9

10

11              C E R T I F I C A T I O N

12

13          I, Karen Hartmann, certify that the foregoing is a

14  correct transcript to the best of my ability, from the

15  electronic sound recording of the proceedings in the above-

16  entitled matter.

17

18  _____          Date:  October 3, 2003

19  TRANSCRIPTS PLUS

20

21

22

23

24

25