UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

FILED

2003 NOV 20  P 2: 49

US DISTRICT COURT
HARTFORD CT

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>      Appellant,<br>v.<br><br>SCOTT CABLE COMMUNICATIONS, INC. and STATE STREET BANK AND TRUST CO. as Indenture Trustee for certain note holders<br><br>      Appellees | ) No. 3:02-CV-1725 (AWT)<br>) (Bankruptcy Appeal)<br>)<br>) [file separately in each case; motion to consolidate pending] |
| UNITED STATES OF AMERICA,<br><br>      Appellant,<br>v.<br><br>AKIN, GUMP, STRAUSS, HAUER & FELD, LLP,<br><br>      Appellee. | ) No. 3:03-CV-357 (AWT)<br>) (formerly No. 3:03-MC-12) |

*Caption as it Appears in the Bankruptcy Court*

| | |
|---|---|
| In re:<br><br>SCOTT CABLE COMMUNICATIONS, INC.<br><br>      Debtor. | ) (Bankr. Ct. Case No. 98-51923)<br>) (Chapter 11)<br>)<br>) November 20, 2003 |

**RESPONSE OF U.S. BANK NATIONAL ASSOCIATION
TO UNITED STATES' REQUEST THAT COURT TAKE JUDICIAL NOTICE OF
HEARING AND ORDER IN DELAWARE BANKRUPTCY COURT POSSIBLY
BEARING ON ISSUES IN APPEALS**

U.S. Bank National Association, as successor to State Street Bank and Trust Company as Indenture Trustee, ("U.S. Bank") hereby responds to the United States' Request That Court Take Judicial Notice of Hearing and Order in Delaware Bankruptcy Court dated October 21, 2003 (the "United States' Request"). Along with its Request, the

United States submitted an October 20, 2003 letter brief it filed with the Delaware bankruptcy court in connection with the referenced proceedings. U.S. Bank asserts that, to the extent this Court takes judicial notice of the materials submitted by the United States relating to the Delaware proceedings that are the subject of the United States' Request, then this Court should also have the benefit of the letter briefs of the other parties in that proceeding.

As the United States explained in its Request, the Honorable Peter J. Walsh in the United States Bankruptcy Court for the District of Delaware, in connection with a hearing on discovery issues related to the adversary proceeding pending in that Court, requested that the parties submit letter briefs on issues relating to the effect of a conversion of this case to Chapter 7. To the extent that this Court grants the United States' Request to take judicial notice of certain of those proceedings, U.S. Bank, Trustee, hereby submits for the Court's review the October 20, 2003 letter brief submitted by U.S. Bank, as well as the October 21, 2003 letter brief submitted jointly by Media/Communications L.P., Chestnut Street Partners, Inc., Milk Street Partners Inc., TA Investors (collectively "Media/Communications") and Allstate Insurance Company ("Allstate"), Noteholder Defendants in the adversary proceeding, in order to provide this Court with the position of all parties involved in that proceeding.

U.S. Bank continues to maintain, consistent with its filings on the issue of conversion which are in the record, that conversion to Chapter 7 would simply add another layer of cost to this already complex and exhaustive litigation, without adding any benefit to the estate or the creditors remaining in the case. All parties recognize that all

that is left in this case is the resolution of the pending adversary proceeding. There is nothing productive remaining for a Chapter 7 Trustee to do. To the extent that the United States might speculate as to possible issues for a Chapter 7 Trustee to explore, we note that any such issues would have already been pursued in the pending proceedings and on appeal, and such actions would necessarily be duplicative. Conversion at this stage would do nothing but add another party and expense to this case, the history of which now spans almost 6 years. Discovery in the adversary proceeding is coming to a close. Once the adversary proceeding is resolved, and all appeals are exhausted, all that will be left is a distribution to the successful litigant.

U.S. Bank therefore respectfully maintains, as set forth in the earlier briefing in this appeal, that conversion would not be productive or beneficial at this time, and respectfully submits the attached letter briefs in response to the United States' Request.

APPELLEE,
U.S. BANK NATIONAL ASSOCIATION,
AS INDENTURE TRUSTEE

By: _____
Ira H. Goldman
Federal Bar No. ct05656
Peter W. Benner
Federal Bar No. ct05938
Kathleen M. LaManna
Federal Bar No. ct16740
For Shipman & Goodwin LLP
One American Row
Hartford, CT  06103
Its Attorneys
(860) 251-5000
bankruptcy@goodwin.com

357995 v.01 S2



**Shipman & Goodwin LLP**
COUNSELORS AT LAW

One American Row
Hartford, Connecticut 06103-2819
Phone: (860) 251-5000

Peter W. Benner
Phone: (860) 251-5719
Fax: (860) 251-5799
pbenner@goodwin.com

October 20, 2003

**VIA HAND DELIVERY**

The Hon. Peter J. Walsh
United States Chief Bankruptcy Judge
United States Bankruptcy Court
for the District of Delware
824 Market Street
Wilmington, DE 19801

Re: <u>United States v. State Street Bank and Trust Co., Adv. No. 01-04605</u>

Dear Judge Walsh:

I am writing to state the position of U.S. Bank National Association, successor to State Street Bank and Trust Company, as Indenture Trustee (the "Indenture Trustee"), in response to the questions raised by the Court at the hearing of October 1, 2003. This response sets forth the perspective of the Indenture Trustee in the case.

With respect to the Court's first question regarding whether a plan can be confirmed without paying the tax liability claim of the United States, a plan can be confirmed if it is consensual as provided in 11 U.S.C. 1129(a)(9)(A), were the parties, including the United States, to agree to the treatment of the administrative tax claim. In the absence of such an agreement, the treatment of the tax claim should be resolved within the pending adversary proceeding. As the Trustee argued before Judge Shiff, who denied the United States' motion to convert and appoint a trustee, conversion to Chapter 7 should not occur at least until the priorities for distribution of the estate are established by the adversary proceeding. Introducing a Chapter 7 trustee into the case at this juncture would be inefficient and expensive, since the Chapter 7 trustee would inevitably seek time to learn the complexities of this long-standing case, and would likely seek fees that would only serve to reduce the recovery to the successful litigants.

With respect to the adversary proceeding, it has been and continues to be the position of the Indenture Trustee that the claims of the United States are unsustainable for the reasons stated in the Trustee's Motion for Summary Judgment which is pending

The Hon. Peter J. Walsh
October 20, 2003
Page 2

before the Court. Certainly the United States' claim for recharacterization of the notes issued in connection with the 1996 plan of reorganization approved by this Court presents issues of law which can be resolved without a trial. The Notes were issued as public debt under an Indenture created pursuant to a plan of reorganization, for which U.S. Bank agreed to serve as Indenture Trustee in 1998. A disposition of this issue can be made by addressing the pending summary judgment motion.

We believe the government's claim for equitable subordination under section 510(c), as stated in the Amended Complaint, is in essence an attempt by the United States to have the notes recharacterized and is similarly barred by the doctrine of finality, as the Trustee asserts in its summary judgment motion. In the event the Court does not grant summary judgment on Count Two as to all noteholders because of disputed facts relating to individual holders, the Court still can grant the motion with respect to the government's equitable subordination argument as it relates to (i) the claim of the Indenture Trustee for its fees and expenses; and (ii) the claims of any holders to whom such facts do not apply.

In the absence of a settlement, the outcome of the adversary proceeding will dictate the distribution of assets. Distribution will be made first to secured creditors whose liens have not been subordinated pursuant to the adversary proceeding, and thereafter in accordance with Section 726 of the Code. This would be a three-step process:

 a. Distribution would be made to the Indenture Trustee, whose fees and expenses are covered by the lien of the Indenture, and have priority over payments to Noteholders who are covered by that lien. The Indenture Trustee believes that its lien should be upheld because it is not properly subject to any of the theories promulgated by the government.

 b. Distribution of the remaining balance would be made by the Indenture Trustee to bondholders, except that to the extent the Court has ordered equitable subordination with respect to distribution to a particular holder, the Indenture Trustee would make such distribution to the Bankruptcy Trustee for further distribution.

 c. The Bankruptcy Trustee would then make further distribution in accordance with Section 726 of the Code.

The Hon. Peter J. Walsh
October 20, 2003
Page 3

      The Indenture Trustee takes no position on the Court's question regarding potential recourse the government would have against third parties. The Indenture Trustee intends to make distribution in accordance with the preceding paragraph once the adversary proceeding is concluded.

      The Indenture Trustee respectfully refers the Court to its pending Motion for Summary Judgment as the means of moving this case most efficiently to a resolution. Please let us know if we may be of any further assistance to the Court in addressing any questions the Court may have. Thank you for your consideration.

                                    Very truly yours,

                                      Peter W. Benner

cc:  Alan M. Shapiro, Esq.
      Toni G. Wolfman, Esq.
      Guy S. Neal, Esq.
      Francis A. Monaco, Esq.
      Thomas G. Macauley, Esq.
      Donald Walton, Esq.
      Daniel H. Golden, Esq.
      David N. Zensky, Esq.
      Ellen W. Slights, Esq.
      Teresa K.D. Currier, Esq.
      Craig I. Lifland, Esq.

355496 v.01 S1

# SIDLEY AUSTIN BROWN & WOOD LLP


RECEIVED
OCT 2 4 2003
SHIPMAN & GOODWIN LLP

| | | |
|---|---|---|
| BEIJING | 1501 K STREET, N.W. | |
| BRUSSELS | WASHINGTON, D.C. 20005 | |
| CHICAGO | TELEPHONE 202 736 8000 | NEW YORK |
| DALLAS | FACSIMILE 202 736 8711 | SAN FRANCISCO |
| GENEVA | www.sidley.com | SHANGHAI |
| HONG KONG | FOUNDED 1866 | SINGAPORE |
| LONDON | | TOKYO |
| | | WASHINGTON, D.C. |

WRITER'S DIRECT NUMBER
(202) 736-8041

WRITER'S E-MAIL ADDRESS
gneal@sidley.com

October 21, 2003

**Via Hand Delivery**

The Hon. Peter J. Walsh
United States Chief Bankruptcy Judge
United States Bankruptcy Court
for the District of Delaware
824 Market Street
Wilmington, DE 19801

Re:    United States v. State Street Bank and Trust Co., Adv. No. 01-04605

Your Honor:

At the October 1, 2003 status conference, Your Honor requested that counsel for the plaintiff and the defendants submit letters stating their positions regarding (1) whether a plan of reorganization can be confirmed in the Chapter 11 case pending before the United States Bankruptcy Court for the District of Connecticut absent payment of the capital gains tax liability, and (2) the effect that conversion to a case under Chapter 7 would have on the obligation to pay such tax liability. Defendants Media/Communications L.P., Chestnut Street Partners, Inc., Milk Street Partners, Inc., and TA Investors (collectively, "Media/Communications") and Allstate Insurance Company ("Allstate") submit this joint letter in response to Your Honor's request. Defendant State Street Bank and Trust Company (now U.S. Bank National Association), as Indenture Trustee for the Junior Secured PIK Noteholders (the "Indenture Trustee"), intends to respond by a separate letter.

### Procedural History

Media/Communications and Allstate were original investors in the 1988 leveraged buyout of Scott Cable Communications, Inc. (then known as Simmons Communication Merger Corp.) ("Scott"). In order to finance the acquisition of Scott's cable systems and to provide Scott with a working capital facility, Scott entered into a series of borrowing transactions in 1988, including (a) a senior secured revolving credit agreement; (b)

**SIDLEY AUSTIN BROWN & WOOD LLP**                    WASHINGTON, D.C.

The Honorable Peter J. Walsh
October 21, 2003
Page 2

separate senior secured note agreements; (c) separate senior subordinated secured note purchase agreements; (d) unsecured zero coupon note agreements; (e) assumption of unsecured public subordinated debentures issued under an indenture; and (f) an unsecured junior subordinated note purchase agreement. Media/Communications and Allstate were holders of the unsecured junior subordinated notes in the aggregate principal amount of $18,000,000.

As a result of the Cable Television Consumer Protection and Competition Act of 1992, sales of cable companies declined dramatically and institutional lending became very limited. Scott's inability to refinance or sell certain of its assets before the maturity of its senior debt forced Scott to file in this Court a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on February 14, 1996. On or about October 31, 1996, Scott filed its Second Amended Disclosure Statement (the "1996 Disclosure Statement") and Second Amended Joint Plan of Reorganization (the "1996 Plan"). The 1996 Plan created two types of restructured, secured notes to be issued by the reorganized debtor to formerly unsecured creditors: (1) the New Restructured Second Secured PIK Notes (the "Senior Secured PIK Notes") and (2) the New Restructured Third Secured PIK Notes (the "Junior Secured PIK Notes"). The 1996 Plan provided that 100% of the Senior Secured PIK Notes and 15% of the Junior Secured PIK Notes would be distributed to Scott's class 6 creditors – the holders of public subordinated debentures described above – while the remaining 85% of the Junior Secured PIK Notes would be distributed to Scott's class 7 creditors – the holders of unsecured junior subordinated notes (i.e., Media/Communications and Allstate). Finova provided Scott $67.5 million as exit financing in connection with the 1996 Plan, taking out the tranches of debt senior to the unsecured public subordinated debentures and the junior subordinated notes.

The 1996 Disclosure Statement made clear that Scott expected that the Senior Secured PIK Notes and the Junior Secured PIK Notes would be paid from the proceeds of a subsequent refinancing or from the proceeds of a "Transaction Event" which was defined in the 1996 Plan as (i) the merger, consolidation, liquidation, reorganization or dissolution of Scott, (ii) the sale of all of the cable television systems currently owned by Scott, and (iii) any similar transaction, including, without limitation, the reclassification of the capital stock of Scott or the dividend or other distribution of any corporate assets to shareholders. Scott also expected that the financing or a Transaction Event would occur before January 1, 2000.

The 1996 Disclosure Statement further made clear that in the event the Senior Secured PIK Notes and the Junior Secured PIK Notes could not be paid off in full at maturity, "it may be necessary for Scott to commence another case under the Bankruptcy Code, in which event the claims represented by the [Senior Secured PIK Notes] and the [Junior Secured PIK Notes] should be secured claims (to the extent the value of their collateral is equal to or exceeds the amount of debt) as opposed to the unsecured status of Class 6 and Class 7 claims under the Plan."

**SIDLEY AUSTIN BROWN & WOOD LLP**                     WASHINGTON, D.C.

The Honorable Peter J. Walsh
October 21, 2003
Page 3

On December 6, 1996, a hearing was conducted before Your Honor to consider confirmation of the 1996 Plan. By order dated December 6, 1996 (the "1996 Confirmation Order"), the 1996 Plan was duly confirmed. The 1996 Confirmation Order provides:

> The terms and conditions of the . . . [Junior Secured PIK Notes], and the forms thereof as may be finalized upon the execution thereof by the Reorganized Debtors, shall constitute the legal, valid, and binding obligations of the Reorganized Debtors, enforceable against the Reorganized Debtors in accordance with their respective terms and are entered into for good and valuable consideration, including the benefits of the plan.

1996 Confirmation Order ¶ 13.

On July 10, 1998, Scott executed an agreement to sell substantially all of its assets to InterLink Communications Partners, LLP ("InterLink"), for approximately $165 million, subject to certain adjustments (the "Asset Sale"). Because the purchase price was insufficient to discharge Scott's three tranches of secured debt (let alone any unsecured debt), Scott filed a second Chapter 11 bankruptcy petition in the District of Connecticut. The United States objected to confirmation of a prepackaged liquidating plan in that case, and by order dated December 11, 1998 Chief Bankruptcy Judge Shiff denied confirmation. See In re Scott Cable Communications, 227 B.R. 596 (Bankr. D. Conn. 1998) (the "Memorandum and Order").[1] Thereafter, Scott sought authorization to consummate the Asset Sale outside the context of a Chapter 11 plan of reorganization, and by order dated January 14, 1999, the Connecticut court approved such sale. Under the terms of the sale order, all liens, claims, and encumbrances on the assets attached to the proceeds of the sale, in the order of their priority, with the same validity, force and effect that they had as against the assets immediately prior to the sale.

Effective as of February 1, 1999, the transactions set forth in the Asset Purchase Agreement closed and Scott received $156,595,562 (plus an escrow of approximately $5.0 million) from InterLink. By motion dated January 22, 1999, Scott sought entry of an order authorizing it to pay the full amount of the first two levels of secured claims possessing liens against the sale proceeds in order to reduce continuing interest accrual. The United States opposed the Debtor's motion on the grounds that the sale proceeds (the Finova secured exit financing and the Senior Secured PIK Notes) should be surcharged under Bankruptcy Code section 506(c). After an extended hearing held on February 9, 1999, the Connecticut court overruled the United States' objection and entered an order authorizing and directing the Debtor to (i) pay the secured claims of Finova and the Senior Secured PIK Noteholders in full and (ii)

---

[1] Neither Media/Communications nor Allstate have taken part in the Connecticut bankruptcy case, including but not limited to proceedings relating to confirmation of the prepackaged liquidating plan.

**SIDLEY AUSTIN BROWN & WOOD LLP**                     WASHINGTON, D.C.

The Honorable Peter J. Walsh
October 21, 2003
Page 4

deposit the remainder of the sale proceeds in a designated interest bearing account. Such payments were made by Scott.

The Junior Secured PIK Notes were not paid out of the proceeds of the Asset Sale as a result of the pendency of this Adversary Proceeding, which the United States had commenced against the Indenture Trustee on November 19, 1998, challenging the characterization of the Indenture Trustee's secured claim against the assets of Scott. On December 17, 1998, the United States amended its complaint (the "Amended Complaint"), adding a second count seeking equitable subordination of the claims of the Junior Secured PIK Noteholders to all administrative claims of the estate. The United States avers that the Junior Secured PIK Noteholders have engaged in a pattern of inequitable conduct which has resulted in injury to the creditors of Scott, specifically, federal and state taxing authorities because there are insufficient assets to pay all secured and administrative claims of the estate. For reasons known only to the United States, the Senior Secured PIK Noteholders have not been sued (and have been paid in full on their claims) despite the fact that they received almost identical treatment under the 1996 Plan.

Pending before this Court is a motion for summary judgment filed by the Indenture Trustee and supported by Media/Communications and Allstate. See Motion for Summary Judgment (Nov. 11, 2002; Docket No. 119). The motion seeks judgment in favor of the defendants on Count One (Recharacterization) on the basis that the United States' recharacterization claim is a direct attack on the 1996 Confirmation Order and the issuance of the Junior Secured PIK Notes pursuant thereto. Sections 1127 and 1144 of the Bankruptcy Code do not permit such a direct attack to recast the terms of the 1996 Confirmation Order, except under limited circumstances described therein, which indisputably do not apply here. The motion also seeks judgment in favor of the defendants on Count Two (Equitable Subordination) on the basis that the United States is attempting to use equitable subordination under Section 510(c) to deprive creditors of rights created by a confirmation process which is (a) designed by Congress to insure fairness and equity, and (b) supervised by a bankruptcy judge who must make a determination that the plan conforms to the Code and is proposed in good faith. This confirmation process, defendants submit, conclusively protects against a subsequent reordering of priorities under Section 510(c). To allow the equitable subordination claim to proceed would give insufficient deference to the confirmation process and further would call into question the finality principle on which parties invariably rely when they negotiate and accept plans of reorganization.[2]

---

[2] Before the transfer of this Adversary Proceeding to this Court, the Debtors and State Street had previously moved for summary judgment to dismiss the Amended Complaint on the basis of, among other things, the res judicata effect of the 1996 Plan and the Confirmation Order. On April 1999, the Connecticut court issued its Memorandum and Order on Defendants' Motion for Summary Judgment, which granted the summary judgment motions of the Debtor and State Street. On the appeal of the United States, the United States District Court for the District of

**SIDLEY AUSTIN BROWN & WOOD LLP**                                   WASHINGTON, D.C.

The Honorable Peter J. Walsh
October 21, 2003
Page 6

Order granting the Debtor's Application to Use Cash Collateral and Denying Motions to Convert or Appoint Trustee. The United States appealed, and the matter is *sub judice* before the United States District Court for the District of Connecticut.

It is the position of Media/Communications and Allstate that this adversary proceeding is a priority dispute between the United States and the Junior Secured PIK Noteholders and, as such, is essentially divorced from the on-going Connecticut proceedings. Accordingly, whether a Chapter 11 plan can be confirmed over the objection of the United States is not determinative of the outcome of this case. The United States, it must be noted, has expressed no willingness to discuss any proposal to settle this Adversary Proceeding or compromise its position in a way that would permit confirmation of a plan.

### Question 2 – Effect of Conversion of Capital Gains Tax Liability

Regardless of whether the main case is converted to Chapter 7, this Court must resolve the priority dispute between the United States and the Junior Secured PIK Noteholders before the remaining proceeds of the Asset Sale can be distributed to the Junior Secured PIK Noteholders or, should the United States prevail here, all administrative creditors including the United States. Unless the United States succeeds in recharacterizing or subordinating the liens of the Junior Secured PIK Notes, the Junior Secured PIK Noteholders remain in a higher priority position than all administrative creditors including the United States and are not exposed in any way to capital gains tax liability.

The one significant difference between Chapter 11 and Chapter 7 mentioned by Your Honor at the status conference is that upon confirmation of a reorganization plan in a chapter 11 case, the debts of the bankrupt entity are discharged pursuant to § 1141(d) of the Bankruptcy Code. While this discharge does not apply to non-debtor entities, some courts have expanded the scope of the discharge to include the release of claims against third-party non-debtor entities including insiders and affiliates of the debtor. The Debtor's 1998 plan proposed to enjoin all entities, including federal, state, and local taxing authorities from asserting a claim against, inter alia, "Company Releasees", i.e., directors, officers, and others; "Third Party Releasees", i.e., holders of interests, the indenture trustees, the Junior Secured PIK Noteholders, and InterLink. Judge Shiff found that such provision violated the Anti-Injunction Act of 26 U.S.C. § 7421, which provides, inter alia, that "no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person . . . ."

The lack of a plan discharge or release does not expose the Junior Secured PIK Noteholders to any capital gains tax liability. There is no dispute that if a corporation sells all of its assets, gain or loss will be recognized upon the sale of each asset. I.R.C. § 1001. These gains and losses are aggregated when computing the corporation's annual income and income tax. If the corporation does not pay its taxes after receiving notice and a demand for payment, a tax lien then arises by operation of law on all of the corporation's property and subsequently-acquired property. Id. § 6321; Treas. Reg. § 301.6321-1. A tax lien does not relate back to the

**SIDLEY AUSTIN BROWN & WOOD LLP**                    **WASHINGTON, D.C.**

The Honorable Peter J. Walsh
October 21, 2003
Page 7

transaction, series of transactions, or taxable year associated with the income for which the tax remains unpaid. Importantly, a tax lien is also not superior to a prior perfected security interest in the corporation's property. I.R.C. § 6323. Thus, when a transaction occurs that results in gain to the corporation, there is no immediately-arising tax lien associated with it. Any cash generated by the transaction is subject to the claims of the corporation's creditors but is not immediately subject to a superior IRS claim for taxes associated with this transaction that may become unpaid in the future.

When a corporation's taxes go unpaid, the IRS can sometimes seek payment from its transferees. Generally, a transferee may be liable for a corporation's tax debts under an express agreement between the two (e.g., a merger agreement), under state law (e.g., successor liability provisions), or because the transferee acquired its property subject to a tax lien. The transferee may also be liable for the corporation's tax debts in equity (e.g., under a state law fraudulent conveyance statute). Generally, the IRS must exhaust its efforts against the corporation before it can proceed against a transferee. Payments to bona fide secured creditors with superior claims to a federal tax lien are generally not recoupable by the IRS under a transferee liability or responsible person theory

Thus, in the case at bar, although conversion to a Chapter 7 liquidation would eliminate the possibility of the contemplated non-debtor releases[4], the fact that the case converts to Chapter 7 does not automatically expose the Junior Secured PIK Noteholders to capital gains tax liability. See, e.g., U.S. v. F.D.I.C., 899 F. Supp. 50 (D.R.I. 1995) (assuming, without discussion, that a secured creditor gets paid before an administrative expense claim of the Government). Conversion of this case would still necessitate the resolution of the United States' recharacterization and subordination claims.

---

[4] The defendants submit that a confusing concession by the Debtor lies at the heart of Judge Shiff's Memorandum and Order. At page 8 of the Memorandum and Order, Judge Shiff states "[i]ndeed, the Debtor concedes that since the capital gains tax is not treated as an administrative expense, Jr. Note Holders will be exposed to tax liability without the proposed injunction." As discussed herein, the defendants maintain that, except for the claims asserted by the United States in this Adversary Proceeding, their "exposure" to the capital gains tax is nonexistent.

## Certificate of Service

This is to certify that the attached Response of U.S. Bank National Association, as Trustee, to United States' Request That Court Take Judicial Notice of Hearing and Order in Delaware Bankruptcy Court Possibly Bearing on Issues in These Appeals was mailed via first class U.S. Mail, postage prepaid, to the following on the 20th day of November, 2003.

Daniel H. Golden, Esq.
Akin, Gump, Strauss, Hauer & Feld, LLP
590 Madison Avenue
New York, NY 10022

Craig I. Lifland
Zeisler & Zeisler
558 Clinton Avenue
Bridgeport, CT 06605

Patricia Beary
Asst. U.S. Trustee
265 Church Street, Ste. 1103
New Haven, CT 06510-7016

Joan Pilver
Assistant Attorney General
State of Connecticut
55 Elm Street, 5th Floor
Hartford, CT 06141

Alan M. Shapiro, Esq.
U.S. Department of Justice
Tax Division
555 4th Street NW, Room 7122
Washington, DC 20044

Peter Sklarew, Esq.
U.S. Department of Justice
Tax Division
P.O. Box 55
Washington, D.C. 20044-0055

Ann M. Nevins, Esq.
Assistant United States Attorney
915 Lafayette Blvd., Room 309
Bridgeport, CT 06604

Kathleen M. LaManna

357995 v.01 S3