UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| In re: ) | |
| ) | **No. 3:02-CV-1725 (AWT)** |
| SCOTT CABLE COMMUNICATIONS, INC., ) | (consolidated bankruptcy appeals) |
| ) | (Bankr. Ct. Case No. 98-51923) |
| Debtor. ) | |
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Appellant, ) | |
| v. ) | |
| ) | |
| SCOTT CABLE COMMUNICATIONS, INC., ) | |
| STATE STREET BANK AND TRUST CO. as ) | |
| Indenture Trustee for certain note holders, and ) | |
| AKIN, GUMP, STRAUSS, HAUER & FELD, LLP, ) | |
| ) | |
| Appellees ) | |

**UNITED STATES' OPENING APPEAL BRIEF**

PETER SKLAREW
Federal Bar No. CT 17864
Tax Division
U.S. Department of Justice
P.O. Box 55
Washington, D.C. 20044-0055
(202) 307-6571

*Local Counsel:*

JOHN A. DANAHER, III
United States Attorney
ANN M. NEVINS
Assistant United States Attorney
Federal Bar No. CT06484
915 Lafayette Blvd., Room 309
Bridgeport, CT  06604
(203) 696-3000

# TABLE OF CONTENTS

**Introduction** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**Statement of Jurisdiction** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

**Statement of the Issues** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
      A.     *Issues for Conversion Appeal* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
      B.     *Issues for Cash-Collateral/Interim-Fees Appeal* . . . . . . . . . . . . . . . 5

**Standard of Review** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

**Statement of the Case – Facts and Procedural History** . . . . . . . . . . . . . . . . . . . . . 6
      *1996 Reorganization* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
      *1998 Petition; Rejected Plan; § 363 Liquidation; Tax Claim* . . . . . . . . . . . . . 7
      *The Adversary Proceeding, Appeal, Remand, and Transfer* . . . . . . . . . . . . . 8
      *The Attempted Appeal of the Transfer, and the Motion to Re-Transfer* . . . . . . . . . . . 9
      *Debtor's Intervention in Delaware as Predicate to Cash Collateral*
           *Stipulation in Connecticut* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
      *Evolving Motion to Convert or Appoint a Chapter 11 Trustee* . . . . . . . . . . . . . 10
      *Cash Collateral Stipulation and Objections and Responses* . . . . . . . . . . . . . . . . 13
      *Additional Related Delaware Motions (and Notice to*
           *Connecticut Bankruptcy Court)* . . . . . . . . . . . . . . . . . . . . . . . . . 15
      *The 7/18/02 Order and Appeal* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
      *Intervention by Noteholders; Comments of Delaware Bankruptcy Court*
           *Regarding its Jurisdiction* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
      *The Fee Applications, U.S. Opposition, and Orders Granting Them* . . . . . . . . . . 19
      *12/3/02 Hearing and Bench Ruling* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
      *The 12/23/03 Order* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
      *Disposition of the Application in Delaware* . . . . . . . . . . . . . . . . . . . . . . . 25
      *Delaware Appeal and Stay* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
      *Procedural Rulings in these Appeals* . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
      *Judicial Notice of Status of the Delaware Adversary Proceeding* . . . . . . . . . . . 26

**Arguments** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

**A.    THE CONVERSION APPEAL** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

      1.      **Conversion to Chapter 7 Was (and Is) Required by the Impossibility
             of Confirming a Plan, Continuing Diminution of the Estate, and the
             Conflict of Interest on the Part of Debtor's Management** . . . . . . . . . . . . . . 27
             *a.     Inability to Effectuate a Plan* . . . . . . . . . . . . . . . . . . . . . . . . 27
             *b.     Continuing Diminution of the Estate* . . . . . . . . . . . . . . . . . . . 28
             *c.     Conflict of Interest of Debtor's Management* . . . . . . . . . . . . . . 29

      2.      **Alternatively, A Chapter 11 Trustee Should Be Appointed** . . . . . . . . . . . 37

**B.     THE CASH COLLATERAL/INTERIM FEES APPEAL** . . . . . . . . . . . . . . . . . . . . . 37

    **1.     The Bankruptcy Court Lacked Power to Transfer Part of the Administration of the Estate to Another District and that Aspect of the Transfer Order is Void; But if the Transfer of Cash Collateral Applications is Not Void, then the 7/19/02 Order's Grant of the Cash Collateral Application Must Be Vacated for Want of Jurisdiction** . . . . . . . 37

        *a.     Introduction – Ramifications; Parties' Positions* . . . . . . . . . . . . . . . . 37
        *b.     Construction of Current Statutory Provisions* . . . . . . . . . . . . . . . . . . . 39
        *c.     Pre-1984 Legislative History* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46
        *d.     The 1984 Amendments* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

    **2.     The Connecticut Bankruptcy Court Erred in Viewing the Delaware Bankruptcy Court's Grant of the Debtor's Motion to Intervene in the Adversary Proceeding as Disposing of Any Objection to the Use of Estate Funds to Compensate Debtor's Counsel for Legal Services in Defense of the Secured Claim of the Indenture Trustee** . . . . . . . . . . . . . . . . . 56

    **3.     It Was Error to Assume That the Estate's Funds Constitute "Collateral" for the Security Interest of the Indenture Trustee Where the Validity of That Security Interest Was under Litigation** . . . . . . . . . . . . . . . . . . . . . . . . . 60

    **4; 5.     It Was Error to Authorize the Use of Estate Funds to Finance Legal Services to Be Provided by Counsel for the Estate's Fiduciary Directed at Defending a Disputable Lien *Against* the Estate Which, If Upheld, Will Render the Estate Penniless; For Similar Reasons, It was Error to Award Interim Fees for Resisting Conversion and Performing Other Services Against the Interests of the Unsecured Creditors** . . . . . . . . . . . . . 62

    **6.     The Bankruptcy Court Erred in Authorizing 100% Payment of Allowed Interim Fees to Debtor's Counsel Where the Estate Is Administratively Insolvent And, Unless the Security Interest for the Junior Notes Is Upheld Fully, Debtor's Counsel Would at Most Be Entitled to a *Pro Rata* Dividend Based on Counsel's Allowed Fees in Comparison to Total Administrative Expenses** . . . . . . . . . . . . . . . . . . 68

**Conclusions (Relief Sought)** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

# TABLE OF AUTHORITIES

**Cases:**

*C.F.T.C. v. Weintraub*, 471 U.S. 343 (1985) ........................................ 30

*Dewsnup v. Timm*, 502 U.S. 410 (1992) .............................................. 55

*Green v. Warden, U.S. Penitentiary*, 699 F.2d 364 (7th Cir. 1983) .......................... 16

*Hartford Underwriters, Ins. Co. v. Union Planters Bank*, 530 U.S. 1 (2000) .......... 11, 31, 32

*Hoffman v. Blasky*, 363 U.S. 335 (1960) ........................................ 49, 57

*In re Barron*, 73 B.R. 812 (Bankr.S.D.Cal.1987) ...................................... 70

*In re Bowman*, 181 B.R. 836 (Bankr. Md. 1995) .................................... 35, 36

*In re Cohn*, 54 F.3d 1108 (3d Cir.1995) ........................................... 51

*In re Cybergenics Corp.*, 226 F.3d 237 (3d Cir. 2000) .............................. 58, 66

*In re Energy Co-op., Inc.*, 55 B.R. 957 (Bankr.N.D.Ill. 1985) ........................... 70

*In re Flagstaff Foodservice Corp.*, 739 F.2d 73 (2d Cir. 1984) ........................... 70

*In re Global Int'l Airways Corp.*, 82 B.R. 520 (Bankr. W.D.Mo. 1988) ................ 62, 63

*In re Golden Recipe Chicken, Inc.*, 109 B.R. 692 (Bankr. W.D.Pa. 1990) ................... 63

*In re Graf Bros. Inc.*, 19 B.R. 269 (Bankr. Me. 1982) ................................. 35

*In re IML Freight, Inc.*, 52 B.R. 124 (Bankr. Utah 1985) ............................... 70

*In re Indian Motocycle Co.* 261 B.R. 800 (1st Cir. BAP 2001) ...................... 39, 40

*In re JLM Inc.*, 210 B.R. 19 (BAP 2d Cir. 1997) ..................................... 66

*In re Kean Corp.* 205 B.R. 690 (Bankr. S.D.N.Y. 1997) ............................... 67

*In re Kendavis Industries Intern., Inc.*, 91 B.R. 742 (Bankr. N.D.Tex. 1988) .............. 64

*In re L.S. Good & Co.*, 8 B.R. 312 (Bankr. N.D. W.Va. 1980) ......................... 34

*In re Lundborg*, 110 B.R. 106 (Bankr. Conn. 1990) .................................. 66

*In re Marvel Entertainment Group, Inc.*, 140 F.3d 463 (3d Cir. 1998) .................... 34

*In re Nadler*, 8 B.R. 330 (Bankr. E.D. Pa. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

*In re Reed*, 890 F.2d 104 (8th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

*In re Robbins*, 151 B.R. 364 (Bankr. W.D. Va. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

*In re Schipper*, 933 F.2d 513 (7th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

*In re Scott Cable*, 227 B.R. 596 (Bankr. Conn. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 29

*In re Sharon Steel Corp.*, 872 F.2d 1217 (3d Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*In re Smith Technology Corp.*, 1999 WL 1427681 (D.Del. 1999) . . . . . . . . . . . . . . . . . . . 64, 65

*In re Taxman Clothing Co.*, 49 F.3d 310 (7th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

*In re Tel-Net Hawaii, Inc.*, 105 B.R. 594 (Bankr. D.Ha. 1989) . . . . . . . . . . . . . . . . . . . . . . . . 36

*In re The Caldor Corp.*, 303 F.3d 161 (2d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*In re Top Grade Sausage, Inc.*, 227 F.3d 123 (3d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . 64

*In re Ward*, 894 F.2d 771 (5th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*In re Waxman*, 148 B.R. 178 (Bankr. E.D.N.Y. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

*In re Weinstein*, 272 F.3d 39 (1st Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Isaacs v. Hobbs Tie & T. Co.*, 282 U.S. 734 (1931) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Kawaauhau v. Geiger*, 523 U.S. 57 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

*Lamie v. U.S. Trustee*, 540 U.S. 526 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

*Liberty Mutual Ins. Co. v. Rotches Pork Packers, Inc.*, 969 F.2d 1384 (2d Cir.1992) . . . . . . . . . . . . . . 16

*Lopez-Soto v. Hawayek*, 175 F.3d 170 (1st Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

*Lopez-Soto v. Hawayek*, 175 F.3d 170 (1st Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

*Matter of Fiesta Homes of Georgia, Inc.*, 125 B.R. 321 (Bankr. S.D.Ga. 1990) . . . . . . . . . . . . 35

*Matter of Marin Motor Oil, Inc.*, 689 F.2d 445 (3d Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Matter of Pro-Snax Distributors, Inc.*, 157 F.3d 414 (5th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . 64

*Matter of Ribs-R-Us, Inc.*, 828 F.2d 199 (3d Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

*Rumore v. Wamstad*, 2001 WL 1426680 (E.D.La. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

*Scherer v. Equitable Life Assurance Soc.*, 347 F.3d 394 (2d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . 16

*United States Fidelity & Guaranty Co. v. Bray*, 225 U.S. 205 (1912) . . . . . . . . . . . . . . . . . . . . 57

*United States v. Boatman's First Nat. Bank*, 5 F.3d 1157 (8th Cir. 1993) . . . . . . . . . . . . . . . . . . 11, 32

*United States v. Noland*, 116 S.Ct. 1524 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

*United States v. State Street Bank and Trust*, 2002 WL 417013 (Bankr. Del. 2002) . . . . 10, 44, 66

*United States v. State Street Bank and Trust*, 259 B.R. 536 (D.Conn. 2001) . . . . . . . . . . . . . . . 8

*United States v. State Street Bank and Trust*, 263 B.R. 6 (Bankr. Conn. 2001) . . . . . . . . . . . . . 9

*Veg-Mix, Inc. v. United States Dep't of Agric.*, 832 F.2d 601 (D.C.Cir.1987) . . . . . . . . . . . . . . . . . . . 16

## Statutes:

11 U.S.C. § 101(16) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

11 U.S.C. § 101(5) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

11 U.S.C. § 1104 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 35

11 U.S.C. § 1106 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59, 65

11 U.S.C. § 1107 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38, 59, 62, 65

11 U.S.C. § 1109 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

11 U.S.C. § 1112 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 10, 27, 35

11 U.S.C. § 1129 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 27, 69

11 U.S.C. § 1141(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

11 U.S.C. § 307 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

11 U.S.C. § 323 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

11 U.S.C. § 327 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 34, 50, 51, 53, 62

11 U.S.C. § 330 . . . . . . . . . . . . . . . . . . . . . . . . . 2, 5, 6, 22, 39, 40, 42, 43, 47, 51, 53, 59, 61, 62, 64, 71

11 U.S.C. § 331 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 25, 39, 40, 42, 51

11 U.S.C. § 361 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

11 U.S.C. § 363 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 13, 27, 38, 41, 42, 50, 51, 57, 61

11 U.S.C. § 502 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51, 53, 61

11 U.S.C. § 503(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

11 U.S.C. § 506(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 31-34

11 U.S.C. § 507(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

11 U.S.C. § 510(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36, 60, 66

11 U.S.C. § 522 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

11 U.S.C. § 525 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

11 U.S.C. § 541(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

11 U.S.C. § 544(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58, 65

11 U.S.C. § 55 (repealed) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

11 U.S.C. § 551 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

11 U.S.C. § 554 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

11 U.S.C. § 704 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59, 65

11 U.S.C. § 725 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

11 U.S.C. § 726(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 69, 71

28 U.S.C. § 1334 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 20, 38-42, 45, 47-49, 51-56

28 U.S.C. § 1404 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48, 49, 54

28 U.S.C. § 1409 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45, 52, 53

28 U.S.C. § 1412 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 39, 40, 45, 46, 48, 54, 55

28 U.S.C. § 1471 (repealed) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48-50, 52-54

28 U.S.C. § 1473 (repealed) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

28 U.S.C. § 1475 (repealed) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48-51, 54

28 U.S.C. § 151 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

28 U.S.C. § 157 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41, 55

28 U.S.C. § 158 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

28 U.S.C. § 586(a)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

**Rules:**

Fed.R.Bankr.P. 1014 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45, 46

Fed.R.Bankr.P. 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39, 41, 42

Fed.R.Bankr.P. 2016 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 42, 53

Fed.R.Bankr.P. 3007 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

Fed.R.Bankr.P. 4001 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

Fed.R.Bankr.P. 7001 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39, 61

Fed.R.Bankr.P. 7087 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

Fed.R.Bankr.P. 8013 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 71

Fed.R.Bankr.P. 9014 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40, 41

Fed.R.Civ.P. 24(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

**Other Authorities:**

H.R.Conf.Rep. 98-882, 98th Cong., 2d Sess. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

H.Rep. 98-9, 98th Cong., 1st Sess. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

H.Rep. No. 95-595, 95th Cong., 1st Sess. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49-51

S.Rep. 95-989, 95th Cong., 2d Sess. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 46, 50, 52

S.Rep. 98-55, 98th Cong., 1st Sess. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

## UNITED STATES' OPENING APPEAL BRIEF

### Introduction

The United States is appealing two orders of the Bankruptcy Court (Judge Shiff).[1/]  The first, entered July 18, 2002 (7/18/02 Order), contained two rulings, both of which the government is appealing.  First, the 7/18/02 Order denied the government's motion to convert the case to Chapter 7, pursuant to § 1112, or to appoint a Chapter 11 trustee pursuant to § 1104.[2/]  Second, it granted a joint application (stipulation) of the debtor and the indenture trustee ["Indenture Trustee"] for the secured, junior subordinated payment-in-kind (PIK) notes ["junior notes"] to authorize the debtor, pursuant to § 363, to use part of the cash proceeds of the sale of all of the debtor's assets, which proceeds are claimed as "cash collateral" securing the lien of the Indenture Trustee.[3/]  The order approved a budget committing $800,000 for payment of past and future legal services to the debtor in helping the Indenture Trustee defend against the government's adversary complaint seeking to recharacterize the junior notes as equity instruments or to equitably subordinate the security interest to administrative taxes.  The adversary proceeding had previously been transferred to the District of Delaware where the debtor was allowed to intervene on the side of the Indenture Trustee.  Tacked on to the transfer order as an afterthought (not addressed or even noticed by the parties at the time) was the transfer of any cash collateral or fee applications for services or expenses associated with the adversary proceeding.  Notwithstanding that transfer, the Connecticut Bankruptcy Court adjudicated the cash collateral application.  The appellees in the first appeal are the debtor and the Indenture Trustee.

The second order, entered on December 23, 2002 ("12/23/02 Order), awarded interim fees

---

1/ By order of March 14, 2005, this Court allowed a combined brief for both appeals, up to 75 pages.

2/ Statutory references are to the Bankruptcy Code (11 U.S.C.) unless indicated otherwise.

3/ U.S. Bank National Association is the successor to Street Bank & Trust as the Indenture Trustee.

to the Akin Gump law firm (the only appellee in the second appeal[4/]) as counsel for the debtor in possession, pursuant to § 330 and § 331, for services in connection with the Connecticut case. It presents issues that are closely intertwined with the appeal from the court's grant of the cash collateral application. Accordingly, we sometimes refer in combination to the "cash-collateral/interim-fees appeal." We also generally refer to the "conversion appeal" since conversion to Chapter 7 is the primary relief sought and appointment of a Chapter 11 trustee is only a fall-back.

As noted below, there are multiple issues. Most fundamentally, the government maintains that the case should have been converted to Chapter 7 long ago, and still should be, because of the impossibility of confirming a Chapter 11 plan, diminution of the estate, and the conflict of interest of debtor's management which holds a 21.5% stake in any recovery on the junior notes.[5/] As for the cash collateral/interim fees appeal, most fundamentally, the government maintains that (1) it is not proper for the estate's fiduciary to litigate in favor of upholding a lien on property of the estate (and this effort was simply another part of the tax avoidance scheme that caused the Connecticut Bankruptcy Court to deny confirmation of the debtor's prepackaged plan of liquidation); (2) it is not proper, in considering interim disbursements, to assume that the government will lose the Delaware adversary proceeding and thus it was not proper to treat the proceeds of the assets sale as "collateral" for a lien securing the junior notes; (3) the case should have been converted and, if it had been converted, there would be no occasion for fee applications by any attorneys for any debtor in possession, and (4) disbursements of interim fees are improper when a bankruptcy estate is *administratively* insolvent (meaning administration expenses exceed assets) and has no prospect for altering that circumstance. Also, Judge Shiff ruled that the government's contention that it is

---

4/ Fees were also awarded to debtor's local counsel, Zeisler & Zeisler, which entered a stipulation with the government partially resolving the government's objections and partially deferring them until a final application for fees in the future. That stipulation is docketed as item 2 in the pre-consolidation docket for the second appeal, Case No. 3:03-cv-357 (AWT).

5/ The appellees may insist that the Delaware bankruptcy court's overruling of the debtor's attorney-client privilege with respect to certain discovery, on the basis of the crime-fraud exception, eliminates the government's need for conversion, but that is not so.

not proper to pay the attorney for a debtor-in-possession to litigate in favor of upholding a lien *against* the estate was precluded because the Delaware Bankruptcy Court already decided the issue against the government when it allowed the debtor to intervene in the adversary proceeding. The United States maintains that this misreads the ruling of the Delaware bankruptcy court, and also that the Delaware Bankruptcy Court lacked jurisdiction to issue any such preclusive ruling.

### Statement of Jurisdiction

The Connecticut Bankruptcy Court at all times had and continues to have "exclusive" jurisdiction over the bankruptcy "case" and over property of the estate. 28 U.S.C. § 1334(a), (e). There is some question as to whether it had jurisdiction to issue the cash collateral order since it had transferred venue over future cash collateral or fee applications to the District of Delaware to the extent related to the expense of defending the adversary proceeding transferred there. Nonetheless, the United States maintains the Connecticut Bankruptcy Court had full jurisdiction over the cash collateral issue because, regardless of whether or not it abused its discretion in transferring the merits of the adversary proceeding to the Delaware Bankruptcy Court, the supplemental transfer of future cash collateral or fee applications to that court is without effect as it exceeded the power of the Connecticut Bankruptcy Court. There is no dispute that the Connecticut Bankruptcy Court had jurisdiction to issue the cash collateral order to the extent it enabled payment of debtor's counsel's fees incurred in connection with the case in Connecticut. There is also no dispute that the Connecticut Bankruptcy Court had jurisdiction to entertain the motion to convert to Chapter 7.

As this Court ruled on March 14, 2005, it has jurisdiction under 28 U.S.C. § 158(a)(1) over the appeal from denial of conversion and the grant of the cash collateral application as final rulings, either traditionally or under the collateral order doctrine. Alternatively, this Court has jurisdiction under § 158(a)(3), having granted the government's alternative motion for interlocutory appeal from those rulings. Prior to that, on February 7, 2003, this Court granted interlocutory appeal from the 12/23/02 order allowing the interim fees award and disbursements.

In exercising its jurisdiction to review the cash collateral order and order awarding interim fees, this Court has jurisdiction to consider the effectiveness of the venue transfer order's tack-on of the transfer of future cash collateral and/or fee applications, incident to determining whether the Connecticut Bankruptcy Court erred in concluding that the Delaware Bankruptcy Court's order granting the debtor's motion to intervene in the adversary proceeding constitutes "law of the case" on the propriety of compensating debtor's counsel. This Court must also determine the validity of that supplemental transfer incident to determining whether the Connecticut Bankruptcy Court retained jurisdiction to enter the 7/18/02 Order to the extent it authorized the use of cash collateral for purposes of paying fees associated with the Delaware adversary proceeding.[6]

### Statement of the Issues

The argument portion of this brief is broadly divided in two by treating first the conversion appeal and then the cash-collateral/interim-fees appeal due to the relationships between the cash collateral issues and interim fees issues. The issues are therefore similarly categorized, but there is also overlap in that the government maintains that compensation for counsel for the debtor should be denied partly because the case should have been converted as soon as the government moved for conversion and certainly long before the debtor moved to intervene in the Delaware adversary proceeding to promote the security interest claimed by the Indenture Trustee for the junior notes over the interests of the bankruptcy estate.

### A.    *Issues for Conversion Appeal*

The issues for the appeal from the denial of the government's motion to convert or appoint a Chapter 11 trustee are:

---

[6] The entire transfer order (*i.e.*, including the merits of the adversary complaint) remains interlocutory and subject to eventual appeal in Delaware where the court denied a motion to re-transfer the matter back to Connecticut. Additionally, in the currently pending appeal from the Delaware Bankruptcy Court's interim fees order to the Delaware District Court (which stayed that appeal pending the resolution of this one), the government is also arguing, *inter alia*, that the provision of that order tacking on the transfer of venue for cash collateral and fee applications is void.

1.    Did the Connecticut bankruptcy court err in denying the motion to convert or appoint a Chapter 11 trustee, where confirmation of a plan that complies with § 1129 is impossible, the estate had been reduced to a cash fund subject only to litigation over a secured claim, and the debtor's management holds a 21.5% stake in the recovery on that secured claim (and is there any reason to remand, or should the District Court reverse and grant the motion to convert)?

2.    In the alternative, did the Connecticut Bankruptcy Court err in denying the appointment of a Chapter 11 trustee in view of the undeniable conflict of interest on the part of debtor's management to the extent the debtor is required to act as a fiduciary primarily for *unsecured* creditors?

### B.    Issues for Cash-Collateral/Interim-Fees Appeal

The questions presented by the appeal from the order granting the stipulated application to

use cash collateral and the subsequent appeal from the allowance of interim fees are:

1.    Did the Connecticut Bankruptcy Court have jurisdiction over the cash collateral issue to the extent it pertained to legal services to be rendered in the Delaware Adversary Proceeding, notwithstanding the provision at the end of the venue transfer order which purported to transfer future "administrative expense and cash collateral applications associated with it," or was that aspect of the transfer order void and of no effect because the determination of an administration expense, such as compensation for a debtor's attorney, cannot properly be divided between two districts?

2.    Did the Connecticut Bankruptcy Court err in concluding that the government was precluded, by the order of the Delaware Bankruptcy Court granting the debtor's motion to intervene in the adversary proceeding, from objecting to the use of estate funds to compensate debtor's counsel for legal services in defense of the secured claim of the Indenture Trustee.

3.    Did the Connecticut Bankruptcy Court err in assuming that the estate's funds constitute "collateral" for the security interest of the Indenture Trustee where the validity of that security interest was under litigation or should the court instead have viewed the motion to use estate funds as evidence of further diminution of the estate, calling for conversion to Chapter 7?

4.    May a bankruptcy court authorize the use of estate funds to finance legal services to be provided by counsel for the estate's fiduciary (trustee or debtor in possession) directed at defending a disputable lien *against* the estate which, if upheld, will render the estate penniless, and where the secured creditors are represented by able counsel?

5.    Did the Connecticut Bankruptcy Court err in granting interim fees to debtor's counsel for legal services in defense of a lien *against* the estate, given that § 330(a)(4) prohibits compensation for "services that were not— (I) reasonably likely to benefit the debtor's estate; or (II) necessary to the administration of the case."

6.    Assuming debtor's counsel may be compensated for the legal services at issue, did the Bankruptcy Court err, where the estate is administratively insolvent (because the

administrative federal and state tax expenses exceed the proceeds of a complete liquidation of assets) in authorizing 100% payment of allowed interim fees to debtor's counsel, where, unless the security interest for the junior notes is upheld fully, debtor's counsel would at most be entitled to a *pro rata* dividend based on counsel's allowed fees in comparison to total administrative expenses?

### Standard of Review

The District Court reviews the Bankruptcy Court's fact findings for clear error. Fed.R.Bankr.P. 8013.  It reviews conclusions of law *de novo*.  It reviews awards of compensation of professionals for abuse of discretion provided such awards are within the parameters permitted under § 330.  The orders on appeal here were not premised on any evidentiary hearings involving witnesses and therefore, the issues are purely issues of law and discretion.

### Statement of the Case – Facts and Procedural History

In this case, the facts relevant to the issues presented for review are to a significant extent coextensive with the procedural history.  Accordingly, the course of the proceedings below is subsumed in the following statement of facts.

#### *1996 Reorganization*

In 1996, Scott Cable Communications, Inc. filed a prior Chapter 11 case in the District of Delaware and underwent reorganization via a confirmed plan.  As part of that reorganization, certain unsecured junior subordinated notes held by the debtor's shareholders were exchanged for new notes – the secured, junior subordinated PIK notes.  The holders did not invest any new cash; rather they just exchanged their unsecured notes for secured ones paying a higher PIK interest rate and with a new maturity date, except that they agreed that 15% of the new secured junior notes would be distributed to the next higher class of creditors – public bond holders.  The public bond holders also upgraded their own securities from unsecured to senior secured subordinated PIK notes with a new maturity date, also without contributing new cash  Existing secured indebtedness

of Scott Cable was refinanced at the time by a new senior secured lender.[7]

At the time of the 1996 reorganization, Scott Cable owed no federal taxes. It did, however, have assets that had been greatly depreciated for tax purposes, lowering their adjusted basis. The value of those assets substantially exceeded their tax-depreciated basis. The excessive depreciation for tax purposes had helped the debtor defer prior taxes that would then presumably be recaptured and paid on a sale of the assets. This is sometimes referred to as "built-in gain."[8] Because of that built-in gain, if the assets had been sold in the 1996 bankruptcy, the need to pay the administrative tax, after payment of secured debt, would have left the debtor with little or no funds left to distribute in payment of the unsecured junior notes that were instead exchanged in the reorganization for the secured junior notes.[9]

### 1998 Petition; Rejected Plan; § 363 Liquidation; Tax Claim

In late 1998, debtor filed a new Chapter 11 petition in Connecticut while proposing a prepackaged plan of liquidation. On December 12, 1998, the Bankruptcy Court denied debtor's

---

[7] The facts in the foregoing paragraph can be derived from the 1996 plan and disclosure statement which were exhibits in a prior appeal to this Court leading to its reversal of the Bankruptcy Court's order dismissing the government's adversary complaint. No. 3:99-CV-918(AWT). This Court may take judicial notice of its own files in that appeal. The government does not believe these facts are disputed.

[8] The built-in gain is indirectly reflected in the magnitude of the tax claim that was filed in this case after the sale of assets in 1998, although that claim also reflects some appreciation in value between 1996 and 1998. If necessary, the United States can produce filings from the pending summary judgment motion record in the Delaware adversary proceeding, of which this Court may take judicial notice, to demonstrate the built-in gain.

[9] The United States believes that it is appropriate for this Court, when deciding these appeals, to keep in view at least a skeletal understanding of the basis for the government's contentions in the Delaware adversary proceeding. The United States maintains, based on a massive discovery record, that the junior note holders, the management of Scott Cable, and their outside counsel developed a scheme to use a Chapter 11 reorganization to exchange the deeply devalued unsecured junior notes for new secured junior notes without providing any new money to Scott Cable, essentially leapfrogging the repayment of their investment ahead of the built-in gains tax. Using a new capital structure that employed notes with heavily back-loaded terms requiring most repayment in balloon payments at maturity, they hoped that, by stalling for time, cable system values would appreciate. Under their scheme, the assets would be sold in a couple of years and the new secured junior notes would be paid before the taxes resulting from the sale. The United States also maintains that the public bond holders, who received 15% of the new secured junior notes while also upgrading their investment in their bonds to a secured one, through their representatives, knowingly participated in the scheme and negotiated for a "piece of the action."

prepackaged plan upon finding it was proposed primarily as a tax avoidance scheme.  *See In re Scott Cable*, 227 B.R. 596 (Bankr. Conn. 1998).  On February 12, 1999, all of the estate's assets were sold pursuant to § 363 for about $160 million, of which all but about $38 million was distributed for expenses and to purported senior secured creditors.  The sale generated an administrative federal income tax (for the year 1999) of $44,590,177 plus penalties and interest, plus various state tax liabilities.  The estate now holds about $40, million, all of which is claimed to be subject to a lien securing the junior notes, which would leave nothing to pay the administrative tax claims.

### *The Adversary Proceeding, Appeal, Remand, and Transfer*

On November 19, 1998, the United States filed a complaint commencing Adversary Proceeding No. 98-5104 in the Connecticut Bankruptcy Court against the Indenture Trustee, seeking to recharacterize the junior notes as equity and, alternatively, seeking equitable subordination (under § 510) of the security interest created for those notes in the 1996 bankruptcy reorganization.  If the government prevails, the $40 million remaining will go to it and eleven state taxing authorities, *pro rata*.  The Bankruptcy Court granted summary judgment against the United States in the adversary proceeding on April 26, 1999.  The government appealed to this Court. (See Case No. 3:99-CV-918(AWT).)  On March 9, 2001, this Court reversed and remanded the matter for trial.  *United States v. State Street Bank and Trust*, 259 B.R. 536 (D.Conn. 2001) (reversing 232 B.R. 558 (Bankr. Conn. 1999)).

The Bankruptcy Court then issued an order to show cause in the Chapter 11 case (not in the adversary proceeding) why the Chapter 11 case or the adversary proceeding should not be transferred to Delaware.  (DI# 301.[10/])  The United States opposed.  (DI# 303.)  The debtor and Indenture Trustee filed a joint response under the caption of the adversary proceeding (although it was docketed by the clerk in the main case, as item 305).  They *agreed* with the government that the Connecticut Bankruptcy Court should retain jurisdiction over the Chapter 11 case, but urged

---

10/ All DI# references are to the items on the docket of the main Chapter 11 bankruptcy case, No. 98-51923, unless otherwise indicated.

that the adversary proceeding be transferred to Delaware.

On June 7, 2001, the Connecticut Bankruptcy Court issued an order in the adversary proceeding (docketed therein as item number 52), entitled ORDER TRANSFERRING ADVERSARY PROCEEDING TO THE DISTRICT OF DELAWARE ("transfer order"). *United States v. State Street Bank and Trust*, 263 B.R. 6 (Bankr. Conn. 2001). The order's introductory paragraph stated that "For reasons that follow, it is determined that in the interest of justice *the adversary proceeding* will be transferred" to Delaware (emphasis added). The discussion in the order explained only why the *adversary proceeding* should (in the Bankruptcy Court's view) be transferred. Notwithstanding this, and apparently unnoticed by the parties at the time (as demonstrated below), the final paragraph of the order states that "adversary proceeding 98-5104, and any administrative expense or cash collateral applications associated with it, are hereby transferred" to Delaware. At that time, there were no administrative expense or cash collateral applications associated with the adversary proceeding.

### The Attempted Appeal of the Transfer, and the Motion to Re-Transfer

The United States moved for leave to appeal the transfer of the adversary proceeding, pursuant to 28 U.S.C. § 158(a)(3) and Bankruptcy Rule 8003. That motion was docketed under the same cause number as the prior appeal (No. 3:99-CV-918(AWT)). On August 30, 2001, Judge Thompson denied leave to appeal. All of the papers related to the Rule 8003 motion addressed only the transfer of the adversary proceeding; the premature transfer of future administrative expense and cash collateral applications was overlooked.

The United States then filed a protective motion in the Delaware Bankruptcy Court to re-transfer the adversary proceeding (now number A-01-04605 in that court) back to Connecticut, in view of precedent requiring a re-transfer motion for a party to preserve the right to appeal a venue transfer at such time as a final appealable judgment is entered by the court to which a case is transferred. The Delaware Bankruptcy Court denied the re-transfer motion. All of the papers

related to the re-transfer motion addressed only the transfer of the adversary proceeding; the transfer of administrative expense and cash collateral applications was overlooked.

### Debtor's Intervention in Delaware as Predicate to Cash Collateral Stipulation in Connecticut

After the transfer, the debtor moved to intervene in the adversary proceeding in Delaware. The government opposed that motion. On March 4, 2002, the Delaware Bankruptcy Court granted intervention. *United States v. State Street Bank and Trust*, 2002 WL 417013 (Bankr. Del. 2002). It observed that, under binding Third Circuit precedent a debtor is a party in interest for all purposes "with an unconditional statutory right to intervene" in any adversary proceeding. *Id*. at *2. The Delaware Bankruptcy Court also opined that the debtor in possession had a duty to protect the capital structure and the bargain that the junior note holders negotiated in the prior bankruptcy involving the predecessor of the debtor. *Id*. at *3. The Delaware Bankruptcy Court's March 4, 2002 order does not discuss the source from which any legal counsel representing the debtor in the adversary proceeding would be paid.

### Evolving Motion to Convert or Appoint a Chapter 11 Trustee

Meanwhile, on June 29, 2000, the United States had filed a motion in the Chapter 11 case to convert to Chapter 7, pursuant to § 1112(b). (DI# 256.) The original motion was premised on the debtor's inability to reorganize. At a hearing on August 8, 2000, Assistant U.S. Attorney Ann Nevins ["AUSA Nevins"] agreed with a court suggestion that the motion be "marked off at this time," because the bankruptcy judge, Judge Shiff, had recently granted summary judgment against the United States in the adversary proceeding, and it made more sense to await the outcome of the pending appeal in this Court. On May 29, 2001, after this Court reversed the summary judgment in the adversary proceeding, the United States requested a hearing on its motion to convert. (Dkt. at DI# 304.) Shortly thereafter, on July 3, 2001, the government supplemented the motion to convert, arguing that the debtor's management had a conflict of interest in determining whether to have the debtor in possession prosecute a § 506(c) claim to recover the capital gains tax from the

proceeds of the § 363 sale of assets as an expense of disposing of the assets.  (DI# 312.)  That

supplement was prompted by the then-recent decision of the Supreme Court in *Hartford*

*Underwriters, Ins. Co. v. Union Planters Bank*, 530 U.S. 1 (2000), holding that only a trustee (or

debtor in possession with the powers of a trustee) may invoke § 506(c).[11/]

On July 23, 2001, Judge Shiff informed the parties that he was deferring the motion to

convert indefinitely.[12/]  The motion to convert lay dormant until the government reminded the

court of it during a hearing on the cash collateral stipulation discussed *infra*, and requested that the

two contested matters (U.S. motion to convert and debtor's and State Street's request for a cash

collateral order) be consolidated.  (DI# 364.)  The Bankruptcy Court then determined that the

motion to convert had to be re-noticed for hearing and the government re-noticed it.  (*Ibid.*)  On

May 22, 2002, the debtor and the indenture trustee filed oppositions to the conversion motion.

(DI## 365, 366.)

On May 31, 2002,  the United States filed a reply and "supplemented" its motion to convert

(DI# 373), based on intervening events during the year since the motion was last supplemented,

and made an alternative request for the appointment of a Chapter 11 trustee.  The supplement's

additional bases for conversion or the appointment of a Chapter 11 trustee included (1) the

Delaware Bankruptcy Court's having granted the debtor's motion to intervene, and (2) the filing

with the Connecticut Bankruptcy Court of the cash collateral stipulation by which State Street and

the debtor were seeking to establish the propriety of using estate funds to pay debtor's counsel for

helping fight the United States in the Delaware adversary proceeding *even if the government*

---

   11/ *Hartford Underwriters* thus abrogated the conclusion in *United States v. Boatman's First Nat. Bank*,
5 F.3d 1157 (8th Cir. 1993), that a creditor may prosecute a § 506(c) recovery, but did not disturb
*Boatman's* treatment of tax incurred in a transaction that benefitted a secured creditor as coming within
§ 506(c).

   12/ As reflected in the transcript of the record made the next day on July 24, 2001 (DI# 325), AUSA
Nevins stated:  "Your Honor, I'd also just like to state for the record that the decision to defer the motion
to convert . . . was made by the court, not at the request of the Internal Revenue Service. . . ."  The Court
responded: "Yes, yes.  Right.  I understand that.  I said I wasn't going to do it, and you didn't -- what
were you going to do[?].  You were stuck."

*prevails*.  Thus, the government's May 31, 2002 filing argued that the intervention combined with the effort to lock in a right to use estate funds to pay to have the debtor's lawyer help the junior note holders take away the estate's remaining property (leaving nothing for administrative creditors), demanded the appointment of a disinterested trustee.  The government argued that a disinterested trustee, whose duties include objecting to claims if there is a reasonable basis to do so (*see* §§ 544 and 704(5)) would recognize the inappropriateness of litigating *against* the estate and, upon being substituted for the debtor in the Delaware adversary proceeding, would likely side with the government and waive the debtor's attorney-client privilege in discovery and at trial.

The supplement to the motion to convert also cited the ongoing diminution of the estate.  It thus observed that, in addition to $535,000 received by the law firm originally retained as debtor's counsel (Stroock & Stroock), on March 16, 1999, the Connecticut Bankruptcy Court granted that firm $376,663 in interim fees plus $28,770 in interim expenses ("subject to final review by this [Connecticut] Court").  When attorney Daniel Golden left Stroock & Stroock and joined the Akin, Gump firm in 1999, the Strook & Strook firm filed a "final" application for $596,540 in fees plus $45,521 in expenses.  Since then, the Akin, Gump firm had been granted the following interim fee/expense awards (all subject to final review):  on January 18, 2000, the sums of $128,070 in fees plus $22,864 in expenses; on December 12, 2000, another $26,285 in fees plus $3,071 in expenses; and on December 11, 2001, another $125, 512 in fees and $13,041 in expenses.  All of this predates the March 4, 2002 order granting intervention (for which the cash collateral stipulation involved in this appeal sought to release another $800,000 as discussed in a moment).

The government's motion to convert was supported by the State of Connecticut (which has a $1.2 million administrative tax claim) and by the United States Trustee (whose statutory function is to monitor improprieties by estate fiduciaries, including potential conflicts of interest).  *See* July 18, 2002 Order at 2 n.2.  A hearing on the motion to convert was held on June 5, 2002.

12

### *Cash Collateral Stipulation and Objections and Responses*

On April 2, 2002, the debtor and Indenture Trustee filed a STIPULATION AUTHORIZING CONTINUED USE OF CASH COLLATERAL ("4/2/02 Stipulation").  (DI# 351.)  As represented therein, this was the sixth time the debtor and Indenture Trustee asked the Court to authorize the use of estate funds.  As the 4/2/02 Stipulation explained (page 3, ¶ I), the Delaware Bankruptcy Court had recently granted the debtor's motion to intervene in the adversary proceeding to help defend the secured status of the junior notes.  The 4/2/02 Stipulation's attached budget through year-end included $800,000 in fees for debtor's counsel.  It unabashedly explains that it would be in "the best interests of the holders of the Junior Secured PIK Notes, for the Debtor to pay the [legal] fees and expenses set forth in the 2002 Budget."[13/]  It does not include any suggestion as to how the bankruptcy estate or any other creditors would benefit.  Since the 4/2/02 Stipulation's budget was mostly for the adversary proceeding, obviously the debtor and Indenture Trustee had overlooked that the June 7, 2001 order transferring the adversary proceeding to Delaware also purported to transfer "any administrative expense or cash collateral applications associated with it."[14/]

The United States objected to the 4/2/02 Stipulation, arguing that it improperly assumed that the Indenture Trustee would prevail in the Delaware adversary proceeding, and that it was in any event improper to treat as an "administrative expense" a fee charged by counsel to make arguments in favor of removing funds from the estate, which the estate's fiduciary (debtor-in-possession) should not be arguing for in the first place.  (DI# 355.)  A  hearing was held on May 1, 2002 (corrected transcript filed as DI# 367).  Although all parties had initially overlooked the language at the end of the venue transfer order, counsel for the government stated at the hearing

---

[13/] Assuming the estate funds are indeed collateral securing the Junior Subordinated PIK Notes, the Indenture Trustee's permission was necessary under § 363(c)(2)(A).  But, regardless of whether the Note Holders have a valid lien, court authorization was also required because the funds are property of the estate and were sought to be used outside the ordinary course of business.  *See* 11 U.S.C. § 363(b)(1).

[14/] Not only does the Stipulation seek funding for the debtor's participation in the adversary proceeding but also its first proposed "finding of fact" recites that the junior note holders are "lenders" -- a claim that is at the heart of one of the issues in the adversary proceeding.

that he had recently reviewed the transfer order and noticed that it purported also to transfer cash collateral and fee applications related to the adversary proceeding.  (DI# 367 at 7-8.)  He noted that the United States maintains that the Connecticut Bankruptcy Court lacked jurisdiction to transfer a portion of the administration of the Chapter 11 "case" without transferring the entire case -- a problem that was not implicated by the transfer of the adversary proceeding.  Nevertheless, government counsel argued that, unless the June 7, 2001 order's partial transfer of administrative matters was declared void, the 4/2/02 Stipulation for use of cash collateral had to be filed in Delaware, and the Connecticut Bankruptcy Court lacked jurisdiction to consider it.

At the May 1, 2002 hearing, Judge Shiff acknowledged that his earlier venue transfer order purported to transfer to Delaware any cash collateral issues as well as applications for administrative expenses related to the adversary proceeding, but nevertheless indicated that the Connecticut Bankruptcy Court could entertain argument on the proposed cash collateral order.  On the merits, debtor argued essentially that the Delaware court's March 4, 2002 order granting intervention implicitly endorses use of estate funds to pay debtor's counsel and that the United States' objection to the use of cash collateral was an attempt to collaterally attack the Delaware court's order granting intervention, which the United States had not appealed.  Judge Shiff agreed, as the following two colloquies with government counsel reflect:

> MR. SHAPIRO: That's true.  That's absolutely true, but it just emphasizes my point further.  That they don't need the Akin, Gump law firm.  And that's what they're trying to do, they're trying to use estate funds to pay for a law firm that has no purpose in this case.  It's the job of the State Street Bank to defend the note holders.  And all they're trying to do is an end run to use the estate funds for an improper purpose.
> THE COURT: And your argument is an attempt to make an end run around Judge Walsh.  He said they could do it.

(DI# 367 at 59-60.)  The colloquy on the point resumed a few moments later:

> MR. SHAPIRO: Suppose the Court deems them to have a priority administrative expense and, therefore, to at least share pro rata in some distribution at a later time.
> It's a pretty likely event, even if the government were to win, then we

would get less than - - for the taxpayers of this country then if they had not been able to participate with the cash collateral order at all.

THE COURT: And that is a -- that probably is correct, but that is the law of this case. Judge Walsh, to say yet again, has authorized this.

There is obviously going to be an expense, the question is, how much of an expense. He wouldn't let them in and not say that they couldn't get paid. He let them in as a representative of the estate. The debtor's attorneys are representing the estate. The estate has an interest, Judge Walsh said.

MR. SHAPIRO: I don't think --

THE COURT: Therefore, that interest is going to have to get paid by the estate which is served by their services by taking care of that interest.

So it had to be part of the equation in Delaware that if they're allowed in, and he says they are, that they would be charging the estate or attempting to charge the estate for their services. The question is, what is reasonable and necessary and that's got nothing to do with why we're here today.

*Ibid.* at 64-65. Judge Shiff noted, however, that if he were to grant the cash collateral order, any applications for fees pursuant to it would still have to be made to the Delaware Bankruptcy Court, and the United States could oppose specific fee requests on other grounds. The United States disputed Judge Shiff's interpretation of Judge Walsh's 3/4/02 order granting intervention, and also argued that the Delaware ruling could not have decided the fees issue because the Connecticut Bankruptcy Court could not transfer jurisdiction over the estate's purse to another court.

Due to inadequate notice to other creditors, the cash collateral issue was continued to a further hearing on June 5, 2002, combined with the hearing on the government's motion to convert. (Transcript at DI# 372.) The State of Connecticut and the United States Trustee then both joined the United States' objection to the cash collateral stipulation and also jointed its motion to convert. The U.S. Trustee also filed a written statement in support. (DI# 371.)

### *Additional Related Delaware Motions (and Notice to Connecticut Bankruptcy Court)*

In light of Judge Shiff's statements about being bound by the Delaware Bankruptcy Court's 3/4/02 order, and the discovery of the language at the end of the venue transfer order that purports also to transfer related cash collateral and/or fee applications, the United States filed two more motions with the Delaware Bankruptcy Court. One was a motion to clarify the 3/4/02 order and, if that order was meant to rule on the appropriateness of allowing fees to be paid from estate funds,

to reconsider it.  Among the grounds argued for reconsideration was a procedural argument that the

Delaware court lacked jurisdiction to pass on cash collateral issues or whether attorney fees are a

proper expense of administration, because the transfer of such issues was void.  The other motion

was a MOTION OF THE UNITED STATES FOR ORDER RE-TRANSFERRING, BACK TO CONNECTICUT,

PORTIONS OF MAIN CHAPTER 11 CASE THAT WERE NOT ADDRESSED IN PREVIOUS RE-TRANSFER

MOTION.  The ground for the additional re-transfer motion was that the transfer of the cash

collateral and fee issues exceeded the authority of the Connecticut Bankruptcy Court.  Both

motions were filed on May 22, 2002.[15/]

On June 17, 2002, the debtor responded separately to each of the government's May 22,

2002 motions in Delaware.  In response to the re-transfer motion, the debtor curiously argued (p.3)

that Judge Shiff's June 7, 2001 transfer order "did not transfer cash collateral matters" to Delaware

despite its explicit language to that effect.  Debtor added that judicial and estate economy,

certainty, uniformity, and the protection of the note holders all dictate that only one court -- the

Connecticut Bankruptcy Court -- hear all matters relating to cash collateral.  Debtor asked the

Delaware court to defer any re-transfer until the Connecticut Bankruptcy Court issued a decision

on the  motion for use of cash collateral because, "[i]n reaching a decision on the 2002 Cash

Collateral Stipulation and Order, it is likely that the Connecticut Bankruptcy Court will clarify or

---

[15/] This Court may take judicial notice of filings in an adversary proceeding that is part of the same
bankruptcy case.  *See Liberty Mutual Ins. Co. v. Rotches Pork Packers, Inc.,* 969 F.2d 1384, 1388 (2d
Cir.1992) ("A court may take judicial notice of a document filed in another court not for the truth of the
matters asserted in the other litigation, but rather to establish the fact of such litigation and related
filings"; internal quotation omitted); *Scherer v. Equitable Life Assurance Soc.*, 347 F.3d 394, 402 (2d Cir.
2003) (court of appeals may take judicial notice of events in related cases); *Veg-Mix, Inc. v. United States
Dep't of Agric.,* 832 F.2d 601, 607 (D.C.Cir.1987) (court of appeals may take judicial notice of official
court records in other cases involving the same subject matter or questions of a related nature between the
same parties, including bankruptcy pleadings); *Green v. Warden, U.S. Penitentiary*, 699 F.2d 364, 369
(7th Cir. 1983) (same).  The filings are accessible via the PACER system as docket items 86 and 87 in the
Delaware adversary proceeding, Adv. No. 01-4605 (Bankr. Del.).  Also, after filing these two motions in
Delaware, on May 23, 2003, the United States attached copies of the two motions to a submission filed
with the Connecticut Bankruptcy Court (DI# 368), in which the United States also provided supplemental
citations that Judge Shiff allowed to be submitted in support of the contention that it is improper to permit
estate funds to be used to pay a fiduciary's counsel to litigate *against* the pecuniary interests of the estate.

interpret the Transfer Order."[16]   The debtor's simultaneous opposition to the motion to have the

Delaware Bankruptcy Court clarify whether its 3/4/02 order granting intervention was in fact

intended to authorize payment of debtor's counsel from estate funds is also curious.  It argued

against any clarification because "the ramifications of This [Delaware] Court's intervention ruling

is at issue before Judge Shiff in the Connecticut Bankruptcy Court."[17]

       The Delaware Bankruptcy Court never formally ruled on the two motions.  But its 12/12/02

Order granting interim fees, discussed *infra* effectively mooted the clarification motion and

implicitly denied the supplemental re-transfer motion.

       ***The 7/18/02 Order and Appeal***

       On July 18, 2002, the Connecticut Bankruptcy Court issued the 7/18/02 Order (entitled

ORDER GRANTING DEBTOR'S APPLICATION TO USE CASH COLLATERAL AND DENYING MOTIONS

TO CONVERT OR APPOINT TRUSTEE).  (DI# 377.)  As the sole explanation for granting use of cash

collateral, it first stated that "the Delaware court had expressly found that Scott's intervention in

the adversary proceeding was warranted"; it then quoted some of the Delaware Bankruptcy Court's

reasons from the 3/4/02 order granting intervention (but did not mention that court's initial holding

that a debtor has an unconditional statutory right to intervene in any adversary proceeding[18]); and

it held that "[t]he final order of the Delaware Bankruptcy Court is not subject to collateral

---

16/ Although debtor also argued that cash collateral issues should be in a "uniform forum at which all parties can be heard," it nevertheless argued that fee applications were properly transferred to Delaware because they are part of the adversary proceeding

17/ These responses are items 90 and 91 in the Delaware adversary proceeding, Adv. No. 01-4605 (Bankr. Del.), accessible on PACER and subject to judicial notice.  *See* footnote 15 *supra*.

18/   The Delaware court's 3/4/02 Order cites *Matter of Marin Motor Oil, Inc.*, 689 F.2d 445 (3d Cir. 1982).  The Second Circuit has recently agreed that parties in interest under § 1109  have a statutory right to intervene in any adversary proceeding.  *In re The Caldor Corp.*, 303 F.3d 161 (2d Cir. 2002).  The United States maintains that this alone makes it untenable to hold that the order granting intervention precludes the United States from challenging the propriety of using estate funds to pay debtor's counsel to litigate against the estate.  Where an order is foreordained under binding circuit precedent, alternative theories for its entry are irrelevant.

review."[19/]  It then stated that the venue transfer order "was intended to provide the maximum latitude to the Delaware court, as this court recognized that the Delaware Court would be the only forum that could assess the necessity and reasonable value of any administrative expenses arising out of that adversary proceeding."  The next and final paragraph not only grants the application for use of cash collateral, but also denies the motion to convert with no explanation at all (unless Judge Shiff meant that Judge Walsh's grant of intervention also somehow precluded the United States from moving to convert to Chapter 7, although that is not stated expressly in the 7/18/02 Order).

The United States appealed the 7/18/02 Order to this Court as No. 3:02-cv-1725.

**_Intervention by Noteholders; Comments of Delaware Bankruptcy Court Regarding its Jurisdiction_**

On August 28, 2002, holders of a substantial portion of the junior notes moved to intervene in the Delaware adversary proceeding.  On August 30, 2002, the United States filed a "conditional non-objection" in which it stated that it would not object if the note holders waived any claim to have their attorney's fees paid from the bankruptcy estate as an expense of administration, or, absent such a waiver, if the court made that part of its ruling.  The note-holders would not waive potential administrative claims for attorney fees, and a hearing was held on September 12, 2002. Thereat, Judge Walsh granted intervention and declined to decide whether the intervenors' attorneys might be entitled to any compensation for three reasons, the first of which is pertinent here:

> And as to whether the intervenors are entitled to any recovery out of the estate, I'm not going to decide for three reasons:  Number one, I don't think it is proper for this Court to decide what an appropriate administrative claim is in a Chapter 11 case which is not before me, that's for the Bankruptcy Court in Connecticut. . . .

---

19/ Even the debtor has admitted in its filings that the order granting intervention was interlocutory and could only be appealed via a motion for leave to appeal under Rule 8003.

(Del.DI# 114 at p.37.)[20/]  Thus, although the Delaware Bankruptcy Court later granted interim fees to debtor's counsel (in an order being appealed to the Delaware District Court), Judge Walsh, before he had any fee application before him, spontaneously indicated his view that it was improper for the Delaware Bankruptcy Court to rule on what is an appropriate administrative claim in a Chapter 11 case where the Chapter 11 case itself is not before that court.  While, to be sure, Judge Walsh apparently changed his mind once he was made aware of the transfer order's explicit tack-on of future fee applications with the transfer of the adversary proceeding, his comments of September 12, 2002, reveal that he could not possibly have believed that on March 4, 2002, he had already *sub silencio* determined the right of debtor's counsel to compensation since, at least as of that time, he did not believe he had jurisdiction to address such issues.

### The Fee Applications, U.S. Opposition, and Orders Granting Them

In late October of 2002, the Akin Gump firm applied for $141,709 in fees (plus $33,926 in expenses) for the 12-month period ended September 30, 2002 (DI# 390 and R.8003 Ex.2),[21/] and the Zeisler firm applied for $21,305 in fees (plus $2,351 in expenses) for the past two years (DI# 393 and R.8003 Ex.3).  Shortly before that, debtor applied to employ local Delaware counsel to assist Akin Gump (DI# 389).  The Akin Gump firm also filed an application in the the Delaware adversary proceeding for over $330,000 in compensation for services in that adversary proceeding from its intervention through September 30, 2002 (Del.DI# 117).  The United States objected to both applications in the Connecticut Bankruptcy Court (DI# 412 and R.8003 Ex.5), and to the Akin Gump application in the Delaware adversary proceeding (Del.DI# 125).  Its arguments in both courts were similar, except that in Delaware it first argued that the venue transfer order is void

---

20/ Again, this Court may take judicial notice of the filings in the Delaware adversary proceeding (No. 01-4605), where the transcript is filed as docket item 114.  The relevant pages of this transcript were also attached to the motion for a stay pending appeal previously filed in this Court.

21/ "R.8003 Ex." refers to the exhibits to Rule 8003 motion for interlocutory appeal from the 12/23/02 Order, consistent with this Court's order of March 14, 2005, granting the motion regarding the consolidated appeal record.

to the extent it attempted to transfer fee applications.[22/]

In both courts, and as applicable to all three applications, the government argued that, because the estate is already administratively insolvent (*i.e.*, the undisputed unpaid expenses of administration under § 503 exceed $60 million whereas only $40 million remains in the estate), and because the debtor has conceded that it is not reorganizing (its assets have all been sold and most of the proceeds distributed to senior secured creditors), interim distributions under § 331 should not violate priority rules for final distributions.  Unless one assumes the government will lose the Delaware adversary proceeding, there is no statutory authority for distributing the remaining funds in a Chapter 11 case without full payment of the administrative taxes, which is impossible.  Under § 1129, a plan *must* provide for full payment of administrative claims to overcome objections by such claimants (and the debtor indicated it has no intention of *ever* submitting a plan anyway).  If the case is converted to Chapter 7, then § 726(b) will require *pro rata* sharing by administrative claimants.  And, if the case is dismissed, the federal tax liens have absolute priority over the claims of debtor's counsel for compensation.

The government anticipated that debtor's counsel would argue that *pro rata* rules do not apply because it is receiving its payment from "cash collateral" carved out of State Street's security interest -- the same security interest that the government's adversary complaint (transferred to Delaware) claims is invalid or should be equitably subordinated.  The government argued that it is not appropriate to distribute money on the assumption that the government will lose the adversary

---

22/ The government argued that the part of the Connecticut Bankruptcy Court's June 7, 2001 transfer order that purported to transfer cash collateral and fee applications is void.  It based this argument mainly, although not entirely, on the "exclusive" jurisdiction over a bankruptcy "case" and all "property of the estate" specified in 28 U.S.C. § 1334(a) and (e) and the ability to transfer only the entire "case" or a "proceeding" under 28 U.S.C. § 1412.  The government argued that "proceeding" in § 1412 refers to a "civil proceeding" that may be within the "not exclusive" jurisdiction, under § 1334(b), of the court in which the case is pending.  The government argued that compensating professionals is part of the title 11 "case" and not a severable "civil proceeding."  The argument is presented fully below as it bears on the correctness of Judge Shiff's ruling that the Delaware Bankruptcy Court's 3/4/02 order granting debtor's intervention in the adversary proceeding implicitly authorized compensation of debtor's counsel and thus bars many of the government's arguments here.

proceeding.  Indeed, that exact assumption was rejected by the Connecticut Bankruptcy Court, even after it granted summary judgment against the government in the adversary proceeding, when it did not grant the debtor's motion (DI# 199) to distribute the remaining funds to repay the junior notes, notwithstanding the government's appeal from that summary judgment ruling.

Also in both courts, but inapplicable to the Zeisler application, the government argued that it is invariably improper for a bankruptcy court to allow compensation for services in aid of helping an alleged secured claimant defend its lien *against* the estate.  In this regard, although Akin Gump sought compensation for services *in* the adversary proceeding only in its Delaware application, the government's objection in Connecticut argued that "many of the services indicated in the instant Akin Gump Application nevertheless relate indirectly to the Delaware adversary proceeding or have the same ultimate goal of upholding the security interest of the Junior Subordinated PIK Noteholders."  The government's objection observed:

> For example, that purpose accounts for most of the "Cash Collateral" category of services ($18,518) on Exhibit B to the application.  It accounts for half of the "IRS Appeal" category indicated at $59,311 (since most of the budget in the cash collateral stipulation was for fighting the IRS).[23/]  That purpose also accounts for all services in the "Retention of Professionals" category ($2,457),  and a significant portion of the services categorized as "Court Hearings" ($17,037).  Additionally, the debtor's only logical purpose in opposing a Chapter 7 trustee, which accounts for much of the "General Case Administration" category ($38,995) and the other half of the "IRS Appeal" category ($59,311), is the same as the purpose for most of its other endeavors -- fighting against the government's effort to invalidate or subordinate the lien of the Junior Subordinated PIK Noteholders.  Although the debtor has suggested it must fight the extra layer of administrative expense that would be caused by conversion to Chapter 7, that makes no sense since, if the security interest of the Junior Subordinated PIK Noteholders is upheld, then of course a Chapter 7 trustee would cost nothing because, after the operation of § 725 (mandating release of property subject to an unavoidable lien), this would be a no-asset case.  The real reason the debtor is fighting conversion is to enhance its manager's prospect of *personally* recovering roughly $8 million for his 21.5% stake in the Junior Subordinated PIK Notes.[24/]

---

23/ The "IRS Appeal" category refers to the already pending appeal from the 7/19/02 Order that is part of this appeal.

24/ As AUSA Nevins put it at the December 3, 2002 hearing, "this debtor has made no secret of the fact that their reason for not simply converting the case is to enable them to fight the Internal Revenue Service's challenge to the Junior PIK note holders."  The debtor has never denied this.

The United States' argument for disallowing compensation for services designed to ward off the challenge to the alleged lien of the Noteholders was that such compensation is flatly prohibited by § 330(a)(4) and is also counter to the spirit of much of the statutory scheme of fiduciary duties of a trustee or debtor in possession. The United States also argued that, while nominally on behalf of the estate, the services objectively advance (in addition to the interests of the alleged secured note holders) only the personal interests of the debtor's manager who stands to collect a 21.5% commission, or about $8 million, if the lien is upheld.

The government's objection to both Akin Gump applications (in Connecticut and Delaware) also included some objections regarding the amounts claimed. It noted that the applications included multiple attorneys in the Akin Gump firm working on the same things at the same time, including multiple attorneys at hearings and also billing full rate for travel time. It suggested the hourly rates (up to $675 per hour) and amounts of resources committed were excessive, particularly considering that (1) debtor admitted it does not have a pecuniary stake in the adversary proceeding or the entire case for that matter, since it is out of business and consists of a bank account to be distributed to creditors, and (2) those who do have a concrete stake are well represented by counsel (the Indenture Trustee's counsel as well as counsel for several Noteholders with large interests who separately intervened).[25/] The United States argued that, even assuming *arguendo* that debtor's defense of the capital structure created by the confirmed plan in the prior bankruptcy case is a proper expense of administration, the breadth, scope, and resulting expense of work reflected in the applications toward that end, in light of the other able counsel representing parties with a direct pecuniary interest, was unjustified and vastly excessive.[26/]

---

[25/] The Delaware Bankruptcy Court required that all Noteholders be given notice that they would be granted permissive joinder if they wished to participate in the adversary proceeding.

[26/] As an example, the United States pointed to almost $60,000 already then claimed for the appeal from the 7/18/02 order (part of this appeal), allocable to researching, meetings over, discussing, preparing, reviewing, and editing a simple motion to dismiss an appeal on the grounds that the order appealed from was not final, and a reply brief in respect thereto. Thus, the government's objection observed that "[i]n contrast to the 259 hours of work billed by Akin Gump for the appeal, Mr. Sklarew,

### *12/3/02 Hearing and Bench Ruling*

The Connecticut Bankruptcy Court held a hearing on December 3, 2002. It first indicated that it had not read the government's objections (a courtesy copy of which had been delivered to the judge's chambers) and asked that they be summarized orally. (DI# 413, R.8003 Ex.6 (transcript) at 4, 10.) As AUSA Nevins was barely getting started summarizing the 25-page objection, and was speaking of the conflict of interest of the debtor's manager, the Court indicated "I've heard all of this before." (*Ibid*. at 7.) AUSA Nevins pointed out that, nevertheless, the Court had not really given any reason for rejecting the government's arguments previously. (*Ibid*.) The Court responded that it might not have articulated its reasoning, but that it did not matter because any payment made in error would be subject to disgorgement. (*Ibid*. at 8.) The AUSA nonetheless quickly summarized the government's main objections that debtor's counsel should not be compensated for litigating in favor of a lien *against* the estate, and that the estate was irretrievably insolvent based on administrative claims alone.

At the hearing, Akin Gump (by Mr. Golden) argued, among other things, that the money payment was a carve out from collateral of the note holders and that their security interest had to be presumed valid until and unless it was actually invalidated. (*Ibid*. at 20-21.) With respect to the conflict of interest, Mr. Golden correctly observed that there was never any attempt to hide the fact that the debtor's manager has a personal stake in the outcome of the Delaware adversary proceeding and that, in the prior bankruptcy case, this had been conceived as an "attempt to incentivize management to maximize the recovery" for the junior note holders. (*Ibid*. at 22-23.) "So for the IRS to suggest that the debtor in possession is doing something untoward because of that incentive arrangement, we think, frankly, is nonsense." (*Ibid.*)

At the end of the hearing, Judge Shiff overruled all of the government's objections. He

---

who has handled the appeal for the government with minimal assistance from other government attorneys, estimates that he spent less than 40 hours on it thus far, primarily responding to the two dismissal briefs filed by Akin Gump for the debtor."

stated that there is a "lower bar" for interim compensation "for the very reason that you can't anticipate during the administration of a case what the final results are going to be." (*Ibid.* at 34.) Judge Shiff again ruled that, to credit the government's arguments about compensating counsel for litigating in favor of a lien against the estate would be to allow a collateral attack on the Connecticut Bankruptcy Court's order granting the debtor's motion to intervene, which is "the law of this case." (*Ibid.* at 35.) With respect to the government's argument that full payment of allowed sums is inappropriate where a Chapter 11 estate is administratively insolvent, Judge Shiff stated that this happens in many Chapter 11 cases and that "it's part of the bankruptcy law and policy to permit companies, honest debtors who are in that position, to regroup, to reorganize, so that they can get out of an insolvent position." (*Ibid.* at 35.) Judge Shiff added that, in view of this policy, he would not consider administrative insolvency to be a relevant consideration at all. (*Ibid.* at 36.) Judge Shiff added that it was his policy to encourage the best lawyers to come to his court and "I don't want to discourage that by putting artificial barriers in the path of people who are going to be working with some risk that they're not going to get paid [and] . . . I don't want to enter any kind of an order that is going to support that." (*Ibid.* at 36-37.)

Judge Shiff also ruled that the note holders are secured by virtue of the plan that was confirmed in the prior bankruptcy case and, although the government is seeking to recharacterize the claim or subordinate the security interest in the Delaware adversary proceeding, nevertheless, as things presently stood, the confirmation order in the prior Delaware bankruptcy case was binding, and this entitled the Noteholders to treat all the money as cash collateral, and that issue, Judge Shiff ruled, would not be "revisited" by the Connecticut Bankruptcy Court. (*Ibid.* at 37-38)

### *The 12/23/03 Order*

On December 23, 2002, the Connecticut Bankruptcy Court entered an ORDER ON DEBTOR'S APPLICATIONS FOR INTERIM COMPENSATION.[27/] (DI# 421, R.8003 Ex. 1.) After reciting

---

27/ The order incorrectly refers repeatedly to the applications as having been filed by the debtor. In fact, the applications were filed by the law firms seeking compensation, as administrative claimants on

some of the history of the case and of the adversary proceeding in Delaware, the order's discussion of the government's objections is confined to a single sentence (p.4): "The IRS objected for essentially the same unpersuasive reasons it raised in opposition to the debtor's motion for the cash collateral carve out, *i.e.*, that the debtor lacks standing to defend the Delaware adversary proceeding, has an actual conflict of interest, and is administratively insolvent."  (The Court apparently misunderstood one of the government's arguments, since the government did not argue that the debtor lacks standing to defend the Delaware adversary proceeding, either in objecting to the cash collateral stipulation, or in objecting to the fee applications.)  The order allows the applications in full (as voluntarily adjusted by debtor's counsel at the hearing by a small sum) "subject to adjustment and disgorgement."

Akin Gump was allowed $139,434 in fees and $4,625 in expenses, and Zeisler & Zeisler, PC was allowed $21,305 in fees and $2,351 in expenses.

### *Disposition of the Application in Delaware*

Meanwhile, on December 6, 2002, the Delaware Bankruptcy Court held a hearing on Akin Gump's fee application in the adversary proceeding and similarly overruled all of the government's objections, which were similar to those made in Connecticut, with the addition of the jurisdictional objection.  (*See* footnote 22 *supra*.)  It did not explain its reasons for overruling any of the government's substantive objections but did address the jurisdictional objection -- *i.e.*, the government's argument that there is no authority to transfer fee applications to a court other than the one with jurisdiction over the "case" under title 11.  In that regard, Judge Walsh indicated that he was persuaded that the government's position was wrong by a part of Senate Report 95-989, regarding the enactment of the Bankruptcy Code in 1978, that states that the word "proceeding" in the venue transfer provisions was meant to include "disputes related to administrative matters in a bankruptcy case."  (Del.DI# 160.)  On December 12, 2002, the Delaware Bankruptcy Court issued

their own behalf, consistent with the requirements of § 331 and Fed.R.Bankr.P. 2016.

a confirmatory written order granting the application in full, denying a stay pending appeal, but granting a stay for 30 days for the government to ask the Delaware District Court for a stay. (Del.DI# 153.)

As practical matter, the Delaware Bankruptcy Court's order granting the fee application denied, *sub silencio*, the motion to re-transfer fee applications to Connecticut and rendered moot the government's motion to clarify the order granting debtor's motion to intervene.

### Delaware Appeal and Stay

The government filed a Rule 8003 motion for leave to appeal the Delaware Bankruptcy Court's 12/12/02 order and asked, in the alternative, for a writ of mandamus. The District Court in Delaware stayed the matter (and continued the stay on disbursements) pending disposition of the appeals in Connecticut by this Court. In so ruling, Judge Jordan of the Delaware District Court stated that he felt that the Connecticut District Court had a paramount interest, since the main bankruptcy case was in Connecticut, and that he would be inclined to defer to judgments rendered by this Court on those issues which are presented in both appeals. Judge Jordan further requested that the parties convey his views in this regard to this Court, which was done by attaching a transcript of the hearing to the motion with respect to the record and briefing filed in these appeals on March 11, 2003.

### Procedural Rulings in these Appeals

On February 7, 2003, this Court granted interlocutory appeal from the 12/23/02 Order awarding interim fees. On March 14, 2005, it denied debtor's motion to dismiss the appeal from the 7/19/02 Order (granting interlocutory appeal in the alternative) and consolidated the appeals.

### Judicial Notice of Status of the Delaware Adversary Proceeding

On March 14, 2005, this Court granted the government's motion to take judicial notice of a hearing held on October 3, 2004, and an order issued on October 16, 2004, in the Delaware adversary proceeding in which Judge Walsh had overruled the assertion of the attorney-client

privilege to the production of certain documents, based on the crime-fraud exception.   Since that

hearing and order, discovery in the Delaware adversary proceeding has concluded and, as of the

date of this brief, the parties are in the midst of briefing summary judgment motions.

**Arguments**

We have elected not to include a summary of the arguments in view of this Court's recent

determination of the motion for a stay pending appeal (which involved a determination of the

government's likelihood of prevailing on the merits).   The enumerated sections of parts A and B

below (the two appeals) correspond to the issues listed in the Statement of Issues above, except

that issues 4 and 5 in part B are combined.   The specific relief (appellate mandate) requested is set

forth in the Conclusion at the end of this brief.

**A.    THE CONVERSION APPEAL**

**1.    Conversion to Chapter 7 Was (and Is) Required by the Impossibility of Confirming a Plan, Continuing Diminution of the Estate, and the Conflict of Interest on the Part of Debtor's Management**

Section 1112(b) provides that a bankruptcy court may convert a Chapter 11 case to

Chapter 7, or dismiss it, "whichever is in the best interest of creditors and the estate, for cause,

including" among other things "(1) continuing loss to or diminution of the estate and absence of a

reasonable likelihood of rehabilitation" or "(2) inability to effectuate a plan."   The list in § 1112(b)

is not exhaustive – there may be other "causes" to convert a case.

**a.    *Inability to Effectuate a Plan***

It is beyond dispute here that the debtor was (and is) unable to effectuate any plan because

it cannot gain confirmation of any plan.   Its prepackaged plan of liquidation was rejected as having

a principal purpose to avoid taxes.   The estate was then liquidated under § 363, so that it is now

just a bank account.   And, that bank account contains insufficient funds to meet § 1129's

requirement to pay all administrative claims promptly upon confirmation of a plan.

b.    *Continuing Diminution of the Estate*

The government also amply demonstrated before the Bankruptcy Court a "continuing loss to or diminution of the estate."  Interim compensation awards to debtor's counsel had surpassed a million dollars before mid 2002, and the original taxes incurred in the sale were accruing (and continue to accrue) interest much faster than the estate was or is earning interest (not to mention failure-to-pay penalties).  It is now beyond debate that the interest and penalties are also accorded administrative priority under § 507(a)(1).  *See In re Weinstein*, 272 F.3d 39 (1st Cir. 2001) (and decisions of other circuits cited therein).

Debtor may now argue that the bleeding has abated because, since the government took the appeal from the interim fees award, debtor's counsel appears to be taking a back seat in the Delaware adversary proceeding, allowing the major note holders and the Indenture Trustee to serve as the laboring oars in the litigation.  While this may somewhat lessen the ongoing diminution of the estate, it does not eliminate it.  Debtor continues to join in motions, responses, and other filings in the Delaware adversary proceeding.  It may also be involved in further appeals, both in Delaware and in Connecticut.  Moreover, the United States is entitled to have its motion to convert be decided in accordance with law, and not have the case be artificially maintained in a chapter in which it does not belong, simply because the debtor has elected to lessen its profile.  Also, the ruling on conversion remains important if for no other reason than to establish that the Bankruptcy Court erred in denying conversion insofar as that ruling impacts other rulings in the case.  For example, the government wishes to argue that debtor's counsel should not be paid for *any* services since the government moved to convert the case, or at least since mid 2002 when the bankruptcy court finally ruled on that motion (the wrong way), with the exception of services that demonstrably benefitted the estate's unsecured creditors.

Debtor and the Indenture Trustee also argued against conversion on the premise that it would add an additional layer of administration expense – that of the trustee for compensation and

for any attorney the trustee may hire.  First, the Indenture Trustee lacks standing to assert this

argument because, if its security interest is ultimately upheld, its lien would prime any unsecured

claim of a trustee.  Stated otherwise, the case would become a "no-asset" Chapter 7 case, as all

funds would go to the Indenture Trustee for the junior note holders.  As to the debtor, to the extent

it is supposedly representing the estate and its unsecured creditors in opposing conversion due to

the need to pay a trustee, the parties that would bear that expense if the government prevails in the

Delaware adversary proceeding will be primarily the United States and the State of Connecticut

(which supported conversion) since their administrative tax claims account for the vast bulk of

total administrative claims.

c.    *Conflict of Interest of Debtor's Management*

The United States also maintains that a debtor should not be left in possession as the

estate's fiduciary where the debtor's principal has a serious and material conflict of interest that

obviously may affect the debtor's most important decisions in the case.  And, when that factor is

coupled with the inability to effectuate a plan, the correct remedy is conversion rather than the

appointment of a Chapter 11 trustee.

Here, although the estate's fiduciary owes its highest duty to unsecured creditors (as

demonstrated in part B *infra*), the debtor's principal has a 21.5% stake in having a secured claim

be allowed as such, thus depriving the taxing authorities of any source from which to pay taxes

incurred by the estate in the sale of all of the assets.  The Bankruptcy Court already found that the

prepackaged plan was a tax-avoidance scheme.  (227 B.R. 596.)  It should be rather obvious that

the decisions of the debtor's principal are biased by his personal stake and his desire to effectuate

what the prepackaged plan failed to achieve.

The debtor's response to this argument in the bankruptcy court was quite remarkable.  In

paragraph 24 of its opposition to conversion (DI# 365), the debtor argued that (1) conversion

would "undermine the Debtor's defense of the IRS Adversary Proceeding"; (2) "a Chapter 7

trustee may choose not to defend the IRS Adversary Proceeding"; and (3) if a Chapter 7 trustee defends the adversary proceeding, it would be disadvantaged "by the IRS's vast knowledge of the case."  In fact, the first two of these arguments served to confirm the materiality of the conflict of interest (while the third argument was simply make-weight that was not true as a matter of fact[28/]). Moreover, at this juncture, with debtor's counsel apparently taking a back seat in the litigation to counsel for the note holders, these responses are not reasons to continue to defy § 1112 and artificially maintain this case in a chapter in which it has not belonged since 1998.

Debtor also argued that the conflict was fully disclosed.  But disclosure has nothing to do with the motion to convert or for a Chapter 11 trustee.  That motion rests on the fact that the conflict is most fundamentally affecting the debtor's decisions with respect to the Delaware adversary proceeding, including its decision to intervene on the side of the alleged secured creditor (which is antithetical to the estate's objective pecuniary interests and also causes it to incur the attorney fees in dispute), and including asserting the attorney-client privilege to prevent the government from accessing information that might help prove that the lien is invalid or should be subordinated.  A trustee would be required to assert or waive the privilege with a view toward its fiduciary duties, which include objecting to objectionable claims, avoiding avoidable liens, and seeking equitable subordination of claims or interests that are subject to such relief, for the benefit of the estate generally.  *C.F.T.C. v. Weintraub*, 471 U.S. 343 (1985) (corporate debtor's privileges pass to its bankruptcy trustee).

It is true that Judge Walsh's overruling of assertions of the attorney-client privilege with respect to certain documents, based on the crime-fraud exception, lessened somewhat the harm

---

28/ Assuming a disinterested trustee were to determine to take the side of the secured noteholders against the government as an unsecured administrative claimant, and further assuming the trustee would take an active role in the litigation, the government would have had no appreciable advantage over a newly appointed trustee.  Discovery and the factual development of the adversary proceeding had only just begun.  Moreover, if a disinterested trustee determined to defend the liens (which we find unfathomable), it could presumably have asked to hire Akin Gump as "special counsel" for the limited purpose of representing the trustee in the Delaware adversary proceeding under § 327(e).

interposed by the conflict of interest, but, in that area as well, it did not eliminate the problem. While debtor, no doubt chastened by Judge Walsh's ruling, refrained from objecting to many questions during depositions of its outside counsel in the 1996 bankruptcy case, it did object to certain questions. The issue is likely to recur at trial in the event that the adversary proceeding is not disposed of by summary judgment motion. Additionally, notwithstanding the overruling of the privilege as to certain documents, a Chapter 7 Trustee would take custody of *all* of the debtor's records and could perform a more disinterested search or, if a Chapter 7 Trustee determined to join the government's efforts to invalidate the security interest of the Indenture Trustee, the Chapter 7 Trustee might simply provide government counsel with open and unlimited access to the debtor's records and those of its outside counsel.

Additionally, even before issues regarding the debtor's intervention in the Delaware adversary proceeding and/or its assertion of the attorney-client privilege arose, on July 3, 2001, the government filed a supplement (DI# 312) to its original motion to convert in light of the decision of the Supreme Court in *Hartford Underwriters, Ins. Co. v. Union Planters Bank*, 530 U.S. 1 (2000), which came down during the government's appeal to this Court from the Connecticut Bankruptcy Court's dismissal of its adversary complaint. *Hartford Underwriters* held that only a trustee (or debtor in possession with the powers of a trustee) may invoke § 506(c) to charge collateral with the expenses of its preservation or disposition. The United States argued that the debtor in possession could not make a disinterested determination of whether to prosecute a § 506(c) claim against the alleged collateral of the note holders that would impair the 21.5% stake in the secured claim held by its management. In that connection, the government continues to need to have a disinterested trustee determine whether to pursue a § 506(c) carve-out for the administrative tax expense associated with the asset sale.

In its response (DI# 365) to this argument filed with the Bankruptcy Court, debtor argued that § 506(c) does not apply to capital gains taxes because, although the transaction causing the tax

31

to be incurred benefitted the note holders, the payment of taxes does not benefit the noteholders. Debtor further argued this was the "law of the case" based on a ruling by Judge Shiff. This response of the debtor, however, it is once again simply taking one side of a two-sided argument, and not surprisingly the side that benefits its management's personal financial interest. If there is even an *arguable* claim to be pursued under § 506(c), the debtor-in-possession has a conflict of interest.

There is indeed at least an *arguable* § 506(c) claim to be pursued for the United States -- and we submit that argument is the correct one. *See United States v. Boatman's First Nat. Bank*, 5 F.3d 1157 (8th Cir. 1993).[29/] See additional authorities cited in the UNITED STATES OBJECTION TO DEBTOR'S MOTION FOR ORDER AUTHORIZING FULL PAYMENT OF THE CLAIMS OF FINOVA CAPITAL CORP AND THE SENIOR SUBORDINATED SECURED PIK NOTEHOLDERS, filed in the bankruptcy case on January 28, 1999 (DI# 133).

As to the "law of the case" argument, it fails. It is true that, in permitting the bulk of the § 363 sale proceeds to be distributed to senior secured claimants (the first and second level secured debt holders), the Bankruptcy Court, at a hearing on February 9, 1999 (DI# 172, transcript) disagreed with the government's argument that the collateral should be charged with the capital gains tax under § 506(c). No opinion was issued. The government appealed the payment authorization order, but then moved to stay the appeal pending the outcome of its adversary proceeding objecting to the claim of the Indenture Trustee for the junior notes by seeking recharacterize the notes as equity, or seeking equitable subordination of the secured claim of the Indenture Trustee for the junior notes. That motion indicated that the other parties to the appeal, including the debtor and the Indenture Trustee, assented to the relief sought, and the stay was granted by this Court on March 2, 1999, in that appeal. On March 27, 1999, this Court *sua sponte*

---

29/ The Supreme Court's decision in *Hartford Underwriters*, abrogates *Boatman's* ruling that a creditor may prosecute a § 506(c) recovery, but did not disturb *Boatman's* treatment of tax incurred in a transaction that benefitted a secured creditor as coming within § 506(c).

dismissed that appeal *with leave to reinstate it at the conclusion of the adversary proceeding in respect to which the appeal was stayed.*

Accordingly, to the extent there is any "law of the case," it is interlocutory and subject to reconsideration by this Court, and certainly the government's position is preserved for future appeals. In the meantime, the Supreme Court then ruled that only a trustee (or debtor in possession) can prosecute a § 506(c) recovery from a secured creditor's collateral, thus making it necessary for the government to convince the debtor in possession (or a future trustee) to reargue the § 506(c) point before Judge Shiff and, upon losing, appeal to this Court.

In determining whether the § 506(c) issue presents the debtor with an additional conflict of interest, the issue is not whether the government is right or wrong to argue that § 506(c) can embrace a capital gains tax in an appropriate case, but rather whether or not an independent trustee might conceivably decide that the issue is sufficiently open to warrant pursuit.[30] In that regard,

---

30/ In this regard, the reasons for Judge Shiff's skepticism regarding the government's § 506(c) argument was that, in his view, costs that make a sale happen fall within § 506(c) but costs that are "consequences" of the sale do not, with capital gains taxes being in the latter category. Judge Shiff suggested that expenses of title searchers, advertisers, brokers, are allowable because they enable the sale, whereas the tax is simply imposed on it. We respectfully disagree that this is a valid basis upon which to determine what expenses fall under § 506(c). Many local jurisdictions have transfer taxes on property sales. The taxes are normally paid at the closing and thus are deducted from the "net" proceeds normally made available to the persons entitled to the net proceeds -- whether the estate or secured creditors. There is no basis to distinguish such local transfer taxes from a tax on the gain, save in the methods by which the taxes are computed (one essentially on the sale price and the other essentially on the sale price less the seller's acquisition cost). Under the "enablement versus consequences" distinction, a trustee for a car dealer could liquidate its inventory subject to floor plan security interests and the sales taxes would then have to borne by other assets and thus reduce the dividend to unsecured creditors (or go unpaid altogether if there are no other assets). Debtor has argued that the *payment* of taxes must benefit the note holders for § 506(c) to be invoked. Under § 506(c)'s plain language, however, it is the "preserving, or disposing of" the collateral that must benefit the secured creditor to justify charging the expenses of such preservation or disposition against that collateral. The government therefore maintains that the focus of the analysis is whether the transaction that produced the tax liability benefitted the secured creditor, and not whether the payment of tax would produce such a benefit. Obviously, it would often be in a secured creditor's interest to stiff the providers of services that preserved or aided in an advantageous disposition of the collateral. After a trustee insured the collateral that was then liquidated (so it no longer needed insurance), the secured creditor would not benefit from payment of the insurance invoice. After making repairs to a house that was then sold by a trustee, a mortgagee, if undersecured, would not benefit from paying the contractor. In the final analysis, reasonable minds may differ on the application of § 506(c), but the United States has been deprived of having a disinterested trustee determine whether to seek to recover the tax from the assets sale proceeds under § 506(c) .

33

prosecution of a § 506(c) recovery need not be costly to a trustee in this case.  Since the benefit would fall mostly on the IRS and to a smaller extent on State taxing authorities, the trustee could retain government attorneys as special counsel under § 327(e) to prosecute a § 506(c) recovery at no charge.

Conflicts between the interests of creditors to whom the debtor in possession owes a fiduciary duty and the personal interests of its management have often been cited in orders appointing a Chapter 11 trustee.  In *In re Marvel Entertainment Group, Inc.*, 140 F.3d 463 (3d Cir. 1998), the court affirmed the appointment of a Chapter 11 trustee in part due to a conflict of interest in the debtor's management that is closely analogous to the conflict posed in the instant case.  In *Marvel Entertainment*, a buyer of prepetition debt claims and bonds issued by a holding company owning the debtor's stock had obtained control of the debtor's board of directors.  The Third Circuit stated that "we are faced with circumstances in which the Icahn interests, themselves creditors of the Perelman holding companies, are currently in control of the debtor" and, "although the Icahn interests are technically and officially fiduciaries to all creditors, they would also be placed in an awkward position of evaluating their own indenture and debt claims."  *Id.* at 473.  That is the situation here where debtor's manager stands to gain $8 million from allowing a secured claim and it is an understatement to say it would be "awkward" for him to evaluate that claim dispassionately.  In *In re Sharon Steel Corp.*, 872 F.2d 1217, 1226 (3d Cir. 1989), the court observed, in sustaining the appointment of a trustee, that debtor's management had failed to move to set aside avoidable transfers made to entities under those managers' control.  It then cited with approval the case of *In re L.S. Good & Co.*, 8 B.R. 312, 315 (Bankr. N.D. W.Va. 1980), as "holding that although no clear proof of fraud, dishonesty, or gross mismanagement had been presented," certain transactions "place[d] current management . . . in a position of having grave potential conflicts of interest and the presumption arises that the current management . . . will be unable to make the impartial investigations and decisions demanded."  872 F.2d at 1227-28.

34

Conflicts of interest faced by a debtor's managers have also been relied upon as "cause" for conversion under § 1112, particularly where coupled with another factor such as the inability to reorganize or the diminution of the estate. For example, in *Matter of Fiesta Homes of Georgia, Inc.*, 125 B.R. 321 (Bankr. S.D.Ga. 1990), the court converted a case where it had denied confirmation of a plan of liquidation that depended upon successful recovery of preferences from insiders who were close family members of the debtor's current management. The court held that this gave rise to conflicts of interest. It then observed that "[s]ince the proposed plan contemplates liquidation, the practical result" of a decision whether to confirm the plan or convert the case "is to determine who will administer the Debtor's liquidation." *Id*. at 324. The court observed that a trustee could be appointed under § 1104 based on the conflict of interest, and indicated that this left as the "remaining question . . . whether the case should proceed under chapter 11 or Chapter 7, or be dismissed." *Id*. at 326. Citing § 1112(b)(2), the court observed that it had denied the debtor's Chapter 11 plan and there was no other plan for the debtor to propose, and therefore the court held that conversion was the appropriate remedy. *Id*.

In *In re Graf Bros. Inc.*, 19 B.R. 269 (Bankr. Me. 1982), the court similarly converted a case from Chapter 11 to Chapter 7 in light of a conflict of interest on the part of the debtor in possession attempting a plan of liquidation. The Court recognized that an estate may be liquidated under Chapter 11, but held that this is not appropriate where the debtor has a conflict of interest. The court held that "[a]nother factor is cost" and observed that "[i]f the liquidation were concluded by a trustee, there would be no reason for continued extensive activity on the part of the creditors' committee and the activity of the professionals and others employed by the debtor-in-possession would be reduced." *Id*. at 270.

Another example is *In re Bowman*, 181 B.R. 836 (Bankr. Md. 1995), in which the court converted a case where a debtor had a conflict of interest in refusing to entertain a settlement agreement that was in the best interests of creditors but not in the best interests of the debtor

individually.  The court observed that the debtor-in-possession's fiduciary duties include a duty of care to protect the assets of the estate, a duty of loyalty, and a duty of impartiality.  *Id*. at 843. After concluding that the conflict of interest could not be reconciled with the debtor remaining in possession, the court recognized it could either appoint a Chapter 11 trustee or convert the case to Chapter 7.  It chose the latter because "the sole asset is the civil action, and the Debtor's plan will be one that will liquidate it" and because it found that the debtor had converted the case from Chapter 7 to Chapter 11 for the sole purpose of attempting to gain control of the litigation that the former trustee was going to compromise for a sum sufficient to satisfy claims of creditors but not produce a surplus for the individual debtor.  *Id*.

In *In re Tel-Net Hawaii, Inc.*, 105 B.R. 594 (Bankr. D.Ha. 1989), the debtor failed to brief preference actions to recover payments made to creditors whose claims had been guaranteed by the debtor's controlling shareholder.  Recovery would obviously harm the shareholder by reviving its liability on the guarantees.  This conflict of interest was held to dictate the appointment of an impartial trustee because it was not considered likely that the debtor would vigorously investigate or prosecute the preference claims.  Similarly, here, where the debtor's management stands to reap a huge sum if State Street's security interest is upheld, the debtor is unlikely to vigorously investigate and prosecute an objection to State Street's secured claim and/or the right to equitably subordinate it and have the lien be transferred to the estate under § 510(c)(2).  To the contrary, the debtor has taken the opposite side, and has also asserted the attorney-client privilege to try to prevent the government from learning the debtor's own understanding of the reason that the debtor granted a security interest in exchange for inadequate consideration in connection with the plan of reorganization in the debtor's prior bankruptcy case.

The Connecticut Bankruptcy Court gave no reason for its denial of the appointment of a Chapter 11 trustee or conversion to Chapter 7.

### 2.        Alternatively, A Chapter 11 Trustee Should Be Appointed

For the reasons set forth in part 1, *c*, above, it is necessary to have a disinterested trustee  be appointed as fiduciary for the estate.  Thus, assuming the Court concludes that, for some reason, conversion to Chapter 7 should not be granted, then it should reverse the Bankruptcy Court's denial of the appointment of Chapter 11 trustee.

## B.    THE CASH COLLATERAL/INTERIM FEES APPEAL

### 1.        The Bankruptcy Court Lacked Power to Transfer Part of the Administration of the Estate to Another District and that Aspect of the Transfer Order is Void; But if the Transfer of Cash Collateral Applications is Not Void, then the 7/19/02 Order's Grant of the Cash Collateral Application Must Be Vacated for Want of Jurisdiction

#### a.        Introduction – Ramifications; Parties' Positions

The transfer order of July 7, 2001, although discussing only the transfer of the adversary proceeding, concluded by directing that "adversary proceeding 98-5104, and any administrative expense or cash collateral applications associated with it, are hereby transferred" to Delaware.  If this transfer was valid in all respects, then it follows that the Connecticut Bankruptcy Court lost jurisdiction over cash collateral applications related to expenses associated with the adversary proceeding and, at least to that extent, the 7/19/02 Order must be vacated.[31/]

In fact, however, the United States maintains that, whatever the merits of the transfer of the adversary proceeding, the Bankruptcy Court lacked power to transfer part of the administration of the estate such as cash collateral applications or interim fee applications.  And, for that reason (and others), the Connecticut Bankruptcy Court erred in concluding that the Delaware Bankruptcy Court's 3/4/02 order granting the debtor's motion to intervene barred the government's objection to the cash collateral application or later fee application in Connecticut on the ground that it was improper to use estate funds to litigate against the interests of the estate.  While the Delaware

---

[31/] The impact of vacating in part (insofar as it pertains to the Delaware adversary proceeding) the grant of the stipulated cash collateral application on the Delaware Bankruptcy Court's subsequent approval of interim fees for debtor's counsel incurred in the Delaware adversary proceeding is a matter that would then have to be addressed by the Delaware District Court in the appeal pending before that Court.

Bankruptcy Court certainly had jurisdiction over the government's adversary complaint and thus jurisdiction to permit intervention by the debtor, the government maintains that it lacked jurisdiction to adjudicate a § 363 application to use estate assets (whether or not anyone's "collateral") that were in the exclusive jurisdiction of the Connecticut Bankruptcy Court under 28 U.S.C. § 1334(e). If we are correct, it follows that, assuming the 3/4/02 order granting intervention did implicitly adjudicate the appropriateness of using estate funds to pay debtor's counsel to support the secured claim of the junior note holders, any such ruling was void and should not have been accorded preclusive force when the issue arose in Connecticut. *See* part B-2 *infra*.

The debtor has been two-faced in its approach to this issue. On the one hand, it has argued that the transfer order "did not transfer cash collateral matters" to Delaware despite its explicit language to that effect, while arguing that judicial and estate economy, certainty, uniformity, and the protection of the note holders all dictate that only one court -- the Connecticut Bankruptcy Court -- hear all matters relating to cash collateral. (Del.DI# 90.) In this regard, debtor is correct: § 363(b)(1) provides that the trustee (which includes a debtor in possession under § 1107), "after notice and hearing, may use . . . other than in the ordinary course of business property of the estate." Such notice and hearing is required regardless of whether any creditors have security interests in the property. Section 363(c)(2) adds that if the property is cash collateral for a creditor's secured claim, such use requires the lienholder's consent and otherwise is restricted -- hence the Indenture Trustee's signature on the stipulated application to use cash collateral.

But, although debtor has argued that cash collateral issues should be in a "uniform forum at which all parties can be heard" (Del.DI# 90), it nevertheless argued that fee applications were properly transferred to Delaware because they are part of the adversary proceeding. In fact, under the Code and rules, fee applications are filed in the main case and, like applications to use property of the estate outside the ordinary course of business, they require notice to all parties in interest in the case -- not just plaintiffs or defendants in an adversary proceeding. *See* 11 U.S.C. §§ 330(a);

331; Fed.R.Bankr.P. 2002(a)(6) and 2016. Fee applications are not listed in the rule governing adversary proceedings. Fed.R.Bankr.P. 7001. Additionally, a final fee application would have to include all services throughout the case, including but not limited to those in every adversary proceeding. 11 U.S.C. § 330(a)(5).

Examination of the jurisdictional and venue statutes and their legislative history confirms that 28 U.S.C. § 1412's authority to transfer a "proceeding" refers to "civil proceedings" arising in or related to the case, within the meaning of 28 U.S.C. § 1334(b), but does not authorize transfer of matters of estate administration, such as cash collateral applications or applications for compensation.

### b.    *Construction of Current Statutory Provisions*

Section 1412 of the Judicial Codes cannot be construed in a vacuum and requires reference to the jurisdiction statute regarding bankruptcy cases and proceedings. Subsection (a) of 28 U.S.C. § 1334 provides that, except as provided in subsection (b), the district courts "shall have original and exclusive jurisdiction of all cases under title 11." Subsection (b) gives the district courts "original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11." Subsection (e) further provides that the district court "in which a case under title 11 is commenced or is pending shall have exclusive jurisdiction of all property . . . of the estate" (and a bankruptcy *case* is, for the most part, an *in rem* proceeding). The Connecticut Bankruptcy Court thus has "exclusive" jurisdiction over the Chapter 11 "case" (§ 1334(a)) and "exclusive" *in rem* jurisdiction over the proceeds of the sale of the debtor's assets (§ 1334(e)). It ought to follow that only that Court can determine appropriate compensation for the estate's counsel and/or order the release of funds to pay it. *Cf. In re Indian Motocycle Co.* 261 B.R. 800, 807-08 (1st Cir. BAP 2001) (determination of tax incurred as part of estate administration was within Massachusetts bankruptcy court's exclusive jurisdiction over the "case" under § 1334(a) and its exclusive *in rem* jurisdiction under § 1334(e), and could not be ceded to

federal district court in Colorado).[32/]   As observed in *Indian Motocycle*, "Congress's intent that

only one court should have jurisdiction over matters concerning the administration of the

bankruptcy estate is evidenced by the addition of 28 U.S.C. § 1334(e) which specifies that the

court in which a bankruptcy case is filed 'has exclusive jurisdiction of the property, wherever

located, of the debtor as of the commencement of such case, and of property of the estate.'  28

U.S.C. § 1334(e)."  261 B.R. at 808.  *See also Isaacs v. Hobbs Tie & T. Co.*, 282 U.S. 734, 739

(1931) (stating, in ruling that a bankruptcy trustee could waive the bankruptcy court's exclusive *in

rem* jurisdiction, that "a court of bankruptcy itself is powerless to surrender its control of the

administration of the estate").

        The venue transfer statute pertaining to bankruptcy cases, 28 U.S.C. § 1412, permits the

transfer of "a case or proceeding" under title 11 "in the interest of justice or for the convenience of

the parties."  The United States maintains that "proceedings" refers to "civil proceedings" of the

kind that are within the "original but not exclusive" jurisdiction of the district courts under 28

U.S.C. § 1334(b).  And, authorizations to use property of the estate under § 363, as well as

applications for compensation under Bankruptcy Code §§ 330 and 331 are administrative matters

and not "civil proceedings" subject to transfer, particularly before any "contested matter" in

respect to an application is commenced under Fed.R.Bankr.P. 9014.

        If "proceedings" in § 1334(b) was interpreted so broadly as to cover such inherently

administrative matters as compensation for trustees and professionals employed by the trustee (or

debtor in possession), then there would be nothing whatsoever that would be within the

"exclusive" jurisdiction of § 1334(a).  Every conceivable matter could come within the concurrent

---

    32/ Although 28 U.S.C. § 1412 was not expressly cited by the BAP in *Indian Motocycle*, the reasoning
of the case -- that the administration expense determination was part of the "case" under § 1334(a)'s
exclusive jurisdiction -- would have prevented a venue transfer under § 1412.  On remand, a § 1412
venue-transfer motion was indeed presented and the bankruptcy court, after denying transfer of the entire
case, also denied a transfer of just the § 505(b) determination of the administrative tax, observing that
such a transfer would be inconsistent with the reasoning of the BAP decision.  *In re Indian Motocycle
Co.*, 266 B.R. 243, 267 (Bankr. Mass. 2001), *aff'd* 288 B.R. 617 (D.Mass. 2003).

jurisdiction of a State court as well as a federal non-bankruptcy tribunal. It is clear from the statute that "proceedings" under the "not exclusive" jurisdiction of district courts under 28 U.S.C. § 1334(b) may be heard by State courts. Indeed, subsection (c) of § 1334 permits the bankruptcy tribunal to abstain, "in the interest of comity with State courts or respect to State law, from hearing a particular proceeding arising under title 11 or arising in or related to a case under title 11." Surely, there must be something that falls under § 1334(a)'s language vesting the bankruptcy tribunal with "exclusive" jurisdiction over the "case."[33]

The cash collateral application in this case was really just a notice and opportunity for hearing on a request to use property of the estate out of the ordinary course of business under § 363(b)(1). To the extent the property was "cash collateral" subject to the additional restrictions of § 363(c)(2), the allegedly secured party had already stipulated to the proposal so that it was not contested. Nor was any "adequate protection" under § 361 and § 363(e) genuinely involved since the debtor was not generating new assets that could serve as "replacement" collateral and the security interest, if valid, already encumbered the fully liquidated (cash) estate. This is presumably why the stipulated application was not denominated as a "motion" commencing a contested matter under Bankruptcy Rule 9014.[34] Regardless of whether collateral is involved, however, the use of property outside the ordinary course of business requires "notice and hearing" under § 363(b)(1). Bankruptcy Rule 2002(a)(2) mandates that notice of the hearing on such a proposal must be given to all creditors – not just those who are parties to some adversary proceeding.

---

[33] We use the phrase "bankruptcy tribunal" because under 28 U.S.C. § 157, bankruptcy cases and proceedings therein "may" be referred to bankruptcy judges (together comprising "units" of the district court under 28 U.S.C. § 151) or may be presided over directly by district judges. *See also* 28 U.S.C. § 157(d).

[34] Rule 9014(a) provides that a contested matter is by motion where not otherwise provided for by the rules. For a proposal to use property out of the ordinary course of business there is no contested matter unless a party in interest files an objection and it is the objection that commences the contested matter. Similarly, § 102 defines the phrase "after notice and hearing" as requiring only notice and an *opportunity* for a hearing, which may be cancelled if no objection is filed. Even where a replacement lien on property not already encumbered is to be granted as part of an agreement to use cash collateral, it is the objection that commences the contested matter, as confirmed by Fed.R.Bankr.P. 4001(d)(2).

It is implicit in § 363(b)(1) and Rule 2002(a)(2), moreover, that the hearing will take place at the court where the bankruptcy case is pending, and not in some other district to which an adversary proceeding may have been transferred.  Moreover, if all property of the estate is within the "exclusive" *in rem* jurisdiction of the court presiding over the "case" under 28 U.S.C. § 1334(e), it simply does not make sense to hold that another court can authorize the use of that property.

Similarly, applications for compensation under § 330 or for interim compensation under § 331, explicitly constituting *administration* expense claims under § 503(b)(2), are fundamentally part of estate administration.  They are part of the "case" within § 1334(a)'s "exclusive" jurisdiction."  Trying to carve out portions of the compensation claimed by a trustee's or debtor's counsel, and have them be determined by each court in which the trustee or debtor appears, would engender serious problems, some of which are already surfacing in this case.  For example, the certificate of service to the Akin Gump application in Delaware reveals that it recognized the need to serve all creditors as required by Bankruptcy Rule 2002(a)(6), and yet most of the creditors are not parties to the Delaware adversary proceeding.  *See also* Fed.R.Bankr.P. 2016.  Nor did creditors have notice and an opportunity to object to any proposed transfer of future fee applications to Delaware.

Even more problematic, final applications for compensation are supposed to cover all work in a case and are supposed to take account of prior interim awards.  11 U.S.C. § 330(a)(5).  So by having interim compensation applications be filed simultaneously in two courts (as occurred here), a single "proceeding" under § 330 has been divided up and only part of that proceeding transferred.  As a related point, interim awards are subject to adjustment at the time of a final fee application.  At that time, the Court may take account of the actual result and "reduce or even disallow the requested amount of compensation when no real benefit is conferred upon the debtor's estate."  COLLIER ON BANKRUPTCY ¶ 330.03[3].  Thus, "fees are subject to reevaluation when benefit to the estate is uncertain."  *Id*. (citing *In re Ward*, 894 F.2d 771 (5th Cir. 1990).  One may

question what is contemplated here -- two separate "final" applications in different courts, without regard for the amount to be awarded by the other court?  Or will the Connecticut Bankruptcy Court be asked to review the Delaware Bankruptcy Court's interim awards?[35]  The Connecticut Bankruptcy Court has provided no guidance in this regard, apparently because it did not think of the problem when it suddenly added future cash collateral and fee applications at the end of its transfer order, without explanation, without notice, and without asking for the parties' views on that issue.[36]

Yet another problem arises as to which region of the United States Trustee's office is supposed to be monitoring the interim applications filed in this Court.  Bankruptcy Code § 307 provides that "*The* United States trustee may  . . . be heard on any issue in any case or proceeding under this title."  The definite article suggests that one United States Trustee (through his or her assistants or other staff members) is responsible for each case.  Bankruptcy Code § 330(a)(2) suggests that the United States Trustee "for the District or Region" has a particularly important role in monitoring fee applications.  Section § 586(a)(3)(A)(i) of the Judicial Code provides that the United States Trustee "within the region for which such United States trustee is appointed, shall" supervise the administration of the estate by, among other things, "reviewing . . . applications filed for compensation and reimbursement under section 330" of the Bankruptcy Code.  If § 586 of the Judicial Code is read literally, it means that the U.S. Trustee for the region including Delaware

---

35/ Judge Walsh, in overruling the government's jurisdictional objection to the application of debtor's counsel for fees for services in the adversary proceeding, stated that it "makes sense" to have the court hearing the adversary proceeding determine the appropriate compensation related thereto because it has a "better informed basis" to judge counsel's services.  (Del.DI# 160 at p.89.)   Under that view, however, one could argue that when a trustee brings suit or is sued n a State court, the bankruptcy court should let the State court judge determine the fees to paid to the trustee's counsel.  More importantly, the court hearing a discrete dispute may know how hard the attorneys worked in the proceeding but may not have the best vantage point from which to determine what impact the particular suit had on the entire administration of the case -- *i.e.* how necessary it was or what benefit it produced, or whether the same benefit might have be produced in a completely different, and more efficient way.

36/ The order to show cause that preceded the transfer order directed the parties to address only whether to transfer the adversary proceeding or the whole case.

should have reviewed the application in Delaware.  Yet only the U.S. Trustee's office in New

Haven, Connecticut was served with that application.[37]

A related procedural problem is that requests to use property as well as fee applications are

supposed to be docketed and heard in the "case" and not in an adversary proceeding under Rule

7001, which makes no reference to such matters.

The split of jurisdiction over administration of the estate also causes issues to arise over

proper application of "law of the case" principles in light of the inability of the government to

appeal one court's ruling in another district.  What has happened is that the United States has been

whipsawed by the debtor and the Indenture Trustee between the two courts handling aspects of an

indivisible issue, and it is suffering Alice-in-Wonderland-like results.  For example, before

transferring the adversary proceeding, the Connecticut Bankruptcy Court indicated that it would

not permit the debtor to intervene under Fed.R.Civ.P. 24(a)(1).  In granting intervention, the

Delaware Bankruptcy Court noted that the Connecticut Bankruptcy Court had declined to rule on

the government's long-pending motion to convert the Chapter 11 case to a Chapter 7 proceeding --

as if that court's simply declining to hear the motion to convert the case somehow undermined the

government's opposition to having the debtor intervene.  *United States v. State St. Bank and Trust*

*Co.*, 2002 WL 417013 at *3 n.6.  At the May 1, 2002 hearing in Connecticut, Judge Shiff

acknowledged the fact that deferral of the government's motion to convert  may have impacted the

course of events in the Delaware adversary proceeding with respect to the motion to intervene.

(DI# 367 at p.73.)  Next, the Connecticut Bankruptcy Court ruled that, although it had issued an

order transferring decisions regarding administrative expenses and cash collateral applications

relating to the adversary proceeding to the Delaware Bankruptcy Court, it could nevertheless still

decide a cash collateral application related to litigation expenses in the Delaware adversary

---

[37] Additionally, counsel for the United States has been told by the Executive Office of the United States Trustees that United States Trustees generally avoid involving themselves with adversary proceedings.

proceeding. And then it held that all of the government's objections to the cash collateral application were precluded by the law of the case because of the Delaware Bankruptcy Court's 3/4/02 order granting the debtor's motion to intervene, even though that order contained no mention of § 330 or compensation. Worse yet, although difficult to be sure, the Connecticut Bankruptcy Court appears to have rejected the government's arguments for conversion or the appointment of a Chapter 11 trustee on the premise that Judge Walsh's supposed ruling that debtor's counsel would be paid for its services in the adversary proceeding also implies a ruling that no trustee is required.[38/] The United States submits that the exclusivity language in subsections (a) and (e) of § 1334 was designed to prevent precisely the kind of confusion that has arisen here.

At a minimum, before a bankruptcy court may transfer any administrative matter such as an application to use property outside the ordinary course of business or for compensation of professionals, there must be an existing contested matter – *i.e.*, a pending objection or at the very least a pending application. Transfer of a hypothetical future "proceeding" under 28 U.S.C. § 1412 that might later arise is simply not within the purview of the venue transfer statute in view of 28 U.S.C. § 1334(a)'s vesting of exclusive jurisdiction over the "case" in one court. In this regard, something that is not pending cannot be a "civil proceeding." This limitation is also supported by the statutory provisions governing venue in the first instance. With exceptions not applicable here, 28 U.S.C. § 1409(a) provides that "a proceeding arising under title 11 or arising in or related to a case under title 11 may be commenced in the district court in which such case is pending." What Judge Shiff attempted to do was amend the statutes governing where "proceedings arising under title 11" are commenced in the first instance.

---

[38/] At the 12/12/02 hearing in the Delaware Bankruptcy Court, Judge Walsh first wanted to know how Judge Shiff had ruled on a companion Application for compensation for services outside the adversary proceeding (which were nonetheless partly in aid of upholding the secured claim of the junior note holders). It is difficult to tell whether this influenced Judge Walsh's allowance of the Application in Delaware.

The Bankruptcy Rules also support the government's position. Rule 1014 governs the transfer of venue for a bankruptcy case, whereas Rule 7087 governs transfer of venue for an adversary proceeding. Rule 7087 provides that the court may transfer an adversary proceeding "or any part thereof" (*e.g.*, one count of a two-count complaint). But Rule 1014 refers to the transfer of "a case" without providing for the transfer of any "part of a case." This suggests that the drafters of the rules did not even think that it was appropriate to transfer a dispute that did not qualify as a separate adversary proceeding.[39/]

> ### c.    *Pre-1984 Legislative History*

At the hearing on the Delaware fees application Judge Walsh opined that the word "proceeding" in 28 U.S.C. § 1412 has a broad meaning and encompasses administration matters, and referred to the following passage from Senate Report 95-989 in 1978:

> . . . . The term "proceeding" is used instead of "matters and proceedings," the terminology currently used in the Bankruptcy Act and Rules. As used in this section everything that occurs in a bankruptcy case is a proceeding. Thus, proceeding here is used in its broadest sense, and would encompass what are not called contested matters, adversary proceedings, and plenary actions under current bankruptcy law. It also includes and [sic] disputes related to administrative matters in a bankruptcy case.

S.Rep. 95-989, 95th Cong., 2d Sess., at 153-54. While this Court is not reviewing Judge Walsh's ruling, we have included this because the debtor and its counsel are sure to point to the same passage and to Judge Walsh's ruling as persuasive authority on the issue, which is relevant both to

---

[39/] In addition, Rule 1014 requires a "motion of a party in interest." While this may seem, at first blush, to be overly formalistic, the history of the rule and Advisory Committee Notes reveal that it was intended precisely to preclude transfers not sought by a party in interest. As the Advisory Committee Note to Rule 1014(a) indicates, it was derived from former Bankruptcy Rule 116(b). That Rule contained a sentence stating that "[t]he transfer may be ordered at or before the first meeting of creditors either on the court's own initiative or on motion of a party in interest but thereafter only on a timely motion." With the promulgation of new Rule 1014(a), the provision authorizing the court to act on its own initiative for a limited time was removed. Thus, the Advisory Committee Note explains that the rule "protects the parties against being subjected to a transfer except on a timely motion of a party in interest." Indeed, the government had no warning, prior to the Transfer Order, that the Connecticut Bankruptcy Court was even considering transferring fee applications, and no chance to object in that court. Its show-cause order asked the parties to indicate their positions on transferring the adversary proceeding, or transferring the entire case, but not on transferring part of the case. Also, since that order to show case was issued only in the adversary proceeding, other creditors did not even receive notice.

whether Judge Shiff had jurisdiction to grant the cash collateral application and to whether it was error to conclude that the Delaware order granting debtor's motion to intervene somehow also determined the appropriateness of an administrative expense claim for debtor's counsel. Before addressing why this legislative history, on closer scrutiny, does not support the proposition that it is permissible to transfer portions of estate administration to another district, we note that Judge Walsh's first impression of this issue (before finding the above passage in the legislative history) was to agree with the government. Thus, as set forth in the statement of facts above, at a hearing on September 12, 2003, Judge Walsh stated: "I don't think it is proper for this Court to decide what an appropriate administrative claim is in a Chapter 11 case which is not before me[;] that's for the Bankruptcy Court in Connecticut."  (Del.DI# 114 at p.37.)

There are two broad reasons why reliance on the above passage of the Senate Report to conclude that cash collateral or interim fee applications for only a portion of the services of a professional can be transferred to another district is misplaced. First, the above passage is discussing a proposed jurisdiction provision covering three kinds of proceedings, and a closer look at the actual competing House and Senate bills, their legislative history, and the language of the original venue transfer provision in 1978 (since modified) confirms, as demonstrated fully below, that the venue transfer authority was limited to only two of the three kinds of proceedings listed in the jurisdictional statute. Section 330 applications are in the one category not embraced by the 1978 venue transfer provision. Second, the primary focus of this passage was to explain that bankruptcy courts could decide every conceivable type of "civil proceeding," including civil proceedings "*related to* administrative matters" (quoting the Senate Report, emphasis added), such as a trustee's suit against a third party to enforce a postpetition (*i.e.*, administrative) contract or sue for breach thereof, grounded upon State law. But to construe "civil proceedings" to embrace pure administrative matters that can exist only as part of a bankruptcy case, such as a § 330 application, would render the bankruptcy court's "exclusive jurisdiction over the case" (28 U.S.C. § 1334(a))

47

meaningless, as also demonstrated below.

Before one can make sense of the legislative history regarding present-day 28 U.S.C. §§ 1334 and 1412, both enacted in 1984, it is necessary to understand their statutory derivation.[40/] Prior to 1978, 28 U.S.C. § 1334 provided simply that "[t]he district courts shall have, exclusive of the courts of the States, jurisdiction of all matters and proceedings in bankruptcy." The only venue transfer provision was in title 11 -- 11 U.S.C. § 55 -- reflecting § 32 of the Bankruptcy Act of 1898, and it provided only for transfer of the entire "case." Civil actions related to bankruptcy cases were often brought (by or against trustees, receivers, or debtors) in other courts and, if brought in federal district courts, could be transferred pursuant to 28 U.S.C. § 1404.

With the enactment of the modern Bankruptcy Code in 1978, old 28 U.S.C. § 1334 was repealed and the jurisdictional provisions placed in 28 U.S.C. § 1471 -- the forerunner of present 28 U.S.C. § 1334. The 1978 Act's original venue transfer provision was 28 U.S.C. § 1475 -- the forerunner of present 28 U.S.C. § 1412. The original jurisdiction and venue provisions trace to the House Bill, H. 8200, rather than to the Senate Bill, S.2266.

The above passage that Judge Walsh quoted pertains to § 216 of the Senate bill, S.2266, which, if enacted, would have amended 28 U.S.C. § 1334 -- the pre-1978 jurisdiction provision. Instead, § 241 of the House bill, with minor modification made in conference, *repealed* 28 U.S.C. § 1334, and § 243 of the bill enacted a new jurisdiction and venue chapter of the Judicial Code -- Chapter 90 -- beginning with § 1471. Section 1471(a) and (b) as proposed by the House were almost the same as amended § 1334(a) and (b) as proposed by the Senate, except that in the House bill jurisdiction was conferred directly on the "bankruptcy courts." Subsection (a) of 28 U.S.C. § 1471 as proposed in H.R.8200 gave the bankruptcy courts exclusive jurisdiction of all "cases under title 11" and § 1471(b) gave them "original but not exclusive jurisdiction of all civil

---

[40/] This portion of this brief is admittedly extensive. The reason is that we have not been able to find any reported court decision adequately analyzing the legislative history of the jurisdiction and venue transfer provisions and their interrelationship. The treatment is often superficial and, as a result, often inaccurate.

proceedings arising under title 11 or arising under or related to cases under title 11." The House Report contains a passage describing new 28 U.S.C. § 1471(b) that is virtually identical to the one from the Senate report regarding proposed § 1334(b), so the debtor will no doubt argue that the House, too, wanted "proceedings" to have the broadest meaning. *See* H.Rep. No. 95-595, 95th Cong., 1st Sess. at 445.

But it is clear that both the House and Senate were unwilling to provide as wide a scope for venue transfer. First, the Senate bill did not contain any venue transfer provision whatsoever. Had S.2266 been enacted, the only applicable venue transfer authority would have been 28 U.S.C. § 1404, which would have enabled the transfer of any "civil action" arising under or related to a bankruptcy case, but only to a district "where it might have been brought" in the first place. *See Hoffman v. Blasky*, 363 U.S. 335 (1960) (holding that there is no power to transfer venue to a district in which the suit could not have been brought). The original venue provisions of the bill did provide a choice of venue for certain civil proceedings arising under or related to a case under title 11, but not proceedings arising under title 11 itself. Clearly, therefore, if the Senate bill had become the law, administrative matters, such as applications for compensation could not have been transferable pursuant to § 1404.

More importantly, the House bill, which in this area (jurisdiction and venue) was ultimately enacted with immaterial modification, did contain a venue transfer provision, 28 U.S.C. § 1475 (the forerunner of present § 1412). That provision, as proposed and as finally enacted, referred only to two of the three kinds of proceedings in § 1471(b) (the forerunner of present § 1334(b)). Section 1471(b) as proposed referred to "*all civil proceedings arising under title 11 or arising under or related to cases under title 11*" -- language identical to the Senate's proposed § 1334(b). In contrast, the venue transfer provision in H.R. 8200 embraced only part of the universe of proceedings referred to in the jurisdictional statute, as revealed by the phrase we have italicized in the following reproduction of the proposed provision:

49

§ 1475  Change of Venue
    A bankruptcy court may transfer a case under title 11 or a *proceeding arising under or related to such a case* to a bankruptcy court for another district, in the interest of justice and for the convenience of the parties.

The plain language thus confirms that proceedings "arising under or related to cases under title 11" could be transferred, but proceedings "arising under title 11" itself (the third category of proceedings identified in proposed § 1471(b)) could not be transferred.  Moreover, both the House and Senate Reports make it abundantly clear that the phraseology in proposed § 1471(b) (the forerunner of present § 1334(b)) was not considered redundant and that there were indeed "three bases" for jurisdiction.  The Senate Report is particularly informative in this regard:

    The phrase "arising under title 11" will enable the bankruptcy court to hear *any matter under which a claim is made under a provision of title 11*.  The combination of the three bases for jurisdiction, "arising under title 11," "arising under a case under title 11,"  and "related to a case under title 11," will leave no doubt as to the scope of the jurisdiction over disputes to be exercised by the bankruptcy court.

S.Rep. 95-989 at 154 (italics added).  The House Report similarly states that "arising under title 11" refers to "any matter under which a claim is made under a provision of title 11," and adds, as examples, claims created by 11 U.S.C. § 522 (exemptions) and § 525 (anti-discrimination rules)," among others.  H.Rep. 95-595 at 445.  Thus, proceedings to adjudicate rights *created* exclusively by title 11 (including compensation under § 330 of professionals hired under § 327, as well as hearings on proposals under § 363 to use property of the estate out of the ordinary course of business) could not be transferred because such proceedings "arise under title 11" only.  They do not arise under nonbankruptcy law "under or related to a case under title 11" (the wording of the 1978 venue provision, § 1475).

In the House-Senate conference, the second use of the word "under" in proposed 28 U.S.C.§ 1471(b) was replaced with the word "in."  Thus, § 1471(b) as enacted gave the district courts "not exclusive" jurisdiction of "all civil proceedings arising under title 11 or arising *in* or related to case under title 11."  28 U.S.C. § 1471(b) (1978) (italics added).  The change from "under" to "in" in § 1471(b) is nowhere explained and cannot be considered material.  The bottom

line is that § 1475, as enacted, was still limited to transfers of the whole "case under title 11" or a "proceeding arising under or related to such a case" founded on a nonbankruptcy cause of action. It did not embrace the transfer of a "proceeding arising under title 11" -- *i.e.*, a dispute involving a cause of action or administrative procedural requirement *created* by title 11. Furthermore, in describing proposed 28 U.S.C. § 1473 -- the original venue provision governing the commencement (as opposed to the transfer) of "proceedings arising under title 11 or under or related to a case under title 11," H.Rep. 95-595 observes (at 446, italics added):

> Though these venue provisions are phrased in broad terms, *with respect to administrative matters in a case they generally will not apply.* The bankruptcy court in which the case is filed will hear those matters.

Clearly a motion under § 363 for permission to use estate property (in the court's exclusive *in rem* jurisdiction under present 28 U.S.C. § 1334(e)), outside the ordinary course of business, is a proceeding "arising under title 11" itself. Similarly, an application under § 330 and/or § 331 for compensation, filed by a professional retained by the trustee or debtor in possession pursuant to § 327, is most fundamentally a matter "arising under title 11" directly, and *only* under title 11. In contrast, a prepetition claim objection proceeding, although in some sense also arising under title 11 (since § 502 provides for filing prepetition claims and mentions the possibility of objections), concerns a dispute that just as well could have arisen in another court, but for the fact that a bankruptcy petition was filed, and nonbankruptcy law will ultimately govern the resolution of that dispute. Hence, a claim objection proceeding is a proceeding "arising under [or 'in'] a case under title 11" that would have been subject to venue transfer under old § 1475.[41/]

---

[41/] The House Report points out that some claims may be considered both to arise directly under title 11 and to arise under or related to a case under title 11. But that ambiguity in the legislative history cannot be relied upon to render several of the words of the statute entirely superfluous by treating *everything* "arising under title 11" as also "arising under or related to a case under title 11." It is well established that "no construction should be adopted which would render statutory words or phrases meaningless, redundant or superfluous." *Lopez-Soto v. Hawayek*, 175 F.3d 170, 173 (1st Cir. 1999); *accord Kawaauhau v. Geiger*, 523 U.S. 57, 62 (1998) (refusing to read one provision of the Bankruptcy Code to render another superfluous); *In re Cohn*, 54 F.3d 1108, 1115 (3d Cir.1995) ("courts are obliged to give effect, if possible, to every word Congress used").

The second broad reason why the 1978 legislative history should not be read to make administrative matters transferable is that it would both render the "exclusive" jurisdiction over the "case" meaningless, and would also mean that state courts could hear matters fundamental to the administration of a bankruptcy estate.  In that regard, the passage from the 1978 Senate Report quoted by Judge Walsh was written primarily to confirm that bankruptcy courts would have the broadest scope of jurisdiction.  Indeed, the paragraph of the Senate Report immediately preceding the passage Judge Walsh quoted emphasizes that

> [t]his broad grant of jurisdiction will enable the bankruptcy courts, which are created as adjuncts of the district court for the purpose of exercising the jurisdiction, to dispose of controversies that arise in bankruptcy case or under the bankruptcy code.  Actions that formerly had to be tried in the State court, or in the Federal district court, at great cost and delay to the estate, may not be tried in the bankruptcy court. . . .  The adjunct bankruptcy courts . . . may handle everything that arises in a bankruptcy case.

S.Rep. 95-989 at 153.

The sentence from the 1978 Senate and House reports that indicates that "proceedings" described in 28 U.S.C. § 1471(b), the language of which is now in § 1334(b), include "disputes *related to* administrative matters in a bankruptcy case" does not necessarily mean that disputes that *are* administrative matters would be within the concurrent jurisdiction of bankruptcy and nonbankruptcy (including State) courts.  For example, a suit by a trustee to recover a postpetition contract receivable would plainly be "related to" an administrative matter because the cause of action arose postpetition and because the resolution of the claim held by the trustee would essentially be part of the liquidation of property of the estate (a claim being a form of personal property).  But a postpetition contract claim of the estate would be an ordinary "civil proceeding" arising under nonbankruptcy law.  Indeed, the venue provisions for commencing proceedings indicate that such claims, in some circumstances, must be brought (in the first instance, without any transfers) in the venue where such a claim could be brought by the debtor if it had not filed for bankruptcy.  28 U.S.C. § 1409(d).  Similarly, postpetition contract claims against the trustee or

debtor in possession may be brought in the district where they could have been brought under nonbankruptcy law. 28 U.S.C. § 1409(e). Surely this does not mean that a professional hired by the trustee under § 327, could apply to a court for compensation under § 330 in the district where that professional lives, simply because a corporate debtor could also have been sued there under nonbankruptcy law. To the contrary, § 1409(d) and (e), like § 1334(b), are referring to "civil proceedings," and are not referring to "applications" for compensation by professionals under § 330 and Rule 2016.

On the other hand, the Senate Report's language that "everything that occurs in a bankruptcy case is a proceeding" within the meaning of Code § 1334(b) as originally proposed by the Senate must be treated as an inaccurate overstatement since, if that were true, then nothing would be left within the "exclusive" jurisdiction of a bankruptcy court under § 1334(a). And, since the jurisdiction in § 1334(b) is explicitly "not exclusive," that would mean that State courts could adjudicate "everything that occurs in a bankruptcy case." The notion that a State court might be permitted to determine the allowability of a claim for compensation by professionals hired by the trustee is preposterous – even if the trustee is a party in a State court action.

### d.    The 1984 Amendments

In 1984, the jurisdictional provisions were revamped in the wake of the Supreme Court's decision in *Northern Pipeline*. Chapter 90 of the Judicial Code (containing § 1471 through 1481) was repealed. Sections 1471(a) and (b), however, were reenacted verbatim as new § 1334(a) and (b). Section 1471(c), which delegated the judicial power to bankruptcy judges, was jettisoned as unconstitutional and replaced with § 1334(c), which permits abstention, *inter alia*, "in the interests of comity with State courts" and mandates abstention from proceedings based on State-law claims. (This mandatory abstention would include proceedings "related to administrative matters," as meant in the 1978 Senate Report, if those proceedings are based on state-law claims. Indeed, it would include an objection to a claim under § 502 if the issue is one of state law.)

Section 1471(e) became § 1334(e) with the following changes:  "The  district court in

which a case under title 11 is commenced or is pending shall have exclusive jurisdiction of all of

the property, wherever located, of the debtor as of the commencement of such case, and of

property of the estate."  This means that the exclusive *in rem* jurisdiction covers proceeds, profit,

earnings, interest, and any other property that comes into the estate after the petition date.  *See* 11

U.S.C. § 541(a)(3), (6), (7).

At the same time, § 1475 -- the venue transfer provision -- was reenacted in slightly

different language in new § 1412 of title 28.  It substituted "district court" in place of "bankruptcy

court" and was made more concise -- permitting transfer of "a case or proceeding under title 11,"

instead of "a case under title 11 or a proceeding arising under or related to such case."  The

legislative history to this 1984 change explains that the new language, initially proposed as an

amendment to § 1475 and then recodified as § 1412, was considered "*virtually identical to the*

*corresponding provision of the 1978 Act*, except for a reference to the district courts rather than the

bankruptcy courts."[42]  Accordingly, no legislative intent to expand what could be transferred may

be ascribed to the change.

In fact, a number of courts have reached the opposite view and have assumed that the

replacement of the phrase "proceedings arising under or related to a case under title 11" in old

§ 1475 with the phrase "proceeding under title 11" in new § 1412 narrowed the scope of what may

be transferred, only to "core" proceedings, and they read "core" proceedings synonymously with

proceedings "arising under title 11."  Thus, these courts assume that proceedings "related to" a

case under title 11 fall outside § 1412 and may only be transferred under § 1404 (which limits

transfer to a place that the action could have been brought in the first instance).  *E.g. Rumore v.*

---

[42]/ S.Rep. 98-55, 98th Cong., 1st Sess., at 43 (italics added).  The Senate bill at the time of this report had proposed the language as an amendment to § 1475.  The House bill proposed no change to the venue transfer statute.  H.Rep. 98-9, 98th Cong., 1st Sess., at 81.  The Conference Report reflects that the final compromise bill put the same language proposed to amend § 1475 under the Senate bill instead into new § 1412.  H.R.Conf.Rep. 98-882, 98th Cong., 2d Sess. at 4.

*Wamstad*, 2001 WL 1426680 at *2 (E.D.La. 2001), and cases cited therein.   These cases are

seriously deficient in almost every aspect of their analyses.  First, they fail to note the absence of

the word "arising" in § 1412, and, without that word, there is no reason to limit the statute to

causes of action created by title 11 exclusively.[43]   Second, these cases completely overlook the

1984 legislative history indicating that no substantive change was intended -- Congress was just

trying to be more concise.  Third, "core" proceedings listed in 28 U.S.C. § 157(b)(2) plainly

encompass much more than proceedings that "arise under title 11" -- *i.e.*, causes of action created

thereby.[44]   We submit that § 1412 should be read neither as narrowing nor expanding old § 1475.

Moreover, even if one were to assume that the 1984 amendments broadened what could be

transferred to include all three of the kinds of "proceedings" referred to in § 1334(b), that provision

is still limited to "*civil proceedings*" that "arise under title 11," or "arise in a case under title 11,"

or are "related to a case under title 11."  There still must be something left of the "exclusive"

jurisdiction in § 1334(a) and (e), and, therefore, pure administrative matters, such as compensation

of professionals and sales of property are not transferable except as part of a transfer of the entire

"case under title 11."  There is certainly no indication the Congress intended to vastly broaden what

could be transferred to include a category of disputes that were never previously transferable under

any bankruptcy statute.  The Supreme Court has repeatedly counseled that the Bankruptcy Code

should not be read "to effect a major change in pre-Code practice that is not the subject of at least

some discussion in the legislative history."  *Dewsnup v. Timm*, 502 U.S. 410, 419 (1992).  The

provisions of the Judicial Code regarding bankruptcy jurisdiction and venue ought to be subject to

_____

  43/ A proceeding may be under title 11 without "arising under" a provision of that title.  Literally every
adversary proceeding provided for by Rule 7001 is "under title 11."  Proceedings that "arise in a case
under title 11," which  the 1978 House and Senate Report both explicitly distinguish from proceedings
that "arise under title 11" (*i.e.*, causes of action created by that title) should still be viewed as
"proceedings under title 11," within the meaning of § 1412.

  44/ For example, § 157(b)(2)(C) makes counterclaims of the estate against a party who files a claim a
core proceeding.  But if that counterclaim arises strictly under state law, it is plainly not a proceeding
"arising under title 11" itself.

the same rule of construction.

To the extent the Court finds any ambiguity in the legislative history, it should not be used to override the express provisions of the statute, wherein only "proceedings" of the kind referred to in § 1334(b) -- *i.e.*, those that could potentially come within the concurrent jurisdiction of other courts -- may be transferred.  The whole "case" may also be transferred, but the administration of a "case" cannot be chopped up into pieces and strewn across multiple districts.  In this regard, it is not difficult to imagine adversary proceedings pending in multiple districts, particularly in large cases, such as *Enron* or *United Airlines*.  Clearly the compensation of counsel for the estate must be centralized.

> **2.**     **The Connecticut Bankruptcy Court Erred in Viewing the Delaware Bankruptcy Court's Grant of the Debtor's Motion to Intervene in the Adversary Proceeding as Disposing of Any Objection to the Use of Estate Funds to Compensate Debtor's Counsel for Legal Services in Defense of the Secured Claim of the Indenture Trustee**

In both the 7/19/02 Order's grant of the cash collateral application and the 12/23/02 Order's award of interim fees (and the bench ruling that preceded it), Judge Shiff ruled that the 3/4/02 order permitting the debtor to intervene in the Delaware adversary proceeding carried with it an implicit ruling that debtor's counsel could be paid from estate funds.  Thus, Judge Shiff held that the government was attempting to collaterally attack the intervention order, which he also stated was a "final" order, seeming to imply that the government waived its right to challenge the ruling by not having filed an appeal.  These rulings and assumptions are fraught with errors.

The first error is that the order granting intervention was a non-appealable interlocutory ruling, whether on the issue explicitly reached (intervention) or on the issue Judge Shiff believes was implicitly reached (compensability of the legal services to be performed).  A party may not appeal, of right, an order *granting* another party's motion to intervene in a lawsuit.  Nor could the United States appeal any implicit ruling on the allowability of a fee application not yet even filed. While the formal grant of an explicit motion for use of estate property outside the ordinary course

of business might well have been appealable, no such motion was filed or noticed under the rules and nor did the transfer order even purport to transfer such issues.  The transfer order only purported to tack on the transfer of "cash collateral" and "fee" applications to the transfer of the adversary complaint.[45/]

Since the Delaware Bankruptcy Court's 3/4/02 order was interlocutory, even assuming the grant of intervention did implicitly adjudicate the compensability of the services to be performed, the government is at liberty to collaterally attack the interlocutory order – at least on jurisdictional grounds that would render it void.  *See United States Fidelity & Guaranty Co. v. Bray*, 225 U.S. 205 (1912) (endorsing the court of appeals' determination to treat as void, and therefore ignore, a bankruptcy court's order surrendering its exclusive jurisdiction to a circuit trial court, out of which the appeal arose).  *See also Hoffman v. Blasky*, supra (affirming Seventh Circuit's grant of an extraordinary writ prohibiting district court in Illinois from hearing action transferred to it by district court in Texas, concluding that transfer was void for lack of statutory authority, notwithstanding Fifth Circuit's denial of writ prohibiting the venue transfer).  In this regard, while interlocutory rulings may tentatively bind parties (subject to eventual appeal), a party is free to argue that an order is jurisdictionally defective as long as the jurisdictional ruling against the party has not become final after exhaustion of appeals.  In fact, because of Judge Shiff's belief that Judge Walsh's determination to grant intervention implicitly ruled on compensability of the legal services to be performed, the government is expressly appealing the 3/4/02 order to the Delaware District Court, as part of its appeal of the Delaware Bankruptcy Court's 12/12/02 Order granting interim fees to debtor's counsel, to the extent the 3/4/02 order is indeed held to have contained such an implicit ruling.   Therefore, the 3/4/02 order has not become final (after the exhaustion of appeals)

---

45/ Cash collateral applications are not necessarily co-extensive with motions to use property outside the ordinary course of business, although the two issues are sometimes combined.  Absent permission, a cash collateral motion is required to use a secured creditor's collateral even *in* the ordinary course of business.  And, notice and hearing is required to use property of the estate outside the ordinary course of business whether or not the collateral of any secured creditor is involved.  *Compare* 11 U.S.C. § 363(b)(1) *with* § 363(c)(2).

and, accordingly, the government remains at liberty to argue before this Court that any aspect of that order is void for want of jurisdiction.

The second error made in treating the 3/4/02 intervention order as barring the government's objection to compensation for services in defense of the secured claim of the indenture trustee for the junior noteholders is that, as already extensively presented above, the Delaware Bankruptcy Court lacks jurisdiction to determine the compensability of the services performed by debtor's counsel.  *See* part B-1 above.

The third error is that it simply does not follow from the grant of intervention that debtor's counsel's services in the adversary proceeding are necessarily compensable.  As Judge Walsh ruled in granting intervention, § 1109 gives a Chapter 11 debtor an "unconditional statutory right to intervene" in any adversary proceeding, based on Third Circuit precedent.  An unconditional right to intervention, however, does not mean it is automatically appropriate to pay for the services with estate funds; stated otherwise, there is no "unconditional statutory right to compensation."  After all, the debtor was not compelled to intervene.  Moreover, its unconditional right to intervene says nothing of which side to intervene on.

The case law also reflects that there are many things that a debtor has standing and a right to do but for which its counsel may not look to the estate for compensation.  Defending objections to a discharge of an individual Chapter 11 debtor is one prime example.  *E.g., In re Robbins*, 151 B.R. 364, 366 (Bankr. W.D. Va. 1993); *In re Waxman*, 148 B.R. 178 (Bankr. E.D.N.Y. 1992).

In this regard, it is necessary to distinguish the debtor from the debtor in possession, as the Third Circuit explained in *In re Cybergenics Corp.*, 226 F.3d 237, 243-44 (3d Cir. 2000) (sale of debtor's assets with court approval did not transfer rights of debtor in possession, in role of trustee, to avoid fraudulent transfers under § 544(b)).  For example, if a Chapter 11 trustee is appointed under § 1104 in a case, the debtor continues to have the same rights under § 1109(a) that the Delaware Bankruptcy Court held give it an "unconditional right to intervene" in any adversary

58

proceeding.  But the litigation expense of a debtor *out of possession* is not automatically the expense of the estate, since the estate is supposed to be represented only by the trustee, as specified in § 323 and Bankruptcy Rule 6009.  Suppose a Chapter 11 trustee had been appointed by the Connecticut Bankruptcy Court in the instant Chapter 11 case.  The corporate debtor could continue to fight on the side of the junior note holders in the Delaware adversary proceeding, while the trustee could intervene on the side of the government.  In that instance, surely the court could not compensate two attorneys taking opposite sides (one for the trustee and one for the debtor), and find that both their positions had the potential to benefit the estate.  Thus, it is a *non-sequitur* to assume that, because a debtor may intervene in an adversary proceeding, its counsel will necessarily be entitled to compensation from the estate for the services rendered thereafter in that proceeding.

The debtor's counsel has previously emphasized that the 3/4/02 order granting debtor's motion to intervene in the Delaware adversary proceeding includes a statement to the effect that the debtor has a duty to defend the capital structure created in the prior bankruptcy case.  But any duty to defend a prior capital structure is the duty of the pre-petition corporation and not the duty of the *debtor in possession qua trustee* in a bankruptcy proceeding.  No provision of § 704 or §§ 1106 and 1107 refers to any duty to defend the prepetition debtor's capital structure.  Indeed, as demonstrated *infra* (part B-4), a number of the duties of a trustee often may conflict with any interest in defending a previous capital structure.[46]   It is also doubtful whether a corporation outside bankruptcy has a duty to expend hundreds of thousands of dollars to defend a lien it granted to another party, even though the corporation no longer has any pecuniary interest in the outcome.  And, as demonstrated in part B-4 *infra*, a bankruptcy trustee certainly has no duty to

---

[46] The United States does not argue that a corporation has no right to defend its "capital structure" -- *i.e.*, to argue that notes it issued are debt rather than equity.  We are simply arguing that doing so is not a necessary cost of bankruptcy administration within the meaning of § 330 where, as here, the debtor has ceased business and is naught but a liquidated fund to be distributed in accordance with Bankruptcy Code priorities.  Instead, claimants (or an indenture trustee on their behalf) should fend for themselves.

defend a creditor's claim against equitable subordination, regardless of whether the challenged claim was part of the prepetition debtor's capital structure.

### 3. It Was Error to Assume That the Estate's Funds Constitute "Collateral" for the Security Interest of the Indenture Trustee Where the Validity of That Security Interest Was under Litigation

In his bench ruling of December 3, 2004, Judge Shiff also held that the government was bound by the 1996 confirmation order's approval of the grant of the security interest in favor of the new junior notes and that, while that issue could be revisited in the adversary proceeding by the court in Delaware, the Connecticut Bankruptcy Court would not revisit that issue. A similar view is implicit in the grant of the cash collateral application. Thus, the Connecticut Bankruptcy Court apparently felt it could release estate funds to debtor's counsel with no harm to the government because the funds were the collateral of another creditor with a security interest. This approach was plain error.

First, this Court already ruled in the prior appeal that the government is not bound by the 1996 plan and confirmation order. Moreover, § 1141(a) defines the extent to which persons are bound by a plan and, since the government was not then a creditor, it could not possibly be bound.

Second, even if 1996 plan's characterizations would normally, absent a challenge, apply, the government is in the midst of litigation, which this Court ruled it could pursue, challenging the security interest for the junior notes both by seeking to recharacterize the notes as equity (which cannot be secured) and alternatively by seeking equitable subordination pursuant to § 510(c). It is simply wrong to assume, as a basis for ruling that any use of estate funds could not harm the government, that it will lose that litigation. If the government prevails in the adversary proceeding, the taxing authorities will have a right to share all of the proceeds of the sale of assets *pro rata* with other administrative claims. The government therefore has standing to object to other administrative claims, since they would increase the pool of claims that would share the limited funds of the estate, which are plainly insufficient to satisfy even the taxes.

Moreover, § 502 provides that a claim is deemed allowed only if no party in interest objects. Once an objection is filed, the presumption falls and the burden of proof is on the party asserting the claim. As part of its adversary proceeding required by Rule 7001 for equitable subordination of the lien of the Noteholders, the United States has, as permitted by Rule 3007, included an objection to the claim, arguing that the junior notes are in fact equity in substance. Therefore, for count 1 of the adversary proceeding, the burden of proof is on the defendants, not on the government. If any presumption is appropriate, it is the presumption that the claimants will fail to meet their burden of proof.

But even assuming *arguendo* that the security interest for the junior notes is presumed valid during the pendency of the litigation challenging its validity, that does not mean the Bankruptcy Court could ignore the statutes and rules and case law governing the allowance of compensation. The point of a cash collateral order is to free up funds from a lien for use by the estate. Once so freed up, their disposition may not violate the Bankruptcy Code. If, as the government argues, § 330 does not authorize payment for the services for which payment is sought, the Bankruptcy Court is not magically endowed with the power to violate § 330 merely because the funds would, but for the cash collateral stipulation, be unusable without the consent of the secured creditor. Therefore, the whole cash collateral argument as a basis for allowing the compensation without regard to the standards in § 330 is a red herring.

Instead of viewing the cash collateral application as harmless on the premise that the only party with an interest in the funds had consented, the Bankruptcy Court should have viewed the application as a proposal to use estate funds outside of the ordinary course of business under § 363(b)(a) and, as such, should have treated it as evidence of further diminution of the estate, calling for conversion to Chapter 7.

**4; 5.   It Was Error to Authorize the Use of Estate Funds to Finance Legal Services to Be Provided by Counsel for the Estate's Fiduciary Directed at Defending a Disputable Lien *Against* the Estate Which, If Upheld, Will Render the Estate Penniless; For Similar Reasons, It was Error to Award Interim Fees for Resisting Conversion and Performing Other Services Against the Interests of the Unsecured Creditors**

On the merits of the cash collateral order, it was wrong for the Bankruptcy Court to authorize the use of estate funds to finance the debtor's intervention on the side of the indenture trustee and note holders in the Delaware adversary proceeding.  For similar reasons, it was also error to award interim fees for resisting conversion to Chapter 7 or the appointment of a disinterested Chapter 11 trustee and for performing other services that were ultimately directed not at obtaining a recovery for unsecured creditors, but rather at advancing the interests of debtor's management in personally earning millions of dollars by upholding the validity of the security interest for the junior notes.  (We are combining the discussion of issues 4 and 5.)

Section 1107(a) gives a debtor in possession the powers and duties of a trustee.  Section 327 permits the trustee (debtor in possession) to hire counsel to "assist the trustee in carrying out the trustee's duties" (not in advancing interests of debtor's management).

Section 330 permits compensation to the attorney only for "necessary services," and services to harm the estate surely are not "necessary."  In *In re Global Int'l Airways Corp.*, 82 B.R. 520 (Bankr. W.D.Mo. 1988), the court denied compensation for debtor's general counsel for services performed contrary to the interests of the debtors estate.  The services were to resist the appointment of special counsel sought by creditors to seek to recover assets transferred to the corporate debtor's chief executive officer (CEO) -- a dispute that was then settled after special counsel was appointed.  The debtor's counsel contended that his opposition to the appointment of special counsel "constituted efforts rendered, 'in aid of administration of the estate' within the meaning of the governing authorities, because special counsel appeared to be in the process of being appointed for the 'unlawful' purpose of setting aside the order of confirmation."  *Id*. at 521 (footnote omitted).  The court rejected this reasoning, holding that

> an unbroken chain of authority holds that services rendered for the benefit of the debtor only, and contrary to the interest of the estate, such as opposing issuance of a turnover order, cannot be compensated from the estate. Based upon this eminent and well established principle alone, the court would be compelled to deny the application at bar, even without determining whether applicant counsel were working in the interests of [the CEO] at a time when those interests were directly opposed to those of the estate.

*Id*. at 522 (footnotes omitted). The court also observed that—

> The monies which were resultingly paid by [the CEO] into the estate now compose the principal quantum of that estate from which applicant counsel propose to recapture their attorney's fee. In essence, then, they expect to be paid from the settlement fund produced by the special counsel whose appointment they opposed.

*Id*. Similarly, in the instant case, if the government wins the Delaware adversary proceeding by invalidating the security interest for the junior notes, the sole source to pay compensation to debtor's counsel will have been money freed up from a lien asserted against all estate property, over the most strenuous objections of said counsel, for which the compensation is being paid.

In *In re Golden Recipe Chicken, Inc.*, 109 B.R. 692 (Bankr. W.D.Pa. 1990), the court denied compensation to debtor's counsel for services benefitting only the corporate debtor's shareholder. The court acknowledged that a Chapter 11 liquidation proceeded more quickly than would have occurred under Chapter 7 and did allow compensation for that endeavor. The corporate debtor then sought to confirm a Chapter 11 liquidation plan that included a release of personal liability for the shareholder. The plan was denied and the case was converted to Chapter 7. The court denied compensation for proposing the Chapter 11 plan, finding that, in effect, the effort was on behalf of the shareholder and not the estate. *Id*. at 693. It also observed that the case has no business being in Chapter 11 and that "[t]he only reason for keeping the case in Chapter 11 appears to have been the desire to keep control of the case in order to work out a settlement with the landlord, so as to relieve the shareholder of his personal guarantee to the landlord." *Id*. at 693-94. There was no evidence that the debtor's counsel had any formal representation agreement with the shareholder -- the court simply refused to ignore the reality that the shareholder was the true intended beneficiary of the debtor's counsel's efforts. *See also In re*

63

*Reed*, 890 F.2d 104, 105-106 (8th Cir. 1989) (overwhelming weight of authority is that use of estate to pay for attorney fees must be for services that are intended to benefit the estate; see also cases cited therein); *In re Kendavis Industries Intern., Inc.*, 91 B.R. 742, 751-52 (Bankr. N.D.Tex. 1988) (estate cannot be used to pay fees for attorneys that actually are defending the interests of the management or owners of the debtor, not the debtor).[47/]

Moreover, in 1994, Congress amended § 330, and added § 330(a)(4)(A)(ii), which expressly prohibits compensation for "services that were not -- (I) reasonably likely to benefit the debtor's estate; or (II) necessary to the administration of the case."   In *In re Top Grade Sausage, Inc.*, 227 F.3d 123, 128-30 (3d Cir. 2000), the Third Circuit held that § 330(a)(4) requires that "the debtor's attorney must show that the representation was reasonably likely to benefit the debtor's estate" and affirmed the disallowance of compensation.  227 F.3d at 132.  In that respect it favorably cited *Matter of Pro-Snax Distributors, Inc.*, 157 F.3d 414, 426 (5th Cir. 1998), in which the court affirmed the district court's reversal of a bankruptcy court's order allowing fees to a debtor's attorney for services rendered prior to the appointment of a Chapter 11 trustee, concluding that services must be directed at a material benefit to the estate to be compensable from the estate.[48/]

In *In re Smith Technology Corp.*, 1999 WL 1427681 (D.Del. 1999), the district court, after

---

[47/] No doubt Akin Gump will point out that it has no agreement to represent debtor's management, and formally represents only the corporate debtor.  But form should not preclude recognition of substance: the corporate debtor is a bank account; the only remaining dispute is who gets the funds; the debtor's counsel is arguing that the funds should be removed from the estate to satisfy a lien against the estate, in respect to which roughly $8 million would go to management.  Obviously, the instructions that debtor's manager provides to debtor's counsel are influenced by the prospect of personally collecting roughly $8 million.

[48/] The Third Circuit in *Top Grade Sausage* disagreed with a different aspect of the Fifth Circuit's ruling in *Pro-Snax* -- its ruling that a debtor *out of possession* (after the appointment of the Chapter 11 trustee) could not be compensated at all under the 1994 amendments to § 330(a)(1).  The Third Circuit held that the debtor's counsel may be compensated, 227 F.3d at 128-30, but only upon a "show[ing] that the representation was reasonably likely to benefit the debtor's estate."  *Id*. at 132.  The Supreme Court has resolved the conflict by limiting compensation for counsel for the debtor to where said counsel is employed by the trustee (or debtor in possession) pursuant to § 327.  *Lamie v. U.S. Trustee*, 540 U.S. 526 (2004).

quoting new § 330(a)(4)(A)(ii),  held that, "In determining whether to allow BI's requested fees relating to the ESOP litigation, the Bankruptcy Court should have addressed whether, at the time BI's actions in the ESOP litigation were taken, they were reasonably likely to benefit the estate. . . . In particular, did a time come in this case when BI should have scaled back its services related to the ESOP and Insurance Trust litigation 'once it became reasonably obvious that further litigation would cost more than it was likely to bring into the estate [?]'"  *Id*. at *6 (brackets and question mark in original).  The district court then cited *In re Taxman Clothing Co.*, 49 F.3d 310, 313-15 (7th Cir. 1995), and described its holding as "(disallowing $85,000 in fees because attorney should have dropped litigation once he realized claim could not yield a net gain to the estate)."  *Id*.  Here the debtor's counsel has not even tried to pursue a recovery for the estate -- he is pursuing a recovery in respect to a security interest in favor of the note holders *against* the estate.

Still other Bankruptcy Code provisions indirectly support the government's position. Section 554 confirms that where a lien exceeds the value of collateral that is property of the estate, and the property is not needed to reorganize (*i.e.*, is of "inconsequential value and benefit to the estate"), the trustee or debtor in possession should abandon it.  The same is true of property "that is burdensome to the estate," and one of the burdens to consider is the cost associated with administering the property, including the trustee's attorney fees.

Section § 704(5) gives trustees the duty to object to the allowance of any claim that is improper if a purpose would be served.  Section 1106(a)(1) imposes the same duty on a Chapter 11 trustee and § 1107(a) gives that responsibility to a debtor in possession.  A claim must be for a right to payment -- and is distinguished from an equity security interest.  *Compare* § 101(5) *with* § 101(16).  One of the government's arguments in the adversary complaint is that the junior notes are, in reality, equity securities.  Thus a trustee would normally have a duty to make that same argument if it is viable.

Sections 544 through 548 confirm that trustees should attempt to avoid liens where grounds

to do so exist and § 551 confirms that the avoided lien then is preserved for the benefit of the estate. Similarly § 510(c)(2) indicates that when a claim is equitably subordinated, the lien securing it is transferred to the estate (*i.e.*, to the trustee for the benefit of unsecured creditors).

Section 725 confirms that liens generally remove property from the estate prior to distribution, at least in a Chapter 7 liquidation. In a liquidating (indeed fully liquidated) Chapter 11 case where confirmation of a plan is impossible, there is no reason to view the situation as materially different than in a Chapter 7.

In the 3/4/02 order granting debtor's motion to intervene in the adversary proceeding, the Delaware Bankruptcy Court cited two Third Circuit cases it suggested stood for the proposition that trustees have a duty to help secured creditors. 2002 WL 417013 at *4. Neither case supports the proposition. The *Cybergenics* decision, *supra*, states that a trustee's "paramount duty . . . is to act on behalf of the bankruptcy estate, for the benefit of the creditors." 226 F.3d at 243. That plainly refers to general creditors and does not support a fiduciary's taking the side of a secured claimant *against* the estate and its other creditors. In *Matter of Ribs-R-Us, Inc.*, 828 F.2d 199, 203 (3d Cir. 1987), the court held that the trustee owed a duty toward an *unsecured* tax claim. In fact, it is simply unheard of in the annals of bankruptcy law for a trustee to take the side of a secured creditor against the estate.

In *In re Lundborg*, 110 B.R. 106, 109 (Bankr. Conn. 1990), Judge Shiff held that "a trustee is a fiduciary of all of the creditors of a bankruptcy estate, but owes a *primary duty to unsecured creditors*" and that "both management and its counsel have fiduciary duties *to an estate* in bankruptcy." (Emphasis added.). Judge Shiff was correct in *Lundborg*, but apparently felt precluded, by collateral estoppel, from questioning Judge Walsh's opposite reasoning in the intervention order. *See also In re Schipper*, 933 F.2d 513, 515 (7th Cir. 1991) (debtor in posses- sion owed duty to "unsecured creditors"); *In re JLM Inc.*, 210 B.R. 19, 25-26 (BAP 2d Cir. 1997).

In fact, a trustee primarily represents the secured creditors only in his capacity as a

custodian of the property upon which they have a lien, but owes them no duty to help defend that lien against challenge.  Thus, in *In re Nadler*, 8 B.R. 330, 333 (Bankr. E.D. Pa. 1980), the court stated:

> The trustee as fiduciary represents all creditors of the bankrupt, secured and unsecured.  However, the Trustee primarily represents the unsecured creditors and represents the secured creditors only in his capacity as the custodian of the property upon which they have a lien.  *In re American Fidelity Corp.*, 28 F.Supp. 462, 471 (S.D.Cal. 1939).

Accordingly, "[t]he attorney has a fiduciary duty to maximize the estate," and "[b]efore enbarking upon costly litigation, a reasonable attorney must weight the likely benefit to the creditors against the likely costs."  *In re Kean Corp.* 205 B.R. 690, 696 (Bankr. S.D.N.Y. 1997) (citations omitted). Further, "Once it becomes reasonably obvious that the prospective costs of commencing or continuing litigation will exceed any benefit to the estate, the attorney is duty-bound to abandon the claim."  *Id.*

In sum, it is simply untenable for the attorney representing the estate's fiduciary to be paid for litigation against the interests of the estate and its unsecured creditors and in favor of upholding a disputable lien against the estate.  In this case, this applies not only to the services directly involved in the Delaware adversary proceeding, but also the debtor's resistance to conversion or the appointment of a trustee, and its cash collateral application and the fees application to the extent that those applications were directed at enabling payment for the improper and unnecessary legal services.  At the December 3, 2002 hearing, Akin Gump (by Mr. Golden) argued, with respect to the conflict of interest of debtor's management, that there was never any attempt to hide the fact that the debtor's manager has a personal stake in the outcome of the Delaware adversary proceeding and that, in the prior bankruptcy case, this had been conceived as an "attempt to incentivize management to maximize the recovery" for the junior note holders.  (DI# 413, R.8003 Ex.6 (transcript) at 22-23.)  The inescapable, although perhaps unintended, point is that "maximiz[ing] the recovery" for the note holders (and thereby himself) is exactly what the debtor's

manager is doing in directing counsel for the debtor in possession -- supposedly a fiduciary for the estate -- to take a position on the side of the note holders whose lien claim is, of course, adverse to the estate.

> **6.** **The Bankruptcy Court Erred in Authorizing 100% Payment of Allowed Interim Fees to Debtor's Counsel Where the Estate Is Administratively Insolvent And, Unless the Security Interest for the Junior Notes Is Upheld Fully, Debtor's Counsel Would at Most Be Entitled to a *Pro Rata* Dividend Based on Counsel's Allowed Fees in Comparison to Total Administrative Expenses**

Assuming debtor's counsel may be compensated for the legal services at issue, it was at least an abuse of discretion (if not beyond the court's statutory authority) to permit disbursement of 100% of allowed interim compensation, given that the estate is administratively insolvent and there is no hope of altering that circumstance. At the December 3, 2002 hearing, Judge Shiff stated that administrative insolvency happens in many Chapter 11 cases and that "it's part of the bankruptcy law and policy to permit companies, honest debtors who are in that position, to regroup, to reorganize, so that they can get out of an insolvent position." (DI# 413, R.8003 Ex.6, at p.35.) Judge Shiff added that, in view of this policy, he would not consider administrative insolvency to be a relevant consideration at all. (*Ibid*. at 36.)

The obvious error in this reasoning is that this is not a case in which the debtor is attempting "to regroup, to reorganize, so that they can get out of an insolvent position." Rather, this is a case of irretrievable insolvency involving a fully liquidated estate of a debtor that has permanently ceased doing business. The policy to encourage reorganization has no relevance here.

In addition, the government maintains that, even when reorganization remains possible, it is inappropriate for a court to require unpaid administrative creditors, whose non-payment in the ordinary course of business was already a violation of the debtor's duties, to then "bank" involuntarily on the hypothetical success of a promised reorganization that might not materialize where the debtor's remaining assets are not even sufficient at present to fully satisfy its overdue *administrative* debts. In this regard, Judge Shiff failed to distinguish corporate insolvency from

*administrative insolvency*.

If the government had already won the Delaware adversary proceeding in this case, the funds could not lawfully be distributed without conversion to Chapter 7, unless in connection with a dismissal of the case.  A plan simply cannot be confirmed.  *See* § 1129(a)(9)(A).  Nor could a plan prefer one creditor over another in the same priority class.  *See* § 1129(a)(7)(A).  In the event of dismissal, any distribution outside bankruptcy would be subject to the federal tax liens, which clearly have priority over the unsecured claim of debtor's counsel for fees.[49/]  In a Chapter 7 (*i.e.*, upon conversion), the claims of professionals for compensation for services rendered during the Chapter 11 phase of the case would share *pro rata* with the Chapter 11 administrative taxes under § 726(b).  If final distribution were possible at the time of the entry of the 12/23/02 Order, all administrative claims would have received less than 65 cents on the dollar.  The Connecticut Bankruptcy Court's authorization of a distribution of 100% of debtor's counsel's allowed fees, with no assurance that the money would be recoverable if the government prevails in the adversary proceeding in Delaware, is not just an abuse of discretion, but also is arguably outside the Bankruptcy Court's statutory authority in the first place.

The government agrees with Judge Shiff that a bankruptcy court has inherent power at the end of a case to order disgorgement from a party that received a greater distribution than it was entitled to receive as a percentage of its allowed claim, but courts have recognized that the possibility of disgorgement is not a basis upon which to grant professionals an interim preference, when it is already a foregone conclusion that the estate is insufficient to pay all administrative

---

[49/] Under §§ 6321 and 6322 of the Internal Revenue Code (26 U.S.C.), a tax lien arises automatically upon assessment and demand for payment and attaches to all property of the taxpayer, real or personal. No act is required to perfect the lien -- it arises automatically by operation of law.  While an assessment lien for a prepetition tax will not attach to property of the estate, due to the fact that a debtor in possession is deemed to be a separate entity in a fiduciary capacity, when there is an *administrative* tax assessment, the taxpayer *is* the estate, and the tax lien arising in respect to the assessment will attach to all property of the estate.  The lien is then unenforceable during the bankruptcy, due to the automatic stay (§ 362(a)(4)). But, even if the tax lien does not attach to property while held in the estate, dismissal would result in immediate attachment of the lien and the government would still have complete priority over any claim of debtor's counsel for attorney fees.

expenses in full. *See In re IML Freight, Inc.*, 52 B.R. 124, 138 (Bankr. Utah 1985) (and cases cited therein). *See also In re Energy Co-op., Inc.*, 55 B.R. 957, 964-65 (Bankr.N.D.Ill. 1985); *In re Barron*, 73 B.R. 812, 813 (Bankr.S.D.Cal.1987). Although other courts have admittedly refused to view administrative insolvency as a reason to deny interim compensation, the United States maintains that violating the statutory priority rules is beyond the authority of a bankruptcy court. *Cf. United States v. Noland*, 116 S.Ct. 1524 (1996) (bankruptcy court may not reorder priorities in derogation of statutory scheme established by Congress). Nothing in § 331 suggests that it was intended to authorize the Court to override the statutory priority scheme and, therefore, it should be construed to authorize only those interim distributions which can be made without derogating from the statutory priorities. Recognizing that mistakes will occur, interim distributions should be subject to disgorgement, but that does not authorize deliberate violations of the priority rules where there can be no doubt that there will be insufficient funds to equalize the claims of other creditors entitled to parity or priority.

At least to this extent, Judge Shiff's stated reluctance at the hearing, to ever have a debtor's attorney be "working with some risk that they're not going to get paid" and his indication that "I don't want to enter any kind of an order that is going to support that" (DI# 413, R.8003 Ex.6, at p.36-37) is not an appropriate basis upon which to pay debtor's attorneys a higher percentage of their claims than creditors with claims of equal priority. So far as our research discloses, there are no reported decisions in which any other bankruptcy court has ruled that *Chapter 11* professionals have a right to full payment of interim allowances in preference to other unpaid administrative claims entitled to equal priority from an administratively insolvent debtor that is fully liquidated, not reorganizing, and has no possibility of an infusion of new cash.[50/]

In *In re Flagstaff Foodservice Corp.*, 739 F.2d 73 (2d Cir. 1984), the Second Circuit held

---

[50/] Interim disbursements to counsel representing Chapter 7 trustees does not raise the same issue because, under § 726(b), such expenses have priority over the expenses of the preceding Chapter 11 phase of the case.

that § 331 does not permit courts to ignore priorities.  *Id*. at 75 ("We conclude that the district court erred in holding that section 330 'empower[ed] the Bankruptcy Judge to make awards without reference to any schedule of priorities, without reference to any contractual agreement with respect to those priorities and on the basis of his assessment in the course of supervising the bankruptcy proceeding that if actual and necessary services have been rendered, they should be compensated for'").  In that case, the priority asserted was by a lien claimant who did not consent to the use of its cash collateral.  In the instant case, assuming the United States wins the Delaware adversary proceeding, it claims at least equal priority with the professionals under § 507(a)(1) in any lawful bankruptcy distribution (*see* § 726(b)) and otherwise claims that the federal tax lien will give it absolute priority for any distribution outside the Bankruptcy Code.

### Conclusions (Relief Sought)

The 7/19/02 Order should be reversed.  Insofar as conversion is concerned, there is no need for a remand; rather, under the authority of Fed.R.Bankr.P. 8013, this Court should order the case converted to Chapter 7.  As regards the cash collateral stipulation, the matter should be remanded with instructions that the Connecticut Bankruptcy Court assert exclusive jurisdiction over all further proposals to use estate funds outside the ordinary course of business, and that it deny any and all further proposals to use estate funds to pay debtor's counsel for any legal services that are not directed at benefitting the estate (including further services for litigation to defend the secured claim of the indenture trustee for the junior notes in the Delaware adversary proceeding).  The Connecticut Bankruptcy Court should also be instructed to assert its exclusive *in rem* jurisdiction over the estate's funds and to prohibit any disbursements without its authorization, notwithstanding any further attempt by the Delaware Bankruptcy Court to order any disbursements.[51]

---

[51] Since this Court lacks authority to review the orders of the Delaware Bankruptcy Court, the United States is not seeking to have this court *directly* review its order allowing (as opposed to ordering the disbursement of funds to pay) compensation to debtor's counsel, and will instead continue to prosecute its appeal in the Delaware District Court.  But the validity or voidness of the transfer order's inclusion of future cash collateral and fee applications is properly before this Court in this appeal for reasons demonstrated herein, and this Court's rulings may of course substantially impact the Delaware appeal (as

The 12/23/02 Order should be reversed, and the matter remanded with instructions to defer

all fee applications until the conclusion of the case, based on administrative insolvency alone, and

with further instructions at that time to deny compensation of debtor's counsel for any legal

services that were not directed at benefitting the estate.

Respectfully submitted,

_____

PETER SKLAREW
Federal Bar No. CT 17864
U.S. Department of Justice, Tax Div.
P.O. Box 55
Washington, D.C. 20044-0055
(202) 307-6571

Local Counsel:

JOHN A. DANAHER, III
United States Attorney

ANN M. NEVINS
Assistant United States Attorney
Federal Bar No. CT06484
915 Lafayette Blvd., Room 309
Bridgeport, CT  06604
(203) 696-3000

---

Judge Jordan has appropriately recognized).  And, this Court does have jurisdiction, incident to 28 U.S.C. § 158(a), as well as under 28 U.S.C. § 1651, to direct the Connecticut Bankruptcy Court on remand to exercise its exclusive *in rem* jurisdiction.  In *Indian Motocycle*, the First Circuit BAP held that § 1334(e) disabled the Massachusetts Bankruptcy Court from abstaining in the exercise of its jurisdiction to determine administrative tax expense (261 B.R. 800) and, on remand (266 B.R. 243), the Massachusetts Bankruptcy Court properly ordered a receiver appointed by the United States District Court in Colorado to return to the bankruptcy trustee funds that were escrowed with the receiver incident to the improper attempt to transfer jurisdiction to the District Court in Colorado, notwithstanding the receiver's argument that the funds were under the control of the District Court in Colorado and no longer subject to the Massachusetts Bankruptcy Court's orders.  The Massachusetts District Court affirmed.  *In re Indian Motocycle Mfg. Co., Inc.*, 288 B.R. 617 (D.Mass. 2003).

Certificate of Service

IT IS CERTIFIED that service of the United States' **UNITED STATES' OPENING APPEAL BRIEF** has this 4th day of April, 2005, been made upon the following by depositing a copy in the United States mail, postage prepaid, addressed to:

Daniel H. Golden
Akin, Gump, Strauss, Hauer & Feld, LLP
590 Madison Avenue
New York, NY  10022

Craig I. Lifland
Zeisler & Zeisler
558 Clinton Avenue
Bridgeport, CT  06605

Ira Goldman
Shipman & Goodwin
One American Row
Hartford, CT  06103-2819

Patricia Beary
Asst. U.S. Trustee
265 Church Street, Ste. 1103
New Haven, CT  06510-7016

Joan Pilver
Assistant Attorney General
State of Connecticut
55 Elm Street, 5th Floor
Hartford, CT 06141

_____
PETER SKLAREW
Attorney, U.S. Dept. of Justice

73