UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

FILED

2005 MAY 18  A 10 50

| | |
|---|---|
| In re | : Chapter 11 |
| SCOTT CABLE COMMUNICATIONS, INC. | : |
| d/b/a AMERICAN CABLE ENTERTAINMENT, | : Case No. 3:02-CV-1725 (AWT) (consolidated bankruptcy appeals) Bankr. Ct. Case No. 98-51923) |
| Debtor. | : |
| UNITED STATES, | : |
| Appellant, | : |
| v. | : |
| SCOTT CABLE COMMUNICATIONS, INC., STATE STREET BANK AND TRUST CO. as Indenture Trustee for certain note holders, and AKIN GUMP STRAUSS HAUER & FELD LLP, | : |
| Appellees. | : |

## APPELLEES' BRIEF OF SCOTT CABLE COMMUNICATIONS, INC. AND AKIN GUMP STRAUSS HAUER & FELD LLP

**AKIN GUMP STRAUSS HAUER & FELD LLP**
Daniel H. Golden
Shuba Satyaprasad
590 Madison Avenue
New York, New York 10022
Telephone (212) 872-1000
Facsimile (212) 872-1001

**AKIN GUMP STRAUSS HAUER & FELD LLP**
L. Rachel Helyar (*pro hac vice* application pending)
Anne K. Edwards (*pro hac vice* application pending)
2029 Century Park East, Suite 2400
Los Angeles, California 90067
Telephone (310) 229-1000
Facsimile (310) 229-1001

Attorneys for Appellees
SCOTT CABLE COMMUNICATIONS, INC. AND
AKIN GUMP STRAUSS HAUER & FELD LLP

## TABLE OF CONTENTS

COUNTER-STATEMENT OF THE ISSUES ........................................................................... 1

STANDARD OF REVIEW .................................................................................................... 1

STATEMENT OF THE CASE................................................................................................ 1

    a.    Debtor's First Chapter 11 Filing in Delaware.................................................. 1

    b.    The Debtor's Second Bankruptcy Filing in Connecticut................................ 2

    c.    The Adversary Proceeding............................................................................. 3

    d.    The Sale of Assets.......................................................................................... 3

    e.    The June 7, 2001 Connecticut Bankruptcy Court Order Transferring
        the Adversary Proceeding to Delaware........................................................... 4

    f.    The March 4, 2002 Delaware Bankruptcy Court's Order Granting
        the Debtor Leave to Intervene......................................................................... 5

    g.    The July 18, 2002 Connecticut Bankruptcy Court Order Approving
        the Cash Collateral Stipulation and Denying the United States'
        Motion to Convert the Case to Chapter 7 or Appoint a Trustee. ..................... 6

    h.    The December 23, 2002 Connecticut Bankruptcy Court Interim Fee Order. ................. 8

LEGAL ARGUMENT.......................................................................................................... 8

    1.    The United States' Effort to Appeal the Transfer Order and the
        Intervention Orders – in Whole or in Part – is Misplaced,
        Because this Court Lacks Jurisdiction to Review Them. .................................... 8

    2.    The Connecticut Bankruptcy Court properly transferred to Delaware issues
        concerning interim fee applications for legal services related to the
        adversary proceeding. ........................................................................................ 13

        a.    The Transfer of the Interim Fee Application To The Delaware Bankruptcy
            Court Does Not Defeat the Statutory Construction of Granting Exclusive
            Jurisdiction Over Chapter 11 Matters to the District Courts. ......................... 15

        b.    The Transfer of Venue Statutes Authorized the Connecticut Bankruptcy
            Court's Transfer of Authority to Review Fee Applications Related to
            the Adversary Proceeding. .............................................................................. 15

i

c.    "Law of the Case" Doctrine Is Not Relevant to Rulings on Interim Fee
Applications Associated with the Adversary Proceeding............................................ 19

3.    The Connecticut Bankruptcy Court did not abuse its discretion in approving
the cash collateral stipulation.......................................................................................... 19

a.    The Indenture Trustee Was Entitled to Assert Lien Rights on Behalf of the
Junior Secured PIK Note Holders for the Purpose of the Cash
Collateral Stipulation. ...................................................................................................... 20

b.    Contrary to the United States' Assertions, the Connecticut Bankruptcy
Court Did Not Permit the Delaware Bankruptcy Court to Adjudicate the
Cash Collateral Stipulation. ............................................................................................ 22

c.    The United States' Objections to the Cash Collateral Order Are All Improper
Collateral Attacks on the March 4, 2002 Intervention Order. ....................................... 24

4.    The Connecticut Bankruptcy Court did not abuse its discretion in approving
the interim fee application. ................................................................................................ 27

a.    Akin Gump's Legal Services Were Necessary and Appropriate.................................. 27

b.    The December 23, 2002 Interim Fee Award to Akin Gump Does Not
Violate the Statutory Priority Rules. .............................................................................. 31

CONCLUSION.......................................................................................................................... 33

## TABLE OF AUTHORITIES

**Cases**

*Americare Health Group* ........................................................................................ 10, 11

*Americare Health Group v. Melillo*, 223 B.R. 70, 74 (E.D.N.Y. 1998) ................................ 10, 11

*Arizona v. California*, 460 U.S. 605, 618 (1983) ........................................................... 23

*Blaski v. Hoffman*, 260 F.2d 317 (7th Cir.), *aff'd*, 363 U.S. 335 (1960) .......................... 12

*Christianson v. Colt Industries Operating Corp.*, 486 U.S. 800, 815-16 (1988) ................... 23

*Chrysler Credit Corp. v. Country Chrysler Inc.*, 928 F.2d 1509, 1516 (10th Cir.1991) .............. 23

*Citibank, N.A. v. Telesphere Communications, Inc.*
    1992 U.S. Dist LEXIS 7750 (N.D.Ill. May 28, 1992) ................................................. 4

*Coopers & Lybrand v. Livesay*, 437 U.S. 463, 468 (1978) ........................................... 11

*Cruz v. Ridge*, 383 F.3d 62, 64 (2d Cir. 2004) ........................................................ 9

*Eisen v. Carlisle & Jacquelin et al.*, 417 U.S. 156, 171 (1974) ...................................... 11

*General Electric Credit Corp. v. Levin & Weintraub*
    *(In re Flagstaff Foodservice Corp.)*, 739 F.2d 73 (2d Cir. 1984) ................................ 32

*Gulfstream v. Mayacamas Corp.*, 485 U.S. 271, 276 (1988) ......................................... 11

*Hoffman v. Blaski*, 363 U.S. 335 (1960) ................................................................ 13

*In re 680 Fifth Avenue Assoc.*, 154 B.R. 38, 43 (Bankr. S.D.N.Y. 1993) ....................... 31

*In re Barron*, 73 B.R. 812, 813 (Bankr. S.D. Cal. 1987) ............................................. 32

*In re Cybergenics Corp.*, 226 F. 3d 237, 243 (3d Cir. 2000) ....................................... 29

*In re Dalton*, 733 F.2d 710, 717 (10th Cir. 1984) .................................................... 11, 12

*In re Energy Co-op*, 55 B.R. 957, 964-65 (Bankr. N.D. Ill. 1985) ................................. 32

*In re Global Int'l Airways Corp.*, 82 B.R. 520 (Bankr. W.D. Mo. 1988) ......................... 30

*In re Golden Recipe Chicken, Inc.*, 109 B.R. 692 (Bankr. W.D. Pa. 1990) ...................... 30

*In re Hechinger Inv. Co. of Delaware, Inc.*, 288 B.R. 398 (Bankr. D. Del. 2003)........................ 16

*In re IML Freight, Inc.*, 52 B.R. 124, 138 (Bankr. Utah 1985) ...................................................... 32

*In re Ionosphere Clubs, Inc.*, 922 F.2d 984 (2d Cir. 1990) ............................................................ 1

*In re Iridium Operating, LLC*, 285 B.R. 822, 836 (S.D.N.Y. 2002) ....................................... 17, 18

*In re JLM, Inc.*, 210 B.R. 19, 23 (B.A.P. 2d Cir. 1997)................................................................... 1

*In re Kendavis Indus. Int'l*, 91 B.R. 742, 746-47 (Bankr. N.D. Tex.1988)............................. 19, 31

*In re Matis*, 73 B.R. 228, 235 (Bankr. N.D.N.Y. 1987) .......................................................... 22, 33

*In re National Enterprise Wire Co.* 103 B.R. 56 (N.D.N.Y. 1989) ................................................ 4

*In re Pannebaker Custom Cabinet Corp.*, 198 B.R. 453, 465 (Bankr. M.D. Pa. 1996)................ 25

*In re Rappaport*, 558 F.2d 87, 90 n.9 (2d Cir. 1977)................................................................... 12

*In re Raytech*, 222 B.R. 19, 24 (Bankr. D. Conn.1998)............................................................... 16

*In re Scott Cable Comms., Inc.*, 2002 Bankr. LEXIS 897
   (Bankr. D. Conn. July 18, 2002) ........................................................................... passim

*In re Smith Technology Corp.*, No. Civ. A. 99-132,
   1999 U.S. Dist. LEXIS 20811  (D. Del. Dec. 23, 1999)............................................. 30

*In re Southern Shores Investments Corp.*, 95 B.R. 304, 307 (Bankr.D.Del. 1988) ...................... 16

*In re Taxman Clothing Co.*, 49 F.3d 310, 4314 (7th Cir. 1995) ...................................... 14

*In the Matter of Ribs-R-Us, Inc.*, 828 F. 2d 199, 203 (3d Cir. 1987)............................................ 29

*International Yacht & Tennis, Inc. v. Wasserman*
   (*In re International Yacht & Tennis*), 922 F.2d 659, 663 (11th Cir. 1991) ............................... 29

*Leighton Holdings, Ltd. v. David Belofsky & Associates*
   (*In re Kids Creek Partners*), 1997 U.S. Dist. LEXIS 15715,
   No. 97 C 3949, 97 V 5776, 94 B 23947 (N.D. Ill. Oct. 2, 1997)............................................ 32

*Magnetic Engineering & Manufacturing Co. v. Dings Manufacturing Co.*,
   178 F.2d 866, 869-70 (2d Cir. 1950) .............................................................................. 12, 23

*Matter of Evangeline Refining Co.*, 890 F.2d 1312, 1321-22 (5th Cir. 1989)............................... 19

*Matz v. Hoseman,* 197 B.R. 635, 640 (N.D. Ill. 1996) .................................................................. 14

*Murphy v. Reid,* 332 F.3d 82, 83-84 (2d Cir. 2003); *Cruz,* 383 F.3d at 64 ................................. 11

*N. Parent, Inc. v. Cotter & Company (In re N. Parent, Inc.),*
    221 B.R. 609, 631 (Bankr. D. Mass. 1998) ........................................................................... 16

*Pipeline Constr. Co. v. Marathon Pipe Line Co.,* 458 U.S. 50 (1982) ........................................ 15

*SEC v. Chestman,* 861 F.2d 49, 50 (2d Cir. 1988) .......................................................................... 9

*SEC v. Churchill Securities, Inc. (In re Churchill Mortgage Invest. Corp.),*
    223 B.R. 415, 419 (S.D.N.Y. 1998) ...................................................................................... 17

*Stringfellow v. Concerned Neighbors in Action,* 480 U.S. 370, 384 (1987).................................. 12

*United States Fidelity & Guaranty Co. v. Bray,* 225 U.S. 205 (1912) ........................................ 13

*United States v. National Westminster Bank USA (In re Q-C Circuits Corp.),*
    231 B.R. 506, 511 (E.D.N.Y. 1999) ...................................................................................... 1

*United States v. State Street Bank and Trust Co.*
    *(In re Scott Cable Comms., Inc.)* 263 B.R. 6, 8 (Bankr. D. Conn. 2002............................ 14, 16

*United States v. State Street Bank and Trust Co.*
    *(In re Scott Cable Comms., Inc.),* 2002 Bankr. LEXIS 183,
    Adv. Proc. No. A-01-04605, at *10 (Bankr. D. Del. March 4, 2002) ............................. 5, 6, 25

*United States v. State Street Bank and Trust Co.,*
    *(In re Scott Cable Communications, Inc.*), 232 B.R. 558 at 561 (Bankr.D.Conn. 1999)
    (citing applicable provisions of the Delaware Plan), *rev'd,* 259 B.R. 536 (2001),
    *appeal pending.*..................................................................................................................... 21

*United States v. State Street Bank and Trust Co.,*
    *(In re Scott Cable Communications, Inc.*), *rev'd,* 259 B.R. 536 (2001), *appeal pending* ....... 21

*Urban v. Hurley,* 261 B.R. 587, 591 (S.D.N.Y. 2001) ................................................................. 10

**Statutes**

11 U.S.C. § 105.............................................................................................................. 14, 15, 16

11 U.S.C. § 105(a) ................................................................................................................... 14

11 U.S.C. § 1109(b)................................................................................................................... 5

11 U.S.C. § 330 ................................................................................................................ 24, 26, 27

11 U.S.C. § 330(a)(4)(A)(ii) ............................................................................................ 24

11 U.S.C. § 363(a) ........................................................................................................... 21

11 U.S.C. § 363(c)(2)(A) ............................................................................................ 20, 22

11 U.S.C. § 363(c)(2)(A) and (B) ................................................................................... 20

11 U.S.C. § 506(c) ..................................................................................................... 3, 4, 31

11 U.S.C. § 330(a)(4) ...................................................................................................... 27

11 U.S.C. § 363 ................................................................................................................ 21

28 U.S.C. § 1292(a)(1 ..................................................................................................... 14

28 U.S.C. § 1292(b) ........................................................................................................ 10

28 U.S.C. § 1334 ............................................................................................................. 15

28 U.S.C. § 1412 ........................................................................................................ 16, 18

28 U.S.C. § 1471 ............................................................................................................. 15

28 U.S.C. § 151 ............................................................................................................... 15

28 U.S.C. § 157(a) ..................................................................................................... 15, 17

28 U.S.C. § 157(b)(1) ..................................................................................................... 17

28 U.S.C. § 157(d) .......................................................................................................... 17

28 U.S.C. § 158(a) .......................................................................................................... 10

28 U.S.C. §1412 ....................................................................................................... 14, 15, 19

**Other Authorities**

15A Wright & Miller, FEDERAL PRACTICE & PROCEDURE
   (1992 & 2005 Supp.) § 3914.12, n.19) ................................................................ 11

19 MOORE'S FEDERAL PRACTICE, § 204.02[9] .............................................................. 12

**Rules**

Bankruptcy Code § 1108 ......................................................................................... 20

Bankruptcy Code § 363(c)(1) ................................................................................. 20

Bankruptcy Code §1109 ........................................................................................... 5

Bankruptcy Code Section 363(c)(1) ....................................................................... 20

Bankruptcy Code section 506(c) .............................................................................. 3

Bankruptcy Rule 8003 ........................................................................................... 10

Federal Rule of Bankruptcy Procedure 1014(a)(1) ........................................... 14, 15

Federal Rule of Bankruptcy Procedure 4001(d) ................................................... 22

Federal Rule of Bankruptcy Procedure 9014 ........................................................ 22

Federal Rule of Civil Procedure 24(a)(2) ............................................................... 5

## COUNTER-STATEMENT OF THE ISSUES[1]

1. **THE UNITED STATES' EFFORT TO APPEAL THE TRANSFER ORDER AND THE INTERVENTION ORDER – IN WHOLE OR IN PART – IS MISPLACED, BECAUSE THIS COURT LACKS JURISDICTION TO REVIEW THEM.**

2. **THE CONNECTICUT BANKRUPTCY COURT PROPERLY TRANSFERRED TO DELAWARE ISSUES CONCERNING INTERIM FEE APPLICATIONS FOR LEGAL SERVICES RELATED TO THE ADVERSARY PROCEEDING.**

3. **THE CONNECTICUT BANKRUPTCY COURT DID NOT ABUSE ITS DISCRETION IN APPROVING THE CASH COLLATERAL STIPULATION.**

4. **THE CONNECTICUT BANKRUPTCY COURT DID NOT ABUSE ITS DISCRETION IN APPROVING THE INTERIM FEE APPLICATION.**

## STANDARD OF REVIEW

Cash Collateral orders are subject to review for abuse of discretion. *United States v. National Westminster Bank USA* (*In re Q-C Circuits Corp.*), 231 B.R. 506, 511 (E.D.N.Y. 1999). An interim fee award is reviewed for abuse of discretion. *In re JLM, Inc.*, 210 B.R. 19, 23 (B.A.P. 2d Cir. 1997). Conclusions of law are reviewed de novo. *In re Ionosphere Clubs, Inc.*, 922 F.2d 984 (2d Cir. 1990).

## STATEMENT OF THE CASE

a.     **Debtor's First Chapter 11 Filing in Delaware.**

On February 14, 1996, Scott Cable Communications, Inc. filed a voluntary petition for relief (the "First Case") in the United States Bankruptcy Court for the District of Delaware (the "Delaware Bankruptcy Court") under chapter 11 of title 11 of the United States Code (the

---

[1] While Appellees, Scott Cable Communications, Inc. (the "Debtor") and Akin Gump Strauss Hauer & Feld LLP ("Akin Gump" and collectively with Debtor, "Appellees") recognize that our Application for an Extension of Time to File Appellees' Brief in the Cash Collateral/Interim Fees Appeal ("Extension Request") was denied, we nevertheless respectfully request, for the reasons previously stated in our Extension Request, that the Court refrain from deciding any issues on the Cash Collateral/Interim Fees Appeal until after the entry of a final order in the Adversary Proceeding (as hereinafter defined). The United States itself has acknowledged at page 3 of its Objection to Fourth Application of Akin Gump for Interim Compensation and Reimbursement of Expenses that "[i]f the [Indenture Trustee's] lien is not invalidated or subordinated, the government's objections to the instant applications will be moot."

"Bankruptcy Code"). On December 6, 1996, the Delaware Bankruptcy Court entered an order confirming the Debtor's Second Amended Joint Plan of Reorganization (the "Plan"). The Plan converted unsecured debt into secured debt by replacing Debtor's Junior Subordinated Unsecured PIK Notes with Junior Subordinated Secured PIK Notes (the "Junior Secured PIK Notes"). The Plan was consummated and Debtor emerged from Chapter 11.

**b.    The Debtor's Second Bankruptcy Filing in Connecticut.**

On October 1, 1998, Debtor filed a Chapter 11 petition (the "Second Case") in the United States Bankruptcy Court for the District of Connecticut (the "Connecticut Bankruptcy Court"). On October 20, 1998, the Connecticut Bankruptcy Court entered an Agreed Final Order Authorizing Use of Cash Collateral (the "First Cash Collateral Order") [Docket #55], which authorized the Debtor to use the cash collateral of its secured lenders, namely, Finova Capital Corporation, Wilmington Trust Company, as successor Indenture Trustee on behalf of the Debtor's 15% Senior Subordinated Pay-In-Kind Debentures due March 18, 2002 ("Wilmington Trust"), and State Street Bank and Trust Company ("State Street")[2], as Indenture Trustee (the "Indenture Trustee") for the holders of the Junior Secured PIK Notes (collectively, the "Secured Lenders").[3] The First Cash Collateral Order recited that the Secured Lenders had valid claims against the Debtor and held valid security interests in the assets of the Debtor's bankruptcy estate (the "Bankruptcy Estate"). Any objections to this order had to be filed by November 1998 or they were deemed waived and the recitations became binding on all of the creditors of the Bankruptcy Estate (each of whom was given notice and an opportunity to object).

---

[2] U.S. Bank National Association is the successor to State Street as the Indenture Trustee.
[3] Subsequently, the Connecticut Bankruptcy Court issued five additional orders authorizing the Debtor's use of cash collateral through December 31, 2002. [Docket # 122, 189, 270, 306 and 351]

c.    **The Adversary Proceeding.**

On November 19, 1998, Appellant, the United States, filed a complaint in the Connecticut Bankruptcy Court initiating an adversary proceeding against State Street as Indenture Trustee (the "Adversary Proceeding"), challenging the claims and liens of the Junior Secured PIK Notes.  As amended on December 17, 1998, the Adversary Proceeding seeks to (1) recharacterize the Junior Secured PIK Notes as equity, (2) invalidate the liens and security interests held by the holders of the Junior Secured PIK Notes, and (3) subordinate the claims of the Junior PIK Notes to all administrative claims.

d.    **The Sale of Assets.**

On December 22, 1998, the Debtor filed a motion (the "Sale Motion") [Docket # 116] seeking authorization to sell most of its assets pursuant to the Asset Purchase Agreement of July 1, 1998 between the Debtor and InterLink Communications Partners, LLP ("InterLink") for $165 million.  The United States consented to the transaction.  On January 14, 1999, the Connecticut Bankruptcy Court entered an order approving the Sale Motion and the transactions contemplated in the Asset Purchase Agreement (the "Sale Order") [Docket # 123].  Under the terms of the Sale Order, all liens, claims, and encumbrances on the assets attached to the proceeds of the sale (the "Sale Proceeds"), in the same order of priority existing prior to the sale. In February 1999, the Asset Purchase Agreement closed and Interlink paid the Debtor $156,595,562 (plus an escrow of approximately $5.0 million).

In January 1999, the Debtor sought entry of an order authorizing it to pay the first two levels of claims held by the Secured Creditors against the Sale Proceeds ( in order to stem the accrual of interest).  The United States opposed this request, claiming that the Sale Proceeds should be surcharged under Bankruptcy Code section 506(c) (11 U.S.C. § 506(c)) for the capital

gains taxes owed on the Sale Proceeds.[4]   After an extended hearing, the Connecticut Bankruptcy

Court rejected the United States' claim and entered an order authorizing and directing the Debtor

to pay the secured claims of Finova and Wilmington Trust in full, and to deposit the remainder of

the Sale Proceeds in a designated interest bearing account secured by the remaining Secured

Creditors' lien in favor of State Street.

### e.   The June 7, 2001 Connecticut Bankruptcy Court Order Transferring the Adversary Proceeding to Delaware.

On May 22, 2001, the Connecticut Bankruptcy Court issued an Order *sua sponte* to Show

Cause why the Adversary Proceeding should not be transferred to the District of Delaware

[Docket # 301].[5]   On June 7, 2001, following a hearing, the Connecticut Bankruptcy Court

entered an order transferring the Adversary Proceeding to the Delaware Bankruptcy Court (the

"Transfer Order") [Docket # 52 of Adv. Proc. 98-05104].  The Transfer Order also transferred

"any administrative expense" applications "associated with" the Adversary Proceeding to the

Delaware Bankruptcy Court. *Id.* at 9.

The United States sought an interlocutory appeal of the Transfer Order in this Court.

After this Court declined to review the Transfer Order, the United States filed a motion in the

---

[4] Generally, administrative expenses in bankruptcy cases are charged against the *bankruptcy estate* and *not* against the equity or assets of the secured creditors. *Citibank, N.A. v. Telesphere Communications, Inc.* 1992 U.S. Dist LEXIS 7750 (N.D.Ill. May 28, 1992).  Title 11 U.S.C. § 506(c) is the recognized exception to the general rule, permitting the bankruptcy trustee to charge a secured creditor with expenses of preserving the estate property, if the expenses were incurred primarily for the benefit of the secured creditor.  *In re National Enterprise Wire Co.* 103 B.R. 56 (N.D.N.Y. 1989).  The exception is not applicable here as the capital gains taxes due the IRS were neither a necessary expense of preserving the assets nor benefited the Secured Creditors.

[5] The Connecticut Bankruptcy Court explained that it was transferring the adversary proceeding to the Delaware Bankruptcy Court because  "the issue of whether the IRS is the holder of a claim superior to that of the Jr. PIK only arises as a matter of interpretation of the effect of the Delaware Plan, of which the IRS had inadequate notice. . . ; That issue arose here only because the IRS did not object to the confirmation of that plan and because [the Debtor] filed a second chapter 11 petition in this district.  That question is best answered by the Delaware bankruptcy court which approved the Delaware Plan [who can best determine from an examination of the Delaware record as to what it would have done had the IRS objected to confirmation of the Delaware Plan]." *United States v. State Street Bank*

Delaware Bankruptcy Court seeking to re-transfer the United States' Adversary Proceeding to the Connecticut Bankruptcy Court (the "First Re-Transfer Motion"). This motion was denied as well.

On May 22, 2002, almost a year after the Transfer Order was issued, the United States filed a "Motion for an Order Re-Transferring Back to Connecticut, Portions of the Main Chapter 11 Case that Were Not Addressed in the Previous Re-Transfer Motion" (the "Second Re-Transfer Motion"), claiming it had failed to notice the portions it now sought to re-transfer, *i.e.*, the provision related to administrative expenses. The Delaware Bankruptcy Court never explicitly ruled on this Second Re-Transfer Motion.

### f.    The March 4, 2002 Delaware Bankruptcy Court's Order Granting the Debtor Leave to Intervene.

On March 4, 2002, the Delaware Bankruptcy Court entered an order approving the Debtor's motion for leave to intervene in the Adversary Proceeding (the "Intervention Order", a copy of which is attached hereto as Exhibit "A"). The Delaware Bankruptcy Court agreed with the Debtor that it had an unconditional right to intervene under 11 U.S.C. § 1109(b), and notwithstanding the Debtor's unconditional right, the court also found that the Debtor had a permissive right to intervene under Federal Rule of Civil Procedure 24(a)(2) since the Debtor had satisfied each of the four elements required by the Third Circuit to establish its right to intervene.[6]

---

*and Trust Co (In re Scott Cable Comms., Inc.).*, 263 B.R. 6, 9, Adv. Proc. No. 98-5104 (Bankr. D. Conn. June 7, 2001).

[6] The Delaware Bankruptcy Court stated that, "First, the applicant must establish that its motion for leave to intervene was timely. Second, the entity seeking to intervene must show that it has a sufficient interest in the litigation. Third, the entity must demonstrate that there is a threat that the interest will be impaired or affected by the disposition of the proceeding in which it seeks to intervene. Finally, the prospective intervenor must also show that the existing parties to the litigation inadequately represent its interest. Debtor has satisfied each of these four elements." *United States v. State Street Bank and Trust Co. (In re Scott Cable Comms., Inc.)*, 2002 Bankr. LEXIS 183, Adv. Proc. No. A-01-04605, at *10 (Bankr. D. Del. March 4, 2002).

Indeed, the Delaware Bankruptcy Court found that the Debtor not only had a *right* to

intervene, but also a *duty*:

> [The] Debtor has an interest in protecting its capital structure
> which has been threatened by [the United States'] attempt to
> recharacterize the PIK Notes as equity. In addition, [the] Debtor's
> fiduciary duty to preserve the [e]state for the benefit of its creditors
> provides it with an additional interest to intervene because the
> United States seeks to strip certain of [the] Debtor's secured
> creditors of their liens and/or subordinate their claims to those of
> the United States.

*Id.* at *11.

Finally, the Delaware Bankruptcy Court rejected the United States' argument that

"allowing [the] Debtor to intervene in favor of the Junior Secured PIK Note Holders would

create a conflict" between the personal financial interest of the Debtor's management and the

Debtor's duty to all creditors "because [m]anagement shared a pecuniary interest with certain

PIK Note Holders." It emphasized that a debtor-in-possession has a fiduciary duty to act on

behalf of all creditors, and "[T]he fact that [m]anagement [of the Debtor] may benefit from the

Debtor's participation in the adversary proceeding does not alter that duty." *Id.* at *12.

**g.** **The July 18, 2002 Connecticut Bankruptcy Court Order Approving the Cash Collateral Stipulation and Denying the United States' Motion to Convert the Case to Chapter 7 or Appoint a Trustee.**

In May 2002, the Debtor and the Indenture Trustee sought approval of a further cash

collateral stipulation (the "Cash Collateral Stipulation") [Docket # 351][7] from the Connecticut

Bankruptcy Court, which retained jurisdiction over the underlying bankruptcy case after the

Adversary Proceeding was transferred. The Cash Collateral Stipulation included a proposed

budget covering the calendar year 2002. As part of the proposed budget, the Indenture Trustee

---

[7] This was the sixth cash collateral stipulation submitted to the Court.

agreed to let the Debtor use up to $800,000 to pay its legal fees, including fees incurred in the Adversary Proceeding.

The United States objected that: (i) the Debtor "has a conflict of interest," (ii) "[the Debtor's] intervention in the transferred adversary proceeding is redundant to the efforts of the [Indenture Trustee],"and (iii) "[the Debtor's intervention] would impose an unwarranted and unreasonable economic burden on the creditors of [the Debtor's] estate." *In re Scott Cable Comms., Inc.*, 2002 Bankr. LEXIS 897 (Bankr. D. Conn. July 18, 2002). The Connecticut Bankruptcy Court rejected these arguments as attempts to revisit issues already decided by the Delaware Bankruptcy Court when it granted the Debtor's motion to intervene in the Adversary Proceeding. *Id.* at *3.

On July 18, 2002, the Connecticut Bankruptcy Court approved the Cash Collateral Stipulation and overruled the United States' motion to convert the case to chapter 7, or alternatively, appoint a chapter 11 trustee (the "July 18 Cash Collateral Order") [Docket # 377]. *Id.* at *5.

The July 18 Cash Collateral Order effectively accomplished three things. First, it prohibited the United States from trying to collaterally attack the Delaware Bankruptcy Court's Intervention Order. Second, it approved the Debtor's use of Cash Collateral for legal fees in 2002. Finally, it clarified the Transfer Order by explaining that the Connecticut Bankruptcy Court intended to retain control over cash collateral applications when it transferred administrative expense applications associated with the Adversary Proceeding. ("As stated on the record on June 5, 2002 [sic] any such determination by the Delaware court [regarding fee applications] would be paid from cash collateral allowed *here* after notice and a hearing."). *Id.* at *2 (emphasis added).

7

###### h.       The December 23, 2002 Connecticut Bankruptcy Court Interim Fee Order.

On December 23, 2002, following a hearing, the Connecticut Bankruptcy Court approved

the interim fee application filed by the Debtor's bankruptcy counsel, Akin Gump Strauss Hauer

& Feld LLP ("Akin Gump") for legal services related to the underlying bankruptcy case. *In re*

*Scott Cable Comms., Inc.*, 287 B.R. 1 (Bankr. D. Conn. 2002); [Docket # 421]. The interim fee

application filed by Akin Gump in the Connecticut Bankruptcy Court did not seek compensation

for services rendered in connection with the Adversary Proceeding; based on the Transfer Order,

those fees and expenses for services rendered in connection with the Adversary Proceeding are to

be reviewed by the Delaware Bankruptcy Court.

On February 6, 2003, this Court granted the United States' motion for an interlocutory

appeal of the December 23 Interim Fee Order. [Docket # 432.] On March 14, 2005, this Court

granted the United States' motion for an interlocutory appeal of the July 18 Cash Collateral

Order and consolidated the two appeals. Finally, this Court granted the United States' motion to

stay the Debtor from distributing any money from the estate.

## LEGAL ARGUMENT

### 1.    THE UNITED STATES' EFFORT TO APPEAL THE TRANSFER ORDER AND THE INTERVENTION ORDERS – IN WHOLE OR IN PART – IS MISPLACED, BECAUSE THIS COURT LACKS JURISDICTION TO REVIEW THEM.

Having been given leave to appeal two interlocutory orders – the December 23 Interim

Fee Order and the July 18 Cash Collateral Order – the United States attempts to take advantage

of the opportunity to revisit its challenges to two other interlocutory orders, namely the

Connecticut Bankruptcy Court's Transfer Order and the Delaware Bankruptcy Court's

Intervention Order, even though this Court denied interlocutory review of the former and the

United States did not seek interlocutory review of the latter.[8]

As the United States acknowledges, neither the Connecticut Bankruptcy Court's Transfer

Order nor the Delaware Bankruptcy Court's Intervention Order are final, appealable orders.

(AOB[9] 4 fn.6, 56; *see Cruz v. Ridge*, 383 F.3d 62, 64 (2d Cir. 2004) ("This Court has repeatedly

held that transfer orders are not appealable because they are interlocutory rather than final

orders"); *SEC v. Chestman*, 861 F.2d 49, 50 (2d Cir. 1988) (denying interlocutory challenge to

permissive intervention order because it could be reviewed on appeal from final judgment).

The United States nevertheless asserts that it is "*at liberty to collaterally attack*" these

Orders – or parts of them -- on jurisdictional grounds.  (AOB 57, emphasis added.)  Specifically,

the United States argues, the Transfer Order is jurisdictionally defective insofar as it purported to

transfer administrative matters to Delaware (AOB 37-38; see 39-56), and the Intervention Order

is jurisdictionally defective because it "implicitly adjudicate[d] the compensability of [legal]

services to be performed" (AOB 57).  Even assuming *arguendo* that the United States'

jurisdictional arguments were well-taken, which, they are note, the arguments simply do not give

this Court jurisdiction to review either of these Orders as part of the appeal from the December

23 Interim Fee Order and the July 18 Cash Collateral Order.

There are a few narrow exceptions that allow an appellate court to review interim orders;

the one cited by the United States is not one of them.[10]

---

[8] The United States did not seek interlocutory review of the Intervention Order, believing that such an effort would be "frivolous." (United States' Motion Pursuant to Rule 8003 for Leave (If Necessary) To Appeal 12/23/02 "Order On Debtor's Applications for Interim Compensation," filed January 2, 2003, seeking interlocutory, collateral order, and writ relief, at 31.) [Docket # 424]

[9] "AOB" is used herein to refer to the Appellant's Opening Brief.

[10] The United States is well aware of the established exceptions to the final judgment rule, because it has repeatedly cited them in seeking interlocutory review of various interim orders throughout the course of this litigation. (*See,*

First, a party may seek interlocutory review pursuant to Bankruptcy Rule 8003 and 28 U.S.C. § 158(a) – a bankruptcy statute that is roughly equivalent to 28 U.S.C. § 1292(b), and that is interpreted using the same standards. *E.g.*, *Americare Health Group v. Melillo*, 223 B.R. 70, 74 (E.D.N.Y. 1998) (and cases cited therein). The United States followed this interlocutory procedure when it sought review of the Transfer Order in this Court in 2001. (AOB 9.) At that time, the United States did not seek to challenge the administrative portion of the Transfer Order it seeks to challenge here, because it had "overlooked" it. (AOB 9, 13-14) It thus waived its opportunity to do so under section 28 U.S.C. § 158(a), which requires applications for review to be made within ten days of entry of the order in question. Unsurprisingly, this Court denied the United States' request to review the Transfer Order pursuant to 28 U.S.C. § 158(a), as it is well-settled that transfer orders are generally inappropriate for interlocutory review. *E.g.*, *Urban v. Hurley*, 261 B.R. 587, 591 (S.D.N.Y. 2001) (denying interlocutory review of order transferring adversary proceeding in bankruptcy); *Americare Health Group* at 72-74. (same). As noted above, the United States did not seek interlocutory review of the Intervention Order under 28 U.S.C. § 158(a) or any other theory.

Second, a party may seek review under the common law collateral order doctrine,[11] which permits the *immediate* appeal of an interlocutory order if it meets all three of the following requirements: "(1) the order must conclusively determine the disputed question; (2) the order must resolve an important question completely separate from the merits of the action; and (3) the order must be effectively unreviewable on appeal from final judgment." *Americare Health*

---

*e.g.*, United States' Motion Pursuant to Rule 8003 for Leave (If Necessary) To Appeal 12/23/02 "Order On Debtor's Applications for Interim Compensation," filed January 2, 2003, seeking interlocutory, collateral order, and writ relief.)

[11] The collateral order doctrine is also known as the *Cohen* doctrine, after the Supreme Court's decision in *Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541 (1949).

*Group,* 223 B.R. at 73 (denying review) (citing *Gulfstream v. Mayacamas Corp.,* 485 U.S. 271,
276 (1988); *Coopers & Lybrand v. Livesay,* 437 U.S. 463, 468 (1978)); *accord, E.g., Murphy v.
Reid,* 332 F.3d 82, 83-84 (2d Cir. 2003); *Cruz,* 383 F.3d at 64.

The United States does not seek review under this doctrine, undoubtedly because it is
well aware that the time for "immediate" appeal is long past. In any event, neither Order
qualifies for review under this doctrine. The Transfer Order fails to qualify because it can be
reviewed at the conclusion of the Adversary Proceeding. *Americare Health Group,* 223 B.R. at
73; *see Cruz,* 383 F.3d at 64 ("it is now well-settled in this Circuit that [habeas] transfer
orders . . . are not collateral" because they are "'effectively reviewable'" by the transferee court);
*accord, In re Dalton,* 733 F.2d 710, 717 (10th Cir. 1984) (cited in 15A Wright & Miller,
FEDERAL PRACTICE & PROCEDURE (1992 & 2005 Supp.) § 3914.12, n.19).

The Intervention Order likewise fails to qualify under the collateral order doctrine,
because it, too, may be reviewed – in *Delaware* – after a final judgment is entered in the
Adversary Proceeding. Indeed, the United States makes no effort to hide the fact that it is even
now "expressly appealing" the portion of the Intervention Order to which it objects in the
Delaware District Court. (AOB 57.)[12]

Third, a party may seek review under the related *Conrad* doctrine, which allows for
review in exceptional cases where hardship will ensue if immediate appeal is not allowed. *E.g.,
Eisen v. Carlisle & Jacquelin et al.,* 417 U.S. 156, 171 (1974). The United States does not and
cannot point to any such hardship here.

---

[12] The United States says that it is appealing the Intervention Order to the extent it contains an implicit ruling that
Akin Gump may receive fees. (AOB 57.) Akin Gump does not agree that the Order is appealable on this ground.
While Delaware is the proper venue to appeal the Intervention Order, any appeal must await final judgment in the
Adversary Proceeding.

Finally, a party may seek review by means of an extraordinary writ – like the petitioner in

*Blaski v. Hoffman*, 260 F.2d 317 (7th Cir.), *aff'd*, 363 U.S. 335 (1960), a case cited by the United

States in support of its argument that it may collaterally attack interlocutory orders "on

jurisdictional grounds that would render it void." (AOB 57.)   But the United State has not asked

for writ relief here, nor could it do so given the amount of time that has elapsed since the Orders

it seeks to challenge were entered. *E.g., In re Rappaport*, 558 F.2d 87, 90 n.9 (2d Cir. 1977)

(denying writ on grounds of delay); see 19 MOORE'S FEDERAL PRACTICE, § 204.02[9]

(explaining that a writ "must be timely"; rule of thumb is that a writ is timely if it is filed within

the time permitted for taking an appeal; writ petition must explain any reason for delay).  In any

event, writ relief is not available where, as here, petitioner retains "the possibility of an appeal

from the final judgment in the transferee [court]." *In re Dalton*, 733 F.2d at 717 (citing *Magnetic*

*Engineering & Manufacturing Co. v. Dings Manufacturing Co.*, 178 F.2d 866, 869-70 (2d Cir.

1950)); *see Stringfellow v. Concerned Neighbors in Action*, 480 U.S. 370, 384 (1987).

Instead of relying on any of the above-listed exceptional procedures, with which it is

well-versed, having repeatedly sought relief under each of them during this litigation on the same

issues, the United States makes a desperate, last-ditch effort to obtain interlocutory review of the

Transfer and Intervention Orders based on the novel and wholly unsupported theory that it may

disregard jurisdictional rules and collaterally attack an interlocutory order if it does so "on

jurisdictional grounds that would render [the order] void." (AOB 57.)  This new theory makes

no sense.  If a reviewing court lacks jurisdiction to consider a ruling, it necessarily lacks

jurisdiction to decide whether the ruling itself is jurisdictionally sound. *See Firestone Tire*, 449

U.S. at 379.

Neither of the cases the United States cites supports its newly-minted theory. First, the United States cites *United States Fidelity & Guaranty Co. v. Bray*, 225 U.S. 205 (1912), interpreting nineteenth century statutes to hold that a federal court of appeals properly reviewed and dismissed, on jurisdictional grounds, an interlocutory order granting injunctive relief. *Id.* at 213-15, 218-19. This case does not hold, as the United States suggests (AOB 57), that a party may collaterally attack any interlocutory ruling simply by challenging it on jurisdictional grounds -- rather, it simply permitted review of an injunction pursuant to the well-established statutory exception.[13] Because the Transfer and Intervention Orders the United States seeks to collaterally attack here are not orders concerning injunctive relief, the case is irrelevant.

Next, the United States cites *Hoffman v. Blaski*, 363 U.S. 335 (1960), affirming the Seventh Circuit's grant of an extraordinary writ to review a transfer order (AOB 57) -- but, as noted above, the United States hasn't sought writ review here, and is not entitled to writ relief, so this case is likewise irrelevant.

In sum, the United States can state no jurisdictional basis for this Court to review either of the Orders, or portions of Orders, it seeks to challenge in this appeal. This Court should therefore disregard the United States' arguments based on challenges to these Orders.

In an abundance of caution, Appellees nevertheless respond on the merits to the United States' jurisdictional arguments.

**2.    THE CONNECTICUT BANKRUPTCY COURT PROPERLY TRANSFERRED TO DELAWARE ISSUES CONCERNING INTERIM FEE APPLICATIONS FOR LEGAL SERVICES RELATED TO THE ADVERSARY PROCEEDING.**

The essence of the United States' argument is that a bankruptcy court in which a bankruptcy case is pending may not or should not relinquish control over the assets of the

---

[13] While the *United States Fidelity* Court looked to nineteenth century statutes, contemporary statutes likewise grant

bankruptcy estate by transferring a portion of the administration of the case to another

jurisdiction. (AOB 40.) But it is well-established that a bankruptcy judge has wide discretion to

administer and control a bankruptcy case assigned to him. 11 U.S.C. § 105(a); *see* 28 U.S.C.

§1412; Federal Rule of Bankruptcy Procedure 1014(a)(1)(transfer provisions).

    The Connecticut Bankruptcy Court here did not relinquish control over the assets of the

Debtor's Bankruptcy Estate, as the United States suggests. Rather, it transferred to the Delaware

Bankruptcy Court the right to evaluate and rule on the administrative expenses associated with

the Adversary Proceeding. *United States v. State Street Bank and Trust Co. (In re Scott Cable*

*Comms., Inc.)* 263 B.R. 6, 8 (Bankr. D. Conn. 2002) . The Connecticut Bankruptcy Court

retained control over the bankruptcy assets, and the Appellees anticipate that the Connecticut

Bankruptcy Court will review the legal fees awarded by the Delaware Bankruptcy Court when

the Debtor files its final fee application.[14] *In re Taxman Clothing Co.,* 49 F.3d 310, 4314 (7TH

Cir. 1995) ("all awards of interim compensation are tentative, hence reviewable—and

revisable—at the end of the case.") Thus, if the Connecticut Bankruptcy Court ultimately

determines that Akin Gump was over-paid, it can require Akin Gump to disgorge any amounts it

deems excessive. *E.g., Matz v. Hoseman,* 197 B.R. 635, 640 (N.D. Ill. 1996) (Courts permit

trustees and creditors to seek disgorgement of excess funds from professionals paid during the

course of bankruptcy proceedings).

---

Courts of Appeals jurisdiction over interlocutory rulings involving injunctive relief. 28 U.S.C. § 1292(a)(1).
[14] While the June 7, 2001 Transfer Order included a reference to transferring cash collateral applications as well, this ambiguity was effectively clarified both by the acts and words of the Connecticut Bankruptcy Court in ruling on the Cash Collateral Stipulation ("As stated on the record on June 5, 2002 [sic], any such determination by the Delaware court would be paid from cash collateral allowed *here* after notice and a hearing.") *In re Scott Cable Comms., Inc.,* 2002 Bankr. LEXIS 897 at *2. (Bankr. D. Conn. July 18, 2002) (emphasis added).

a.    **The Transfer of the Interim Fee Application To The Delaware Bankruptcy Court Does Not Defeat the Statutory Construction of Granting Exclusive Jurisdiction Over Chapter 11 Matters to the District Courts.**

Congress enacted  Section 1334 in response to the Supreme Court's decision in *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50 (1982), which held that under the then 28 U.S.C. § 1471 (since repealed), the "essential attributes of the judicial power" from the Article III district court was being vested in a non-Article III adjunct (the bankruptcy court) and that such a grant of jurisdiction  could not be sustained as an exercise of Congress's power to create adjuncts to Article III courts. *Id.* at 87.  28 U.S.C. § 1334 grants federal bankruptcy jurisdiction to the district courts and provides for mandatory abstention of certain state law claims.  Having thus established initial jurisdiction in the district courts, Congress added 28 U.S.C. § 157(a), which permits the district courts to refer most of the jurisdiction to the bankruptcy courts established by 28 U.S.C. § 151 as units of the district courts.  Subsections (a) and (e) of 28 U.S.C. § 1334 grant district courts jurisdiction over all cases under title 11 to the exclusion of state courts.  They are not intended to address jurisdictional disputes between district courts and have no bearing on the power of a bankruptcy court to transfer a fee application associated with an adversary dispute to the bankruptcy court that will be hearing that dispute, particularly where, as here, the first court retains control of the ultimate administration of the estate through its ruling on a final accounting and any disgorgement of fees.

b.    **The Transfer of Venue Statutes Authorized the Connecticut Bankruptcy Court's Transfer of Authority to Review Fee Applications Related to the Adversary Proceeding.**

The Connecticut Bankruptcy Court determined that it had authority under Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") 1014(a)(1), 28 U.S.C. §1412, and Bankruptcy Code section 105 to transfer the Adversary Proceeding to the Delaware Bankruptcy

Court along with fee applications related to that proceeding. *United States v. State Street Bank and Trust Co. (In re Scott Cable Comms., Inc.),* 263 B.R. 6, 8, Adv. Proc. No. 98-5104 (Bankr. D. Conn. June 7, 2002). The Connecticut Bankruptcy Court's determination was entirely proper under these provisions. Bankruptcy Rule 1014(a)(1) provides that a district court may transfer a case to another district court if it determines that the transfer is in the interest of justice or for the convenience of the parties; 28 U.S.C. § 1412 provides that a district court may transfer a case or proceeding under title 11 to a district court in another jurisdiction, in the interest of justice or for the convenience of the parties; and 11 U.S.C. § 105 provides that a bankruptcy court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of Title 11. *Id.* at 8. Ultimately, the decision to transfer or retain venue of a bankruptcy proceeding lies in the sound discretion of the bankruptcy court. *See In re Hechinger Inv. Co. of Delaware, Inc.,* 288 B.R. 398 (Bankr. D. Del. 2003).

In describing its authority under Bankruptcy Code section 105, the Connecticut Bankruptcy Court explained, "[s]ection 105(a) was enacted to permit courts a measure of flexibility from the literal language of the code to carry out the drafters' intent, recognizing that, under isolated circumstances, a literal reading might thwart its purpose." *In re Scott Cable Comms., Inc.,* 263 B.R. 6, 8, (Bankr. D. Conn. 2002); *see In re Raytech,* 222 B.R. 19, 24 (Bankr. D. Conn.1998) (holding that "[s]ection 105(a) was enacted to permit courts a measure of flexibility from the literal language of the Code to carry out the drafters' intent, recognizing that under isolated circumstances, a literal reading might thwart its purpose."); *N. Parent, Inc. v. Cotter & Company (In re N. Parent, Inc.),* 221 B.R. 609, 631 (Bankr. D. Mass. 1998) (invoking Bankruptcy Code section 105 to transfer venue pursuant to 28 U.S.C. § 1412); *In re Southern Shores Investments Corp.,* 95 B.R. 304, 307 (Bankr.D.Del. 1988) (same).

The United States cites no authority to support its argument that the Connecticut Bankruptcy Court lacked authority to transfer the fee application proceeding to Delaware. (AOB 39-46) Nothing in the Judicial Code, the Bankruptcy Code or the Bankruptcy Rules prohibits a court from transferring an administrative proceeding that is "part" of a case under title 11 to a bankruptcy court in another district.

Indeed, the notion that a fee application may *not* be transferred is contradicted by 28 U.S.C. § 157(d).[15] Under that statute, a district court may "withdraw, in whole *or in part*, any case or proceeding referred under [section 157], on its own motion or on timely motion of any party, for cause shown." 28 U.S.C. § 157(d) (emphasis added); *see SEC v. Churchill Securities, Inc. (In re Churchill Mortgage Invest. Corp.),* 223 B.R. 415, 419 (S.D.N.Y. 1998) (bankruptcy court may transfer fee applications based on the following considerations: (1) the most efficient use of judicial resources; (2) the delay and costs to the parties; (3) promotion of uniformity in bankruptcy administration; and (4) prevention of forum shopping).[16]

Here, the Connecticut Bankruptcy Court properly transferred authority to resolve fee applications to the Delaware Bankruptcy Court because it found that it was "in the interest of justice" to do so. *In re Scott Cable Comms., Inc,* 263 B.R. 6, 8 (Bankr. D. Conn. 2001); *see In re Iridium Operating, LLC,* 285 B.R. 822, 836 (S.D.N.Y. 2002) (transfer analysis examines

---

[15] Under 28 U.S.C. § 157(a) each district court may provide that any or all cases under title 11 and any or all proceedings arising under title 11 or arising in or related to a case under title 11 shall be referred to the bankruptcy judges for the district. Under § 157(b)(1) bankruptcy judges may hear and determine all cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11, referred under subsection (a) of this section, and may enter appropriate orders and judgments, subject to review under section 158 of this title. The Adversary Proceeding is a "core matter" under section 157(b)(2)(K).

[16] The court in *Churchill Mortgage* decided to retain jurisdiction over the fee application in the bankruptcy case based on its finding that a bankruptcy judge should make the determination on the fee application, as opposed to an Article III judge, and the fact that "withdrawing the plaintiff's motion [from the bankruptcy court to the district court] would not advance the interest of judicial economy" based on the facts specific to that case. *Id.* at 419 (*citing Shawmut Bank Connecticut v. Lawrence,* 209 B.R. 588, 590 (N.D.N.Y. 1997)

whether the transfer "would promote the efficient administration of the bankruptcy estate, judicial economy, timeliness and fairness"); *see also id.* ("interest of justice" standard is a broad and flexible standard to be applied on a case-by-case basis).

The United States nevertheless argues that a fee application proceeding may not be severed from a bankruptcy case, and is not the type of "proceeding" that may be transferred to another district court, because it is a "proceeding under a case" as opposed to a "proceeding arising under a case" and is thus the type of proceeding "exclusive" to the jurisdiction of the bankruptcy courts. The United States argues that 28 U.S.C. § 1412 only authorizes transfer of an entire bankruptcy case (as opposed to a "part" of a case) or a civil proceeding (meaning an "adversary proceeding," *i.e.* one that is commenced by way of a summons or complaint). (AOB 40, 46). It describes at length the legislative history of both the Senate report and the House report in making recommendations and changes to the text of the 1978 Bankruptcy Reform Act. The changes to the language in the jurisdictional and venue statutes are, however, irrelevant to this Court's determination of this issue because the Connecticut Bankruptcy Court's Transfer Order involves the transfer of a determination of an *interim* fee application to another bankruptcy court whose ruling on the interim fees application is ultimately subject to the final review by the bankruptcy court administering the case.

Likewise, the United States misses the point when it argues that the transfer of an administrative matter "would render the 'exclusive' jurisdiction over the 'case' meaningless" and "mean that state courts could hear matters fundamental to the administration of a bankruptcy estate," (AOB 52). A transfer of an "administrative part" of a case under 28 U.S.C. § 1412 would *not* mean that "state courts could hear matters fundamental to the administration of a

18

bankruptcy estate" because § 1412 authorizes transfers of the venue of a case or proceeding *to a district court from another district,* not to a *state* court.

###   c.    "Law of the Case" Doctrine Is Not Relevant to Rulings on Interim Fee Applications Associated with the Adversary Proceeding.

The United States suggests that "the split of jurisdiction over administration of the estate also causes issues to arise over proper application of 'law of the case' principles in light of the inability of the government to appeal one court's ruling in another district." (AOB 44)  But the "law of the case" doctrine does not apply to an interim fee application.   As the Fifth Circuit explained in *Matter of Evangeline Refining Co.,* 890 F.2d 1312, 1321-22 (5th Cir. 1989),

> [F]or the law of the case doctrine to apply [to an interim fee order], only a final ruling will do. . . . Finality in this sense does not refer to technical concepts of finality but rather is a functional finality which seeks to identify a determination intended to put a matter to rest.  Interim fee awards are not final determinations intended to put a matter to rest.  Rather, they are interlocutory and reviewable, and are intended only to provide some interim relief from the economic hardships of subsidizing litigation.  Thus, we conclude that the law of the case doctrine does not apply to interim fee awards and Judge Boe was not obligated to apply the doctrine when reviewing Judge Bernard's interim awards.

(Citations and internal quotations omitted); *accord, In re Kendavis Indus. Int'l,* 91 B.R. 742, 746-47 (Bankr. N.D. Tex.1988) (rejecting law of the case doctrine for interim fee awards).

Because an interim fee award by the Delaware Bankruptcy Court will have no "law of the case" effect when the Connecticut Bankruptcy Court rules on the Debtor's final fee application, the United States' concerns over "law of the case" in this context are baseless.

### 3.    THE CONNECTICUT BANKRUPTCY COURT DID NOT ABUSE ITS DISCRETION IN APPROVING THE CASH COLLATERAL STIPULATION.

The United States challenges the Connecticut Bankruptcy Court's approval of the Cash Collateral Stipulation on a number of grounds.  First, the United States claims the Connecticut

Bankruptcy Court improperly interpreted the Intervention Order as ruling on the Cash Collateral Stipulation. Second, the United States argues that the Court should not have "assumed" that the Debtor's funds constituted the collateral for the Indenture Trustee's lien while the validity of the Indenture Trustee's lien was still being litigated. Finally, the United States argues that it was improper to approve a Cash Collateral Stipulation that will permit estate funds to be used to pay the Debtor's counsel for an "improper purpose". As we show, all of these arguments are meritless.

a. <strong>The Indenture Trustee Was Entitled to Assert Lien Rights on Behalf of the Junior Secured PIK Note Holders for the Purpose of the Cash Collateral Stipulation.</strong>

Bankruptcy Code section 363(c)(1) provides that "if the business of the debtor is authorized to be operated under . . .§ 1108," and "unless the court orders otherwise, the [debtor] may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing."[17]  Bankruptcy Code section 363(c)(1) also permits the debtor to use secured property, *other than cash collateral* as defined in subsection (a), without the secured creditor's permission and consent.

Under section 363(c)(2), if the secured property constitutes cash collateral,[18] the debtor may not use, sell, or lease the cash collateral unless it obtains either (A) the consent of "each entity that has an interest in such cash collateral," or (B) authorization from the Court after notice and a hearing. 11 U.S.C. §§ 363(c)(2)(A) and (B). Since the Sale Proceeds come within the

---

[17] 11 U.S.C. §1108 permits the debtor's business to continue in operation unless the court orders otherwise.

[18] Under Bankruptcy Code section 363(a), "cash collateral" includes "cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest and includes the proceeds, products, offspring, rents, or profits of property . . . , whether existing before or after the commencement of a case under this title."

definition of cash collateral under Bankruptcy Code section 363(a), they constitute the Junior

Secured PIK Note Holders' cash collateral (the "Cash Collateral") and the Debtor was required

either to obtain the consent of the Indenture Trustee, on behalf of the Junior Secured PIK Note

Holders, as the entity having a secured interest in the Sale Proceeds (alternatively, "Cash

Collateral"), or file a motion to obtain that authority.  It is undisputed that the Debtor succeeded

in obtaining the consent of the Indenture Trustee to its use of the Cash Collateral, so a motion

under 11 U.S.C.§ 363 was not necessary.[19]

The Junior Secured PIK Note Holders acquired their security interest as a result of the

confirmation of the Debtor's 1996 Chapter 11 Plan, which provided that "New Restructured

Third Secured [Junior] PIK Note[s] shall . . . (iv) be secured by a lien on all of the assets of

[Reorganized] Scott . . . ."  *United States v. State Street Bank and Trust Co., (In re Scott Cable*

*Communications, Inc.)*, 232 B.R. 558 at 561 (Bankr.D.Conn. 1999) (citing applicable provisions

of the Delaware Plan), *rev'd*, 259 B.R. 536 (2001), *appeal pending.*

The United States contends that it was improper to assume that the Bankruptcy Estate's

funds constituted "collateral" while the Indenture Trustee's security interest was being litigated.

First, the United States argues that since this Court (in ruling on the United States' appeal of the

Indenture Trustee's order of dismissal on Motion for Summary Judgment) "found that the

government is not bound by the 1996 plan and confirmation order" (AOB 60), then the

Connecticut Bankruptcy Court should not be bound by it, either (*i.e.*, regarding the secured notes

issued to the Indenture Trustee under the 1996 confirmed plan).  That is not the law.  This

Court's determination that the Plan does not have a *res judicata* effect barring the United States

21

from pursuing its Adversary Proceeding against the Indenture Trustee does not foreclose or diminish the Junior Secured PIK Note Holders' lien rights in the Cash Collateral. *See United States v. State Street Bank & Trust Company,* 259 B.R. 536, 545-548 (D.Conn. 2001) (finding that while the Delaware Plan and Delaware Disclosure Statement provided assurance that upon confirmation the holders of the Third Secured PIK Notes would hold secured claims rather than unsecured claims, these documents failed to adequately provide notice to the IRS that under certain scenarios the IRS would be precluded from, or limited in any way from pursuing a claim against the "Reorganized Scott once the Delaware Plan was confirmed).

Bankruptcy Code section 363 does not require a secured creditor to "prove-up" its lien before it is able to assert lien rights in the Cash Collateral. *See* 11 U.S.C. § 363(c)(2)(A). The Junior Secured PIK Note Holders have a *prima facie* right to claim lien status and, as such, to exercise their rights to consent to the Debtor's use of the Cash Collateral. *See In re Matis,* 73 B.R. 228, 235 (where the interim fee application of debtor's attorney was granted notwithstanding creditor's objection that litigation was still pending over security interest). Accordingly, the Indenture Trustee, on behalf of the Junior Secured PIK Note Holders was empowered to assert its lien rights by entering into a stipulation with the Debtor for the use of its Cash Collateral.

     **b.**     **Contrary to the United States' Assertions, the Connecticut Bankruptcy Court Did Not Permit the Delaware Bankruptcy Court to Adjudicate the Cash Collateral Stipulation.**

The United States argues that the Connecticut Bankruptcy Court failed to rule on its objections to the Cash Collateral Stipulation based on the Court's perception that it was

---

[19] Under Federal Rule of Bankruptcy Procedure 4001(d) and 9014, the Debtor was still required to move for approval of the Cash Collateral Stipulation with service on the entities required thereunder. There is no dispute as to the Debtor's compliance with these Rules.

precluded from ruling on cash collateral issues already adjudicated by the Delaware Bankruptcy Court when it granted the Intervention Order. This approach represents yet another effort to bootstrap into this appeal an impermissible collateral attack on the Intervention Order. The United States cannot attack that order here, nor can it complain that the Connecticut Bankruptcy Court deferred to the Delaware Court, because it was required to do under "law of the case" doctrine.

"Law of the case" requires courts to follow their own prior decisions as well as those of coordinate courts. *Christianson v. Colt Industries Operating Corp.*, 486 U.S. 800, 815-16 (1988) ("This rule of practice promotes the finality and efficiency of the judicial process ... [T]he doctrine applies as much to the decisions of a coordinate court in the same case as to a court's own decisions."); *Chrysler Credit Corp. v. Country Chrysler Inc.*, 928 F.2d 1509, 1516 (10th Cir.1991) (citing *Magnetic Eng'g & Mfg. v. Dings Mfg.*, 178 F.2d 866, 868 (2d Cir.1950) (L. Hand, J.)) ("[W]hen an action is transferred, it remains what it was; all further proceedings in it are merely referred to another tribunal, leaving untouched whatever has been already done."); *see id.* ("Traditional principles of the law of the case counsel against the transferee reevaluating the rulings of the transferor court, including its transfer order"); *Arizona v. California*, 460 U.S. 605, 618 (1983) (Under the doctrine of the law of the case, "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case").

In its July 18, 2002 ruling on the Cash Collateral Order, the Connecticut Bankruptcy Court made clear that the objections raised by the United States *to the use of the cash collateral* had all been raised in the June 5, 2001 hearing in front of the Delaware Bankruptcy Court on the Debtor's intervention motion. The Connecticut Bankruptcy Court quoted from the March 4

23

Intervention Order where the Delaware Bankruptcy Court rejected these very arguments. *In re Scott Cable Comms., Inc.,* 2002 Bankr. LEXIS 897 (D. Conn. 2002). The Connecticut Bankruptcy Court did not "interpret" the Delaware Bankruptcy Court's order as a decision on the issue of using estate funds to pay attorney fees for the Debtor. Rather, it exercised its discretion to find that allocating a budget for attorneys' fees related to the intervention was appropriate given the Delaware Bankruptcy Court's approval of the intervention. As the Connecticut Bankruptcy Court noted, "all the permission to use cash collateral does is saying that if the debtor is able to show a judge, that judge, this judge, that there is necessary and reasonable attorneys fees, there's a place to get it. No skids are greased." [May 1, 2002 Hearing Transcript at p. 30:10-13; Docket # 367]

The Connecticut Bankruptcy Court properly exercised its discretion in approving the Cash Collateral Stipulation in keeping with law of the case.

### c.    The United States' Objections to the Cash Collateral Order Are All Improper Collateral Attacks on the March 4, 2002 Intervention Order.

The United States continues its improper collateral attack on the Delaware Bankruptcy Court's March 4, 2002 Intervention Order by arguing that the Debtor's use of Cash Collateral to pay the Debtor's attorneys' fees associated with the adversary proceeding violates Bankruptcy Code section 330(a)(4)(A)(ii), "which expressly prohibits compensation for 'services that were not – (I) reasonably likely to benefit the debtor's estate; or (II) necessary to the administration of the case.'" (AOB 64.) Along the same lines, the United States also argues that that the Debtor owes a primary fiduciary duty to its unsecured creditors before its duty to its secured creditors, and that by pursuing the Adversary Proceeding, the Debtor is in violation of that duty and counsel's fees are not reasonably likely to benefit the estate. These arguments not only fail to address *any* of the legal issues pertinent to an analysis of the July 18 Cash Collateral Order, they

address the very same issues the Delaware Bankruptcy Court rejected when it granted the Intervention Order.[20]

The Cash Collateral Stipulation and Order do not require the Debtor to use the Cash Collateral in a certain manner, but rather provide that, should the Debtor use the Cash Collateral in which the Junior Secured PIK Note Holders asserts a security interest, it must abide by the spending parameters set by the 2002 Budget. This limitation was granted to protect the Junior Secured PIK Note Holders' interests in the Debtor's Sale Proceeds.

The proposed use of the Cash Collateral in the 2002 budget was well within the ordinary course and scope of the previously court authorized activities for the Debtor and the Debtor's counsel, Akin Gump. *United States v. State Street Bank and Trust Co. (In re Scott Cable Comms., Inc.)*, 2002 Bankr. LEXIS 183, Adv. Proc. No. A-0104605, at *9 (Bankr. D. Del. March 4, 2002) (the Debtor properly intervened in the Adversary Proceeding because, *inter alia*, the Debtor had "an interest and fiduciary duty, as debtor in possession, to ensure that the Estate's assets [were] distributed in accordance with the proper legal and equitable priorities of the parties in interest.").[21]

Regardless of its status as collateral, the Debtor's cash, *i.e.* the Sale Proceeds, like unencumbered funds, "may be disbursed to professionals during the pendency of a bankruptcy case only in accordance with the relevant provisions of the Bankruptcy Code." *In re Pannebaker Custom Cabinet Corp.*, 198 B.R. 453, 465 (Bankr. M.D. Pa. 1996). The relevant restrictions on such payments, in addition to secured party consent under Bankruptcy Code section 363(c)(2),

---

[20] The Delaware Court has already ruled that the Debtor had a *duty* to intervene, and thus its involvement *benefits* the estate, contrary to the United States' assertions.

[21] The Delaware Bankruptcy Court categorically determined that it *was* necessary for the Debtor to be involved in the Adversary Proceeding because it had a duty to its creditors. *Id.* at *11. It also ruled that the fact that the Debtor's Management might benefit from the Debtor's involvement did not alter that duty. *Id.* at *12.

are found in Bankruptcy Code section 330's provisions for the retention of professionals and payment of fees and reimbursement of expenses, as supplemented by the Bankruptcy Rules, local rules, applicable guidelines promulgated by the Office of the United States Trustee and orders of the court.

On June 8, 1999, the Connecticut Bankruptcy Court entered the "Order Authorizing the Retention of Akin Gump Strauss Hauer & Feld, LLP as Substitute General Bankruptcy Counsel for the Chapter 11 Debtor and Withdrawal of Strook & Strook & Lavan LLP as General Bankruptcy Counsel" [Docket #209] (the "Akin Gump Retention Order"). Pursuant to the Akin Gump Retention Order, (1) Akin Gump was retained on the terms set forth in its employment application filed on June 2, 1999 [Docket #204] (the "Akin Gump Retention Application") and (2) the Debtor was authorized to compensate Akin Gump in accordance with sections 330 and 331 of the Bankruptcy Code, the Bankruptcy Rules, and such other procedures as may be fixed by order of the Court (collectively, the "Compensation Rules"). The Akin Gump Retention Application provides that Akin Gump will perform all legal services for the Debtor which may be necessary in the Debtor's chapter 11 case, including, without limitation, with respect to the filing of motions and other documents, including adversary proceedings, and appearances in court to protect the interests of the Debtor.

The services provided to the Debtor by Akin Gump in connection with the intervention in and prosecution of the Adversary Proceeding, this appeal, and the underlying bankruptcy case in the Connecticut Bankruptcy Court all fall within this broad definition. Therefore, regardless of the status of the Cash Collateral Stipulation, the Debtor has ample authority to compensate Akin Gump in connection with these matters (upon the filing and review of an interim fee application).

**4.    THE CONNECTICUT BANKRUPTCY COURT DID NOT ABUSE ITS DISCRETION IN APPROVING THE INTERIM FEE APPLICATION.**

Citing Bankruptcy Code section 330(a)(4), the United States challenges the Connecticut Bankruptcy Court's December 23 Interim Fee Order approving Akin Gump's interim fee application to the extent it included interim fees (1) that resisted the conversion of the case to a chapter 7 or alternatively resisted the appointment of a chapter 11 trustee; or (2) that performed "other services that were ultimately directed not at obtaining a recovery for unsecured creditors, but rather at advancing the interests of the Debtor's management in personally earning millions of dollars by upholding the validity of the security interest for the junior notes."[22] (AOB 64.)  It also challenges the award on the grounds that it violates the statutory priority rule.  The United States is wrong.  As we explain, the Connecticut Bankruptcy Court acted well within its discretion in awarding interim fees to Akin Gump.

**a.    Akin Gump's Legal Services Were Necessary and Appropriate.**

According to the United States, Akin Gump's legal services were inappropriate under Bankruptcy Code section 330  to the extent they advanced the interests of the Debtor's management in upholding the validity of the Junior Secured PIK Note Holders.[23]  This argument is wholly without merit because, as detailed in the interim fee application filed by Akin Gump with the Connecticut Bankruptcy Court, the compensation sought by Akin Gump in the Connecticut Bankruptcy Court is for services provided on behalf of the Debtor acquitting its fiduciary duty and is unrelated to the Adversary Proceeding pending in the Delaware Bankruptcy Court.

---

[22] 11 U.S.C.§ 330(a)(4) provides that the court shall not allow compensation for-- (i) unnecessary duplication of services; or (ii) services that were not- (I) reasonably likely to benefit the debtor's estate; or (II) necessary to the administration of the case.

[23] These are the same arguments that the United States raises in opposition to the July 18 Order and the Intervention Order.

It is beyond dispute that the Akin Gump fees approved by the Connecticut Bankruptcy Court in its December 23 Interim Fee Order were all in the realm of services that debtors' counsel are required to provide to debtors. As evidenced by Akin Gump's Fee Application [[Docket # 390], Akin Gump sought reimbursement for fees in six areas: (1) typical case administration, (2) the cash collateral applications, (3) the motions by the United States for conversion of the Chapter 11 case and/or the appointment of a Chapter 11 trustee, (4) the appeal that resulted from the Connecticut Bankruptcy Court's grant of the cash collateral application and denial of the conversion motion, and (5) the fee application. In addition, the time records attached as an exhibit to the fee application demonstrate that fees were also incurred for case management purposes, handling creditor inquiries, and dealing with issues related to the automatic stay. All of these services are typical services that debtor's counsel is expected to provide.

> **(i)**    **The Connecticut Bankruptcy Court Acted Within Its Discretion in Allowing the Fees Incurred in Negotiating and Handling the Cash Collateral Stipulation.**

In order to pay Akin Gump for any of its legal services, as discussed above, the Debtor was required to enter into the Cash Collateral Stipulation. Without the Cash Collateral Stipulation, the Debtor would have been unable to pay Akin Gump even for the services of handling minor automatic stay issues since the Debtor had no cash or access to cash that was not encumbered by the liens of the Junior Secured PIK Note Holders. Thus, the Connecticut Bankruptcy Court certainly acted within its discretion to approve the fees incurred by Akin Gump in negotiating and handling issues related to the Cash Collateral Stipulation.

**(ii)    The Connecticut Bankruptcy Court Acted Within Its Discretion in Allowing the Fees Incurred in Litigating the Conversion/Trustee Motion.**

Similarly, the Connecticut Bankruptcy Court acted within its discretion in allowing the fees incurred by Akin Gump in defending against the attempts by the United States to convert the Chapter 11 case to one under Chapter 7 or to appoint a trustee. As a debtor-in-possession, the Debtor has a duty to object to improper claims and contentions, and to attempt to preserve as much of the estate as possible for the benefit of rightful creditors. *International Yacht & Tennis, Inc. v. Wasserman (In re International Yacht & Tennis)*, 922 F.2d 659, 663 (11th Cir. 1991); *see also In re Cybergenics Corp.*, 226 F. 3d 237, 243 (3d Cir. 2000) (noting that the paramount duty of a debtor in possession in bankruptcy case is to act on behalf of bankruptcy estate and for benefit of creditors); *In the Matter of Ribs-R-Us, Inc.*, 828 F. 2d 199, 203 (3d Cir. 1987) (stating that upon filing Chapter 11 petition, debtor-in-possession assumes duties of a trustee and has status of fiduciary for benefit of creditors). Further, as noted by the Delaware Bankruptcy Court, the Debtor also has a duty to protect a negotiated plan of reorganization, capital structure and its estate. *See United States v. State Street Bank and Trust co. (In re Scott Cable Communications, Inc.)*, 2002 Bankr. LEXIS 183, Adv. Proc. No. A-01-04605, at *11 (Bankr. D. Del. March 4, 2002).

Here, the Debtor had a duty to defend against the attempts by the United States to convert the Chapter 11 case to Chapter 7 or to appoint a trustee because, *inter alia*, it would have added significant costs to the administration of the case. A chapter 7 or chapter 11 trustee would have to spend time and resources to understand the lengthy history of this case and to take part in the Adversary Proceeding (which the Debtor is no longer actively participating in). The Debtor, in carrying out its fiduciary duties, protected the estate from incurring such costs. Additionally, the

benefit that Debtor's management would gain with the appointment of a chapter 11 trustee or with conversion is unclear and speculative at best (though the United States argues there would be some benefit).

The Debtor's duty to maximize the value of the estate for its creditors is not altered by any beneficial effect that Debtor's participation in the Adversary Proceeding may have on its management. As argued before the Connecticut Bankruptcy Court at the December 3, 2002 hearing on the Akin Gump interim fee application [Docket # 413], the Debtor's management was intentionally given an interest in any recovery for the Junior Secured PIK Note Holders in connection with the Debtor's First Case in order to induce management to maximize the enterprise value of the Debtor's business and, thereby, the recovery for creditors upon a sale of the Debtor's assets, which is a fairly typical arrangement in chapter 11 cases. Management achieved its goal by obtaining the best sale price possible for the Debtor's assets. Based on the economic trends in the telecommunication and cable industry at that time, the sale of the Debtor's assets would have yielded much less money had the assets been sold later. Further, if the assets had not been sold, there would be no funds to distribute to creditors and the Debtor would have languished in bankruptcy. In short, in carrying out its fiduciary obligations to the creditors, the members of management did exactly what they were required to do.

The cases cited by the United States (AOB 66-67) are inapposite because they involve attorneys who had some actual conflict with the debtors, their affiliates or their owners, or provided services that clearly failed to benefit the debtor's estate. *In re Smith Technology Corp.*, No. Civ. A. 99-132, 1999 U.S. Dist. LEXIS 20811 (D. Del. Dec. 23, 1999)1999 ; *In re Golden Recipe Chicken, Inc.*, 109 B.R. 692 (Bankr. W.D. Pa. 1990); *In re Global Int'l Airways Corp.*, 82 B.R. 520 (Bankr. W.D. Mo. 1988); *In re Kendavis Industries Intern., Inc.*, 91 B.R. 742, 751-52

30

(Bankr. N.D. Tex. 1988). These cases are inapposite, because there is no showing that Akin

Gump's efforts on behalf of the Debtor have failed to benefit the Debtor's estate or that Akin

Gump has any conflict of interest with the Debtor.

The United States' unsupported argument that Akin Gump's services are prohibited by

section 330(a)(4) is meritless. Given the Debtor's duty to act on behalf of *all* its creditors, the

Connecticut Bankruptcy Court acted well within its discretion in granting Akin Gump's interim

fee application.

b.    **The December 23, 2002 Interim Fee Award to Akin Gump Does Not Violate the Statutory Priority Rules.**

In addition to challenging the "propriety" of the fees awarded to Akin Gump, the United

States challenges the amount of fees awarded on various grounds, arguing that "100% payment

of the allowed interim fees should not have been awarded where the estate is administratively

insolvent and where the Debtor's counsel, at best, will only get paid a *pro rata* share of its

expenses *if* the Debtor loses the Adversary Proceeding." (AOB 69.) The United States claims

that the award thus violates the statutory priority rules.[24]

This rule does not apply here because the Indenture Trustee has consented to the Debtor's

use of its Cash Collateral.[25] Further, the United States' argument is improperly based on the

speculative assumption that it will prevail in the Adversary Proceeding.

A debtor in possession "may collect fees and expenses from encumbered assets if either

(a) the party on whose behalf the rents and income are held as cash collateral *consents* impliedly

or expressly, or (b) if the trustee or debtor in possession meets the exception set forth in 11

U.S.C. § 506(c)". *In re 680 Fifth Avenue Assoc.*, 154 B.R. 38, 43 (Bankr. S.D.N.Y. 1993); *In the*

---

[24] The United States acknowledges that other courts have "admittedly refused to view administrative insolvency as a reason to deny compensation." (AOB 70.)

*Matter of CD Electric Company, Inc.*, 146 B.R. 786, 789 (Bankr. N.D. Ind. 1992) ("[O]ne may recover compensation and expenses from encumbered assets if the secured creditor consented to the charges.")  Because the Indenture Trustee for the Junior Secured PIK Note Holders, the only creditor who currently has an asserted claim against the Cash Collateral, has consented to the payment of interim fees to Akin Gump, full interim payment of fees and expenses to Akin Gump is appropriate and warranted.

The cases cited by the United States (AOB 69-70) are inapposite, because they involve secured parties who did not agree to the use of estate funds to pay interim fees. *See General Electric Credit Corp. v. Levin & Weintraub (In re Flagstaff Foodservice Corp.)*, 739 F.2d 73 (2d Cir. 1984) (holding approval of interim fee award to counsel was improper because counsel's services did not benefit the secured creditor, and the secured creditor did not consent to the use of cash collateral to pay counsel's fees); *In re Barron,* 73 B.R. 812, 813 (Bankr. S.D. Cal. 1987); *In re IML Freight, Inc.,* 52 B.R. 124, 138 (Bankr. Utah 1985); *In re Energy Co-op,* 55 B.R. 957, 964-65 (Bankr. N.D. Ill. 1985).

Further, the United States assumes that its administrative claim against the Debtor's estate will be paid prior to payment to the Junior Secured PIK Note Holders.  The issue, however, of the priority of the United States' claims is the subject of the Adversary Proceeding, which has not yet been decided.  Therefore, no reason exists to bar interim payment, which is subject to disgorgement should it turn out to be excessive.  *Leighton Holdings, Ltd. v. David Belofsky & Associates (In re Kids Creek Partners)*, 1997 U.S. Dist. LEXIS 15715, No. 97 C 3949, 97 V 5776, 94 B 23947 (N.D. Ill. Oct. 2, 1997) (where creditor's alleged administrative claim was contingent on prevailing in an adversary proceeding, payment of interim fees was

32

warranted unless and until creditor succeeded or creditor's success was imminent); *see also In re*

*Matis*, 73 B.R. 228, 235 (Bankr. N.D.N.Y. 1987) (where creditor did not have security interest in

debtor's assets and nature of any potential security interest was pending in litigation, denial of

interim compensation solely on strength of creditor's objection would be inequitable and

premature).

Because the Indenture Trustee for the Junior Secured PIK Note Holders consented to the

payment of legal fees, and because the United States' success in the Adversary Proceeding is not

a foregone conclusion, the Connecticut Bankruptcy Court properly exercised its discretion in

awarding interim fees to Akin Gump.

## CONCLUSION

For the foregoing reasons, the Court should affirm the Connecticut Bankruptcy Court's

(1) July 18, 2002 order approving the Cash Collateral Stipulation and denying the motion to

convert case to chapter 7 or alternatively appoint a receiver; and (2) the Connecticut Bankruptcy

Court's December 23, 2002 order awarding interim fees to Akin Gump.

Dated: Bridgeport, Connecticut

May 17, 2005                        AKIN GUMP STRAUSS HAUER & FELD LLP


                                    Daniel H. Golden
                                    Shuba Satyaprasad (admitted *pro hac vice*)
                                    590 Madison Avenue
                                    New York, New York  10022
                                    (212) 872-1000

                                    L. Rachel Helyar (*pro hac vice* application to be filed)
                                    Anne K. Edwards (*pro hac vice* application to be filed)
                                    2029 Century Park East, Ste. 2400
                                    Los Angeles, California 90067
                                    (310) 229-1000                        -and-

                                    ZEISLER & ZEISLER P.C.

Craig Lifland
558 Clinton Avenue
Bridgeport, CT 06605
(203) 368-4234

Co-Counsel to the Debtor