UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| In re: ) | **No. 3:02-CV-1725 (AWT)** |
| ) | (consolidated bankruptcy appeals) |
| SCOTT CABLE COMMUNICATIONS, INC., ) | (Bankr. Ct. Case No. 98-51923) |
| ) | |
| Debtor. ) | |
| ) | |
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Appellant, ) | |
| v. ) | |
| ) | |
| SCOTT CABLE COMMUNICATIONS, INC., ) | |
| STATE STREET BANK AND TRUST CO. as ) | |
| Indenture Trustee for certain note holders, and ) | |
| AKIN, GUMP, STRAUSS, HAUER & FELD, LLP, ) | |
| ) | |
| Appellees ) | |
| ) | |

**UNITED STATES' COMBINED REPLY BRIEF**

PETER SKLAREW
Federal Bar No. CT 17864
Tax Division
U.S. Department of Justice
P.O. Box 55
Washington, D.C. 20044-0055
(202) 307-6571

*Local Counsel:*

KEVIN J. O'CONNOR
United States Attorney
ANN M. NEVINS
Assistant United States Attorney
Federal Bar No. CT06484
915 Lafayette Blvd., Room 309
Bridgeport, CT  06604
(203) 696-3000

# TABLE OF CONTENTS

**Introduction** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**Correction of Typos in Opening Brief** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

**A.**   **REPLY TO THE INDENTURE TRUSTEE'S BRIEF ON THE CONVERSION
APPEAL** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

**B.**   **REPLY TO DEBTOR'S AND AKIN GUMP'S BRIEF ON THE CASH
COLLATERAL AND INTERIM FEES ISSUES** . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

      **1.**   **There is Virtually No Chance of this Appeal Becoming Moot** . . . . . . . . . . . 12

      **2.**   **The Argument that the 7/18/02 Order "Clarified" the Transfer
Order is Untenable** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

      **3.**   **The Connecticut Application Included Services Directed at Upholding
the Security Interest in Favor of the Junior Notes** . . . . . . . . . . . . . . . . . . . . 15

      **4.**   **The United States Is Not Appealing the Intervention Order and This
Court Does Have Jurisdiction to Consider the Whether the Transfer
of Administrative Matters was Void** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

      **5.**   **Debtor's Arguments Regarding Retention of Jurisdiction, Law of the
Case, and Collateral Estoppel, are Internally Inconsistent and Two-Faced** . 21

      **6.**   **"Law of the Case" Does Not Apply Across Different Disputes** . . . . . . . . . . . 23

      **7.**   **Neither Rule 1014, Nor § 105, Nor 28 U.S.C. 157(d), Authorized the
Transfer of Administrative Matters** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

      **8.**   **The United States Does Not Argue that Only Adversary Proceedings
May Be Transferred** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

      **9.**   **Appellees Distort the Duties of a Trustee** . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

      **10.**   **Appellees Arguments For Violating Priorities All Boil Down to
Assuming the Validity of the Disputed Security Interest** . . . . . . . . . . . . . . . 29

**Conclusion** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

# TABLE OF AUTHORITIES

**Cases:**

*Boguslavsky v. Kaplan*, 159 F.3d 715 (2d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Bowers v. Connecticut Nat. Bank*, 847 F.2d 1019 (2d Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Hawksbill Sea Turtle v. FEMA*, 126 F.3d 461 (3d Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*In re Golden Recipe Chicken, Inc.*, 109 B.R. 692 (Bankr. W.D.Pa. 1990) . . . . . . . . . . . . . . . . . . 28

*In re Indian Motocycle Co.*, 261 B.R. 800 (1st Cir. BAP 2001) . . . . . . . . . . . . . . . . . . . . . . . . 18, 19

*In re Kean Corp.* 205 B.R. 690 (Bankr. S.D.N.Y. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*In re Ludlow Hospital Society, Inc.*, 124 F.3d 22 (1st Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*In re Lundborg*, 110 B.R. 106 (Bankr. Conn. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*In re Maghazeh*,  310 B.R. 5 (Bankr. E.D.N.Y. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*In re Maghazeh*, 315 B.R. 650 (Bankr. E.D.N.Y. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*In re Matis*, 73 B.R. 228 (Bankr. N.D.N.Y. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*In re Nadler*, 8 B.R. 330 (Bankr. E.D. Pa. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Leighton Holdings, Ltd. v. David Belofsky & Assoc. (In re Kids Creek Partners)*,
1997 WL 627652 (N.D. Ill. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*SEC v. Churchill Securities Inc.*, 223 B.R. 419 (S.D.N.Y. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Specker Motor Sales Co. v. Eisen*, 393 F.3d 659 (6th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Sterling Consulting Corporation v. United States*, 245 U.S. 1161 (10th Cir. 2001) . . . . . . . . . . . . . . . . 19


**Statutes:**

11 U.S.C. § 105 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

11 U.S.C. § 1112 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

11 U.S.C. § 330 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 17, 20, 23, 25, 26, 29, 32

11 U.S.C. § 331 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

11 U.S.C. § 363 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

11 U.S.C. § 364 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

11 U.S.C. § 503 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

11 U.S.C. § 506(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9, 11

11 U.S.C. § 544(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

11 U.S.C. § 726(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

28 U.S.C. § 1292(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

28 U.S.C. § 1334 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 17, 18, 25, 26

28 U.S.C. § 1412 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

28 U.S.C. § 1471(e) (repealed) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

28 U.S.C. § 157(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

28 U.S.C. § 157(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

28 U.S.C. § 158(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 23

**Rules:**

Fed. R. Bankr. P. 1014 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Fed. R. Bankr. P. 9014 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 26

**Other Authorities:**

S.Rep. 95-989, 95th Cong., 2d Sess. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

## <u>UNITED STATES' REPLY BRIEF</u>

### Introduction

This brief, which continues abbreviations defined in the United States' Opening Brief on Appeal ("Opening Brief"), replies to the Brief of Appellee, U.S. Bank National Association ("Indenture Trustee's Brief"), in defense of the part of the 7/18/02 Order denying conversion to Chapter 7, in which the debtor subsequently joined, and to the Appellees' Brief of Scott Cable Communications, Inc. and Akin Gump Strauss Hauer & Feld LLP ("Debtor's and Akin Gump's Brief"), in defense of the part of the 7/18/02 Order that authorized the use of bankruptcy estate funds, alleged to be cash collateral of the Indenture Trustee, to pay for certain legal expenses of the debtor, and also in defense of the 12/23/02 Order awarding interim fees to Akin Gump.[1]

While this reply, because it addresses two separate answer briefs, for the most part separates the conversion issue from the cash collateral and interim fees issues, it should be reiterated that the issues are somewhat intertwined. In this regard, a preliminary point in the Indenture Trustee's Brief, pointing out the restrictions in the cash collateral stipulation, prompts us to highlight that those same restrictions are additional support for conversion to Chapter 7. The government maintains that the cash collateral order was improper, and its approval reversible error, partly because, in it, the debtor and Indenture Trustee agreed that the debtor's counsel would only be paid if the debtor took a position in litigation that was antithetical to its duty to challenge disputable liens against the estate. The fact that the debtor eagerly accommodated the Indenture Trustee's interests is yet more evidence of the extent to which the debtor's management allowed their personal interests to infuse the debtor's entire approach to this case from day one onward. The cash collateral stipulation is, in that regard, just another manifestation of the tax avoidance purpose that was also reflected in the

---

[1] Akin Gump is the only appellee with respect to the 12/23/02 Order but the debtor in possession is a party in the appeal from the 7/18/02 Order not only in having opposed conversion, but also because it was a party to the cash collateral stipulation. The United States does not dispute the debtor's standing in this regard, but submits that its continued support for expending the estate's funds to litigate against the estate is further support for conversion to Chapter 7.

plan of liquidation as found by the Connecticut Bankruptcy Court in its decision denying confirmation of the plan.  The cash collateral stipulation's limitation that debtor could use the money only to litigate against the estate, but not to take the estate's side of the litigation, constitutes further support for conversion to Chapter 7.

### Correction of Typos in Opening Brief

Before addressing the appellees' briefs, the United States wishes to alert the Court to several typographical errors in its opening brief.  First, in multiple record citations to the transcript of the December 3, 2002 hearing in the Connecticut Bankruptcy Court, the opening brief was off by a page.  The errors apply to transcript page numbers above page 30 and appear on pages 24 (six citations), 68 (one citation), and 70 (one citation) of the Opening Brief.  The information cited is usually found on the page of the transcript before the one cited.

Second, on page 52, the United States quoted from S.Rep. 95-989 at page 153 and, in the fifth line of the quoted passage, the word "not" should be "now."

Third, at the top of page 54, the brief offered a comparison between 28 U.S.C. § 1471(e) enacted in 1978 and 28 U.S.C. § 1334(e) enacted in 1984.  The words "bankruptcy court" were supposed to be included, in strike-out text, just before the underlined words "district court" at the beginning of the quotation.

If the Court wishes, the United States will supply a corrected copy of the brief.

### A.    REPLY TO THE INDENTURE TRUSTEE'S BRIEF ON THE CONVERSION APPEAL

The United States would highlight the portion of the "Background" statement of the Indenture Trustee noting that senior secured creditors have already received distributions of most of the proceeds from the complete sale of the debtor's assets.  This confirms the complete inappropriateness of having not converted this case to Chapter 7 the first time the government requested that relief back in 2000 and before the debtor incurred significant attorney's fees in connection with the adversary proceeding (which had not yet been transferred to Delaware).

The Indenture Trustee's brief may be capsulized as follows. It acknowledges that no plan can be confirmed and concedes that "conversion may be appropriate at some point in this case, following resolution of the Delaware Adversary Proceeding," but argues that conversion now would result in unnecessary delay. Without citing any portion of any court order or bench ruling, the Indenture Trustee suggests that the Bankruptcy Court "determined that conversion would be inefficient, prejudicial and would only lead to further diminution of the estate." The Indenture Trustee's brief goes on to argue that "[t]here is nothing left to do in the case other than resolve the pending adversary proceeding." The Indenture Trustee reasons that, if this case is converted, "one of two things will occur: 1) the Chapter 7 Trustee will determine that no action on its part is necessary or appropriate, thereby maintaining the status quo, or 2) the Chapter 7 Trustee will seek to participate in the Delaware Adversary Proceeding." According to the Indenture Trustee, delay would be the result if the Trustee decided to take the government's side, because the government would ask to reopen discovery in the Delaware Adversary Proceeding. It also argues that "anything" a Chapter 7 Trustee might do in the adversary proceeding would be duplicative and therefore a waste of resources.

First, nowhere did the Connecticut Bankruptcy Court give any indication that it was denying conversion on the ground asserted by the Indenture Trustee – avoiding delay. The sole explanation for the rulings in the 7/18/02 Order was that the government was bound by the Delaware Bankruptcy Court's order allowing the debtor to intervene. While the 7/18/02 Order states explicitly that this is the reason for overruling the government's objections to the cash collateral stipulation, it is also implicitly the basis for the Bankruptcy Court's concurrent denial of conversion, particularly given that the government's motion to convert was indeed based on some similar arguments regarding the conflict of interest of the debtor's management. As Judge Shiff apparently saw it, and understandably so, Judge Walsh's order allowing the debtor to intervene implicitly rejected the government arguments that a debtor in possession should not be permitted to litigate against its own estate in

light of its fiduciary duty to defend the estate. Review of the Delaware Bankruptcy Court's intervention order does indeed reflect that *that* Court did think it was perfectly acceptable for the a debtor in possession to litigate in favor of upholding a lien against its own estate. The issue then became whether the Connecticut Bankruptcy Court was compelled to apply that reasoning in adjudicating the government's motion to convert (as well as its objection to compensating debtor's counsel for such services).[2/]

That is why the government's Opening Brief in these appeals expends considerable effort in arguing that it was error for the Connecticut Bankruptcy Court to conclude that the Delaware Bankruptcy Court's order granting debtor's intervention is an appropriate basis to apply the doctrines of law of the case or collateral estoppel to the government's contentions regarding conversion. Law of the case is inapplicable because it applies only within the same lawsuit and, in a bankruptcy case, each separate adversary proceeding and/or contested matter is a separate "judicial unit" that is separately appealable. The applicable doctrine to apply to determine the extent to which rulings in the Delaware adversary proceeding operate preclusively in other contested matters is the doctrine of collateral estoppel.[3/]

Collateral estoppel is inappropriate for many reasons, not least of which is that the Delaware

_____

[2/] That Judge Shiff assumed the government was precluded from raising the conflict of interest of debtor's management in support of conversion to Chapter 7 is indirectly confirmed by the subsequent 12/23/02 Order granting interim fees to Akin Gump. The latter order includes rejection of supposed repeat government arguments "that the debtor lacks standing to defend the Delaware adversary proceeding" or "has a conflict of interest." But the conflict of interest argument was made primarily in support of the government's motion to convert to Chapter 7; it was not the basis for objecting to Akin Gump's fees. The real objection is that Akin Gump may not be compensated for service's antithetical to the estate's pecuniary interests *regardless* of whether caused by the conflict of debtor's management or not. Judge Shiff was simply recalling the government's previous arguments in support of conversion and reiterating his reasons for rejecting those arguments. Similarly, the government never alleged, as a basis of the government's objection to compensation, that the debtor lacked standing to intervene. (That argument had been previously advanced in support of conversion, but had been abandoned not long after the government reviewed the Delaware intervention decision.)

[3/] Also, if only "law of the case was involved," then Judge Shiff had the authority to determine that the law had been wrongly decided and to alter it. Only if the law of the case emanates from an appellate court is it a mandate that the trial judge must follow. At all events, law of the case established in the trial court does not hamstring this Court when exercising its appellate jurisdiction under 28 U.S.C. § 158(a).

intervention order's primary ruling was that a debtor has an unconditional statutory right to intervene in any adversary proceeding, anywhere, anytime. Since that ruling was, as Judge Walsh held, compelled by binding Third Circuit precedent, an appeal from the grant of intervention would be frivolous, even when the ruling becomes final and appealable. As a consequence, the United States is unable to appeal the intervention order's fall-back dictum that the debtor had a duty to defend its capital structure. The ability to appeal a ruling on a particular point of law is an essential predicate to permanently barring a party from raising that point of law in another proceeding involving a different issue.

Additionally, even as to the Delaware Bankruptcy Court's secondary reasons for granting the debtor's motion to intervene, the United States maintains that nothing in its decision indicates that conversion would be improper (or that debtor's counsel would necessarily be entitled to compensation). To the contrary, as reflected in the government's October 23, 2004 request that this Court take judicial notice of events at a hearing in Delaware (which this Court granted), Judge Walsh, long after granting the debtor's motion to intervene, wondered aloud at a hearing why the underlying bankruptcy case had not been converted to Chapter 7, and asked for letter briefs on the impact conversion would have on certain matters. (See transcript attached to this Court's docket item no. 22.) Judge Walsh was unaware (until the requested letter briefs were filed) that Judge Shiff had denied a motion to covert and that the denial was then already on appeal to this Court. Thus, it cannot possibly be that Judge Walsh intended his order granting debtor's motion to intervene to signal that conversion to Chapter 7 would be inappropriate.

Nor does anything in the intervention order negate the government's argument that debtor's management has a conflict of interest due to its 21.5% stake in a recovery on the junior notes, the security interest for which the debtor intervened to help defend, and that this factor supports conversion. As this Court stated in explaining its determination not to dismiss the appeal from the denial of conversion and to grant interlocutory appeal, "[i]t is not apparent to me how any reasonable person

could rely on the management of the debtor to undertake an objective evaluation of the issues."
(Transcript of 3/14/05 hearing at 4.)  Admittedly, the Delaware Bankruptcy Court permitted
intervention notwithstanding the conflict of interest.  But it did not find that there was no conflict
and did not remotely address whether such a conflict supports conversion.

Other reasons collateral estoppel or issue preclusion do not apply here are discussed in part
B of this reply since Debtor's and Akin Gump's Brief argues that the government is improperly
attempting to appeal and/or collaterally attack the intervention order or the transfer order.  The point
here is that it would be error to assume that the Connecticut Bankruptcy Court's denial of
conversion was premised on avoiding delay and more appropriate to treat it as premised on the same
ground that Court gave for overruling the government's objections to the cash collateral stipulation –
*i.e.*, on collateral estoppel.

Even assuming that the Connecticut Bankruptcy Court's reason for denying conversion was
a determination that it would cause delay, such a ruling would be reversible error for multiple
reasons.  Preliminarily, there is no *evidence* that conversion would result in delay, and certainly not
at the time of the 7/18/02 Order.  At that time, discovery had barely begun.  The government argued
before the Connecticut Bankruptcy Court that it was entitled to have a disinterested fiduciary make
determinations regarding the assertion of privilege in discovery.  The Indenture Trustee (and the
debtor) opposed that contention and should not now be heard to argue, having resisted conversion
when it would have caused no delay, that this Court should now deny conversion because now it
might cause some delay.

Furthermore, there is still no basis to assume that any significant delay would be occasioned
by conversion.  As stated in the government's opening brief, conversion at this time – before trial in
the adversary proceeding – would at least enable a disinterested Trustee to determine whether to
open the debtor's files and that of its former attorneys to government inspection and also whether or
not to assert privilege in response to questions propounded at trial to the debtor's officers or former

attorneys.  The government has *not* stated anywhere that the appointment of a Trustee would prompt it to "seize the opportunity to seek to reopen discovery" or "file further motions and appeals." (Indenture Trustee's Brief at 8.)  To the contrary, at least for purposes of the pending summary judgment motions, the government is content with the present discovery record.

If summary judgment is denied, the appointment of a Trustee would not necessarily require more formal discovery, let alone delay.  To the contrary, if a Trustee opened the debtor's files to government inspection, there would be no need for any further Rule 34 requests.  It is conceivable that the government would find something in those files that would cause it to seek to depose a witness prior to trial, but, apart from the fact that such an outcome is pure speculation, it is not a proper basis upon which to deny conversion when the standards for conversion are plainly met.  In fact, nowhere does § 1112[4] suggest that a case in which confirmation of a plan is impossible may nevertheless remain under Chapter 11 simply because of a possibility that conversion will cause some delay.  Notably, the Indenture Trustee fails to cite a single case in which a bankruptcy court, faced with an admitted impossibility of confirming a plan, ongoing diminution of the estate, and a conflict of interest on the part of debtor's management, ruled that conversion would be denied simply because it might cause some delay in concluding the case.

In this regard, waiting to convert the case until after a trial in the adversary proceeding will, if the government loses the adversary proceeding, engender a greater likelihood of causing additional appeals and additional delays because the government maintains that it was entitled to have a disinterested trustee all along, particularly in determining whether to grant the government open access to the debtor's files (and those of its former attorneys) and in determining whether to assert the attorney-client privilege in response to questions propounded to witnesses at trial.  It was wrong for the Bankruptcy Court to have deferred ruling on the government's motion to convert in 2000, wrong for it to have deferred ruling in 2001, and wrong for it to have denied the motion

---

[4]/ Statutory references are to the Bankruptcy Code (11 U.S.C.) unless indicated otherwise.

belatedly in 2002, and it would only compound those errors to affirm on the basis that, at this juncture, conversion might cause delay. Instead, this Court should endeavor to resolve the conversion issue in this appeal well in advance of the October, 2005 trial that has been tentatively scheduled in the event that the case is not disposed of by the pending Rule 56 motions.

Diminution of the estate, moreover, continues if the case is not converted. The debtor, while taking a lower profile since the intervention by the holders of most of the junior notes, continues to participate in the Delaware adversary proceeding. In the event that summary judgment is denied, debtor's counsel will ask at some point to be compensated for its services in connection with what will be an extremely lengthy trial (Judge Walsh has set aside two weeks in October, 2005, and the government maintains that trial will in fact take much longer). This may also engender multiple trips by debtor's counsel from New York to Wilmington, Delaware, for several lengthy stays.

The Indenture Trustee attempts, in a cursory footnote, to dispose of the government's alternative argument that it is entitled to have a disinterested trustee determine whether to invoke § 506(c) as a basis for charging the Indenture Trustee's collateral with the gains tax caused by the sale, assuming its security interest is upheld. As acknowledged in our Opening Brief, the Bankruptcy Court ruled that capital gains taxes, even if a necessary expense of the sale transaction, are simply not within the ambit of § 506(c). The Indenture Trustee argues that this would preclude a Chapter 7 Trustee from bringing a new § 506(c) claim. The argument is frivolous. This Court dismissed *without prejudice* the government's previous appeal on that issue pending the outcome of the Delaware adversary proceeding which might moot the issue. Thereafter, the Supreme Court ruled that only a trustee can invoke § 506(c) (thus greatly magnifying the government's need for a disinterested one). Since the appeal was dismissed *without prejudice* and with leave to renew the argument if necessary, and since the government is now unable to reinstate the appeal due to intervening precedent confirming that it never had *standing* to assert the claim in the first place, res judicata is inapplicable. A trustee is not bound by a judgment against the United States which, while

still subject to appeal, was rendered moot by a determination that there was no jurisdiction in the first place. As noted in our Opening Brief, the case law is not clear on whether § 506(c) can be used to recover capital gains taxes, and Judge Shiff's reasoning contains flaws, making it appropriate for a disinterested Trustee to determine whether to renew the argument and appeal to this Court.[5/]

In a footnote (p.7 n.1), the Indenture Trustee suggests that a Chapter 7 Trustee would only participate in the Delaware adversary proceeding if it calculated that the "the prospect of a 3% recovery" – referring to a trustee's commissions – was sufficient to outweigh the "risk of not recovering for its services if the Indenture Trustee and the Noteholders were to prevail." The Indenture Trustee argues this is because it will "not agree to any carve-out to make such a payment" for services by a Chapter 7 Trustee litigating on the side of the United States. Indeed, its cash collateral stipulation with the debtor states that, while it agreed that the debtor could use the purported collateral to litigate on its side, the debtor could not use that collateral for other purposes. This argument is related to one made on page 2 of its brief where it states that, although it is only addressing the conversion issue, it disputes the government's contention, contained in the government's April 20, 2005 opposition to Akin Gump's motion to bifurcate the appeals, that the Indenture Trustee waived its lien rights with respect to the amount of fees that are subject to the cash collateral order, regardless of whether such amounts are actually paid to Akin Gump – *i.e.*, that other administrative claims could be substituted for Akin Gump's claim under the cash collateral carve-out.

To the extent this Court might be concerned for how a Chapter 7 Trustee would be paid, we address these points. Before doing so, however, two preliminary observations are in order. First, footnote 1 of the Indenture Trustee's brief thoroughly undermines its standing to oppose conversion

---

[5/] Although the debtor and Akin Gump had already joined the Indenture Trustee's brief regarding conversion and were supposed to confine their separate brief to the cash collateral/interim fees issues, it includes a gratuitous footnote (p.4 n.4) arguing that § 506(c) does not apply to capital gains taxes on the same premise adopted by the Bankruptcy Court – *viz*, that the *expense* must benefit the secured creditor. But that is not what the statute says. It refers to the "expense of preserving, or disposing of," the encumbered asset. A capital gains tax is an expense incurred in disposing of property via a sale. It should thus be sufficient that the sale by the bankruptcy trustee (the relevant disposition) benefits the secured creditor, in order to charge it with the expenses thereof.

on the premise that it will lead to further diminution of the estate. The footnote acknowledges that any claims of a Chapter 7 Trustee for compensation or reimbursement of expenses could not possibly reduce the Indenture Trustee's recovery if the security interest is upheld in the Delaware adversary proceeding. Second, the Indenture Trustee's argument is yet additional support for the government's arguments that this case should have been converted. Without even realizing it, the Indenture Trustee is confirming its ability to control the litigating decisions of the estate's fiduciary by a combination of (1) its conditioning a carve-out for litigation expenses on whose side the estate's fiduciary takes in the Delaware adversary proceeding and (2) the built-in bias of the debtor's management based on the management incentive agreement according it a 21.5% stake in any recovery on the junior notes. In essence, while it is the duty of the estate's fiduciary to object to liens where an objection would be colorable, the Indenture Trustee and debtor entered a stipulation under which debtor's counsel could only get paid for taking one side of a dispute and, worse, the side that is antithetical to the interests of unsecured creditors. Thus, the cash collateral stipulation is itself an additional ground for conversion to Chapter 7.

As to how a Trustee might be paid, the government disagrees with the Indenture Trustee's belief that it can recover that which it has already let go of. Once a secured creditor allows part of its cash collateral to be used to pay counsel for a debtor in possession, it cannot then say, if the award it agreed to is reversed on appeal because the services pursued were a violation of the debtor in possession's fiduciary duty, that its lien is reimposed on those funds so that they cannot be used to pay a trustee's attorney for services that were not a violation of the trustee's fiduciary duties. The condition the Indenture Trustee tried to impose in this regard is void as against public policy. The funds at issue were freed of its lien and its lien may not be retroactively reimposed on them. The funds that debtor's counsel was awarded, both by the Connecticut Bankruptcy Court and the Delaware Bankruptcy Court, would become available, if those orders are reversed on appeal, for any

10

other administrative expense.[6]  In this regard, there are countless cases in which secured claimants consent to use of cash collateral under § 363 for a variety of purposes that include compensating counsel for the debtor in possession and creditors committee, where the case is later converted to Chapter 7.  If there are ultimately insufficient funds to pay the Chapter 7 administrative expenses, which have priority over the administrative expense claims from a failed reorganization effort,[7] the Chapter 11 professionals are liable for disgorgement to assure compliance with the Code's priorities.  *See Specker Motor Sales Co. v. Eisen*, 393 F.3d 659 (6th Cir. 2004).  At the same time, this Court need not determine this issue now.

Finally, even if a Chapter 7 Trustee did, due to the uncertainty of getting compensated or reimbursed for expenses, determine not to participate actively in the Delaware adversary proceeding, such a trustee would remain duty-bound to determine whether or not to waive any of the debtor's privileges and thus whether to open the debtor's files to government inspection.  And, a trustee would be required, under bankruptcy law, to make that determination based on what is in the best interests of *unsecured* creditors to whom a trustee owes his primary duty, as demonstrated in the government's Opening Brief.  In this regard, at least, one aspect of the Indenture Trustee's brief is perhaps well considered – that is, its determination to ignore the government's alternative request for

---

[6] There are two situations that need to be distinguished in considering this point.  First, there was no § 364 reorganization loan in this case.  Under § 364, a lender is supplying new funds to a bankruptcy estate and may be accorded considerably more freedom in conditioning the use of the loan proceeds or any postpetition financing lien granted to secure the loan.  Here, the Indenture Trustee held only an alleged prepetition security interest and the collateral it agreed to allow the debtor to use was property of the estate that was simply being freed of an encumbrance.  Another situation to be distinguished is where a secured creditor limits the use of its collateral to allowable kinds of expenses designed to preserve or liquidate its collateral.  Since a secured creditor's collateral may be charged with such expenses even over its objection based on § 506(c), there is nothing untoward about its imposition of such a limitation in an agreement that avoids an unnecessary and pointless dispute.  But it is our argument here that the estate's fiduciary is not supposed to help a secured creditor defend against a colorable challenge to the security interest, since it is the fiduciary's duty instead to object to objectionable liens.  If we are correct, then it follows that such activity does not become appropriate simply because the secured creditor offers to pay the fiduciary's litigation expenses.

[7] Under § 726(b), the expenses of a Chapter 7 proceeding have priority over the expenses of a Chapter 11 proceeding.  This alone would be a source of payment for a Chapter 7 Trustee's legitimate expenses because, if the case is converted, the Trustee could even seek disgorgement of prior interim fees disbursed to Chapter 11 professionals under § 331.

the appointment of a Chapter 11 trustee. The possibility that there may be no source from which to pay a Chapter 11 trustee for his or her services is indeed a reason not to appoint one. But that does not apply to a Chapter 7 trustee. Chapter 7 trustees are chosen from a panel of eligible trustees who have agreed to be appointed not only in asset cases but also in no-asset cases, as well as cases in which the prospect of recovery is uncertain. They receive a limited amount of compensation from Congressional appropriations for no-asset cases. When appointed in a case in which the prospect of recovering assets is uncertain, they have a fiduciary duty to consider more than their own pocket books. Accordingly, the possibility that the government may lose the Delaware adversary proceeding and the further possibility that Akin Gump's fees will not become available to compensate or reimburse the expenses of a Chapter 7 Trustee is not a basis upon which to affirm the Bankruptcy Court's denial of conversion.

## B.    REPLY TO DEBTOR'S AND AKIN GUMP'S BRIEF ON THE CASH COLLATERAL AND INTERIM FEES ISSUES

### 1.    There is Virtually No Chance of this Appeal Becoming Moot

As a preliminary point, Debtor's and Akin Gump's Brief (p.1 n.1) asks that the Court "refrain from deciding any issues on the Cash Collateral/Interim Fees Appeal until after" the Delaware adversary proceeding is concluded, and quotes out of context from the government's December 2, 2002 objection to the interim fees application (DI# 412) a sentence stating that "[i]f the [Indenture Trustee's] lien is not invalidated or subordinated, the government's objections to the instant applications will be moot." The quoted sentence was contained in a portion of the objection in which the government requested the Connecticut Bankruptcy Court to adjourn the interim fees application pending the resolution of the pending appeal from the cash collateral order because one of the issues in the already pending appeal "is whether it is appropriate to treat the cash as 'collateral' for purposes of authorizing use and distribution of the funds, when the validity and enforceability of the lien is under challenge (before the Delaware Bankruptcy Court) and has not

been resolved." At the time the statement was made, the undersigned assumed that a government loss in the Delaware adversary proceeding would prompt the government to drop its objections to compensating Akin Gump, at least if the interim fees application had been stayed.

But the Bankruptcy Court went ahead and decided the interim fees application, and that has materially altered the issue regarding potential mootness. When the funds were not yet awarded to Akin Gump, disallowance of Akin Gump's fees after a government loss in the Delaware adversary proceeding would result in no economic benefit to the United States, since the freed-up funds would go to the junior noteholders. In other words, had the Bankruptcy Court agreed to stay the interim fees application, the government's standing to object to it might arguably have evaporated if it then lost the Delaware adversary proceeding.

On the only hand, once the interim fees were actually awarded, the argument that the Indenture Trustee's lien is irrevocably lost as to that amount of the funds (even if they are taken from Akin Gump and instead awarded to other administrative claimants) becomes much stronger. After that, the government had to appeal the interim fees order and obtain a stay pending appeal, or else it would later have to seek disgorgement of the disbursement to Akin Gump. In that context, the Indenture Trustee would have no economic stake in whether the funds in fact ended up in Akin Gump's pocket or in the hands of other administrative claimants. At that point, the funds would either go to Akin Gump or the IRS and State taxing authorities, and would not go back to the Indenture Trustee. Furthermore, if Akin Gump's services were ultimately held not to be compensable as a matter of law (for example, if this Court holds that it is simply not appropriate to award compensation under § 330 for services designed to aid a secured creditor's defense of a disputed lien against the bankruptcy estate), then it would become untenable to suggest that Akin Gump could circumvent the law and the policies behind it simply by having negotiated the inclusion in a cash collateral stipulation from a secured creditor a restriction stating that property of the estate could only be used for an improper purpose – *i.e.*, representing the estate's fiduciary in an endeavor

to strip the estate of all equity.

At this juncture, the government maintains that, if it loses the Delaware adversary proceeding, all interim fees awarded to Akin Gump that are the subject of this appeal (and the Delaware appeal), as well as all interim fees previously disbursed to it, must be held to have been released from the lien of the Indenture Trustee (whether or not it intended that result) and will be available for disgorgement and redistribution to other administrative claimants to the extent that Akin Gump's fees are ultimately disallowed in a final ruling.

Moreover, as noted in part A above, the conversion issue is not entirely separable from the cash collateral dispute.  Because the conversion issue and cash collateral issue are thus intertwined, it would be best if this Court determined all interrelated issues in these interrelated appeals sooner rather than later.[8/]

### 2.    The Argument that the 7/18/02 Order "Clarified" the Transfer Order is Untenable

In implicit recognition of the need to explain how the Connecticut Bankruptcy Court had jurisdiction to consider the cash collateral application after having provided that all such matters were transferred to Delaware, Debtor's and Akin Gump's Brief argues that one of the three things accomplished by the 7/18/02 Order's approval of the cash collateral stipulation was that "it clarified the Transfer order by explaining that the Connecticut Bankruptcy Court intended to retain control over cash collateral applications when it transferred administrative expense applications associated with the Adversary Proceeding."

This argument is untenable and irreconcilable with its argument that this Court lacks jurisdiction to consider whether the transfer of future fee applications was void.  Debtor and Akin

---

[8/] The United States does not, however, object to the Court's expediting the conversion appeal if this Court determines that it is prepared to reverse the denial of conversion, but needs additional time to reach its conclusion with respect to the cash collateral and/or interim fees issues.  For reasons indicated in part A above, there is indeed reason to expedite the resolution of the conversion issue – *i.e.*, so that it is determined well in advance of a trial (now tentatively set for October 17-28, 2005, unless summary judgment is granted).

Gump contend that, because the transfer order was interlocutory and can only be appealed as part of a final judgment in the adversary proceeding in Delaware, this Court may not consider the effectiveness of that order, even for purposes of reviewing the *Connecticut* Bankruptcy Court's order applying collateral estoppel principles based on a subsequent order of the Delaware Bankruptcy Court on a subject that the United States argues could not possibly have been transferred. On the other hand, they argue that the transfer could be partially rescinded – *i.e.*, as to cash collateral applications – by means of an order issued 13 months later by the Connecticut Bankruptcy Court and simply clarifying that this was not the intent of Judge Shiff. But the transfer order used a single phrase to tack onto the transfer of the adversary proceeding the transfer of all "administrative expense and cash collateral applications associated with it." The government argues that the transfer was void as to both future cash collateral applications and future fee applications.

If it is possible to transfer purely administrative matters (contrary to the demonstration in the government's Opening Brief), the transfer order did so with respect to both cash collateral applications and fee applications related to the payment of fees for services in the adversary proceeding. It would then follow that the Connecticut Bankruptcy Court had lost jurisdiction to consider the cash collateral application insofar as it pertained to the adversary proceeding. If, as the government maintains, it is not possible to transfer purely administrative matters or, alternatively, not possible to transfer a future contested matter that has not yet been filed, then the transfer was ineffective as to *both* future cash collateral applications and future fee applications. And that, in turn, would *ipso facto* deprive the June 7, 2002 intervention order from having any preclusive force with respect to any issue regarding the payment of fees.

### 3.    The Connecticut Application Included Services Directed at Upholding the Security Interest in Favor of the Junior Notes

Akin Gump argues (p.8) that its interim fee application filed in Connecticut did not seek compensation for services in the adversary proceeding. That is true and the government's appeal here is not based on a contrary assertion. Rather, the government's objection in Connecticut argued

that "many of the services indicated in the instant Akin Gump Application nevertheless relate indirectly to the Delaware adversary proceeding or have the same ultimate goal of upholding the security interest of the Junior Subordinated PIK Noteholders."  Examples are quoted on page 21 of the government's Opening Brief.  Indeed, the debtor's vigorous opposition to conversion to Chapter 7 was plainly to retain fiduciary status for purposes of controlling the approach of the estate's fiduciary to the Delaware litigation.  Debtor has never denied this.[9/]  If this Court were to reverse the 12/23/02 Order on the premise that debtor's counsel may not be paid for services that offered no potential benefit for the bankruptcy estate, it would be appropriate to remand the matter to the Bankruptcy Court for further proceedings to determine what part, if any, of the services for which compensation was sought offered potential benefit for the estate.

4.    **The United States Is Not Appealing the Intervention Order and This Court Does Have Jurisdiction to Consider the Whether the Transfer of Administrative Matters was Void**

The first of the acknowledged "arguments" in Debtor's and Akin Gump's Brief is devoted to trying persuade this Court that the government is attempting to appeal the transfer order and the Delaware intervention order.  First, the brief admits that the Delaware intervention order was interlocutory, and thus admits that the 7/18/02 Order errs in stating it was a final order.  This is important because only a final order binds parties to a determination that a court had jurisdiction to issue the order.  Jurisdictional objections are preserved during appeals or during any further proceedings that must be concluded before a jurisdiction-based appeal may be taken.  Thus, for example, a party who fails to appeal an appealable injunction (injunctions are usually appealable of right, *see* 28 U.S.C. § 1292(a)) may not defend against a contempt motion by asserting that the injunction exceeded the court's jurisdiction.  But if an appeal from an injunction is pending, a party may then defend against a contempt motion by reasserting its jurisdictional defense to the

---

9/ As AUSA Nevins put it at the December 3, 2002 hearing, with no disagreement then indicated by the debtor, "this debtor has made no secret of the fact that their reason for not simply converting the case is to enable them to fight the Internal Revenue Service's challenge to the Junior PIK note holders."

enforceability of the original order. And, even beyond jurisdictional arguments, a party who appeals an appealable interlocutory ruling by one court may argue before other courts that collateral estoppel is inappropriate because the order containing the allegedly preclusive ruling was interlocutory and will be set aside on appeal.

When an order is being appealed on jurisdictional grounds, moreover, other courts may have to make their own determination as to whether collateral estoppel is appropriate, including by making their own determination as to whether the supposedly binding order was validly entered. In this regard, debtor and Akin Gump miss the mark in expending several pages explaining the limited circumstances under which interlocutory orders may be appealed because the government is not appealing the intervention order here. In the instant appeals, the government is only arguing that the intervention order (1) could not possibly have preclusive force with respect to a purely administrative matter because a purely administrative matter could not possibly have effectively been transferred to the Delaware Bankruptcy Court, unless the "case" under 28 U.S.C. § 1334(a) was transferred, and/or (2) was not intended by Judge Walsh to contain any implicit (silent) ruling on the compensability of the services at issue.[10]

An example of an appellate court, in reviewing an order on appeal, ascertaining for itself that another trial court lacked jurisdiction over an issue notwithstanding the other court's ruling that it

---

[10] The United States is appealing the substance of the intervention order in the Delaware appeal to the extent (and only to the extent) it is indeed to be construed as having the effect that Judge Shiff has ascribed to it – *i.e.*, implicitly precluding the IRS from disputing the compensation for debtor's counsel's work in the adversary proceeding by containing a silent implication that the services at issue are compensable under § 330. Akin Gump's argument that the government cannot do that is frivolous. It is black letter law that an interlocutory order (such as the intervention order) may be appealed through a later appeal from an order that renders one or more of the earlier order's ruling appealable. The government maintains that the Delaware Bankruptcy Court's 12/12/02 Order granting interim fees to Akin Gump is appealable of right as a collateral order and, alternatively, has moved for leave to appeal under Bankruptcy Rule 8003. The Delaware District Court has stayed that motion (and stayed disbursements) until this Court decides these appeals. If the Delaware District Court allowed the government's appeal from the fees award to proceed, the government can surely argue in that appeal that, to the extent the earlier order granting intervention created "law of the case" on the issue of whether compensation is allowable, such a ruling was legally incorrect. The government can assert that position on any ground – whether lack of jurisdiction or based on the same substantive arguments made in its Opening Brief in these appeals regarding the proper application of § 330.

did have such jurisdiction, is found in *In re Indian Motocycle Co.*, 261 B.R. 800 (1st Cir. BAP 2001).  In that case, the government appealed from an order of the Massachusetts bankruptcy court abstaining from adjudicating an administrative tax claim in favor of allowing that claim to be determined by the federal district court in Colorado.  One of the government's primary arguments in the appeal was that the abstention was improper because the district court in Colorado lacked subject matter jurisdiction.  During the appeal from the Massachusetts bankruptcy court's abstention order, the district court in Colorado ruled that it did in fact have jurisdiction to determine the bankruptcy estate's tax liabilities, overruling the government's jurisdictional objections.  The appellee in the First Circuit BAP then attempted to argue that the government was bound by the interlocutory Colorado decision and that the First Circuit BAP could not pass on the correctness of the Colorado district court's explicit and considered jurisdictional ruling.

The First Circuit BAP rejected the argument as follows.  First, it agreed with the government that "[a]bstaining from hearing a matter necessarily presumes that another court has jurisdiction to hear that matter."  *Id*. at 807.  Next, the BAP held that the bankruptcy court's jurisdiction over estate administration was exclusive:

> Once a bankruptcy case is commenced in a proper forum court, that court has exclusive jurisdiction over administration of the bankruptcy estate. Congress's intent that only one court should have jurisdiction over matters concerning the administration of the bankruptcy estate is evidenced by the addition of 28 U.S.C. § 1334(e) which specifies that the court in which a bankruptcy case is filed "has exclusive jurisdiction of the property, wherever located, of the debtor as of the commencement of such case, and of property of the estate."  28 U.S.C. § 1334(e).[11]

*Id*.  Then, squarely meeting the issue of whether the district court in Colorado had jurisdiction, the BAP held that "[b]ecause the Colorado district court was without jurisdiction to determine the tax liabilities of the bankruptcy estates, which are core matters within the exclusive jurisdiction of the

---

11/ While Akin Gump argues (p.15) that § 1334(a) and (e) "are not intended to address jurisdictional disputes between district courts and have no bearing on the power of a bankruktpcy court to transfer a fee application," they provide no citations.  The BAP in *Indian Motocycle* stated that the exclusivity language in these provisions "resolves 'not only jurisdictional disputes between bankruptcy and state courts, but also disputes which might arise among the districts.'" 361 B.R. at 807-08 (quoting *Cook v. Cook*, 215 B.R. 975, 978 (Bankr.E.D.Mich.1997)).

bankruptcy court, the bankruptcy court erred by ceding jurisdiction over those issues to the Colorado district court." *Id.* at 808. Finally, in a footnote (*id.* n.3), the BAP explicitly "acknowledge[d] that the Colorado district court has ruled that it does in fact have jurisdiction to determine the tax liabilities of the bankruptcy estates." Observing that the government had taken an interlocutory appeal to the Tenth Circuit, the BAP agreed with the appellee's argument that "the Colorado court's decision is not before us and we decline to address that court's findings." Nevertheless, it reversed the ruling that was before it on appeal – the order abstaining in favor of letting the district court in Colorado adjudicate the administrative tax expense – based on the BAP's own view that the Colorado district court lacked jurisdiction, and ignoring the Colorado court's contrary view.[12]/

Similarly, in the instant case, the government is not asking this Court to reverse the Delaware Bankruptcy Court's ruling permitting intervention. The government is instead arguing that this Court must make its own determination of whether the Delaware Bankruptcy Court had any jurisdiction over the matter of whether the debtor's counsel must be compensated. It must make that jurisdictional determination because it has to review the *Connecticut* Bankruptcy Court's ruling that the Delaware Bankruptcy Court had that issue before it and already ruled that debtor's counsel could be paid from estate funds. Because that ruling by the *Connecticut* Bankruptcy Court became the excuse upon which that court first overruled the government's objections to the cash collateral stipulation and then overruled its objections to the *Connecticut* interim fees application, this Court *must* determine the correctness of the government's contention that the Delaware Bankruptcy Court's interlocutory ruling respecting compensating debtor's counsel (if there was such a ruling in the intervention order) is utterly void and therefore non-binding. This Court similarly must determine the correctness of the government's contention that such a ruling was *not* in fact part of the Delaware order, as well as the government's contention that any such interlocutory ruling is just

_____

12/ The Tenth Circuit ultimately agreed with the First Circuit BAP. *Sterling Consulting Corporation v. United States*, 245 U.S. 1161 (10th Cir. 2001). *See id.* at n. 3 (referring to a version of the BAP's decision that was later withdrawn and reissued with minor modifications).

plain wrong on the merits.

The government, is, in this regard, also arguing that the Connecticut Bankruptcy Court erred in reading the Delaware intervention as containing a ruling that debtor's counsel's service are compensable under § 330.  There is no indication that Judge Walsh gave any consideration to whether the services could somehow benefit the estate (as opposed to simply defending the corporation's capital structure as established prior to its 1998 bankruptcy petition).  Nor is there any indication that Judge Walsh determined whether a potential benefit to the estate is essential to a determination that services may be compensated under § 330.

The government is also arguing that if there was such an implicit ruling in the intervention order, it is not appropriate to apply collateral estoppel or issue preclusion principles because the ruling was not only interlocutory but also essentially dictum in view of the concurrent ruling that a debtor has an unconditional statutory right to intervene under binding Third Circuit precedent.  When a party simply cannot appeal an alternative ruling because a primary ruling makes an appeal impossible, issue preclusion is not appropriate.  In this regard, one of the factors required under the doctrine of collateral estoppel or issue preclusion is that the determination sought to have preclusive effect was necessary to the decision.  *Boguslavsky v. Kaplan*, 159 F.3d 715, 720 (2d Cir. 1998); *Hawksbill Sea Turtle v. FEMA*, 126 F.3d 461, 474-75 (3d Cir. 1997).  Another requirement is that the issue was actually decided in a decision that was final, valid, and on the merits.  *Id*.  Neither of these requirements are met here.  The issue of compensability for services of debtor's counsel was not necessary to the intervention order because, as the order recites, the grant of intervention was compelled by binding Third Circuit precedent according debtors an absolute statutory right of intervention in any adversary proceeding.  The decision was not final but rather was interlocutory.  And, as already argued, if the decision also determined whether debtor's counsel would be entitled to compensation, then it was not valid because the transfer order could not possibly have transferred purely administrative matters to another district.

The appellees' related argument that the government is attempting to appeal the transfer order is a bit closer to the mark but not quite on the mark.  The government is arguing that the transfer order's spontaneous tacking onto the transfer of the adversary proceeding the additional transfer of future cash collateral and fee applications was ineffective since the Bankruptcy Court lacked the power to order such a transfer.  In addition to all the reasons argued in our Opening Brief, the Bankruptcy Court lacked the authority to do so because, at the time, there were no such applications pending and no court can transfer a proceeding that is not yet commenced.  But it is not correct to characterize the government's present appeals as seeking to reverse the transfer order. Instead, the government is asking this Court to review the 7/18/02 Order's and the 12/23/03 Order's reliance on issue preclusion flowing from any administrative matter determination in Delaware, based on the contention that any such determination could not be valid.

> **5.    Debtor's Arguments Regarding Retention of Jurisdiction, Law of the Case, and Collateral Estoppel, are Internally Inconsistent and Two-Faced**

Acknowledging that the total award of fees to a debtor's attorney at the end of a case is a unitary ruling that may reconsider prior interim awards, the appellees for the first time disclose that they "anticipate that the Connecticut Bankruptcy Court will review the legal fees awarded by the Delaware Bankruptcy Court when the Debtor files it final fee application."  (Debtor's and Akin Gump's Brief at 14; *see also id.* at 18 (more emphatically asserting that the Delaware court's interim awards will be subject to final review in Connecticut).)  They later add that interim fee awards cannot create "law of the case," thus supposedly undermining the government's concern for being whipsawed between two courts.

First, these arguments are completely inconsistent with the contention (repeated emphatically on pages 24-25 of appellees' brief) that the alleged *sub silencio* determination of the Delaware Bankruptcy Court, in the intervention order, that debtor's counsel may be paid, collaterally estops the government, absent reversal of the intervention order in an appeal in Delaware, from arguing in the Connecticut Bankruptcy Court that it is improper to pay fees to debtor's counsel for services

supporting a questionable lien against the estate.  But if this Court wishes to accept appellees' newly articulated position that all of the fee determinations of the Delaware Bankruptcy Court are open to reconsideration in Connecticut at the end of the case, then it should summarily reject all of the collateral estoppel contentions.  If all the transfer did was afford Judge Walsh a chance to grant provisional allowances subject to final redetermination in Connecticut, it follows that nothing in any of Judge Walsh's decisions can preclude the government from making any argument in Connecticut with respect to administrative matters.  This Court is not reviewing Judge Walsh's rulings (although it may have to consider their propriety in resolving collateral estoppel contentions).  This Court is determining whether the cash collateral order was appropriate and whether the 12/23/02 interim fees award in *Connecticut* was appropriate in light of the government's various substantive arguments (as well as procedural argument).  The government is only challenging the transfer order because of the holding of Judge Shiff, and the arguments of debtor and Akin Gump that prompted that holding, that the government is precluded from arguing that compensation is inappropriate for Akin Gump because Judge Walsh already decided to allow it (by granting intervention).

At the same time, much as we would like to overcome the collateral estoppel issue so easily, candor calls upon us to point out that the transfer order and cash collateral order do not, in our view, suggest that Judge Shiff plans on reviewing Judge Walsh's determinations *de novo* at the end of the case, giving them no preclusive force.  To the contrary, that seems inconsistent with his rulings, which have already relied upon the supposed preclusive effect of the Delaware Bankruptcy Court's order granting intervention.

Similarly inconsistent with appellees' new concession are appellees' arguments regarding "law of the case" principles.  They now argue that no law of the case emanates from Judge Walsh's interim fee awards because such awards are provisional and subject to revisiting when setting a final fee allowance.  And elsewhere they argue that only *interim* fee applications were transferred, so that the Connecticut Bankruptcy Court will be the ultimate arbiter of final compensation.  Nevertheless,

then they proceed to repeat (p.24) their argument made to the Connecticut Bankruptcy Court that the government is improperly collaterally attacking the Delaware intervention order which somehow decided the issue of compensability for debtor's counsel's services in the adversary proceeding in such a manner as to preclude the government from arguing that such services are not compensable under § 330.

      **6.**       **"Law of the Case" Does Not Apply Across Different Disputes**

Appellees mis-identify the applicable preclusion doctrine as "law of the case." Law of the case refers to prior rulings in the same civil proceeding. The adversary proceeding in Delaware, in which the intervention order was issued, is not the same judicial unit as the contested matters commenced by the government's objection to the cash collateral stipulation and its related subsequent objection to Akin Gump's application for interim compensation in Connecticut. *See* Fed.R.Bankr.P. 9014 and Advisory Committee Note to its original promulgation. *See Bowers v. Connecticut Nat. Bank*, 847 F.2d 1019, 1022 (2d Cir. 1988) ("each contested matter 'should be considered a separate judicial unit for purposes of determining finality'").

The frequent reference in "law of the case" decisions to earlier decisions of a "coordinate court" does not refer to the relationship between the Delaware Bankruptcy Court and the Connecticut Bankruptcy Court where the controversies transferred to the former are not the same proceeding or contested matter. Coordinate courts that must apply the "law of the case" refer to where the same civil action has either been transferred to a different trial court, and it should adhere to the interlocutory decisions of the transferor court, or where there has been an appeal and a remand and second appeal to a different panel, different circuit (due to transfer of venue), or different kind of appellate tribunal (*e.g.*, a bankruptcy appellate panel and a district court are coordinate appellate courts for purposes of bankruptcy appeals under 28 U.S.C. § 158(a)).

Moreover, "law of the case" based on trial court rulings is not an inexorable principle and trial courts are ultimately free to revise prior interlocutory decisions of their own or a coordinate

court if they become convinced there has been an error of law.  (Only appellate decisions create a mandate for remand trial-level proceedings.)  In this regard, no law of the case emanating from the Delaware *Bankruptcy* Court can possibly prevent this *District* Court from disagreeing.  Accordingly, if we are not correct and the applicable doctrine is in fact "law of the case" rather than collateral estoppel, then this Court should feel completely free to simply ignore any ruling of Judge Walsh that it considers to be substantively wrong.  It is only if collateral estoppel applies that the Delaware Bankruptcy Court's rulings could conceivably have preclusive force here, assuming the requisites for collateral estoppel were met.  We have already demonstrated above, however, that the conditions for collateral estoppel are not met.

On page 24, appellees quote Judge Shiff as stating that "no skids are greased" by the cash collateral order.  But when Judge Shiff was subsequently faced with the government's objection to the interim fees application, he stated that he had already heard all of the government's arguments before and had rejected them already, strongly implying that the government could not then argue any longer that it was inappropriate to compensate a debtor's attorney for litigating on the side of a secured creditor to defend a disputable lien that would consume the entire bankruptcy estate.

### 7.    Neither Rule 1014, Nor § 105, Nor 28 U.S.C. 157(d), Authorized the Transfer of Administrative Matters

While appellees insist that Fed.R.Bankr.P. 1014 authorized the transfer of administrative fee determinations, it plainly did not do so for the reasons argued at pages 45-46 and footnote 39 of the Opening Brief.  In fact, Rule 1014 flatly precluded a *sua sponte* transfer of part of the case.

The argument that § 105 authorized the transfer is ludicrous.  Section 105 is not remotely a venue or jurisdiction provision allowing bankruptcy courts to bend the Judicial Code, Title 28.  It is a remedy provision.  It authorizes the bankruptcy courts to carry out other provisions of "this title" (referring to Title 11).  As the First Circuit has observed:

> A bankruptcy court may invoke section 105(a) only if the equitable remedy utilized
> is demonstrably necessary to preserve a right elsewhere provided in the Code.

*In re Ludlow Hospital Society, Inc.*, 124 F.3d 22, 28 (1st Cir. 1997).

Even sillier is the argument that 28 U.S.C. § 157(d) "contradicts" the argument that a fee application may not be transferred to a court in another district.  Section 157(d) of the Judicial Code does nothing more or less than permit the withdrawal of the reference of a bankruptcy case, or any part of a bankruptcy case.  What this means is that the referral by the district court, granted jurisdiction under 28 U.S.C. § 1334, to the bankruptcy judges of that court pursuant to 28 U.S.C. § 157(a), may be withdrawn so that an Article III judge may preside directly over the case or the portion of the case to be withdrawn.  The provision has nothing to do with spreading administration of the case across multiple districts.

To characterize *SEC v. Churchill Securities Inc.*, 223 B.R. 415, 419 (S.D.N.Y. 1998), as standing for the proposition that a "bankruptcy court may transfer fee applications based on" the factors considered for § 157(d) withdrawal, as characterized on page 17 of Debtor's and Akin Gump's brief, is egregious in its improper effort to mislead this Court.  The word "transfer" does not even appear in the court's opinion.[13]  And nor does the case have anything whatsoever to do with an award of fees under § 330.  The case involved an unsuccessful motion by a district court receiver appointed in a case commenced by the S.E.C. to withdraw to the district court the determination of the receiver's claim for compensation in connection with the administration of the *receivership case*.  To the extent the receiver made a dubious argument that it was entitled to administrative priority status under § 503 (which the district court declined to address), the case at most stands for the proposition that an administrative expense claim may be withdrawn (or not) for direct adjudication by a district judge based on the factors in § 157(d).

Moreover, the fact that § 157(d) explicitly allows withdrawal by a district judge of "part" of a case under title 11, if anything, confirms that Congress knows how to refer to a "part" of a "case" under title 11.  In contrast, 28 U.S.C. § 1412 permits transfer of the "case" (within the exclusive

---

[13]  It does appear in two headnotes but refers therein not to transfer between district but to "Withdrawal or Transfer to District Court" from the bankruptcy court – *i.e.*, under § 157(d).

jurisdiction of a single court under § 1334(a), or of a "proceeding" (within the explicitly non-exclusive jurisdiction provided under § 1334(b)) but not "part of a case."

### 8.    The United States Does Not Argue that Only Adversary Proceedings May Be Transferred

Akin Gump misconstrues the government's position that the phrase "case or proceeding" in 28 U.S.C. § 1412 means the entire case or an "adversary proceeding." Our opening brief contains no such argument. To the contrary, we believe that many "contested matters" under Bankruptcy Rule 9014 are transferable under 28 U.S.C. § 1412. The word "proceeding" in our view refers to ancillary "civil proceedings" under the non-exclusive jurisdiction of 28 U.S.C. § 1334(b) rather than purely administrative matters that are part of the "case" under the exclusive jurisdiction of 28 U.S.C. § 1334(a). We also point out that, although the 1984 venue transfer provision was revamped to refer only to "proceedings," the earlier 1978 provision was limited to two of the three kinds of proceedings addressed in the jurisdictional provision and the legislative history suggests that the change of wording was intended to remove surplusage and not to alter the kinds of disputes that could be transferred out of the court presiding over the main case.[14/]  But even assuming we are wrong in that regard, a purely administrative matter, such as the allowance of interim compensation for a trustee or trustee's counsel under § 330, is not a "civil proceeding."

### 9.    Appellees Distort the Duties of a Trustee

Appellees argue (p.29) that a debtor in possession, in its role as trustee, has a duty to protect its capital structure as created under a previously negotiated plan of reorganization from an earlier bankruptcy. The only case cited that actually supports this is the Delaware Bankruptcy Court's intervention order. This Court is not bound by that ruling for multiple reasons already addressed. Moreover, the intervention order does not say that such a duty is that of a bankruptcy trustee, as

---

[14/] The Opening Brief contains an extensive presentation of the historical derivation of the current jurisdiction and venue provisions and their legislative history, demonstrating that Congress intended the transfer provision to embrace only certain kinds of proceedings to be severable from the main case, and certainly did not anticipate a transfer of only part of the determination of the overall compensation of a lawyer hired by the trustee to represent the estate.

opposed to an ordinary corporate duty.  In bankruptcy law, a trustee's duties supersede those imposed by State corporate law.

For example, a trustee's duties include a duty under § 544(b) to attempt to set aside fraudulent transfers, including the fraudulent transfer of a security interest in the debtor's assets. Putting aside the debt versus equity issue, the facts adduced in discovery in the Delaware adversary proceeding confirm that the 1996 plan was conceived in advance by the junior note holders in order to enable them to exchange deeply devalued unsecured junior notes that would have received nothing from a liquidation at the time for new secured notes in order to leap-frog over capital gains taxes that the note holders knew would result from a liquidating assets sale and further knew, based on their internal documents, would otherwise wipe out any recovery for them.  No new funds or other objectively valuable consideration was given in the exchange.  The transfer of the security interest was patently fraudulent.  Assuming *arguendo* that reasonable minds might differ on that view and to the extent that the note holders have excuses or defenses, it was nevertheless the *duty* of a trustee to fight for the avoidance of the security interest under § 544(b).  Under prevailing case law, the United States, moreover, lacks standing to assert a § 544(b) action – only a "trustee" (including a debtor in possession) is given that statutory right and obligation.  Similarly, to the extent that reasonable minds may differ over the issue of whether the note holder's purported debt claim should be disallowed because their securities are actually equity in substance, it is the duty of a bankruptcy trustee to object to the claim.  It is simply not a proper function of a bankruptcy trustee to defend a lien or claim of a creditor if that lien or claim is subject to a reasonable good faith dispute instituted by another party in interest.  With the exception of this case and one other, the undersigned has, in over twenty years of bankruptcy practice, never seen a trustee take the side of a secured creditor against the bankruptcy estate the trustee is supposed to represent in a dispute between the lien creditor and another party who is disputing the validity of the lien.[15]

---

15/ In the one other case referred to, the IRS first, despite the Trustee's efforts, successfully set aside the lien.  *In re Maghazeh*,  310 B.R. 5 (Bankr. E.D.N.Y. 2004).  Then, since this enabled other creditors to be

Numerous cases cited at pages 62-64 of the Opening Brief confirm that services must at least be directed at benefitting the estate in order to be compensable. None of the cases cited by appellees here support allowing compensation for services to support a disputed lien that would eliminate any equity for the bankruptcy estate.

Appellees also argue that the debtor had a duty to defend against the government's motion to convert because "it would have added significant costs to the administration of the case." As noted already, however, if the lien is upheld, the junior note holders whose banner the debtor has taken up would not be affected by any additional administrative expense because their lien will have priority. If the debtor is instead arguing that it is protecting the unsecured creditors from increased costs that a Chapter 7 Trustee would incur, it should be noted that the government's motion to convert was supported by the State of Connecticut and that no other creditor objected. This Court need not blind itself to reality. In *In re Golden Recipe Chicken, Inc.*, 109 B.R. 692 (Bankr. W.D.Pa. 1990), the court, in a decision denying compensation to a debtor's counsel for services benefitting only the corporate debtor's shareholder, observed that "[t]he only reason for keeping the case in Chapter 11 appears to have been the desire to keep control of the case in order to work out a settlement with the landlord, so as to relieve the shareholder of his personal guarantee to the landlord." *Id.* at 693-94. In a telling slip-up on pages 29-30 of their brief, appellees question how the "Debtor's management" would gain from conversion or the appointment of a Chapter 11 trustee. The United States maintains that Akin Gump's services have, throughout this case, been almost exclusively dedicated to representing the bests interests of the debtor's management, rather than the unsecured creditors to whom a trustee or debtor in possession owes it "primary duty." *See In re Lundborg*, 110 B.R. 106,

---

paid, the government was awarded reimbursement of its own attorney's fees from the estate. *In re Maghazeh*, 315 B.R. 650 (Bankr. E.D.N.Y. 2004). The United States then objected to about $27,000 of an $85,000 claim for attorney's fees of the Trustee. At a hearing on May 25, 2005, the Court agreed with the government's argument that a trustee should not litigate in favor of a secured claim against his own estate. Since the Trustee had retained his own law firm as counsel, instead of disallowing $27,000 of the attorney's fees claimed, the Court reduced the Trustee's personal commissions by 20%, which amounted to approximately the amount of the attorney's fees to which the government objected. Unfortunately there is no written decision. A transcript (not yet available) could be supplied at this Court's request.

109 (Bankr. Conn. 1990) ("primary duty to unsecured creditors"); *In re Nadler*, 8 B.R. 330, 333 (Bankr. E.D. Pa. 1980) ("Trustee primarily represents the unsecured creditors and represents the secured creditors only in his capacity as the custodian of the property upon which they have a lien").

Contrary to what Akin Gump would like this Court to believe, the United States is not resting on any theory that the law firm itself had a conflict of interest. The cases cited on page 30 of appellees' brief that disallow fees on that basis often include an alternative holding based simply on the fact the services could not have benefitted the estate. Like the trustee, the trustee's "attorney has a fiduciary duty to maximize the estate." *In re Kean Corp*. 205 B.R. 690, 696 (Bankr. S.D.N.Y. 1997). It is antithetical to that duty to litigate in favor of a disputed lien *against* the estate. It is equally antithetical to resist conversion solely to keep a conflicted management structure in control of the debtor's litigating decisions and prevent the appointment of a trustee that might act to maximize the estate.

This Court should lay down a clear precedent that services in aid of defending a secured creditor's lien against a challenge from an unsecured creditor are not necessary or appropriate services under § 330 because the activity is not consistent with the fiduciary duty of the trustee to defend the estate against questionable liens.

### 10.    Appellees Arguments For Violating Priorities All Boil Down to Assuming the Validity of the Disputed Security Interest

The final portion of Debtor's and Akin Gump's brief regarding the violation of the need for *pro rata* distributions among administrative claimants where the estate is administratively insolvent all boil down to assuming the validity of the Indenture Trustee's disputed lien. Appellees emphasize that a motion to use cash collateral only implicates the interest of the lien holder and, since the lien holder consented, a motion was not even required.

But the government did not purport to object to the cash collateral stipulation on the basis of it being a motion to use the Indenture Trustee's collateral under § 363(c)(2); it objected on the basis that a motion was nevertheless required to use property of the estate outside the ordinary course of

business under § 363(b)(1).  That provision applies to the use of property that is not collateral.  And, as to the later application for an interim allowance, the government had an undeniable right to object to disbursements from a cash fund that is insufficient to satisfy the administrative tax claim even in the event the Indenture Trustee's lien is set aside.

The law of the case, based on this Court's decision in the prior appeal, is that the IRS is not bound by the previous plan's creation of a security interest for the junior notes.  Given that the government can object to the Indenture Trustee's claim, it is like any other claim that is only pre- sumed valid until objected to.  Once objected to, the secured claim is no longer presumptively valid.  In view of the pending adversary proceeding in Delaware, there is simply no basis on which to decide an interim fees application on an irrebuttable presumption that the government will lose.[16]

Akin Gump's reliance upon *Leighton Holdings, Ltd. v. David Belofsky & Assoc. (In re Kids Creek Partners)*, 1997 WL 627652 (N.D. Ill. 1997), is thoroughly misplaced and the case in fact supports the government's position here.  In that case, Leighton asserted a mortgage that the trustee disputed.  To enable a sale, the parties entered a stipulation by which Leighton was fully paid and the trustee could commence an adversary action to dispute the lien and recover the payment if he prevailed.  The stipulation provided that Leighton would be entitled to a superpriority attorney's fees claim if it prevailed.  When the trustee's attorney applied for interim fees, Leighton objected on the ground that its own attorney's fees claim would have priority.  The bankruptcy court, affirmed by the district court, ruled that Leighton's own superpriority attorney's fees claim was "contingent" on its first prevailing and that, in the meantime, the trustee's counsel had a non-contingent administra-

---

[16] A related straw man argument earlier in appellees' brief (p.22) is that the Indenture Trustee did not have prove up its lien to have rights under § 363.  The government agrees never argued it did.  In fact, we agree that the debtor needed the Indenture Trustee's consent to use purported cash collateral (unless it wanted to start disputing the lien along with the government and, even then, the Indenture Trustee could have asked the court to prohibit the use of the funds pending the outcome of the litigation).  But that does not mean that when an unsecured creditor objects to an application to use property of the estate out of the ordinary course of business under § 363, and when that unsecured creditor argues that the property is not anyone's collateral, and when it is in the midst of an adversary proceeding directed at establishing the invalidity of the alleged lien, the court can simply dismiss the objections on the premise that the property is collateral anyway and unsecured creditors have no standing to object to any use that is proposed.

tive claim. And if it did not prevail, then the estate would not be administratively insolvent as there were sufficient funds on had to cover all non-contingent administrative expenses. Moreover, because the district court concluded that Leighton's chances of prevailing in the adversary proceeding had become stronger than at the time of the interim award, it ruled the further disbursements of interim fees would be an abuse of discretion and remanded with instructions not to allow any more. (There was no stay pending the appeal so the award on appeal had already been disbursed.) In the instant case, the government's administrative tax claim is not contingent and the estate is undisputedly administratively insolvent.

Akin Gump's reliance on *In re Matis*, 73 B.R. 228 (Bankr. N.D.N.Y. 1987), is similarly misplaced as that case, too, supports the government's position. In it, the Court held that because a prepetition lien was under active dispute, it would be inappropriate to assume the validity of the lien as a basis to deny interim fees. Nevertheless, except for applying a prepetition retainer, the court held that all future interim awards must come from income that was not part of the alleged collateral of the secured creditor. In the instant case, it is no more appropriate to assume the validity of a disputed lien in order to *grant* interim fees based on a carve-out from the alleged collateral than it was to assume the validity of a disputed lien in order to *deny* interim fees in *Matis*. At the same time, the Court's limitation of further disbursements to income not claimed as collateral in *Matis* reflects the generally preferable approach of avoiding disbursements from limited funds the entitlement to which is in dispute, until the dispute is resolved.

## Conclusion

There is no possibility to confirm a Chapter 11 plan and diminution of the estate continues. That alone justifies conversion to Chapter 7. If more is needed, then the conflict of interest of debtor's management tips the scales in favor of conversion in order to have a disinterested Chapter 7 trustee be appointed. This Court should reverse the 7/18/02 Order's denial of the government's motion to convert and instruct the Bankruptcy Court on remand to convert the case.

Debtor's counsel is not entitled to compensation under § 330 for services that could not benefit the estate, let alone services designed to strip it of all assets.  The intervention order in Delaware could not have addressed these issues because the transfer order was effective only with respect to the adversary complaint.  Alternatively, the intervention order did not address these issues and, if it did, it does not have preclusive effect both because this Court is a higher court and because, once the Delaware Bankruptcy Court had decided that binding Third Circuit precedent gave the debtor an unconditional statutory right to intervene, its fall-back discussion with respect to the debtor's supposed duty to represent secured creditors was dictum.  This Court should reverse the 12/23/02 Order granting interim fees as well as the 7/18/02 Order's approval of the cash collateral stipulation, and remand with instructions to disallow fees or expenses for services that could not benefit the estate, including but not limited to those associated with Delaware adversary proceeding, the opposition to conversion, and the defense of these appeals, and to stay all interim applications until the conclusion of the case when final distributions can be determined in light of the finally determined priorities of the various claims.

<div style="margin-left: 50%;">

Respectfully submitted,


_____/s/ *Peter Sklarew*_____
PETER SKLAREW
Federal Bar No. CT 17864
U.S. Department of Justice, Tax Div.
P.O. Box 55
Washington, D.C. 20044-0055
(202) 307-6571

</div>

*Local Counsel:*

KEVIN J. O'CONNOR
United States Attorney

ANN M. NEVINS
Assistant United States Attorney
Federal Bar No. CT06484
915 Lafayette Blvd., Room 309
Bridgeport, CT  06604
(203) 696-3000

<div align="center">Certificate of Service</div>

      IT IS CERTIFIED that service of the United States' **UNITED STATES' COMBINED REPLY BRIEF** is, this 31st day of May, 2005, being made upon the following by depositing a copy in the United States mail, postage prepaid, addressed to:

Daniel H. Golden
Akin, Gump, Strauss, Hauer & Feld, LLP
590 Madison Avenue
New York, NY  10022

Craig I. Lifland
Zeisler & Zeisler
558 Clinton Avenue
Bridgeport, CT  06605

Ira Goldman
Shipman & Goodwin
One American Row
Hartford, CT  06103-2819

Patricia Beary
Asst. U.S. Trustee
265 Church Street, Ste. 1103
New Haven, CT  06510-7016

Joan Pilver
Assistant Attorney General
State of Connecticut
55 Elm Street, 5th Floor
Hartford, CT 06141

          /s/ *Peter Sklarew*
          PETER SKLAREW
          Attorney, Tax Division, Dept. of Justice