

|  |  |
|---|---|
| | **U.S. Department of Justice** |
| | Tax Division |
| | *Civil Trial Section, Northern Region* |
| Section Tel. No. (202) 307-6533 | P.O. Box 55 |
| Section Fax No. (202) 514-5238 | Washington, D.C.  20044 |
| Attorney:  Peter Sklarew | 555 Fourth Street, N.W.  (Rm. 7804) |
| Attorney's Direct Line:  (202) 307-6571 | Washington, D.C.  20001 |

5-14-6702

October 22, 2007

Hon. Alvin W. Thompson
Judge, United States District Court  **By FedEx (and by ECF Filing)**
450 Main Street
Hartford, Connecticut 06103

Re:  *In re Scott Cable Comm., Inc.*, No. 3:02-CV-1725 (consolidated bankruptcy appeals)

### Reply on Rule 8015 Motion, With Request for Judicial Notice
### (and Suggestion for Telephonic Argument)

Dear Judge Thompson:

      I am writing for three reasons, each addressed separately after this introduction.  One reason is to present the government's brief arguments in reply to both the appellees' objections (DI#s 98, 99) to the United States' pending motion (DI# 97) for rehearing.  (I am filing this electronically as a "reply.")  Second, and before presenting the reply, the United States' asks that Your Honor take judicial notice of certain matters in the Delaware Adversary Proceeding, including arguments of the appellees that are fundamentally inconsistent with Your Honor's ruling and with the appellees' arguments throughout these appeals.  In light of appellees' recent arguments in Delaware, Your Honor's affirmance of Judge Shiff's denial of conversion to Chapter 7 would work a manifest injustice on the United States, and will reward the appellees' ongoing manipulations of the jurisdictional divide of proceedings in the Chapter 11 case between two districts (and circuits).  Third I am suggesting oral argument (telephonic or otherwise) on the rehearing motion if the Court has any questions about the issues.

      Please do not assume that the outcome of the Delaware adversary proceeding is likely to moot the government's appeal from the denial of conversion to Chapter 7.  The affirmance makes the denial of conversion a final appealable order if it stands unchanged after the motion for rehearing, regardless of the remand with respect to Judge Shiff's other rulings.  (See footnote 2 in motion for rehearing.)  While I cannot say what the ultimate determination will be, our trial section (including the Section Chief) is planning to recommend appeal to the Second Circuit if rehearing is simply denied.  In that appeal, notwithstanding the assertion in appellees' objections to rehearing that Your Honor's decision could not be more clear, we will be recommending that a further appeal include an argument that Your Honor's decision does not address the correctness of one of the government's most central arguments in these consolidated appeals regarding what it considers to be the bankruptcy court's most fundamental error.  I am referring to Judge Shiff's repeated statements (at least half a dozen times during the proceedings) that the 3/4/02 intervention order in the Delaware adversary proceeding was the "law of the case" or "collateral estoppel" and precluded the government's conflict-of-interest arguments for any and all purposes, including its motion to convert, its objection to the cash collateral order, and its objection to the fees application.  The debtor now argues that Your Honor has unambiguously affirmed that aspect of Judge Shiff's ruling, even though Your Honor's opinion does not even mention the government's contention that, for multiple reasons, issue preclusion based on law of the case does not apply.  Because the issue will also substantially affect the scope of the proceedings on remand with respect to the cash collateral and fees orders, moreover, the government's motion for

rehearing seeks "clarification" in that appeal even if Your Honor declines to grant rehearing in the appeal from the denial of conversion.

If appellees are correct that Your Honor clearly intended to affirm Judge Shiff's assumption (also never explained) that the interlocutory Delaware intervention ruling is binding on the government in all of the Connecticut proceedings, then please say so, and we can proceed from there, although we also submit you should say why, lest the Second Circuit may be left guessing if the matter does reach that level.  As argued in our motion for rehearing, such a ruling would be completely unprecedented and at odds with fundamental principles of the doctrine of issue preclusion.  It at least merits an explanation from this Court, particularly given that no explanation for that ruling was given by the bankruptcy court.

### 1. Request for Judicial Notice of Matters in Delaware

Your Honor's decision states that among its reasons for affirming the denial of conversion (or the appointment of a Chapter 11 trustee) was the availability of less intrusive remedies for ameliorating a debtor's conflict of interest.  For example, it is possible to authorize a creditors committee or a creditor to represent the bankruptcy estate in a § 544(b) action to avoid a state-law fraudulent transfer of a security interest.  During the recently concluded trial in Delaware, and in the post-trial briefs filed just this past Friday, October 19, 2007, certain evidence admitted at trial and arguments presented by the Indenture Trustee (and other defendants) reveal new information as to why that solution could not be employed in this case.  Even more recently, and more importantly, **the Indenture Trustee (and other defendants) now argue that the government's equitable subordination count in its adversary complaint in Delaware must now (after 9 years) be dismissed for lack of jurisdiction because** *only a trustee has standing to bring that kind of action as well*.  Several matters cry out for judicial notice in this regard.  The following may all be confirmed by materials accessible through the Pacer/ECF system for the Delaware Bankruptcy Court ("AP DI#" references are to the Pacer docket in Delaware Bankruptcy Court Adv. No. 01-4605.  At the Court's request, I will send copies of cited items to chambers.)

First, during the trial, the government moved to amend its pleadings to conform to the evidence (Rule 15(d)) in order to include a § 544(b) action – that is, to argue that the security interest granted by the debtor to the junior note holders in the 1996 Delaware Chapter 11 reorganization was a fraudulent transfer of a security interest.  The United States obtained evidence of that fraud when it pierced the attorney-client privilege under the crime-fraud exception in 2003 and had included a fraudulent transfer allegation in its motion for summary judgment in 2005.  In response to the motion to conform the pleadings to the evidence, the Delaware Bankruptcy Court (Judge Carey) suggested the government first ask Connecticut Bankruptcy Court for authority to represent the estate under § 544(b).  (AP DI# 545.)  The government did that and Judge Shiff transferred the authority motion to Delaware.  (AP DI# 544.)  Judge Carey then denied the motion at a hearing on February 12, 2007.  (Transcript at AP DI# 595.)

The first reason Judge Carey gave for denying the motion for authority to represent the estate was that the first cash collateral order entered in the Chapter 11 case in October 1998 by Judge Shiff included a deadline of mid-November 1998 for the commencement of any § 554(b) action, which Judge Carey felt that only Judge Shiff could modify.  (At the time of the 10/98 cash collateral order imposing a one-month deadline, a § 544(b) action could only be brought by the *debtor-in-possession*, with its conflicting interest in having its management earn millions of dollars by not bringing such an action.)  The second reason Judge Carey gave was that § 546 imposes a two-years limitations period on § 544(b) actions, and that period had long passed.  (AP DI# 595 at p.217.)

Judge Carey's third reason for not granting authority to represent the estate by adding a § 544(b) claim to the government's complaint, which he indicated was more important, was his view that everything the government wished to argue about a fraudulent transfer could be argued as part of its equitable subordination count.[1] (DI# 595 at p.217-18). The United States has filed a protective appeal from the denial of authority to represent the estate by adding a § 544(b) claim to its complaint in Delaware, and the court in Delaware has agreed to stay that appeal at the government's request until there is a final appealable merits decision on the equitable subordination and debt/equity recharacterization claims. (AP DI#s 603, 604, 658.)

If the appeal to the Delaware District Court is not ultimately mooted, the government will argue that the truncated (one-month) deadline on § 544(b) actions, imposed by Judge Shiff in the 10/98 cash collateral order agreed between the debtor and Indenture Trustee is void for lack of court authority, and otherwise is something that Judge Shiff gave Judge Carey authority to reconsider by transferring to Judge Carey the government's motion for authority to represent the estate.[2] With respect to the two-year limitations period, the government will argue (1) that it does not apply to the *defensive* assertion of fraudulent transfer as part of a trustee's objection to a secured claim filed *against* the estate, as § 502(d) provides, and/or (2) that courts have uniformly held that the limitations period in § 546 is subject to equitable tolling, and that equitable tolling should apply in this case because the government had moved to convert and have a trustee appointed within the two-year period (*i.e.*, the issue in this appeal). We argued (and would argue in any appeal) that if we were entitled to a trustee within the two-year limitations period, then defendants' resistance to conversion requires tolling the limitations period.

Perhaps most importantly, just this last week, the Delaware defendants (including the Indenture Trustee) filed post-trial submissions (joined by the debtor belatedly today) that include an argument, and cite cases for the proposition that, only a trustee can bring an equitable subordination claim and therefore the government's equitable subordination claim must be dismissed for lack of jurisdiction. In the alternative, they argue that even if the United States has standing to seek equitable subordination, it can only do so on its own behalf and not for the various state taxing authorities that it has been arguing will also benefit from a judgment equitably

---

1/ The government hopes Judge Carey is correct in this regard, but fears that there may be differences, particularly because there may be certain defenses to equitable subordination that would not be viable defenses to a fraudulent transfer. For example, the appellees are arguing in Delaware that the recent Enron decision by the Southern District of New York (2007 WL 2446498), reversing its bankruptcy court, holds that equitable subordination depends on showing misconduct by particular defendants, which may not be imputed to a transferee (such as the Series B noteholders in the *Scott Cable* case). But, putting aside whether the Enron decision is correct, a creditor may set aside a fraudulent transfer even to a completely innocent transferee who paid inadequate consideration (giving a lien on the asset for any valuable consideration actually paid). There are other issues that may engender different treatment under fraudulent transfer doctrine than equitable subordination.

2/ Defendants argued that the government apparently had agreed to the original cash collateral order with its restriction on future § 544(b) actions. While the government acknowledged before Judge Carey that a *different provision* in the 10/98 cash collateral order looked like it probably was included at the government's request, we most certainly did not agree to the deadline, did not sign the stipulation, and could not possibly have (1) waived a *future trustee's* rights to bring an action that the statute authorizes the trustee to bring, or (2) waived the lack of statutory power of a bankruptcy court to shorten the statutory period of limitations. The fact that the debtor inserted the bar on § 544(b) actions into a proposed order in the first month of the bankruptcy is further confirmation of the seriousness of the conflict of interest.

subordinating the secured junior PIK notes. (AP DI# 690 at 85-86; AP DI# 696.) Our response to these arguments are not due until November 30, 2007, and since we have just received over 400 combined pages of defendants' post-trial submissions, we have not begun to research the cases on which defendants rely.[3/] (We do note, however, that if defendants are correct about the second point only, then the State of Connecticut and other states will lose millions of dollars in state gains taxes incurred in the sale of Scott Cable's assets, even if the United States wins, unless a trustee is appointed.)

What is important to glean from these matters is that, while the Indenture Trustee and debtor here argue that Your Honor correctly affirmed the bankruptcy court's denial of conversion in part because of other alternatives such as having a creditor represent the estate, they not only fought that effort on procedural grounds with respect allowing the United States to add a § 544(b) count to its complaint, but also are further arguing that the government's fraudulent transfer claim also cannot be recognized indirectly through its equitable subordination claim under § 510(c) unless a trustee is appointed by the Connecticut Bankruptcy Court. These arguments in our view make it imperative for the government to continue pressing its arguments for a trustee in this Court, as well as in the Second Circuit if necessary. A trustee could still, even after trial, intervene in the Delaware adversary proceeding and at least support the government in the appeals within the Third Circuit that are almost certain to ensue, and thereby moot the argument that the government lacks standing.

More immediately, the arguments of the Indenture Trustee and debtor in the Delaware provide this Court with plenty of reason to reverse the denial of conversion and immediately mandate the appointment of a Chapter 7 trustee before the procedural web that has been spun by the debtor and those with whom it actively conspired to defraud the United States becomes even more difficult to untangle.[4/] **After nine years of litigation on the government's adversary complaint, this Court should not tolerate even the remotest possibility that the government, no matter what facts are shown to establish a fraud, might be entirely deprived of a remedy simply because a Trustee was not appointed.**

---

3/ We are not complaining about length – our submissions were even lengthier. The trial consumed 33 days of testimony and another four days of presenting trial deposition evidence and other procedural issues. Judge Carey agreed there was no page limited for proposed findings and conclusions and allowed 60-page briefs.

4/ This is not hyperbole – the government's recently-filed proposed findings of fact and conclusions of law in Delaware take the position, and in our view fully demonstrate, that there was in fact a conspiracy to defraud the United States in violation of 18 U.S.C. § 371, and bankruptcy fraud in violation of 18 U.S.C. § 157, that the conspiracy began prior to the 1996 case among the junior note holder defendants, the debtor, and its 1996 bankruptcy counsel (the Baer Marks law firm), and that the conspiracy was furthered in the period leading up to the filing of the 1998 case in Connecticut, when present counsel for the debtor decided that it was acceptable for it to help the debtor reap the fruits of the fraud set up in the prior case. One of the exhibits that defendants were required to turn over, based on the crime-fraud exception to the attorney client privilege was a 4/28/98 memo discussing various approaches to a prepackaged Chapter 11 plan, which contained hand-written notes added by a lawyer who helped plan the 1996 bankruptcy, stating: "fraud on 1st transaction but not liable on 2nd sale" and then under that "but old Bd. liable on 1st" Other exhibits show that the scheme to defraud the United States was conceived in 1995 in planning the first (1996) bankruptcy in which the debtor and its lawyers and the junior note holders discussed using a bankruptcy as a pretext to grant a security interest to the junior note holders in order to leapfrog their eventual recovery over a capital gains tax that would have wiped out the junior notes if they were not upgraded with a security interest.

4

## 2. Reply to Objections to Rehearing

The objections to rehearing filed by the debtor and Indenture Trustee essentially ignore for the most part the merits of the government's motion for rehearing, while trying to persuade the Court that the arguments are not new and therefore violate the standards for rehearing. Actually, if the arguments were "new," they would violate those standards, unless the decision caused unfair surprise. A traditional ground for rehearing is that the court "overlooked" or "misapprehended" an argument that *was* made.

Our motion for rehearing argues and demonstrates that the Court did not address the government's main argument in these appeals – which is that the bankruptcy court erred in viewing the interlocutory 3/4/02 order of the Delaware Bankruptcy Court granting the debtor's motion to intervene as having issue preclusion consequences (based on "law of the case" or "collateral estoppel" or "res judicata") with respect to the government's conflict-of-interest arguments both in objecting to the cash collateral and fees applications and in moving to convert to Chapter 7. This Court's decision *did* recognize that the bankruptcy court rested its cash collateral order and grant of fees on "law of the case" or collateral estoppel suggestions, and *did* decide that those rulings were not sufficient to support the orders because they do not resolve whether there was a "business purpose" for the use of cash collateral to finance litigation by the debtor. It therefore remanded to determine whether there was an adequate "business purpose." With respect to conversion, this Court looked to the transcript of a hearing to ascertain reasons, not included in any order or bench ruling by the bankruptcy court, as to why it *may have exercised* discretion to deny conversion to Chapter 7, after concluding the written order was "unclear." As a result, it affirmed on the basis that the denial of conversion was not an abuse of discretion.

But this Court never addressed the government's argument that the same issue preclusion ruling at least affected (we would say infected) the bankruptcy court's exercise of discretion on conversion, and that the issue preclusion ruling was legally incorrect. And, it also has not provided any guidance on whether, in resolving the remand determination, the government is precluded from by "law of the case" from relying in part on the conflict of interest argument in resisting the grant of fees. The Court overlooked these arguments presumably because it did not understand them to be necessary to the Court's decision. If so, then the Court misapprehended how the issue preclusion ruling of the bankruptcy court affects the other issues that this Court did address. In this regard, while the "business purpose" rule bears on the cash collateral issue, the fees issue goes well beyond that standard. The government is arguing that, regardless of any "business purposes" for a corporation conducting business, it is never appropriate to grant fees to an attorney for a *debtor in possession* – i.e., in the role of the estate's fiduciary – to litigate in support of a disputable lien *against the entire bankruptcy estate*. We have searched far and wide in the case law and have thus far not been able to find one case in which a debtor in possession's counsel has been paid for siding with a secured creditor defending that secured creditor's claim in a proceeding in which another creditor is objecting to that claim or lien. The correctness of Judge Shiff's "law of the case" supposition also affects the conversion issue because courts have consistently held that a judge who refuses to consider a relevant factor (here the conflict of interest) for a legally incorrect reason (here, the notion that law of the case precluded its consideration) necessarily abuses his discretion.

The debtor's objection to the rehearing motion argues that this Court's decision is absolutely clear in endorsing what it argues is the correct ruling of Judge Shiff that all of the government's conflict of interest arguments are barred by the "law of the case" emanating from the interlocutory order granting the debtor's motion to intervene in the Delaware adversary proceeding, including the government's motion to convert (notwithstanding that the judge who

5

issued that order, Judge Walsh, subsequently stated on the record that he thought the case should be converted and wanted an inquiry made to Judge Shiff as to why it had not been converted, whereupon we informed Judge Walsh of the pendency of this appeal). AP DI# 233 at pp.4-6 (Judge Walsh); DI# 228 (government's explanation).[5] Curiously, the Indenture Trustee's objection to rehearing, while also repeatedly insisting that Your Honor's decision is "clear and concise," avoids stating whether the decision does or does not affirm Judge Shiff's view that collateral estoppel bars the government's conflict-of-interest arguments.

If Your Honor indeed meant to affirm the bankruptcy court's ruling that the 3/4/02 intervention order does have preclusive effect, then, unless you change your mind, please simply say so. It will save the parties from what will otherwise be extensive arguments before the bankruptcy court on remand about the meaning of Your Honor's decision and inevitably result in a further appeal making all of the same arguments in this Court again. (It may also save the Second Circuit from wondering whether this Court meant to affirm Judge Shiff's view of issue preclusion, if our recommendation to appeal the denial of conversion further is accepted.)

I will not repeat the merits arguments in our rehearing petition, which explains why the 3/4/02 Delaware intervention order has no preclusive force limiting the government's reliance on a conflict of interest as supporting conversion or denial of fees. I do wish to add a couple of historical points that were brought to mind in preparing the government's recently-filed proposed findings and conclusion in the Delaware adversary proceeding, that bear on how important it is to have a Trustee determine the exercise of the privilege. First, when this Court tentatively stated in a telephonic hearing in May of 2006 that it would be reversing the denial of conversion, the Delaware Bankruptcy Court granted the government's motion to postpone the then scheduled 6/12/06 start of the trial, stating that "it does raise the possibility that the privilege would be waived, and I find that significant in this case, especially when I see things only recently coming to light." AP DI# 471 (Tr.6/5/06) at 50. While the evidentiary trial is now concluded, a trustee could still review attorney-client communications (1) to see if any contain evidence to support the denial of the fee application that this Court has remanded for the bankruptcy court to reconsider, and (2) to see if any contain sufficiently important additional evidence of fraud for the trustee to seek to reopen the record in the Delaware case.

Second, debtor's present counsel and the Baer Marks law firm that represented debtor's counsel in the 1996 case were not the only sets of attorneys with respect to which a privilege was claimed during the trial. It seems that in April of 1998, just around the time the debtor and its present counsel started actively planning the 1998 pre-packaged Chapter 11 (which was rejected by Judge Shiff as a "tax avoidance" scheme), the debtor conveniently hired as "special counsel" the main law firm that had been representing the largest of the junior note holders for years, which represented them during the first bankruptcy in Delaware in 1996, and which now represents them in the Delaware adversary proceeding. By this expedient, the attorneys for the debtor and the attorneys for the largest group of junior note holders were suddenly able to share ideas about how to avoid the taxes and then maintain there was no inter-party communication that would result in a waiver of the privilege. This is confirmed by (1) the privilege logs from discovery (admitted as a trial exhibit), and (2) a $34,000 bill for legal services paid by the debtor shortly before the 1998 bankruptcy for which a nominal unpaid amount was then filed by the law firm as a claim in the

---

[5] Also notable is that Judge Carey, in denying the government authority to bring a § 544(b) action, did not remotely suggest that the conflict of interest of debtor's management could not be asserted by the government because of any "law of the case" springing from the 3/4/02 grant of debtor's motion to intervene by Judge Walsh.

Connecticut Chapter 11 case. (Conn. Bkcy Case No. 98-51923, Claim #84.) But that's not all. While debtors counsel discussed in April 1998 that the IRS might assert a contention in the forthcoming second bankruptcy that there was fraud in the first one, and although it was obvious that the Baer Marks attorneys from the first case would be material witnesses (and they ultimately were), the debtor hired that firm too as "special counsel" for the 1998 case. This had the effect of enabling the two other firms (one of which is primarily counsel for the junior note holders – a third party) to interview these material witnesses (the Baer Marks attorneys) and then claim attorney-client privilege for those communications as well. The trial testimony and exhibits supporting these points is discussed in the government's recently filed proposed findings of fact ¶s 922-968 (AP DI# 693 at pp.172-182). This case cries out for a trustee to review these various "privileged" communications, which to this day remain cloaked with privilege, and to determine whether to waive the privilege. And, the problem cannot possibly be solved (and could never have been solved) by appointing a creditor to represent the estate for the limited purpose of the Delaware adversary proceeding because a creditor could not waive the debtor's privilege.

### 3. Suggestion for Oral Argument

I have tried to explain in this letter some of the reasons why the government continues to feel it needs the appointment of a trustee, notwithstanding the conclusion of the testimony in the Delaware adversary proceeding. Some of the reasons are also mentioned in the rehearing motion – regarding the impact that conversion may have on the resolution of several other issues in the case. The issues in this case are complex and novel and, while I am not affirmatively "requesting" oral argument at the rehearing stage if the Court is disinclined, nevertheless, I will at least suggest that the Court consider if oral argument (telephonic or otherwise) would be helpful.

                              Sincerely yours,

                              /s/ *Peter Sklarew*

                              Peter Sklarew
                              Assistant Chief
                              Civil Trial Section
                              Northern Region

cc:    John Hughes
         Civil Chief, U.S. Attorney's Office

         Appellees' counsel (by ECF service)